James S. Richter
MIDLIGE RICHTER LLC
645 Martinsville Road
Basking Ridge, New Jersey 07920
*Counsel for Defendant*
*Natco Pharma Limited*

Eric I. Abraham
William P. Murtha
Kristine L. Butler
HILL WALLACK LLP
21 Roszel Road
Princeton, New Jersey 08540
*Counsel for Defendant Sandoz Inc.*

Loly Tor
K&L GATES LLP
One Newark Center, 10th Floor
Newark, New Jersey 07102
*Counsel for Defendants Cipla USA, Inc. and*
*Cipla Limited*

Theodora McCormick
Lauren B. Cooper
Alec Wong
BAKER DONELSON
Office One
4365 Route 1 South
Suite 301
Princeton, New Jersey 08540
*Counsel for Defendants Zydus Lifesciences*
*Ltd. and Zydus Pharmaceuticals (USA) Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA UK LIMITED, ASTRAZENECA AB, KUDOS PHARMACEUTICALS LIMITED, THE UNIVERSITY OF SHEFFIELD, AND MSD INTERNATIONAL BUSINESS GMBH, <br><br> *Plaintiffs,* <br><br> v. <br><br> NATCO PHARMA LIMITED, SANDOZ INC., CIPLA LIMITED, CIPLA USA, INC., ZYDUS PHARMACEUTICALS (USA) INC., AND ZYDUS LIFESCIENCES LIMITED, <br><br> *Defendants.* | Civil Action No. 23-cv-796 (RK)(TJB) (Consolidated) <br><br> *Document filed electronically* |

### DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .................................................................................................. 2

    A.    Formulation Patents ................................................................................. 2

    B.    '562 Patent ............................................................................................... 3

III.    LEGAL STANDARDS ....................................................................................... 4

    A.    Claim Construction ................................................................................. 4

    B.    Order of Steps in a Method Claim .......................................................... 4

    C.    Disclaimer ............................................................................................... 5

IV.    DEFENDANTS' POSITIONS AND PROPOSED CONSTRUCTIONS ........................... 6

    A.    '562 Patent Order of Method Steps ........................................................ 6

        1.    The claim language does not require a specific order of steps. ................. 7

        2.    Neither logic nor grammar require a specific order of steps. .................... 8

        3.    The specification does not require a specific order of steps. .....................11

        4.    The file history does not require a specific order of steps. ...................... 12

    B.    "Composition" ...................................................................................... 14

        1.    The claim language compels Defendants' construction. ........................... 15

        2.    The specification supports Defendants' construction. .............................. 17

        3.    The prosecution history supports Defendants' construction. .................... 18

        4.    Plaintiffs' "ordinary meaning" construction would improperly make "composition" a moving target. ................................................................ 19

    C.    "at least one polymer chosen from . . ." ............................................... 20

        1.    The patentee disclaimed povidone from the claimed composition in the specification. ............................................................................... 21

        2.    During prosecution of the parent '842 patent, the patentee disclaimed povidone as a matrix polymer in the claimed formulation. ............................................................................................. 25

3.     The patentee did not rescind its disclaimer of povidone during prosecution of the '001, '695, and '810 patents........................................ 27

V.     CONCLUSION................................................................................................... 28

## TABLE OF AUTHORITIES

### Cases

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ............................................................................. passim

*Augustine Med., Inc. v. Gaymar Indus., Inc.*,
  181 F.3d 1291 (Fed. Cir. 1999) ................................................................................. 5, 28

*Avidyne Corp. v. L-3 Commc'ns Avionics Sys., Inc.*,
  No. 05-cv-11098, 2008 WL 4849894 (D. Mass. Nov. 7, 2008) ............................... 10, 11

*Azurity Pharm., Inc. v. Alkem Lab'ys. Ltd.*,
  No. 2023-1977, 2025 WL 1036994 (Fed. Cir. Apr. 8, 2025) ................................... 6, 27

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008) ...................................................................................... 7

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
  533 F.3d 1362 (Fed. Cir. 2008) .................................................................................... 16

*Biogen, Inc. v. Berlex Lab'ys, Inc.*,
  318 F.3d 1132 (Fed. Cir. 2004) .................................................................................... 28

*Biovail Lab'ys Int'l SRL v. Impax Laby's, Inc.*,
  433 F. Supp. 2d 501 (E.D. Pa. 2006) ............................................................................. 5

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
  895 F.3d 1374 (Fed. Cir. 2018) .................................................................................... 19

*C-Cation Techs., LLC v. Time Warner Cable, Inc.*,
  No. 2:14-CV-0059-JRG-RSP, 2015 WL 1849014 (E.D. Tex. Apr. 20, 2015) ............ 10

*Dexcel Pharma Techs. Ltd. v. Sun Pharma Global FZE*,
  No. 15-cv-8017, 2017 WL 962942 (D.N.J. Mar. 13, 2017) ................................... 19, 20

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
  No. 2:22-CV-00125-JRG, 2023 WL 4181266 (E.D. Tex. June 26, 2023) .................. 10

*Globespanvirata, Inc. v. Texas Instrument, Inc.*,
  No. 03-cv-2854, 2005 WL 984346 (D.N.J. Apr. 7, 2005) ..................................... 9, 11

*Hakim v. Cannon Avent Grp., PLC*,
  479 F.3d 1313 (Fed. Cir. 2007) ................................................................................. 5, 28

*Halliburton Energy Servs., Inc. v. MI LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) .................................................................................... 19

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
527 F.3d 1379 (Fed. Cir. 2008) ........................................................................... 15

*HID Global Corp. v. Vector Flow, Inc.*,
No. 21-1769, 2023 WL 2655117 (D. Del. Mar. 27, 2023) ...................................... 20

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) ............................................................................. 5

*IBSA Institut Biochimique, S.A. v. Teva Pharm. USA, Inc.*,
966 F.3d 1374 (Fed. Cir. 2020) ........................................................................... 16

*In re Katz Interactive Call Processing Patent Litig.*,
639 F.3d 1303 (Fed. Cir. 2011) ........................................................................... 16

*In re Varma*,
816 F.3d 1352 (Fed. Cir. 2016) ........................................................................... 17

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ........................................................................... 17

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ......................................................................... 4, 5

*Invensus Corp. v. Renesas Elecs. Corp.*,
No. 11-448, 2013 WL 3753621 (D. Del. Jul. 15, 2013) ....................................... 20

*Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*,
No. 1:04-cv-396, 2007 WL 710119 (N.D. Ind. Mar. 6, 2007) ................................ 8

*MacroSolve, Inc. v. Antenna Software, Inc.*,
No. 6:11-CV-287, 2014 WL 243429 (E.D. Tex. Jan. 21, 2014) .........................11, 13

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996) ............................................................................................. 4

*MBO Laby's., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007) ........................................................................... 27

*Moba, B.V. v. Diamond Automation, Inc.*,
325 F.3d 1306 (Fed. Cir. 2003) ............................................................................. 9

*Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*,
No. 21-1015-GBW, 2023 WL 4314485 (D. Del. July 3, 2023) .......................... 8, 10

*Omega Eng'g, Inc., v. Raytek Corp.*,
334 F.3d 1314 ( Fed. Cir. 2003) .................................................................. 13, 25, 28

v

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) ................................................................. 5

*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*,
    170 F.3d 1373 (Fed. Cir. 1999) ................................................................. 5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................. 4, 16, 17, 19

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ............................................................... 21

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2003) ............................................................... 13

*Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co.*,
    691 F. Supp. 2d 946 (N.D. Iowa 2010) ..................................................... 8

*Tuna Processors, Inc. v. Hawaii Int'l Seafood, Inc.*,
    327 F. App'x 204 (Fed. Cir. 2009) ..................................................... 8, 10

## Statutes

35 U.S.C. § 112(b) ....................................................................................... 18

## Rules

L. Pat. R. 4.2(a) .......................................................................................... 19

**TABLE OF ABBREVIATIONS**

| Abbreviation | Term/Description |
| --- | --- |
| '842 patent | U.S. Patent No. 8,475,842 |
| '562 patent | U.S. Patent No. 8,859,562 |
| '396 patent | U.S. Patent No. 11,633,396 |
| '001 patent | U.S. Patent No. 11,975,001 |
| '695 patent | U.S. Patent No. 12,048,695 |
| '810 patent | U.S. Patent No. 12,144,810 |
| '842 FH | File history of U.S. Patent Appl. No. 12/574,801, which issued as the '842 patent |
| '562 FH | File history of U.S. Patent Appl. No. 10/555,507, which issued as the '562 patent |
| '001 FH | File history of U.S. Patent Appl. No. 18/312,333, which issued as the '001 patent |
| '695 FH | File history of U.S. Patent Appl. No. 18/312,375, which issued as the '695 patent |
| '810 FH | File history of U.S. Patent Appl. No. 18/785,092, which issued as the '810 patent |
| Natco | Natco Pharma Limited |
| Sandoz | Sandoz Inc. |
| Cipla | Cipla Limited and Cipla USA, Inc. |
| Zydus | Zydus Pharmaceuticals (USA), Inc. and Zydus Lifesciences Limited |
| Defendants | Natco Pharma Limited, Sandoz Inc., Cipla Limited, Cipla USA, Inc., Zydus Pharmaceuticals (USA) Inc., and Zydus Lifesciences Limited |
| Plaintiffs | AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, AstraZeneca AB, KuDOS Pharmaceuticals Limited, The University of Sheffield, and MSD International Business GmbH |
| Olaparib | The active pharmaceutical ingredient in the formulations described in the patents-in-suit, having the chemical name 4-[3-(4-cyclopropanecarbonyl-piperazine-1-carbonyl)-4-fluorobenzyl]-2H-phthalazin-1-one |
| Patents-in-Suit | '842, '562, '396, '001, '695, and '810 patents |

| Core Composition | Uncoated tablet core (Dkt. 192 at 3) |
|---|---|
| HR | Homologous recombination |
| Formulation Patents | '842, '396, '001, '695, and '810 patents |

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 1 | '842 patent file history (excerpted) |
| 2 | '396 patent |
| 3 | '695 patent |
| 4 | '001 patent |
| 5 | '810 patent |
| 6 | '562 patent |
| 7 | Lucio Tentori et al., *Potential Clinical Applications of Poly(ADP-Ribose) Polymerase (PARP) Inhibitors*, 45 PHARM. RES. 73 (2002) ("Tentori 2002") |
| 8 | Plaintiffs' March 21, 2025 Claim Construction Disclosure (excerpted) |
| 9 | '562 patent file history (excerpted) |
| 10 | '842 patent |
| 11 | '695 patent file history (excerpted) |
| 12 | Handbook of Pharmaceutical Excipients (Raymond C. Rowe et al. eds., 5th ed. 2006) ("HPE 2006") (excerpted) |
| 13 | '001 patent file history (excerpted) |
| 14 | '810 patent file history (excerpted) |

## I.    INTRODUCTION

This is a patent infringement lawsuit arising under the Hatch-Waxman Act.  Plaintiffs market LYNPARZA® (olaparib) for the treatment of various cancers, and Defendants submitted abbreviated new drug applications to FDA seeking approval to market generic versions.  Plaintiffs sued Defendants via serial complaints that were consolidated in the above-captioned case.  Plaintiffs currently assert one method of treatment patent (the '562 patent) and three formulation patents (the '001 patent, '695 patent, and '810 patent) against all Defendants.  Plaintiffs additionally assert two more formulation patents (the '842 patent and '396 patent) against Sandoz.  While Plaintiffs have collectively asserted more than 90 claims of the patents-in-suit against Defendants, the parties' current claim construction dispute has been narrowed to only three issues.

First, the parties dispute whether the method steps of claim 1 of the '562 patent must be performed in a particular order.  Specifically, Plaintiffs argue that claim 1 *requires* that the step of "administering" a drug as part of the claimed method *must always* be performed *after* two "identifying" steps: identifying whether the patient's cancer has a particular genetic mutation, and identifying whether the drug being administered has certain properties that make it what the claim calls a compound that "inhibits PARP-1."  Defendants disagree, as the claim language, the specification, the prosecution history, and controlling case law make clear that claim 1 requires no particular order, and certainly does not require that the "administering" step always be performed after the "identifying" steps.

Second, while the parties agree that "core composition" means "uncoated tablet core," the parties dispute the construction of the broader term "composition" from the formulation patents.  Defendants construe "composition" to mean "the entire pharmaceutical composition including any core and coating."  Plaintiffs, on the other hand, provide no construction at all, and unhelpfully construe "composition" to mean "composition."  Notwithstanding Plaintiffs' non-construction, the

1

plain language of the claims, the specification, and the prosecution history make clear that "composition" means "the entire pharmaceutical composition including any core and coating."

Third, Plaintiffs and Zydus dispute whether the genus of polymers recited in the '001, '695, and '810 formulation patents should include the species "povidone." As the specification and prosecution history make evident, povidone *cannot* be included as a claimed polymer species because Plaintiffs clearly and unequivocally disclaimed povidone as a matrix polymer in the claimed composition.

For the reasons discussed below, the Court should adopt Defendants' constructions of the disputed terms.

## II.    BACKGROUND

### A.    Formulation Patents

The formulation patents share a common priority application and a substantively identical specification. All the asserted claims of these patents recite an "immediate-release pharmaceutical composition" that includes, *inter alia*, (i) a polymer; and (ii) particular percentages of olaparib by weight of either the "composition" or the "core composition."

The parties' claim construction disputes stem from the evolving and expanding scope of these two claim limitations throughout the patent family. Plaintiffs obtained issuance of the first formulation patent ('842 patent) only after narrowing the claims to require that the polymer be copovidone to distinguish a prior art formulation using povidone. (Ex. 1 ('842 FH, Mar. 14, 2012, Response to Restriction Requirement) at 2, 5.) In the newest patents, Plaintiffs further expanded the claims to recite eight additional polymers besides copovidone, one of which is povidone, which Plaintiffs have disclaimed as within the scope of the invention. The '842 patent also requires that the claimed weight percentage of the ingredients be a measure of the overall "composition." (Ex. 10 ('842 patent) at claim 1.) Plaintiffs subsequently filed and obtained additional related patents

requiring that particular weight percentages of the ingredients be a measure of the "core composition."  (*E.g.*, Ex. 2 ('396 patent) at claim 1; Ex. 3 ('695 patent) at claim 1.)

**B.       '562 Patent**

The sole asserted claim of the '562 patent broadly recites the use of a class of compounds known as PARP inhibitors for the treatment of a class of cancers caused by a defect in genes that mediate a process called homologous recombination ("HR").  The claim recites, in full:

> 1. A method of treatment of cancer cells defective in homologous recombination (HR), the method comprising:
> identifying a human patient with a familial predisposition to gene-linked hereditary cancer,
>
> wherein said cancer comprises cancer cells defective in homologous recombination;
> identifying a compound which inhibits PARP-1, and administering to said human patient a therapeutically effective amount of said compound.

Most relevant to the claim construction dispute over claim 1 is that it can undisputedly be divided into three steps: the "identifying a human patient" step, the "identifying a compound" step, and the "administering" step.

Each of these three steps is separately discussed in the '562 patent.  In terms of identifying PARP inhibitors, the patent's specification recites certain prior art PARP inhibitors, as well as known methods for identifying additional PARP inhibitors.  (Ex. 6 ('562 patent) at 3:46-59.)  As concerns "administering," the '562 patent also generally discusses administering PARP inhibitors to cancer patients.  (*Id.* at 3:60-4:19.)  In fact, the '562 patent teaches that PARP inhibitors were already in the prior art being administered to cancer patients in combination with radiation and chemotherapy to "enhance the effectiveness" of those treatments.  (*Id.* at 1:62-67.)  And as for identifying patients with the particular cancers identified in the claim, the patent teaches that

3

"[b]reast cancer is the most common cancer disease among women in the Western world today" and that "[c]ertain families have strong predisposition for breast cancer, which is often owing to an inherited mutation in one allele of either BRCA1 or BRCA2" (*i.e.*, genes with HR function). (*Id.* at 3:6-33.) The '562 patent teaches that patients with HR defective cancers "can be identified using multiplex PCR techniques, array techniques . . . or using other screens known to the skilled person." (*Id.* at 3:41-45.)

## III. LEGAL STANDARDS

### A. Claim Construction

Claim construction is a question of law exclusively within the province of the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 391 (1996). "[T]he words of a claim are generally given their ordinary and customary meaning," which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). Claim terms are read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification," which "is always highly relevant." *Id.* at 1313-15. The Court may also consider the prosecution history of the asserted patent. *Id.* at 1317. Extrinsic evidence, such as "expert and inventor testimony, dictionaries, and learned treatises," may also be considered in some circumstances. *Id.* However, extrinsic evidence such as expert testimony is generally considered "less reliable" than intrinsic evidence in determining how to read claim terms. *Id.* at 1318.

### B. Order of Steps in a Method Claim

Whether the steps of a method claim must be performed in a particular order is a matter of claim construction. *See, e.g.*, *Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1342-44 (Fed. Cir. 2001); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1368-71 (Fed. Cir. 2003).

4

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift*, 256 F.3d at 1342. The Federal Circuit applies a "two-part test for determining if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in the order in which they are written." *Altiris,* 318 F.3d at 1369. First, courts "look to the claim language to determine if, as a matter of logic or grammar, the [claimed steps] must be performed in the order written. . . . If not, [courts] next look to the rest of the specification to determine whether *it* 'directly or implicitly requires such a narrow construction.'" *Id.* at 1369-70 (quoting *Interactive Gift*, 256 F.3d at 1343). "If not, the sequence in which such steps are written is not a requirement." *Id*. at 1370.

### C.     Disclaimer

Claim terms must be read in view of the specification of which they are part. *See, e.g.*, *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006) (limiting claim term based on specification's repeated referral to "this invention" or "the present invention"); *Biovail Lab'ys Int'l SRL v. Impax Laby's, Inc*., 433 F. Supp. 2d 501, 514 (E.D. Pa. 2006) ("the claims cannot be of broader scope than the invention that is set forth in the specification") (citing *On Demand Mach. Corp. v. Ingram Indus., Inc*., 442 F.3d 1331, 1340 (Fed. Cir. 2006)).

Moreover, a patentee cannot recapture in litigation claim scope that was surrendered, either by amendment or argument, during the prosecution of the patent. *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc*., 170 F.3d 1373, 1376-77 (Fed. Cir. 1999). For related patent applications, "the prosecution of a parent application may limit the scope of a later application using the same claim term." *Augustine Med., Inc. v. Gaymar Indus., Inc*., 181 F.3d 1291, 1300 (Fed. Cir. 1999). Absent sufficiently clear rescission of any disclaimer made during the prosecution of an earlier related application, the estoppel created by those disclaimers will affect the related child applications. *See Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1318 (Fed. Cir. 2007)

5

("Although a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited."); *see also Azurity Pharm., Inc. v. Alkem Lab'ys Ltd.*, No. 2023-1977, 2025 WL 1036994, at *10 (Fed. Cir. Apr. 8, 2025).

## IV.    DEFENDANTS' POSITIONS AND PROPOSED CONSTRUCTIONS

### A.    '562 Patent Order of Method Steps

| Disputed Claim Term | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| "the method comprising" <br><br> '562 patent, claim 1 | Plain and ordinary meaning, which is: "the claimed method is not limited to administering a PARP-1 inhibitor in a monotherapy." <br><br> ***The claim as a whole requires the two "identifying" steps (i.e., "identifying a human patient with a familial predisposition to gene-linked hereditary cancer" and "identifying a compound which inhibits PARP-1") to be performed prior to the "administering" step (i.e., administering to said human patient a therapeutically effective amount of said compound").*** | Plain and ordinary meaning, which is: "the claimed method is not limited to administering a PARP-1 inhibitor in a monotherapy, *and the claimed method steps may be performed in any order*." |

The parties' dispute as to the '562 patent relates solely to whether the steps of the claim— "identifying a human patient" as having a particular type of cancer, "identifying a compound" as being a PARP inhibitor, and "administering" the compound—need to be performed in a particular order.  Defendants contend that the steps do not need to be performed in any particular order.

Plaintiffs appear to agree that the first two "identifying" steps can be performed in any order, but contend that the "administration" step must come last.

Defendants' construction—*i.e.*, that there is no required order for the claim steps—is correct under all relevant factors: (1) the claim language does not require a particular order; (2) rules of logic and grammar do not require a particular order; (3) the specification does not require a particular order; and (4) the file history does not require a particular order. Plaintiffs' effort to import an ordering requirement is a litigation driven effort to try to prevent an invalidity finding. The claim, *as the patentee wrote it*, is enormously broad, which subjects it to a serious obviousness attack as well as a serious threat for failure to adequately describe and enable the invention as claimed. Plaintiffs apparently believe that importing an ordering requirement will narrow the claims and increase their odds of avoiding invalidity. Plaintiffs' position has no basis in controlling claim construction law.

### 1.    The claim language does not require a specific order of steps.

The express language of claim 1 contains none of the traditional markers that reflect the patentee's intent to impart a particular order to the steps of a method claim. Claim 1 does not use any sort of conditional language (*e.g.*, step only performed "if" a previous step/result occurs), temporal language (*e.g.*, "before" or "after," "first" or "second"), numbers, ordinals, or other labeling (*e.g.*, "(a) . . . (b) . . .", "(1) . . . (2) . . ."), past participles (*e.g.*, "*identified* human patient" or "*identified* compound"), or any other language that would indicate the recited steps must be performed in a particular order. *See, e.g.*, *Altiris,* 318 F.3d at 1370 ("The only order mandated by the claim language is the conditional  language in several of the steps . . . ."); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1346 (Fed. Cir. 2008) ("But this language . . . does not unequivocally preclude a different order of steps, and this court sees no justification in the specification for imposing a temporal constraint on claim 14 that is not required by or implicit in

the language of the claim itself."); *Tuna Processors, Inc. v. Hawaii Int'l Seafood, Inc.*, 327 F. App'x 204, 209 (Fed. Cir. 2009) (holding that the "use of the past participle confirms" sequential ordering and "the specification confirms the appropriateness of such a temporal limitation").  Thus, claim 1 does not require the claimed steps to be performed in ***any*** particular order, let alone ***require*** that the two "identifying" steps ***must always*** be performed before the "administering" step.

Plaintiffs also admit that claim 1 of the '562 patent is an "open-ended set of steps."  (Ex. 8 (Pls.' Mar. 21, 2025 Claim Construction Disclosure) at 13.)  That should end the discussion because the plain and ordinary meaning of an "open-ended" method claim generally does not limit the steps to the order recited in the claim.  *See, e.g.*, *Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, No. 21-cv-1015-GBW, 2023 WL 4314485, at *14-16 (D. Del. July 3, 2023) (declining to construe that "the claimed method be performed in a particular order of steps" because "the claim language uses the term 'comprising,' which 'in a method claim indicates that the claim is open-ended and allows for additional unrecited steps'"); *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, No. 1:04-cv-396, 2007 WL 710119, at *13 (N.D. Ind. Mar. 6, 2007) ("Since the claim is not foreclosed to additional steps, the steps themselves are not foreclosed from being carried out in a different order than stated in the claim."); *Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co.*, 691 F. Supp. 2d 946, 950 (N.D. Iowa 2010) (agreeing that "'comprising the steps of' is open-ended language meaning that the method includes the steps listed in the claim, but is not limited to those steps or the order in which the steps are recited in the claim").

### 2.    Neither logic nor grammar require a specific order of steps.

Applying the Federal Circuit's "two-part test" in *Altris* also does not require that the two "identifying" steps *must always* be performed prior to the "administering" step, as Plaintiffs contend.  There is nothing in the claim language that requires, as a matter of logic or grammar, that the two "identifying" steps *must always* be performed before the "administering" step.  *See, e.g.*,

8

*Altiris,* 318 F.3d at 1369 ("First, we look to the claim language to determine if, as a matter of logic or grammar, the[ claimed steps] must be performed in the order written."); *Globespanvirata, Inc. v. Texas Instrument, Inc.*, No. 03-cv-2854, 2005 WL 984346, at *11 (D.N.J. Apr. 7, 2005) ("Plaintiff's proposed construction would impose an absolute requirement that step (b) occurs after step (a) at all times. The plain language of the claim does not indicate that this is always the case."). Plaintiffs have cited no evidence, for instance, suggesting that one performing the claimed method could not *first* administer a known prior art PARP inhibitor to a breast cancer patient, and then *subsequently*, as part of the same treatment regimen, "identify" through genetic testing that the patient had "a familial predisposition to gene-linked hereditary cancer, wherein said cancer comprises cancer cells defective in homologous recombination," as required by the first listed "identification" step.

The fact that the claimed "administering" step references providing to "said human patient" the "said compound" earlier referenced in the claim does not require a different outcome. As many courts have found, including the Federal Circuit, the use of "said" in reference to a previously introduced subject of the claim is not sufficient—and certainly not sufficient *alone*—to find that the steps of a method claim must be performed in the order recited. *See, e.g.*, *Altiris,* 318 F.3d at 1367-71 (holding that "the claim language . . . neither grammatically nor logically indicates that the 'setting' step must occur in a particular order compared to the other steps" and "[t]he only order mandated by the claim language is the conditional language in several of the steps, indicating that they must be performed after the 'testing' step" despite claim's use of "said" antecedent basis); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1310, 1313-15 (Fed. Cir. 2003) (holding that the district court's claim construction "did not require sequential performance" and "[n]owhere does the plain language of claim 24 require separate and consecutive performance of

9

the various guiding steps" despite claim's use of "said" antecedent basis); *Avidyne Corp. v. L-3 Commc'ns Avionics Sys., Inc.*, No. 05-cv-11098, 2008 WL 4849894, at *8 (D. Mass. Nov. 7, 2008) ("Avidyne's argument that the word 'said' in the 'compensating' step—'compensating said craft attitude measurement'—is a sequence-determining signal lacks merit. The use of 'said,' in this context, is simply a way to avoid needless repetition of the full term to which it applies."); *Nippon*, 2023 WL 4314485, at *14-16 (holding that the claimed method need not be performed in a particular order despite the use of "said" antecedent basis because the "claim's use of the word 'said' simply 'refers back to an earlier phrase in the claim'" and requires the compound as previously defined "rather than the results of the prior step"); *C-Cation Techs., LLC v. Time Warner Cable, Inc.*, No. 2:14-CV-0059-JRG-RSP, 2015 WL 1849014, at *19 (E.D. Tex. Apr. 20, 2015) (holding that use of "said" antecedent basis "does not however mandate a step order").

Relatedly, claim 1 does not use a past participle. It does not refer to "said *identified* human patient" or "said *identified* compound," which could arguably insinuate an order. Rather, claim 1 merely refers to "said human patient" and "said compound," neither of which implies any necessary order. *See, e.g.*, *Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-CV-00125-JRG, 2023 WL 4181266, at *27-28 (E.D. Tex. June 26, 2023) (requiring ordering of "digitizing" and "selecting" steps only because of use of past participles in "said *digitized* plurality of frequencies" and "said *selected* plurality of television channels"); *Tuna Processors*, 327 F. App'x at 209 (holding that the "use of the past participle confirms" sequential ordering and "the specification confirms the appropriateness of such a temporal limitation"). For all these reasons, contrary to Plaintiffs' contention, there is nothing in the language of claim 1 that requires the claimed steps to be performed in any particular order, let alone that the two "identifying" steps *must always* be performed before the "administering" step.

10

**3.      The specification does not require a specific order of steps.**

There is likewise nothing in the specification that "directly or implicitly *requires*" the two "identifying" steps *must always* be performed before the "administering" step.  *Altiris,* 318 F.3d at 1370 (emphasis added).  The specification is completely silent as to *any* requirement for *any* order of *any* steps of the claimed method.  In fact, the specification does not disclose a single embodiment that includes all steps of claim 1.  While it generally discusses ways of "identifying" patients with certain HR defective cancer cells (*see, e.g.*, Ex. 6 ('562 patent) at 3:1-45), "identifying" certain PARP-1 inhibitors (*see, e.g.*, *id.* at 3:46-59), and "administering" PARP-1 inhibitors to patients with HR defective cancers (*see, e.g.*, *id.* at 3:60-4:19), nowhere does it ever discuss these steps together, in a single embodiment, or in any context that would suggest the steps of claim 1 require *any* particular order.  Because there is no direct or implicit evidence in the specification regarding any ordering of the claimed method steps, claim 1 does not require the claimed steps to be performed in any particular order, let alone <u>require</u> that the two "identifying" steps <u>must always</u> be performed before the "administering" step.  *See, e.g.*, *Globespanvirata*, 2005 WL 984346, at *11 ("As the court found in *Altiris,* here there are no statements in the specification suggesting that the method must be performed in the way Plaintiff proposes . . . ."); *Avidyne*, 2008 WL 4849894, at *7 ("The specification describes an embodiment in which the steps are performed in the order in which they are set out in the claims, and it is therefore clear that the method *can* be practiced by following that sequence. The question is, however, whether the method *can only* be practiced in that sequence."); *MacroSolve, Inc. v. Antenna Software, Inc.*, No. 6:11-CV-287, 2014 WL 243429, at *9 (E.D. Tex. Jan. 21, 2014) ("The specification and applicant's remarks make it clear that that the method may be performed during a period of no network connectivity.  What is unclear is if the method *must* be performed during a period of no network connectivity.").

Moreover, the specification actually contemplates performance of the "administering" step *before* the "identifying a human patient" step. It indicates that PARP-1 inhibitors were already being successfully used in combination with "traditional radiotherapy and chemotherapy," and that those combination therapies included treatment of hereditary cancers. (*See* Ex. 6 ('562 patent) at 1:62-67, 12:1-3 (citing Tentori 2002); Ex. 7 (Tentori 2002) at 76.) As Plaintiffs admit, the claimed method encompasses such combination therapies. (Dkt. 192-1 at 6 ("[T]he claimed method is not limited to administering a PARP-1 inhibitor in a monotherapy.").) Coupled with the well-known time-sensitive nature of initiating treatment in cancer patients, and the specification's discussion of known HR-defective cancers (*see, e.g.*, Ex. 6 ('562 patent) at 3:1-40) and complete lack of any temporal requirement for implementing the known methods of identifying said cancers (*see, e.g.*, *id.* at 3:41-45), it is entirely possible that a patient with the claimed hereditary cancer would be "administered" the claimed PARP-1 inhibitor in conjunction with chemotherapy and/or radiation and be "identified" as a patient with the claimed hereditary cancer *after or in conjunction with* that treatment. Neither the claim nor the specification precludes such a possibility.

Similarly, there is nothing in the specification that requires that the step of "identifying a human patient" be *completed* prior to the "administering" step. For example, the specification not only contemplates "identifying" the human patient using a simple family history, but also discloses known analytical techniques and screens for identifying such patients. (*See, e.g.*, *id.* at 3:1-45.) Thus, it is possible that the step of "identifying a human patient" begins with a family history and is completed upon receiving the results of an analytical test. Neither the claim nor the specification precludes such a possibility.

### 4.    The file history does not require a specific order of steps.

There is also nothing in the prosecution history of the '562 patent that shows the patentee "expressly relinquished" or "unequivocally disavow[ed]" claim scope necessary to limit claim 1

12

to the ordering of steps proposed by Plaintiffs. *See MacroSolve*, 2014 WL 243429, at \*8-9 (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325-26 (Fed. Cir. 2003) and *Omega Eng'g, Inc., v. Raytek Corp.,* 334 F.3d 1314, 1324 ( Fed. Cir. 2003)).

At most, the patentee stated that the prior art was "silent about hereditary cancers or the *possibility* of identifying patients who are predisposed to such cancers, before administering a compound." (Ex. 9 ('562 FH, Feb. 22, 2011, Appellants' Brief) at 13 (emphasis added); *see also id.* (Aug. 3, 2011, Appellants' Reply Brief) at 14.) The "*possibility*" that patients are identified as having the claimed cancer *before* administering a compound "does not evidence a clear and unmistakable disavowal of claim scope" that would preclude patient identification *after* administration. *MacroSolve*, 2014 WL 243429, at \*9. Furthermore, while the Patent Office (incorrectly) agreed with Appellants that the prior art did not render the disputed claim obvious, nowhere did the Board express that the patentability of the claimed method was based on "identifying" a patient before "administering" a compound. (Ex. 9 ('562 FH, Mar. 27, 2014, PTAB Decision on Appeal) at 11 ("Neither the claims of the '701 patent, nor any of the other cited references, discuss the heritability of cancer susceptibility or a familial predisposition to cancer."); *see also id.* at 19-20.) In fact, in quoting Appellants' arguments, the Board notably omits Appellants' language regarding "before administering a compound." (*See id.* at 11, 19-20.) Thus, nothing in the file history suggests the clear and unmistakable disavowal or relinquishment of claim scope required to limit the method steps of claim 1 to any particular order, let alone *require* that the two "identifying" steps *always* be performed before the "administering" step.

For all the reasons stated above, contrary to Plaintiffs' contention, there is nothing in the claim language, specification, or prosecution history that requires the method steps of claim 1 to be performed in any particular order, let alone *requires* that the two "identifying" steps *must always*

13

be performed before the "administering" step.  As such, Plaintiffs' construction should be rejected, and Defendants' construction should be adopted.

### B.       "Composition"

| Disputed Claim Term | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| "composition"<br><br>'842 patent, claims 1-10<br><br>'396 patent, claims 1-12, 14-30<br><br>'001 patent, claim 1-2, 5-13<br><br>'695 patent, claims 1-10<br><br>'810 patent, claims 1-30 | Plain and ordinary meaning, which is:<br><br>"composition" | Plain and ordinary meaning, which is:<br><br>"the entire pharmaceutical composition including any core and coating" |

The parties dispute the meaning of the word "composition" as it is used in the term "immediate-release pharmaceutical composition," and when it is used on its own, in some claims, to refer back to the "immediate-release pharmaceutical composition."  Many of the asserted claims also refer to a "core composition." The parties agree that "core composition" means the "uncoated tablet core," but dispute the meaning of the broader term "composition."  (Dkt. 192 at 2-5.)

Defendants maintain that "composition" means "the entire pharmaceutical composition including any core and coating," because that is the construction that is compelled by the plain language of the claims, the specification, and the prosecution history.  Plaintiffs' proposed construction, on the other hand, is no construction at all.  They ask the Court to adopt the non-construction of "plain and ordinary meaning" so that they can twist and contort the claims to mean whatever they want, depending on the circumstances, to give themselves flexibility to argue infringement across the 90 asserted claims of the formulation patents.  Plaintiffs seek to sometimes argue "composition" means the entire "immediate-release pharmaceutical composition" and other times just a portion of the "immediate-release pharmaceutical composition," resulting in the term

14

"composition" having the same meaning as "core composition" in some claims. Plaintiffs' results-driven construction is divorced from the intrinsic evidence, runs counter to Federal Circuit precedent, and should be rejected. The term "composition" should be construed consistent with the intrinsic evidence to mean the entire pharmaceutical formulation.

### 1.    The claim language compels Defendants' construction.

The language of the asserted claims makes clear that "composition" refers to the entire pharmaceutical composition. For example, claim 1 of the '842 patent is directed to an "immediate-release pharmaceutical composition" and then uses the term "the composition" to refer back to "the immediate-release pharmaceutical composition." The same is true for dependent claims that refer back to the "immediate-release pharmaceutical composition" described in an independent claim. (*See, e.g.*, Ex. 3 ('695 patent) at claim 2 (referring to the "immediate-release pharmaceutical composition" of claim 1 as "[t]he composition").) "Immediate-release" refers to the release profile of the drug as delivered to a patient. (*See e.g.*, Ex. 10 ('842 patent) at 3:37-38 (referring to an immediate release tablet having a "target bioavailability of around 90% (relative to an intravenous solution)").) The *entire* drug product is delivered to the patient—not a component piece. As such, the "composition" in the "immediate-release pharmaceutical composition" is the entire pharmaceutical formulation.

The claims' use of the term "core composition" indicates that "composition" means something more than the naked core composition on its own. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381-82 (Fed. Cir. 2008) ("[D]ifferent claim terms are presumed to have different meanings."). The claims of the '695 and '396 patents are instructive because they contain both the "composition" and "core composition" terms. Claim 1 of the '695 patent recites "[a]n immediate-release pharmaceutical ***composition*** in the form of a tablet comprising: (a) a ***core composition*** comprising  .  .  .  and; (b) optionally a tablet coating. . . ."

15

(Ex. 3 ('695 patent) at claim 1 (emphasis added).) Thus, the overarching "composition" may include two distinct components: (1) the "core composition"; and (2) the tablet coating. Similarly, claim 1 of the '396 patent recites "[a]n immediate-release pharmaceutical *composition* comprising: a *core composition* comprising . . . ." (Ex. 2 ('396 patent) at claim 1 (emphasis added).) Again, this claim language confirms that "composition" and "core composition" are not the same thing. Defendants' construction of "composition" should be adopted because it preserves the distinction drawn by the claims between "composition" and "core composition." *See Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) (construing two terms to have different meanings because "[t]he fact that the claim distinguishes between 'each pre-programmed code' and 'the matched one or more pre-programmed codes' is significant. . . . Different claim terms are presumed to have different meanings."); *IBSA Institut Biochimique, S.A. v. Teva Pharm. USA, Inc.*, 966 F.3d 1374, 1379 (Fed. Cir. 2020) (finding "the claim language clarifies . . . that a 'half-liquid' differs from a liquid" when the two terms appeared in the same claim).

Plaintiffs' proposal that "composition" be given a vague plain and ordinary meaning construction so that the term may be given different scope across the various asserted claims runs counter to the Federal Circuit precedent holding that "claim terms are normally used consistently throughout the patent." *Phillips*, 415 F.3d at 1314. This tenet of consistent usage extends to related patents. *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011) ("[W]e ordinarily interpret claims consistently across patents having the same specification."). Against this backdrop, the Federal Circuit has held, "[u]nless otherwise compelled, when different claims of a patent use the same language, we give that language the same effect in each claim." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d

16

1111, 1119 (Fed. Cir. 2004); *see also In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016) ("[T]he principle that the same phrase in different claims of the same patent should have the same meaning is a strong one, overcome only if "it is clear" that the same phrase has different meanings in different claims."). Plaintiffs' flexible "plain and ordinary meaning" construction should be rejected because no compelling reason exists for deviating from this rule with respect to "composition."

### 2.    The specification supports Defendants' construction.

As noted above, "immediate-release pharmaceutical composition" and "composition" are synonymous in the asserted claims, and the specification makes clear that "immediate-release" refers to the release profile of the drug as delivered to a patient. (*See e.g.*, Ex. 10 ('842 patent) at 3:37-38.) The entire drug product is delivered to a patient, not just a component. Thus, the specification supports Defendants' proposed construction that "composition" refers to the entire pharmaceutical composition.

The examples in the specification confirm that "composition" refers to the entire composition, including both the core and, if present, the tablet coating. *See Phillips*, 415 F.3d at 1315 ("[C]laims must be read in view of the specification, of which they are a part."). Table 17 describes an exemplary "composition" that includes both the "Tablet core" and "Tablet Coating":

TABLE 17

Composition of Compound 1/copovidone solid dispersion tablet

| Components | 25 mg tablet | 100 mg tablet | | |
|---|---|---|---|---|
| | Quantity (mg per tablet) | | Quantity (% core weight) | Function |
| Tablet core | | | | |
| Compound 1 | 25.00 | 100.00 | 25.00 | Active pharmaceutical ingredient |
| Copovidone | 57.50 | 230.00 | 57.50 | Polymeric carrier |
| Colloidal silicon dioxide | 1.83 | 7.33 | 1.83 | Glidant |
| Mannitol | 14.67 | 58.67 | 14.67 | Soluble filler |
| Sodium stearyl fumarate | 1.00 | 4.00 | 1.00 | Lubricant |

17

| Core tablet weight | 100.00 | 400.00 | | |
|---|---|---|---|---|
| **Tablet Coating** | Quantity (mg per tablet) | | Quantity (% coating weight) | Function |
| Hypromellose (HPMC 2910) | 2.19 | 8.75 | 62.5 | Film former |
| Titanium dioxide (E171) | 0.88 | 3.51 | 25.05 | Opacifier |
| Macrogol/ PEG 400 | 0.22 | 0.88 | 6.25 | Plasticiser |
| Iron oxide yellow (E172) | 0.16 | 0.64 | 4.55 | Colouring agent |

(Ex. 10 ('842 patent) at Table 17 (highlighting added).) Thus, the specification illustrates that the "composition" is the entire pharmaceutical composition including the core and any coating.

### 3.    The prosecution history supports Defendants' construction.

The prosecution history also confirms that "composition" refers to the entire pharmaceutical formulation consistent with Defendants' construction. During prosecution of the '695 patent, the examiner rejected application claim 21 (issued claim 1) as indefinite under 35 U.S.C. § 112(b). That claim was directed to an "immediate-release pharmaceutical composition." The Examiner stated that it was unclear whether the claim required 10-50% olaparib by weight of the tablet as a whole (i.e. the entire "immediate-release pharmaceutical composition") or just the dispersion in the tablet core:

> [T]he following limitation is ambiguous: "wherein the total concentration of Compound 1 is in the range of from 10% by weight to 50% by weight." The foregoing limitation raises the following query: *by weight of what?* Does the range refer to the concentration of Compound 1 in the solid dispersion <u>only</u>, which is a constituent of the tablet? Alternatively, does it refer to the concentration of Compound 1 in the tablet as a whole, which includes both the solid dispersion and all other tablet constituents, both recited and unrecited? This ambiguity renders [the claim] and all claims depending thereon indefinite.

(Ex. 11 ('695 FH, Jan. 18, 2024, Final Rejection) at 3 (emphasis in original).) The applicant then amended the claim to clarify that "the total concentration of Compound 1 <u>in the core composition</u> is in the range of from 10% by weight to 50% by weight" and the claim was allowed. (*Id.* (Apr. 16, 2024, Amend. & RCE) at 2, 5-8; *id.* (Jun. 5, 2024 Notice of Allowance).) The patentee's

18

amendment confirms that "composition" does not mean the same thing as "core composition." *See Phillips*, 415 F.3d at 1317; *see also Blackbird Tech LLC v. ELB Elecs., Inc.*, 895 F.3d 1374, 1379 (Fed. Cir. 2018) (construing claim not to require a fastening mechanism for the ballast cover based on deletion of the ballast fastening limitation during prosecution history).

Plaintiffs' proposed construction of "composition" injects back into the claims the very ambiguity that the Patent Office sought to eliminate by requiring that certain limitations applied only to the "core composition." That ambiguity would result in fatally indefinite claims. Plaintiffs' construction should therefore be rejected. *Halliburton Energy Servs., Inc. v. MI LLC*, 514 F.3d 1244, 1253 (Fed. Cir. 2008) ("[W]here a claim is ambiguous as to its scope we have adopted a narrowing construction when doing so would still serve the notice function of the claims.").

### 4. Plaintiffs' "ordinary meaning" construction would improperly make "composition" a moving target.

Plaintiffs' naked "plain and ordinary meaning" construction is improper here where there is a dispute about whether Defendants' products meet particular claim limitations depending on how "composition" is construed. L. Pat. R. 4.2(a) ("[T]he parties shall simultaneously exchange preliminary proposed constructions of each term identified by any party for claim construction, including constructions for each term for which 'plain and ordinary' meaning is asserted."); *Dexcel Pharma Techs. Ltd. v. Sun Pharma Global FZE*, No. 15-cv-8017, 2017 WL 962942, at *4 (D.N.J. Mar. 13, 2017) ("A determination that no construction is needed would . . . be inappropriate" where it "would not resolve the parties' dispute."). In order to assert as many claims as possible, Plaintiffs apply different meanings to "composition" in different claims—a point illustrated by claim 7 of the '842 patent and claim 8 of the '695 patent. Claim 7 of the '842 patent recites "an immediate-release pharmaceutical *composition* . . . wherein the total concentration of Compound 1 [olaparib]

19

in the composition is 25% by weight." (Ex. 10 ('842 patent) at 42:66-67, 43:8-9.) Claim 8 contains the same limitation except that the "core composition"—not the overall "composition"—must be 25% by weight olaparib. To calculate the total percent by weight for each claim, the weight of the olaparib [numerator] is divided by the weight of either the "composition" or the "core composition" [denominator] according to the following formulas:

**'842 patent, claim 7**          **'695 patent, claim 8**

$$weight\ (\%) = \frac{weight\ of\ olaparib}{weight\ of\ \textbf{composition}} \times 100 \qquad weight\ (\%) = \frac{weight\ of\ olaparib}{weight\ of\ \textbf{core}\ composition} \times 100$$

Under Defendants' construction, a pharmaceutical formulation with a coating cannot meet both claims' requirement of having "25% by weight" olaparib because the coating will change the denominator and thus the overall weight (%). Plaintiffs nonetheless seek a construction of "composition" that allows them to selectively argue the composition is sometimes just the core composition without the coating so that they can assert both claims against a single ANDA product.

The Court should not permit Plaintiffs' mischief and instead follow other courts that have rejected naked "plain and ordinary meaning" constructions that mask disputes. *E.g.*, *Dexcel*, 2017 WL 962942, at *4; *HID Global Corp. v. Vector Flow, Inc.*, No. 21-1769, 2023 WL 2655117, at *5 (D. Del. Mar. 27, 2023) (holding disputes require further construction); *Invensus Corp. v. Renesas Elecs. Corp.*, No. 11-448, 2013 WL 3753621, at *1 n.1 (D. Del. Jul. 15, 2013) (disputes "compel[led] the court to offer further guidance through construction").

C.    **"at least one polymer chosen from . . ."**

| Disputed Claim Term | Plaintiffs' Position | Zydus's Position |
|---|---|---|
| "at least one polymer chosen from copovidone, povidone, hypromellose phthalate, | Plain and ordinary meaning, which is:<br><br>"at least one polymer chosen | "at least one polymer chosen from copovidone, hypromellose phthalate, |

20

| Disputed Claim Term | Plaintiffs' Position | Zydus's Position |
|---|---|---|
| hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate" [1]<br><br>'001 patent, cl. 1-13<br><br>'695 patent, cl. 1-6, 8-10<br><br>'810 patent, cl. 1-8, 14-27 | from copovidone, *__povidone__*, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate" (emphasis added) | hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate" |

The parties disagree as to whether the genus of polymers recited in the asserted claims of the '001, '695, and '810 patents should include the species of povidone. The asserted claims should be construed to exclude povidone because the patentee—through clear repudiation in the specification and the prosecution history—disclaimed povidone as a matrix polymer in the claimed formulation. The patentee admits in the specification that povidone does not have the requisite low hygroscopicity to meet the patentee's own definition of a matrix polymer in the claimed composition. During prosecution of the parent application, the patentee also distinguished its invention over prior art disclosing povidone, arguing that its invention does not include povidone as a matrix polymer and that povidone does not result in a stable solid dispersion formulation for olaparib. Plaintiffs should not be allowed claim scope that is not part of the invention described in the intrinsic evidence.

### 1. The patentee disclaimed povidone from the claimed composition in the specification.

The shared specification of the formulation patents makes clear that the purported invention does not encompass povidone. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.,*

---

[1] Natco, Sandoz, and Cipla take no position on the construction of this claim term.

*Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.").

In the shared specification, the patentee repeatedly describes the invention as "a pharmaceutical formulation comprising [olaparib] in a solid dispersion with a matrix polymer that exhibits low hygroscopicity and high softening temperature." (Ex. 4 ('001 patent) at 1:29-33; 4:11-22; 4:32-38.) The patentee defines "matrix polymer" as "a material that exhibits low hygroscopicity and high softening temperature comprising a polymer or a blend of two or more polymers." (*Id.* at 4:55-58.) The patentee further defines "low hygroscopicity" as "having an equilibrium water content <10% at 50% relative humidity, as determined by Dynamic Vapour Sorption (DVS)." (*Id.* at 4:59-63.)

The patentee thereafter unambiguously discloses that povidone does not possess the requisite low hygroscopicity to be considered a matrix polymer in the claimed composition. Table 4 in the specification discloses that povidone has an equilibrium water content (hygroscopicity) of 16%, which is uniquely high compared to other polymers and higher than the patentee's "<10%" definition of "low hygroscopicity" for matrix polymers:

22

TABLE 4

Characteristics of polymers used in pharmaceutical solid dispersion formulations

| Polymer | Grade | Supplier | Hygroscopicity (%w/w)[a] | Softening Point[b] Tg (° C.) | Softening Point[b] Tm (° C.) |
|---|---|---|---|---|---|
| Copovidone | Kollidon VA64 | BASF SE | 5 | 106 | N/A |
| Povidone | Kollidon 17PF | | 16 | 136 | N/A |
| | Kollidon 25 | | | 155 | N/A |
| | Kollidon 30 | | | 168 | N/A |
| Hypromellose phthalate | HP55S | Shin-Etsu | 4 | 145 | N/A |
| (HPMCP) | HP55 | Chemical Co., | | 145 | N/A |
| Hypromellose acetate | Aqoat LF | Ltd | 4 | 120 | N/A |
| succinate (HPMCAS) | Aqoat LG | | | 120 | N/A |
| | Aqoat MG | | | 130 | N/A |
| 2-hydroxypropyl-ß-cyclodextrin (HPBCD) | Kleptose HP | Roquette Freres | 7 | 278 | N/A |
| Hypromellose (HPMC) | Pharmacoat 606 | Shin-Etsu Chemical Co., Ltd | 4 | 175 | N/A |
| Poly(methacrylic acid, ethyl acrylate) 1:1 | Eudragit L100-55 | Evonik Degussa | 4 | 115 | N/A |
| Poly(methacrylic acid, methyl methacrylate) 1:1 | Eudragit L100 | GmbH | 6 | 160[#] | N/A |
| Poly(butylmethacrylate, (2-dimethylaminoethyl) methacrylate, methyl methacrylate) 1:2:1 acid, ethyl acrylate) 1:1 | Eudragit E100 | | 1 | 48 | N/A |
| Poly(methacrylic acid, methyl methacrylate) 1:2 | Eudragit S100 | | 11 | 160[#] | N/A |
| Polyethylene glycol (PEG) | PEG 6000 | Fluka AG | 2 | N/A | 55-63 |
| Poloxamer | Pluronic (Lutrol) F68 | BASF SE | 2 | N/A | 52-57 |
| | Pluronic (Lutrol) F127 | | | N/A | 52-57 |
| Hydroxypropyl cellulose (HPC) | Klucel EF | Hercules, Inc. | 5 | 130 | N/A |
| Cellulose acetate phthalate (CAP) | Aquacoat CPD | FMC Biopolymer | 6 | 176 | N/A |

Key: N/A = Not Applicable

[a] Equilibrium water content at 50% Relative Humidity (literature values)

[b] Softening temperature expressed as glass transition temperature (Tg) or melting point (Tm) - suppliers data

[#] Accurate determination not possible due to chemical degradation

(*Id.* at 15 (Table 4).)  This disclosure in the specification is consistent with extrinsic evidence teaching that povidone is "***very hygroscopic***", having an equilibrium moisture of ***greater*** than 10% at 50% relative humidity.  (Ex. 12 (HPE 2006) at 612, Figs. 1, 2 (emphasis added).)

The patentee also discloses in the specification that povidone does not provide the stability and bioavailability that the patentee considered critical to the invention.  Throughout the specification the patentee states that the invention relates to the use of solid dispersion of olaparib

23

in a matrix polymer in order to increase the stability and bioavailability of olaparib for treating cancer in a patient. (*See, e.g.*, Ex. 4 ('001 patent) at 1:23-28; 1:37-43; 4:11-22; 5:54-59; 6:4-32; 11:20-26.) The specification teaches that stability of olaparib in amorphous form—*i.e.*, the "ability to remain in amorphous form and resist converting to crystalline form" (*id.* at 10:62-67)—is advantageous because it increases the solubility and dissolution rate of olaparib, (*id.* at 10:30-37), which in turn enhances its bioavailability (*id.* at 2:60-63).

Yet the patentee admits that povidone does not result in a stable composition of olaparib. In Example 4, the patentee discloses a stability study where solid dispersions of olaparib were prepared with various polymers and assessed for stability and dissolution. (*Id.* at 24:16-43.) The inventors state that povidone exhibits poor stability and dissolution in the claimed composition:

> The results of the stability study demonstrate that solid dispersions produced using the relatively hygroscopic polymer povidone tended to crystallise when stored at 40° C./75% relative humidity, leading to a reduction in dissolution rate. Solid dispersions produced using 2-hydroxypropyl-β-cyclodextrin and hypromellose phthalate were stable under all tested conditions.

(*Id.* at 27:1-7.)

Consistent with the above-described disclosures that povidone is unacceptable, the patentee did not include povidone in the list of specific matrix polymers suitable for use in the described compositions:

> Suitable matrix polymers for use in the invention include: copovidone, hypromellose phthalate (hydroxypropylmethylcellulose phthalate, HPMCP), hypromellose acetate succinate (hydroxypropylmethylcellulose acetate succinate, HPMCAS), –2-hydroxypropyl-β-cyclodextrin (HPBCD), hypromellose (hydroxypropylmethylcellulose, HPMC), polymethacrylates (poly(methacrylic acid, methyl methacrylate 1:1; poly(methacrylic acid, ethyl acrylate) 1:1), hydroxypropyl cellulose (HPC), and cellulose acetate phthalate (CAP).

24

(*Id.* at 5:7-16.)   Indeed, each of these disclosed matrix polymers has the requisite low hygroscopicity (<10% at 50% relative humidity) (*id.* at 15 (Table 4); *see also id.* at 4:55-63), while highly hygroscopic povidone is excluded.

Having disavowed povidone as an acceptable polymer, lacking both the requisite low hygroscopicity of a matrix polymer and the corresponding stability necessary for the bioavailability central to the alleged invention, patentees cannot now assert it as part of the invention.  (*Id.* at 4:55-63, 5:7-16, 27:1-7; *see also id.* at 15, Table 4; Ex. 12 (HPE 2006) at 612, Figs. 1, 2.)

> **2.      During prosecution of the parent '842 patent, the patentee disclaimed povidone as a matrix polymer in the claimed formulation.**

Consistent with the repeated disclosure in the specification that povidone is not a matrix polymer in the invention, during prosecution of the '801 application, which issued as the '842 patent (parent of the '001, '695, and '810 patents), the patentee advanced arguments and amended claims that disclaimed povidone as a matrix polymer.  *See Omega Eng'g*, 334 F.3d at 1324 ("But where patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.")  In response to the examiner's obviousness rejection, the patentee distinguished the claimed invention from prior art references teaching povidone as a matrix polymer:

> [T]he Martin reference does not contemplate use of solid dispersion formulation nor use of a matrix copolymer such as copovidone.  At most, Martin points one of skill in the art ***to the possible use of povidone, which is not utilized in the current formulation.***
>
> * * *
>
> Thus, given the problem identified in the present application, with a drug formulation which required administration of far too many pills to have a reasonable commercial formulation, one of skill in the art would not have been motivated to use an ingredient such as povidone which is known to produce pills which are too numerous and too large to effectively administer.  ***In fact, Buhler***

25

> *teaches that povidone would not be useful at all to solve the problem identified in the application – if anything it may augment the problem*. Therefore, Buhler teaches away from use of povidone and matrix polymers in solid dosage forms such as tablets and capsules which require high amounts of API.

(Ex. 1 ('842 FH, Mar. 14, 2012, Response to Non-Final Rejection) at 6-7 (emphasis added).) The patentee also amended the independent claims to require the matrix polymer "is copovidone." (*Id.* at 2.)

The Examiner maintained the rejection, and in response the patentee again argued that povidone would be unacceptable for its claimed formulation, pointing specifically to Example 4 of the specification (col. 27, ll. 1-7):

> Even if one skilled in the art did consider solid dispersion formulations, the most conventional excipients used in solid dispersion formulations are not effective for Olaparib. The skilled person would appreciate that successful formulation as a solid dispersion requires not only improvement in bioavailability but also adequate stability during manufacture and long-term storage. Polymers previously used for solid dispersions such as polyethylene glycol and poloxamers proved unable to provide stable formulations. (See Example 3 and in particular paragraph [0122] of the Application as filed). Likewise, *povidone* (PVP), which according to Buhler, is an "excellent auxiliary for manufacture of solid solutions/dispersions," and has provided stable solid dispersion formulations for numerous compounds (see Buhler page 84 and Table 80 on page 93), *unexpectedly failed to provide a stable solid dispersion formulation for Olaparib*. (See Example 4 of the application as filed, [0140], stating "the results of the stability study demonstrate that solid dispersions produced using the relatively hygroscopic polymer povidone tended to crystallize when stored at 40°C/75% relative humidity, leading to reduction in dissolution rate.)

(*Id.* (Dec. 21, 2012, Response to Final Rejection) at 9 (emphasis added).)

In the Statement of Reasons for Allowance, the Examiner noted the claims had "been narrowed sufficiently to overcome the § 103 rejection of record, which was advanced on the basis of Martin . . . in view of Buhler." (*Id.* (Mar. 1, 2013, Notice of Allowability) at 5.) The Examiner went on to note Martin's disclosure of povidone in tablet formulations:

> Martin et al. (the primary reference) includes <u>no</u> disclosure concerning *copovidone* but does suggest that *povidone* is an appropriate *binder* for a tablet formulation comprising Compound 1 (para. [0226]). Povidone (*i.e.*, polyvinylpyrrolidone) and

26

*copovidone (i.e.*, copolymer of 1-vinyl-2-pyrrolidone and vinyl acetate in a ratio of 6:4 by mass) were/are *not* considered either equivalent in function or substantially equivalent in function by persons having ordinary skill in the art of pharmaceutical formulations.

(*Id.*)

Thus, in order to overcome the prior art during prosecution, the patentee unequivocally stated that povidone is (1) ***not*** a matrix polymer of the claimed invention, and (2) ***not*** useful in solving the problems allegedly overcome by the invention. *See MBO Laby's., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007) (prosecution arguments that "draw distinctions between the patented invention and the prior art are useful for determining whether the patentee intended to surrender territory, since they indicate in the inventor's own words what the invention is not.") The patentee's statements amount to a clear disclaimer of povidone as a matrix polymer in the claimed invention. *See Azurity*, 2025 WL 1063994, at *5 (patentee's statements in a parent application that "clearly and unmistakably distinguished its invention from [cited prior art] by asserting that the claimed formulations did not contain propylene glycol" were effective to disclaim propylene glycol from the scope of the claims).

### 3.    The patentee did not rescind its disclaimer of povidone during prosecution of the '001, '695, and '810 patents.

During prosecution of each of the applications leading to the '001, '695, and '810 patents, patentee did not rescind the disclaimer of povidone as a matrix polymer in the claimed composition. The patentee argued against the Examiner's obviousness rejection over the same prior art as in the prosecution of the '842 patent, including Martin, Buhler, and Goertz, or filed a terminal disclaimer over the earlier related patents. (Ex. 13 ('001 FH, Feb. 28, 2024, Remarks); Ex. 11 ('695 FH, Dec. 14, 2023, Remarks); *id.* (Apr. 16, 2024, Remarks); Ex. 14 ('810 FH, Sept. 20, 2024, Terminal Disclaimer).) The patentee distinguished its invention in these prosecution histories instead on the basis of the amounts of olaparib and polymer in the composition (Ex.

27

13 ('001 FH, Feb. 28, 2024, Remarks) at 5-11; Ex. 11 ('695 FH, Dec. 14, 2023 Remarks) at 8-10; *id.* (Apr. 16, 2024 Remarks) at 8-12) or filed a terminal disclaimer prior to allowance (Ex. 14 ('810 FH, Sept. 20, 2024 Terminal Disclaimer)).

Absent a sufficiently clear rescission of any disclaimer made during the prosecution of an earlier related application, the estoppel created by those disclaimers will affect the related child applications. *See Hakim*, 479 F.3d at 1318 ("Although a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited."); *Omega Eng'g*, 334 F.3d at 1323 ("In general, the prosecution history regarding a particular limitation in one patent is presumed to inform the later use of that same limitation in related patents, 'unless otherwise compelled.'"); *see also Augustine*, 181 F.3d at 1300 ("[T]he prosecution of a parent application may limit the scope of a later application using the same claim term."); *compare Biogen, Inc. v. Berlex Lab'ys, Inc.*, 318 F.3d 1132, 1139 (Fed. Cir. 2004) (not applying estoppel based on arguments in an earlier related application where the applicant pointed out an erroneous understanding in the earlier related application).

\*       \*       \*

For all the reasons stated above, the asserted claims should be limited to compositions comprising "at least one polymer chosen from copovidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate."

## V.    CONCLUSION

Defendants respectfully request that the Court adopt their proposed constructions.

\*       \*       \*

28

Dated: April 25, 2025

By:  /s/ *James S. Richter*
James S. Richter (jrichter@midlige-richter.com)
**MIDLIGE RICHTER LLC**
645 Martinsville Road
Basking Ridge, New Jersey 07920
(908) 626-0622 (telephone)

*Of Counsel:*
Kevin Warner (kwarner@rmmslegal.com)
Paul J. Molino (pmolino@rmmslegal.com)
William A. Rakoczy (wrakoczy@rmmslegal.com)
Nicholas D. Bortz (nbortz@rmmslegal.com)
**RAKOCZY MOLINO MAZZOCHI SIWIK LLP**
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 527-2157 (telephone)

*Attorneys for Defendant/Counterclaim-Plaintiff Natco Pharma Limited*

Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08540
T: (609) 924-0808
F: (609) 452-1888

Mark H. Remus (mremus@crowell.com)
Laura A. Lydigsen (llydigsen@crowell.com)
Mary E. LaFleur (mlafleur@crowell.com)
**CROWELL & MORING LLP**
455 North Cityfront Plaza Drive
NBC Tower, Suite 3600
Chicago, IL 60611
T: (312) 321-4200
F: (312) 321-4299

Ryan H. Seewald (rseewald@crowell.com)
**CROWELL & MORING LLP**
1601 Wewatta Street, Suite 815
Denver, CO 80202
T: (303) 524-8661

29

*Attorneys for Defendant Sandoz Inc.*

Loly G. Tor (loly.tor@klgates.com)
**K&L GATES LLP**
One Newark Center, 10th Floor
Newark, NJ
T: (973) 848-4026
F: (973) 848-4001

*Of Counsel:*
Anil H. Patel (anil.patel@klgates.com)
**K&L GATES LLP**
609 Main Street, Suite 4150
Houston, TX 77002
T: (713) 815-7300
F: (713) 815-7301

Elizabeth Weiskopf
(elizabeth.wesikopf@klgates.com)
Jenna Bruce (jenna.bruce@klgates.com)
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
T: (206) 623-7580
F: (206) 623-7022

*Attorneys for Defendants/Counterclaim-Plaintiffs
Cipla Limited and Cipla USA, Inc.*

Theodora McCormick
Lauren B. Cooper
Alec Wong
BAKER DONELSON
Office One
4365 Route 1 South
Suite 301
Princeton, New Jersey 08540
T: (609) 490-4860
F: (732) 242-8051
tmccormick@bakerdonelson.com
lcooper@bakerdonelson.com
twong@bakerdonelson.com

*Of Counsel:*
Michael J. Gaertner
James T. Peterka

30

Emily L. Savas
David M. Knapp
Hannah J. Thomas
**BUCHANAN INGERSOLL & ROONEY P.C.**
125 South Wacker Drive
Chicago, Illinois 60606
(312) 261-8777
michael.gaertner@bipc.com
james.peterka@bipc.com
emily.savas@bipc.com
david.knapp@bipc.com
hannah.thomas@bipc.com

*Attorneys for Zydus Pharmaceuticals (USA) Inc.
and Zydus Lifesciences Ltd*.

31