James S. Richter
MIDLIGE RICHTER LLC
645 Martinsville Road
Basking Ridge, New Jersey 07920

*Counsel for Defendant*
*Natco Pharma Limited*

Eric I. Abraham
William P. Murtha
Kristine L. Butler
HILL WALLACK LLP
21 Roszel Road
Princeton, New Jersey 08540

*Counsel for Defendant Sandoz Inc.*

Loly Tor
K&L GATES LLP
One Newark Center, 10th Floor
Newark, New Jersey 07102

*Counsel for Defendants Cipla USA, Inc. and*
*Cipla Limited*

Theodora McCormick
Lauren B. Cooper
Alec Wong
BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ, PC
Office One
4365 Route 1 South, Suite 301
Princeton, New Jersey 08540

*Counsel for Defendants Zydus Lifesciences*
*Ltd. and Zydus Pharmaceuticals (USA) Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA UK LIMITED, ASTRAZENECA AB, KUDOS PHARMACEUTICALS LIMITED, THE UNIVERSITY OF SHEFFIELD, AND MSD INTERNATIONAL BUSINESS GMBH, <br><br> *Plaintiffs,* <br><br> v. <br><br> NATCO PHARMA LIMITED, SANDOZ INC., CIPLA LIMITED, CIPLA USA, INC., ZYDUS PHARMACEUTICALS (USA) INC., AND ZYDUS LIFESCIENCES LIMITED, <br><br> *Defendants.* | Civil Action No. 23-cv-796 (RK)(TJB) (Consolidated) <br><br> *Document filed electronically* |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.............................................................................................. iv

TABLE OF ABBREVIATIONS ..................................................................................... vii

TABLE OF EXHIBITS.................................................................................................... ix

I.      INTRODUCTION ................................................................................................ 1

II.     THE PARTIES' POSITIONS............................................................................... 2

        A.      '562 Patent Order of Method Steps ......................................................... 2

                1.      The claim language does not *require* that the two "identifying" steps must always be performed before the "administering" step. ..................... 3

                        a.      The preamble is not limiting. ............................................ 4

                        b.      The use of "said" antecedent basis does not require the "identifying" steps to be performed first. ....................................... 5

                        c.      Defendants' construction does not render the claim nonsensical because the objective of the claim is still achieved regardless of the order the claimed method steps are performed. ................................................................. 8

                2.      The specification does not *require* that the two "identifying" steps must always be performed before the "administering" step. ..................... 9

                3.      The prosecution history does not *require* that the two "identifying" steps must always be performed before the "administering" step. ........... 12

        B.      "Composition" ................................................................................... 13

                1.      Defendants' construction of "composition" is the only one supported by the claim language. ................................................................. 14

                2.      The specification supports Defendants' construction of "composition." .................................................................................. 18

                        a.      The specification of the formulation patents distinguishes between "composition" and "core composition." ........................ 18

                        b.      Defendants' construction does not exclude all embodiments in the specification. ...................................................... 20

                3.      Plaintiffs ignore the prosecution history because it confirms Defendants' construction of "composition."......................................... 22

C.    "at least one polymer chosen from . . ."...................................................... 23

    1.    Plaintiffs' proposed construction is not supported by the intrinsic evidence. ......................................................................................... 24

    2.    The intrinsic record supports Zydus's proposed construction. ................. 26

    3.    The patentee's positions taken in the prosecution history of the '842 patent limit the scope of later-issued claims in the formulation patent family. ......................................................................................... 28

III.    CONCLUSION............................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003) ................................................................................ 9

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) .............................................................................. 18

*Augustine Med. Inc. v. Gaymar Indus., Inc*,
181 F.3d 1291 (Fed. Cir. 1999) .............................................................................. 28

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013) .............................................................................. 28

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
320 F.3d 1339 (Fed. Cir. 2003) ................................................................................ 5

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ......................................................................... 16, 19

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
8 F.4th 1331 (Fed. Cir. 2021) ............................................................................... 4, 5

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999) ................................................................................ 28

*Griffin v. Bertina*,
285 F.3d 1029 (Fed. Cir. 2002) ................................................................................ 5

*Hakim v. Cannon Avent Grp.*,
479 F.3d 1313 (Fed. Cir. 2007) .............................................................................. 29

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
687 F.3d 1300 (Fed. Cir. 2012) ................................................................................ 6

*Hormone Research Found., Inc. v. Genentech, Inc.*,
904 F.2d 1558 (Fed. Cir. 1990) .............................................................................. 23

*Hytera Commc'ns Co. v. Motorola Sols., Inc.*,
841 F. App'x 210 (Fed. Cir. 2021) ........................................................................... 7

*Jansen v. Rexall Sundown, Inc.*,
342 F.3d 1329 (Fed. Cir. 2003) ................................................................................ 5

*JBS Hair, Inc. v. SLI Prod. Corp.*,
No. 22-1576, 2024 WL 195257 (D.N.J. Jan. 18, 2024) ......................................... 15

*Lizardtech, Inc. v. Earth Res. Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005) .................................................................................. 26

*Lucent Techs., Inc. v. Gateway, Inc.*,
525 F.3d 1200 (Fed. Cir. 2008) .................................................................................. 19

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (2005) .................................................................................................. 27

*Mitsubishi Chem. Corp. v. Barr Lab'ys, Inc.*,
435 F. App'x 927 (Fed. Cir. 2011) ............................................................................. 17

*Myco Indus., Inc. v. BlephEx, LLC*,
955 F.3d 1 (Fed. Cir. 2020) ....................................................................................... 22

*NTP, Inc. v. Research in Motion*,
418 F.3d 1282 (Fed. Cir. 2005) .................................................................................. 16

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005) .................................................................................. 23

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ............................................................................ 19, 28

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
778 F.3d 1021 (Fed. Cir. 2015) .................................................................................. 21

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................................. 9, 14, 16, 17

*Rembrandt Data Techs., LP v. AOL, LLC*,
641 F.3d 1331 (2001) .................................................................................................. 27

*Rolls-Royce, PLC v. United Techs. Corp.*,
603 F.3d 1325 (Fed. Cir. 2010) .................................................................................. 21

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys. Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) .................................................................................. 24

*Takeda Pharm. Co. v. Norwich Pharms., Inc.*,
No. 20-8966, 2022 WL 621041 (D.N.J. Mar. 3, 2022) .............................................. 15

*Techtronic Indus. Co. v. Int'l Trade Comm'n*,
944 F.3d 901 (Fed. Cir. 2019) .................................................................................... 25

*Telit Cinterion Deutschland GmbH v. 3G Licensing, S.A.*,
No. 2023-1497, 2025 WL 401647 (Fed. Cir. Feb. 3, 2025) ..................................... 3, 6

v

*Uship Intell. Props., LLC v. United States*,
  714 F.3d 1311 (Fed. Cir. 2013) ........................................................................ 29

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ........................................................................ 22

*White v. Dunbar,*
  119 U.S. 47 (1886) ............................................................................................ 18

**TABLE OF ABBREVIATIONS**

| Abbreviation | Term/Description |
|---|---|
| '842 patent | U.S. Patent No. 8,475,842 |
| '562 patent | U.S. Patent No. 8,859,562 |
| '396 patent | U.S. Patent No. 11,633,396 |
| '001 patent | U.S. Patent No. 11,975,001 |
| '695 patent | U.S. Patent No. 12,048,695 |
| '810 patent | U.S. Patent No. 12,144,810 |
| '842 FH | File history of U.S. Patent Appl. No. 12/574,801, which issued as the '842 patent |
| '562 FH | File history of U.S. Patent Appl. No. 10/555,507, which issued as the '562 patent |
| '001 FH | File history of U.S. Patent Appl. No. 18/312,333, which issued as the '001 patent |
| '695 FH | File history of U.S. Patent Appl. No. 18/312,375, which issued as the '695 patent |
| '810 FH | File history of U.S. Patent Appl. No. 18/785,092, which issued as the '810 patent |
| Natco | Natco Pharma Limited |
| Sandoz | Sandoz Inc. |
| Cipla | Cipla Limited and Cipla USA, Inc. |
| Zydus | Zydus Pharmaceuticals (USA), Inc. and Zydus Lifesciences Limited |
| Defendants | Natco Pharma Limited, Sandoz Inc., Cipla Limited, Cipla USA, Inc., Zydus Pharmaceuticals (USA) Inc., and Zydus Lifesciences Limited |
| Plaintiffs | AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, AstraZeneca AB, KuDOS Pharmaceuticals Limited, The University of Sheffield, and MSD International Business GmbH |
| Olaparib | The active pharmaceutical ingredient in the formulations described in the patents-in-suit, having the chemical name 4-[3-(4-cyclopropanecarbonyl-piperazine-1-carbonyl)-4-fluorobenzyl]-2H-phthalazin-1-one |
| Patents-in-Suit | '842, '562, '396, '001, '695, and '810 patents |

vii

| Abbreviation | Term/Description |
|---|---|
| Core Composition | Uncoated tablet core (Dkt. 192 at 3) |
| HR | Homologous recombination |
| Formulation Patents | '842, '396, '001, '695, and '810 patents |
| Defs.Br. | Defendants' Opening Claim Construction Brief (Dkt. 198) |
| Pls.Br. | Plaintiffs' Opening Claim Construction Brief (filed under seal as Dkt. 199) |

**TABLE OF EXHIBITS**

| Exhibit No. [1] | Description |
|---|---|
| 1 | '842 patent file history (excerpted) |
| 2 | '396 patent |
| 3 | '695 patent |
| 4 | '001 patent |
| 5 | '810 patent |
| 6 | '562 patent |
| 7 | Lucio Tentori et al., *Potential Clinical Applications of Poly(ADP-Ribose) Polymerase (PARP) Inhibitors*, 45 PHARM. RES. 73 (2002) ("Tentori 2002") |
| 8 | Plaintiffs' March 21, 2025 Claim Construction Disclosure (excerpted) |
| 9 | '562 patent file history (excerpted) |
| 10 | '842 patent |
| 11 | '695 patent file history (excerpted) |
| 12 | Handbook of Pharmaceutical Excipients (Raymond C. Rowe et al. eds., 5th ed. 2006) ("HPE 2006") (excerpted) |
| 13 | '001 patent file history (excerpted) |
| 14 | '810 patent file history (excerpted) |
| 15 | S.L. Neuhausen & E.A. Ostrander, *Mutation Testing of Early-Onset Breast Cancer Genes BRCA1 and BRCA2*, 1 Genetic Testing 75 (1997) ("Neuhausen 1997") |
| 16 | Defendants' Invalidity Contentions Regarding the '562 Patent (Oct. 18, 2024) (excerpted) ("'562 INV Contentions") |

---

[1] Exhibit Nos. 1-14 were filed with the Declaration of Nicholas D. Bortz in support of Defendants' Opening Claim Construction Brief. (*See* Dkt. 198-1 – 198-15.)

I.      INTRODUCTION

Plaintiffs' proposed constructions are untethered to how Plaintiffs themselves defined those terms in the claims, the specification, and the prosecution histories.

With respect to the method claimed in the '562 patent, Plaintiffs seek to rewrite the claim by requiring a particular order of steps where none is required by the claim.  The patentee chose an open-ended claim format that does not require a particular order of steps and drafted a specification that provides no example of the claimed method being practiced at all, let alone in the order Plaintiffs suggest.  Plaintiffs now seek to limit the claim by reading in a particular order of the claimed steps.  Nothing in the claim language, specification, or the prosecution history supports reading such a limitation into the claim.

With respect to "composition" in the formulation patents, Plaintiffs conflate "composition" with "core composition," despite the fact that they took the exact opposite position in all of the intrinsic evidence.  The patentee distinguished between "composition" and "core composition" in the asserted claims and then emphasized that distinction in their arguments to the Patent Office to obtain those claims.  That distinction is consistent with the specification which also differentiates between the entire composition and a "core composition" that is merely a component of that composition.  No amount of extrinsic evidence can overcome this intrinsic evidence that compels a finding that "composition" means the entire composition, including any core and coating.

Just as they did with "composition," Plaintiffs' proposed construction for the "polymer" term ignores the instructive intrinsic evidence.  Plaintiffs' proposed construction disregards the patentee's clear and unambiguous disavowal of "povidone," and the patentee's own admission that povidone is not part of the invention and is too hygroscopic to impart stability to a solid dispersion of olaparib.  Plaintiffs now offer the untenable position that one should simultaneously accept the patentee's denigration and distinguishing of povidone with its subsequent enforcement of claims

1

reciting povidone.  The intrinsic evidence, from the filing of the application for the '842 patent to the still-issuing patent claims in the formulation patent family, leads to only one equitable result that is fully supported by the prosecution histories and shared specification of the formulation patents: the scope of the claims should not include povidone.

For the reasons discussed below, the Court should adopt Defendants' constructions of the disputed terms.

## II.    THE PARTIES' POSITIONS

### A.    '562 Patent Order of Method Steps

| Disputed Claim Term | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| "the method comprising" '562 patent, claim 1 | Plain and ordinary meaning, which is: "the claimed method is not limited to administering a PARP-1 inhibitor in a monotherapy." *The claim as a whole requires the two "identifying" steps (i.e., "identifying a human patient with a familial predisposition to gene-linked hereditary cancer" and "identifying a compound which inhibits PARP-1") to be performed prior to the "administering" step (i.e., administering to said human patient a therapeutically effective amount of said compound").* | Plain and ordinary meaning, which is: "the claimed method is not limited to administering a PARP-1 inhibitor in a monotherapy, *and the claimed method steps may be performed in any order*." |

Plaintiffs concede that the '562 patent's sole claim allows the steps of "identifying a human patient" and "identifying a compound which inhibits PARP-1" to be performed in any order.  Either the drug or the claimed patient can be identified "first."  That position is consistent with the lack of any ordering language or signaling in the claim language—*e.g.*, no (a), (b), (c) or (i), (ii), (iii).

2

Yet Plaintiffs oddly then take the position that while two of three listed steps are not bound in order, the other listed step—"administering" the drug to the patient—must come last.  Plaintiffs identify "three reasons" the Court should accept that internally inconsistent construction, based on the claim language, the patent's specification, and its file history.  (Pls.Br. at 19.)  None of these reasons *requires* that the two "identifying" steps must always be performed before the "administering" step.  Plaintiffs' contrary construction should be rejected.  If Plaintiffs were concerned that practicing the claimed method steps in an order other than as recited would be "inconsistent with" or "divorce[d]" from the "new and better method" that Dr. Helleday allegedly invented (*id.* at 28), they should not have drafted a claim broad enough to encompass such alleged inconsistencies.  Plaintiffs had every opportunity during prosecution of the '562 patent's sole claim to make it clear that its steps had to be performed in the order listed.  It is too late for them to write that order into the claim now.

> **1.    The claim language does not *require* that the two "identifying" steps must always be performed before the "administering" step.**

Plaintiffs admit that method claims using "comprising" language—like the claim of the '562 patent—are generally "open-ended, and any steps they recite can be performed in any order." (*Id.* at 20); *see also Telit Cinterion Deutschland GmbH v. 3G Licensing, S.A.,* No. 2023-1497, 2025 WL 401647, at *3 (Fed. Cir. Feb. 3, 2025) ("[T]here is a presumption that steps of a method claim are *not* required to occur in the order they are listed.") (emphasis added).  Not happy with that law, Plaintiffs pivot and argue that, notwithstanding this presumption, "logic and grammar . . . require the identification steps to be performed first for three reasons." (Pls.Br. at 21.)  None of those reasons compels adopting Plaintiffs' construction.

3

### a.    The preamble is not limiting.

Plaintiffs' argument that the claim preamble requires the "identifying" steps to come first is fundamentally flawed because the preamble—"[a] method of treatment of cancer cells defective in homologous recombination (HR)"—is not limiting at all and thus does not require that the physician performing the method "intend" at the outset to treat these specific cancer cells. (*Id.*; Ex. 6 ('562 patent) at claim 1.) Plaintiffs rely primarily on *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331 (Fed. Cir. 2021) to argue otherwise. In *Eli Lilly*, the preambles at issue were "the essence of the claimed invention" and thus limiting because they provided "antecedent basis" for terms in the body of the claims, and the claims' references to treatment of vasomotor symptoms were found "only in the preambles." *Id.* at 1342-43. None of that is true in the context of the preamble of claim 1 of the '562 patent. It provides no antecedent basis for any claim terms. That is, no term in the claim's body refers back to any word in the preamble. To the contrary, the body of the claim *expressly* references "cancer cells defective in homologous recombination" without referring back to the preamble. (Ex. 6 ('562 patent) at claim 1.) Thus, claim 1 is still directed to a method of treating "cancer cells defective in homologous recombination" in certain patients using certain compounds even if the preamble were deleted. The preamble changes nothing about the claim's scope. It no more embodies the "essence" or "*raison d'être*" of the claimed invention than does the body of the claim itself.[2] (*See* Pls.Br. at 22.)

Plaintiffs' other cited cases are similarly distinguishable. In *Jansen*, the court relied on claim language about the patient "in need" of treatment, which gave "life and meaning to the

---

[2] Defendants note that, to the extent the preamble is held to be non-limiting, Plaintiffs apparently concede that claim 1 "lacks any fathomable utility." (Pls.Br. at 22 ("This is especially true where, as here, the preamble identifies the '*raison d'être* of the claimed method itself,' without which the method lacks any 'fathomable utility.'"); *see also* Ex. 16 ('562 INV Contentions) at 367-70 ("The Asserted Claim Lacks Utility.").)

preambles' statement of purpose," to find the preamble limiting. *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003). No such "in need" of treatment language exists in the claim of the '562 patent. *Boehringer* involved a method of "growing and isolating" viruses, which provided "the *raison d'être* of the claimed method itself" because only by "[g]auging the effect" of the preamble was it apparent that the claim was directed to a process for "growing or isolating" viruses. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003). Similarly, in *Griffin*, the term "diagnosing" in the preamble of a method of diagnosing thrombosis was held to be the claim's "essence" because "the absence of the preamble's stated objective to diagnose thrombosis" meant the rest of the claim language was "empty language" and had "no purpose." *Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002). That is not true here, where the body of the claim itself limits the claimed method to treatment of "cancer cells defective in homologous recombination."

Plaintiffs also ignore that none of the cases they cite in Section IV.A.1 (Pls.Br. at 21-24) support the proposition that a preamble also limits the order of the claimed method steps. None of Plaintiffs' cited cases involved any dispute over the order of steps in a method claim. For example, *Eli Lilly* understandably had nothing to do with the order of steps claimed because the disputed claims in that case "comprise[d] ***a single step*** of administering an effective amount of a compound." *Eli Lilly*, 8 F.4th 1344 (emphasis added).

In sum, nothing about the preamble of claim 1 *requires* that the two "identifying" steps *must always* be performed before the "administering" step.

### b.   The use of "said" antecedent basis does not require the "identifying" steps to be performed first.

Plaintiffs next assert that the grammar of claim 1—*i.e.*, the use of antecedent basis— "*requires* that the patient and compound both be identified before the 'administering' step."

(Pls.Br. at 24 (emphasis added).)  This antecedent basis theory also lacks support.  Method claims with multiple steps frequently refer to other steps for antecedent basis, but that does not impose a particular order for the claimed steps.  Instead, there must be language in the claims that expressly requires a particular order, which simply does not exist in claim 1.

For example, like the cases cited in support of Plaintiffs' preamble theory, *Highmark* had nothing to do with the order of steps in a method claim.  *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1311-12 (Fed. Cir. 2012).  Instead, the court in *Highmark* held that the preamble of a method claim was limiting because a claim element "derive[d] its antecedent basis . . . from the preamble."  *Id.* at 1311.  Apart from having nothing to do with the order of steps in the claim, *Highmark* is also distinguishable in that none of the elements of claim 1 of the '562 patent derive their antecedent basis from the preamble.[3]  Furthermore, even if *Highmark* had involved a dispute over the ordering of steps (it did not), the claim at issue there contained additional markers of intent to impart a particular order of steps, including ordinals (*e.g.*, "(a) . . . (b) . . .") and conditional language (*e.g.*, "preventing said system from approving payment for said proposed medical treatment if said proposed medical treatment requires utilization review until such utilization review has been conducted").  *See id.* at 1306-07.  No such markers of intent exist in claim 1 of the '562 patent.  (*See* Ex. 6 ('562 patent) at claim 1; Defs.Br. at 7-8.)

Plaintiffs' remaining cases are also distinguishable.  While *Telit* involved a dispute over the order of steps in a method claim, the claims at issue there contained traditional markers of intent to impart a particular order of steps in addition to an antecedent basis, including extensive use of temporal language.  *Telit*, 2025 WL 401647, at \*2-3 ("a first message," "a second message," "a message preceding another message").  Claim 1 of the '562 patent conspicuously contains no such

---

[3] *Eli Lilly* is inapposite for the same reasons.

temporal language or intent to impart a particular order. (*See* Ex. 6 ('562 patent) at claim 1.) In *Hytera*, the parties *agreed* that the "transmitting" step must be performed last, whereas the parties here *dispute* whether the "administering" step must be performed last. *Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021). Furthermore, the claim language at issue in *Hytera* contained traditional markers of intent to impart a particular order of steps in addition to an antecedent basis, including temporal language (*e.g.*, "a first set" and "a second set"), conditional language (*e.g.*, "if the timeslot is the current desired timeslot, selecting a synchronization pattern"), and past participles (*e.g.*, "the synchronization pattern that was selected"). *Id.* at 213-14, 218. Here, claim 1 contains no such language or intent. (*See* Ex. 6 ('562 patent) at claim 1.)

Further still, *Telit* and *Hytera* are nonprecedential Federal Circuit opinions, which cannot supplant binding precedential Federal Circuit authority, such as *Altiris*, *Baldwin Graphic*, and *Moba*, cited by Defendants. (*See* Defs.Br. at 7-10); *see also, e.g.*, *Hytera*, 841 F. App'x at 216 ("Our nonprecedential opinions are also not binding."). As Defendants explained in their opening brief, many courts—including the Federal Circuit—have found that no order of steps is required even in the face of antecedent basis. (Defs.Br. at 9-10.) Yet, Plaintiffs do not even attempt to address the fact that the language of claim 1 contains none of the typical markers indicating the patentee's intent to require a specific order of the claimed steps, other than antecedent basis. (*Id.* at 7-10.) And, as also explained in Defendants' opening brief, the question is not whether the claimed steps *can* be performed in a particular order, but whether they *must* be performed in that order. (*See id.* at 11.) Nothing in the language or grammar of claim 1 suggests such a requirement. For all these reasons, Plaintiffs' construction should be rejected.

7

<blockquote>

**c.      Defendants' construction does not render the claim nonsensical because the objective of the claim is still achieved regardless of the order the claimed method steps are performed.**

</blockquote>

Regardless of whether the preamble is limiting, Plaintiffs are incorrect that "a physician practicing the method must *intend* to treat HR-defective cancer cells, [and so] must *first* understand that the patient has HR-defective cancer cells to treat." (Pls.Br. at 24 (emphases added).)  If this order were so important, you would expect that the patentee would have used language in the claim specifying that identification of HR-defective cells be done "first."  But the claim says nothing of the sort.

Neither the evidence nor logic preclude "identifying" the patient as having the claimed HR-deficient cancer *after* the "administering" step, and that would still be a treatment of HR defective cancer cells using compounds that are PARP-1 inhibitors.  This is fully consistent with the specification and does not mean that the claim would permit a doctor to "administer a random medicine to a random patient." (*Id.* at 25.)

The invention is directed to the use of PARP-1 inhibitors "in the treatment of certain forms of cancer in particular breast cancer." (Ex. 6 ('562 patent) at 1:6-9.)  A breast cancer patient could thus be "administered" an effective amount of a PARP-1 inhibitor (alone or in combination with other therapies), as the patent acknowledges had been done in the prior art.  (*Id*. at 1:62-64 ("Inhibitors of PARP-1 activity have been used in combination with traditional anti-cancer agents such as radio therapy and chemotherapy.")  *After* administration has begun, the patient may then be "identified" through genetic testing as having a particular form of hereditary HR-deficient breast cancer, such as BRCA1- or BRCA2-deficient breast cancer. (*Id*. at 3:6-44 ("[T]he PARP inhibitor is useful in the treatment of cancer cells defective in the expression of a gene involved in HR . . . [including] BRCA1, BRCA2 . . . .  BRCA1 and BRCA2 mutations can be identified using multiplex PCR techniques, array techniques . . . or using other screens known to the skilled

8

person.").)   In such a scenario, as in *Altiris*, the claimed method's "stated purpose could be achieved without performing the [identifying] step prior to the [administering] step." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003).

Plaintiffs' repeated cries that any other order of the claims is "illogical" are belied by black letter law that the claims have the "meaning that the term would have to a person of ordinary skill in the art in question *at the time of the invention*." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  The '562 patent does not purport to disclose new methods for detecting genetic defects, but instead relies solely on techniques "known to the skilled person" at the time of the patent in July 2003, including tests disclosed in articles such as Neuhausen 1997.  (Ex. 6 ('562 patent) at 3:41-45, 12:21-23.)  While it would have been obvious to a skilled person to utilize these known tests as of July 2003, due to the potential time-consuming nature of those tests, a skilled person would not have been *required* to wait for the results of those tests before initiating treatment.  (*See* Ex. 15 (Neuhausen 1997) at 76.)  Thus, the only illogical construction is Plaintiffs' *requirement* that the "administering" step *must always* be performed last because doctors would not be *required* to delay treatment of a life-threatening cancer while they wait for potentially time-consuming tests to be completed.  In those cases, they would start treatment—potentially with multiple drugs—and *then* test.

### 2.    The specification does not *require* that the two "identifying" steps must always be performed before the "administering" step.

There is also nothing in the specification that directly or implicitly *requires* the two "identifying" steps *must always* be performed before the "administering" step.  Plaintiffs' assertion that "there is no example anywhere in the patent of the method being practiced in the way Defendants suggest" is misleading for several reasons.  (Pls.Br. at 26.)

9

*First*, there is no example anywhere in the patent of the claimed method being practiced *at all*. The only actual examples are tests and analyses of cell lines. (*See, e.g.*, Ex. 6 ('562 patent) at 7:61-10:44.) The suggestion that the inventor had actually practiced the claimed invention and described it as an example in the patent is incorrect.

*Second*, to the extent the patent describes what the inventor thought would someday in the future be a useful treatment using PARP-1 inhibitors, the specification is completely silent as to *any* requirement for *any* order of *any* steps of the claimed method. For example, Plaintiffs point to the Abstract as proof of a required order of steps, but nowhere does the Abstract reference "identifying" a patient as having HR defective cancer cells, let alone making that identification *before* administering a PARP-1 inhibitor to the patient. (*See* Pls.Br. at 26; Ex. 6 ('562 patent) at Abstract.) Plaintiffs also assert that "the specification likewise explains that the purpose of the invention is to administer PARP-1 inhibitors to patients *who have been identified* as having gene-linked hereditary cancer and HR-defective tumors," citing to various portions of the specification that do not talk about "identifying" patients. (Pls.Br. at 27 (citing 1:6-9, 3:3-5, 3:18-20, and 3:37-40).) Plaintiffs are importing language regarding an identification step—and specific order of that step—into the specification where none exists.

*Third*, Plaintiffs ignore the only portions of the specification that do expressly reference "identifying" certain patients and compounds. (*See* Ex. 6 ('562 patent) at 3:41-45, 3:51-59.) While these portions describe some ways to identify PARP-1 inhibitors and HR-deficient genes, they do not reference "identifying" the claimed cancer or compound in the context of any order, let alone in any context that would *require* identification of a patient with the claimed cancer before administration of a claimed compound. (*See id.*)

10

*Fourth*, Plaintiffs assert that the specification does not contemplate "administering" a PARP-1 inhibitor to a patient before "identifying" that patient as having HR defective cancer cells. (*See* Pls.Br. at 28.)  Not true.  As discussed above, that scenario is entirely consistent with the specification.  (*See supra* at 8-9; Defs.Br. at 12.)  As the '562 patent explains, cancer patients were already being successfully treated with PARP-1 inhibitors in combination with chemotherapy and radiotherapy.  (Ex. 6 ('562 patent) at 1:62-67.)  These patients—for instance, breast cancer patients who are already being "administered" a PARP-1 inhibitor—could subsequently be "identified" as having the claimed HR defective cancers cells to further inform the proper treatment plan for these patients.  There is nothing nonsensical or illogical about that scenario, and there is nothing in the claim language, specification, or prosecution history that precludes such a scenario.

*Fifth*, Plaintiffs state that permitting the steps of the claimed method to be performed in any order "is inconsistent" with the "new and better method of treating a certain type of patient with a certain type of cancer with PARP-1 inhibitors."  (Pls.Br. at 28.)  Putting aside the fact that Dr. Helleday did not invent a "new and better method" of anything, the scope of claim 1 of the '562 patent is indisputably broader than the alleged "newly-discovered method" that "allows for more targeted treatment of a specific type of patient with a specific type of drug, compared to traditional chemotherapy."  (*Id.* at 27.)  As Plaintiffs admit, the claimed method encompasses the prior art technique of administering a PARP-1 inhibitor in combination with other therapies.  (*See, e.g.*, *id.* at 18 ("[T]he claimed method is not limited to administering a PARP-1 inhibitor in a monotherapy."); Defs.Br. at 12 (citing Dkt. 192-1 at 6 (same)).)  And as explained above, starting such a combination therapy and subsequently "identifying" that patient as having the claimed HR defective cancer cells is well within the scope of the specification and the scope of the claimed invention.  (*See supra* at 8-9.)

In sum, as Plaintiffs concede, the specification "*contemplate[s]* treating patients who have already been identified as possessing HR-defective cancer."  (Pls.Br. at 28 (emphasis added).)  However, *contemplating* a particular order of steps is a far cry from *requiring* such an order.  At most, the specification implies that the claimed method *can* be performed in the order Plaintiffs suggest, not that it *must* be performed in that order.  (*See, e.g.*, Defs.Br. at 11 (citing *Globespanvirata*, *Avidyne*, and *MacroSolve*).)  As such, Plaintiffs' proposed construction should be rejected.

### 3. The prosecution history does not *require* that the two "identifying" steps must always be performed before the "administering" step.

Plaintiffs argue that statements made during the prosecution of the application that led to the '562 patent "made clear that both identifying steps must occur prior to the administering step." (Pls.Br. at 28.)  However, as Defendants explained in their opening brief, the statements made during the prosecution of the application that led to the '562 patent do not amount to an express relinquishment or unequivocal disavowal necessary to limit claim 1 to the ordering of steps proposed by Plaintiffs.  (Defs.Br. at 12-14.)  Nothing in the file history excuses Plaintiffs' failure to expressly require an ordering of steps in the claim if that is what the inventor viewed as his invention.

For example, Plaintiffs point to the Examiner's statement that treating the claimed cancers "*first* requires identifying a mammal having a cancer that meets the claimed limitations."  (Pls.Br. at 29.)  However, Plaintiffs conveniently ignore the patentee's statements that "identifying patients who are predisposed to such cancers, before administering a compound" was merely a "*possibility*," not a *requirement*.  (*See, e.g.*, Ex. 9 ('562 FH), Feb. 22, 2011, Appellants' Brief at 13 (emphasis added); Defs.Br. at 13.)  Plaintiffs also ignore the Patent Trial & Appeal Board's obvious omission of the patentee's references to the possibility of the identification step occurring "before"

the administration step.  (*Compare, e.g.*, Ex. 9 ('562 FH), Aug. 3, 2011, Appellants' Reply Brief at 14 ("The [prior art is] silent about hereditary cancers or the possibility of identifying patients who are predisposed to such cancers, *before administering a compound*.") (emphasis added) *with* Ex. 9 ('562 FH), Mar. 27, 2014, PTAB Decision on Appeal at 11 ("Appellant argues that the claims of the '701 patent 'are silent about hereditary cancers or the possibility of identifying patients who are predisposed to such cancers' (Reply Br. 14).").)  Furthermore, while Plaintiffs argue that the various statements in the file history about "identifying" the claimed compound before "administering" the claimed compound somehow creates a required order of steps, nowhere did the patentee, Examiner, or Board state that those steps *must* be performed in that order.

As stated in Defendants' opening brief, these statements do not suggest "the clear and unmistakable disavowal or relinquishment of claim scope required to limit the method steps of claim 1 to . . . *require* that the two 'identifying' steps *always* be performed before the 'administering' step." (Defs.Br. at 13.)  Thus, Plaintiffs' proposed construction should be rejected, and Defendants' proposed construction should be adopted.

###   B.        "Composition"

| Disputed Claim Term | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| "composition"<br>'842 patent, claims 1-10<br>'396 patent, claims 1-12, 14-30<br>'001 patent, claim 1-2, 5-13<br>'695 patent, claims 1-10<br>'810 patent, claims 1-30 | Plain and ordinary meaning, which is:<br><br>"composition" | Plain and ordinary meaning, which is:<br><br>"the entire pharmaceutical composition including any core and coating" |

13

Plaintiffs' brief confirms what Defendants previewed in their opening brief—Plaintiffs' non-construction is an attempt to rewrite "composition" to sometimes mean "core composition" so they can argue infringement of as many claims as possible across their still growing thicket of formulation patents.   (Pls.Br. at 7.)   But that construction is inconsistent with the claims themselves, the specification, and the file histories, which all use "composition" consistent with Defendants' construction to distinguish the entire pharmaceutical composition from the "core composition."   Nonetheless, Plaintiffs repeatedly say that the claims and specification "could not be clearer" in supporting them (Pls.Br. at 6, 8) and that Defendants' position is "entirely unsupported."   Saying the evidence is "clearly" in your favor does not make it so.   Plaintiffs' brief reveals that their so-called "clear" evidence consists of extrinsic court decisions involving different patents, mischaracterizing Defendants' construction as reading out a preferred embodiment, and ignoring the file histories.   Defendants' construction, on the other hand, is supported by voluminous intrinsic evidence, including that the antecedent basis in the claims for "composition" is the entire "immediate-release pharmaceutical composition," the patent claims and specification distinguish between the "composition" and component "core composition," and that the patentee likewise distinguished between the two terms during prosecution.

> **1.**     **Defendants' construction of "composition" is the only one supported by the claim language.**

Defendants' construction of "composition" is correct because it comports with the "'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"   *Phillips*, 415 F.3d at 1312.   Plaintiffs' decision to selectively use either "composition" or "core composition" in otherwise identical claim limitations across Plaintiffs' thicket of formulation patents indicates that those terms have different meanings.

This is aptly illustrated by a comparison of the relevant portions of claim 8 of the '695 patent and claim 7 of the '842 patent:

| **Claims 1 and 8 of the '695 patent** | **Claim 7 of the '842 patent** |
|---|---|
| 1.  An immediate-release pharmaceutical *composition* in the form of a tablet comprising:<br>(a) a *core composition* comprising:<br>a solid dispersion . . .<br>(b) optionally a tablet coating . . . .<br><br>8.  The composition of claim 1, wherein the total concentration of [olaparib] in the *core composition* is 25% by weight. | 7.  An immediate-release pharmaceutical *composition* in the form of a solid dispersion . . .<br>wherein the total concentration of [olaparib] in the *composition* is 25% by weight . . . . |

As shown, some claims (*e.g.*, '695 patent, claim 8) require that olaparib compose 25% by weight of the "core composition" while others (*e.g.*, '842 patent, claim 7) require that olaparib compose 25% by weight of the entire "composition."  Only an uncoated tablet like the one disclosed in Table 13 of the '842 patent could potentially meet the 25% limitation of both claims because the uncoated tablet would be both the core composition and the entire composition.  Yet, Plaintiffs now ask the court to adopt a non-construction[4] that allows them the flexibility to argue that, for coated tablets, the term "composition" is really "core composition"—in violation of the bedrock principle of patent law that the claims define the invention.  Plaintiffs' results-driven desire to assert both sets of claims against the same coated tablets is not a reason to break from the well-

---

[4] There is no shortage of decisions in this district rejecting the type of non-construction proposed by Plaintiffs. *JBS Hair, Inc. v. SLI Prod. Corp.*, No. 22-1576, 2024 WL 195257, at *2 (D.N.J. Jan. 18, 2024) ("Plaintiff's proposed construction is simply 'plain meaning.' This violates Local Patent Rule 4.3 . . . The phrase 'plain meaning' is not a proposed construction. Plaintiff has failed to give the Court specific proposed constructions of the terms at issue."); *Takeda Pharm. Co. v. Norwich Pharms., Inc.*, No. 20-8966, 2022 WL 621041, at *8 (D.N.J. Mar. 3, 2022) (criticizing party for "propos[ing] no particular construction for Term 4, despite the requirement of L. Pat. R. 4.2(a) that parties propose constructions 'for which "plain and ordinary" meaning is asserted.'"); (*see also* Defs.Br. at 20 (collecting other cases)).

established tenet of claim construction that the claims mean what they say. *See Phillips*, 415 F.3d at 1312. Thus, in those patent claims that refer to a percent weight of the "composition," the term refers to the entire composition including any coating—not just the core composition.

Defendants agree that the heart of this dispute is how to calculate the weight percent required by the claims. (Pls.Br. at 7-8.) The two exemplary claims above illustrate how the "composition" and "core composition" terms are each tied to the weight percentages. Claim 8 of the '695 patent requires that "the *core composition* is 25% by weight" while claim 7 of the '842 patent requires that "the *composition* is 25% by weight." The issues are one and the same. Plaintiffs make this clear when they summarize their position: "Plaintiffs propose that the total weight (the denominator) is the weight of the core composition, without adding the weight of any tablet coating." (*Id.* at 7.) Plaintiffs' denominator proposal cannot hold true for claim 7 of the '842 patent (reproduced above) unless "composition" is rewritten in that claim as "core composition"—in flat violation of Federal Circuit precedent holding that claims cannot be rewritten in litigation. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1375 (Fed. Cir. 2004) ("[W]e have repeatedly declined to rewrite unambiguous patent claim language.").

Defendants' construction is also the only one that comports with the fact that the term "composition" in every asserted claim refers back to the "immediate-release pharmaceutical composition" that is introduced in the claims' preamble.[5] As noted in Defendants' opening brief, an "immediate-release composition" is the finished dosage form that is administered to a patient, not a component thereof. (Defs.Br. at 15 (citing Ex. 10 ('842 patent) at 3:37-38).) The preamble

---

[5] It is a common principle of claim drafting that references to "a" component provide antecedent basis for later references to "the" component later in the claim. *See, e.g.*, *NTP, Inc. v. Research in Motion*, 418 F.3d 1282, 1306 (Fed. Cir. 2005) (noting phrase reciting "*the* at least one of the plurality of destination processors" in the body of a claim referred back to "*a* plurality of destination processors" in the preamble (second emphasis added)).

16

does not recite an immediate-release "core composition" or "component." Yet, Plaintiffs simply ignore the "immediate-release pharmaceutical composition" claim language in their campaign to selectively rewrite "composition" as "core composition."

The weakness of Plaintiffs' position on "composition" is underscored by the fact that they begin their briefing on this term not with the claim language, but extrinsic evidence. Specifically, Plaintiffs ask the Court to adopt a purported ordinary meaning for "composition" in the formulation patents based on what other courts did when construing similar terms in unrelated patents. (Pls.Br. at 5-6.) These court decisions are "external to the patent and prosecution history" and therefore extrinsic evidence, which is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317. Yet, that is where Plaintiffs begin their argument. Moreover, the sole Federal Circuit decision Plaintiffs cite actually supports Defendants' construction, holding that "the term 'pharmaceutical' is relevant to the *entire* composition . . . not just to the argatroban component." *Mitsubishi Chem. Corp. v. Barr Lab'ys, Inc.*, 435 F. App'x 927, 934 (Fed. Cir. 2011) (emphasis added). Similarly, the term "composition" in the formulation patents refers back to "immediate-release pharmaceutical composition" in the preamble and thus means the entire composition, including a coating if present.

Plaintiffs also argue Defendants' construction somehow imports a coating requirement into claim 1 of the '695 patent even though the claim recites "optionally a tablet coating." (Pls.Br. at 6.) Not so. Defendants' construction does not *require* that a composition have a coating to infringe, only that when a competitor is assessing whether a product infringes the claimed weight percentages of the "composition," the competitor should measure those percentages as a function of the entire "composition" just as the claim instructs. If the tablet has no coating, the denominator

17

is the core because that is the entire tablet.  If the tablet has a coating, the denominator includes both the core and coating, i.e., the entire "composition."

Plaintiffs also make a specious accusation that Defendants' construction "attempt[s] to rewrite the patent's disclosure to try and avoid infringement." (Pls.Br. at 11.)  It is Plaintiffs—not Defendants—that attempt to rewrite select claims to swap "composition" for "core composition" so they can argue infringement of every possible claim.  (*See, e.g., supra* at 14-15 ('842 patent, claim 7); Pls.Br. at 7.)  As the Federal Circuit has aptly stated, "A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (citing, *inter alia*, *White v. Dunbar,* 119 U.S. 47, 51 (1886)).  Plaintiffs' results-driven non-construction should be rejected.

**2.    The specification supports Defendants' construction of "composition."**

**a.    The specification of the formulation patents distinguishes between "composition" and "core composition."**

As explained in Defendants' opening brief, the specification of the formulation patents, including Table 17,[6] distinguishes between "composition" and "core composition" and thus confirms Defendants' construction of the "composition" as the entire formulation. (Defs.Br. at 17-18 (citing '842 patent, Table 17).)  Plaintiffs selectively highlight the same table to argue it supports the opposite conclusion that "composition" is actually limited to just the core. (Pls.Br. at 9.)  But, as the red arrows added to Plaintiffs' version of Table 17 show, the table itself distinguishes between "*core* weight" (yellow) and the overall "composition" (purple):

---

[6] Table 17 was renumbered as Table 16 in some of the formulation patents.  For convenience and consistency, Defendants rely on the table numbering used in the '842 patent.

18

TABLE 17

Composition of Compound 1/copovidone solid dispersion tablet

| Components | 25 mg tablet | 100 mg tablet | | |
|---|---|---|---|---|
| Tablet core | Quantity (mg per tablet) | | Quantity (% core weight) | Function |
| Compound 1 | 25.00 | 100.00 | 25.00 | Active pharmaceutical ingredient |
| Copovidone | 57.50 | 230.00 | 57.50 | Polymeric carrier |
| Colloidal silicon dioxide | 1.83 | 7.33 | 1.83 | Glidant |
| Mannitol | 14.67 | 58.67 | 14.67 | Soluble filler |
| Sodium stearyl fumarate | 1.00 | 4.00 | 1.00 | Lubricant |
| Core tablet weight | 100.00 | 400.00 | | |
| Tablet Coating | Quantity (mg per tablet) | | Quantity (% coating weight) | Function |
| Hypromellose (HPMC 2910) | 2.19 | 8.75 | 62.5 | Film former |
| Titanium dioxide (E171) | 0.88 | 3.51 | 25.05 | Opacifier |
| Macrogol/ PEG 400 | 0.22 | 0.88 | 6.25 | Plasticiser |
| Iron oxide yellow (E172) | 0.16 | 0.64 | 4.55 | Colouring agent |

(Pls.Br. at 9 (purple, yellow, pink highlighting and arrows added).)

Plaintiffs are bound by the language they chose to claim as their alleged invention, regardless of its consequences. The patentee chose to draft claim 10 of the '842 patent to claim an "immediate release pharmaceutical composition" with specific weight percents based on the entire "composition," not just a component of that composition such as the "core composition." The claims cannot be rewritten now.[7] *See, e.g., Chef Am.*, 358 F.3d at 1373-74 (declining to rewrite a claim's clear recitation of heating "to" as heating "at" even though dough heated "to" the claimed 400-850°F range would nonsensically be "burned to a crisp"); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008) (declining to rewrite claim language even

---

[7] The patentee may make statements during the prosecution of a patent that limit otherwise clear claim scope. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003). Here, no such disclaimer exists to support selectively rewriting "composition" as "core composition."

though, as drafted, the claim was "not supported by the sole embodiment described in the specification").

### b. Defendants' construction does not exclude all embodiments in the specification.

Plaintiffs' argument that Defendants' construction excludes embodiments in the specification fails for multiple reasons. *First*, Defendant's construction does not exclude all embodiments. Plaintiffs sought and obtained claims—like claims 8 and 9 of the '695 patent (below), which recite the same percentages as Table 17 and specify that those percentages are based on the "core composition":

TABLE 17

Composition of Compound 1/copovidone solid dispersion tablet

| Components | 25 mg tablet | 100 mg tablet | | |
|---|---|---|---|---|
| Tablet core | Quantity (mg per tablet) | | Quantity (% core weight) | Function |
| Compound 1 | 25.00 | 100.00 | 25.00 | Active pharmaceutical ingredient |
| Copovidone | 57.50 | 230.00 | 57.50 | Polymeric carrier |
| Colloidal silicon dioxide | 1.83 | 7.33 | 1.83 | Glidant |
| Mannitol | 14.67 | 58.67 | 14.67 | Soluble filler |
| Sodium stearyl fumarate | 1.00 | 4.00 | 1.00 | Lubricant |
| Core tablet weight | 100.00 | 400.00 | | |
| Tablet Coating | Quantity (mg per tablet) | | Quantity (% coating weight) | Function |
| Hypromellose (HPMC 2910) | 2.19 | 8.75 | 62.5 | Film former |
| Titanium dioxide (E171) | 0.88 | 3.51 | 25.05 | Opacifier |
| Macrogol/ PEG 400 | 0.22 | 0.88 | 6.25 | Plasticiser |
| Iron oxide yellow (E172) | 0.16 | 0.64 | 4.55 | Colouring agent |

1. An immediate-release pharmaceutical composition in the form of a tablet comprising:
(a) a core composition comprising:
a solid dispersion comprising:
(i) 100 mg to 200 mg of 4-[3-(4-cyclopropanecarbonyl-piperazine-1-carbonyl)-4-fluorobenzyl]-2H-phthalazin-1-one (Compound 1); and
(ii) at least one polymer chosen from copovidone, povidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-B-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate;
wherein the weight ratio of Compound 1 to the at least one polymer in the core composition is in the range of from 1:1 to 1:9,
wherein the total concentration of Compound 1 in the core composition is in the range of from 10% by weight to 50% by weight; and
(b) optionally a tablet coating;
wherein release of Compound 1 from the core composition is greater than 80% as measured by reverse-phase high performance liquid chromatography (HPLC) after 120 minutes of dissolution of the core composition which had been stored in a closed high density polyethylene (HDPE) bottle with a polyethylene liner and with desiccant for 1 month at 25° C. and 60% relative humidity (RH), 3 months at 25° C. and 60% RH, 4 months at 25° C. and 60% RH, 1
8. The composition of claim 1, wherein the total concentration of Compound 1 in the core composition is 25% by weight.
9. The composition of claim 8, wherein the total concentration of the at least one polymer in the core composition is 57.5% by weight.

Claims 8 and 9 of the '695 patent thus expressly cover the embodiment of Table 17 even under Defendants' construction of "composition." As such, Plaintiffs' claim that Defendants' construction impermissibly "excludes *all* disclosed embodiments" is flat wrong.

20

*Second*, Plaintiffs' argument is based on the false premise that every claim must cover every embodiment, which simply is not true.  (Pls.Br. at 10-11); *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1026 (Fed. Cir. 2015) ("[E]very claim does not need to cover every embodiment."); *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1334-35 (Fed. Cir. 2010) ("Although reluctant to exclude an embodiment, this court must not allow the disclosed embodiment to 'outweigh the language of the claim . . . .'").  There is nothing wrong with the fact that some claims cover the Table 17 embodiment (e.g., claims 8 and 9 of the '695 patent), while others do not.  *See Pacing Techs.*, 778 F.3d at 1026.  Indeed, it would make little sense to obtain so many claims, with each claim having slightly different wording, if Plaintiffs intended them all to have exactly the same scope.

*Third*, Plaintiffs' argument that claim 10 of the '842 patent would exclude all embodiments under Defendants' construction incorrectly assumes Table 17 discloses the *only* embodiment in the specification.  But Table 13 discloses another embodiment consisting of an *uncoated* tablet that meets the precise percent weight limitations of claim 10 under Defendants' construction.[8]  (Ex. 10 ('842 patent) at 27:35-52.)  The specification also purports to disclose embodiments with a wider range of weight percentages of the components than those provided in Table 17, many of which would fall into the scope of the claims under Defendants' construction.  For example, the specification states that "in certain embodiments, the [olaparib] will be present in an amount of 10 to 70%," "fillers will be present in an amount of 1 to 70% by weight," and "binders will be present

---

[8] Table 8 discloses a third embodiment, which is a soft gel capsule formulation.  (Ex. 10 ('842 patent) at 23:18-49.)  As such, Table 8's capsule formulation is outside the scope of the asserted claims, which all concern solid dispersions, and is not particularly pertinent to the construction of "composition."  (*See* Pls.Br. at 9.)  Further, just like Table 17, Table 8 distinguishes between the weight percentages for the "capsule contents" and the "capsule shell."

in an amount of 2 to 40%." (Ex. 10 ('842 patent) at 8:38-9:27; *see also id.* at 10:36-45 (reciting premix with "5-60% by weight [olaparib]" and "40-95% copovidone").)

**Fourth**, Plaintiffs invite the Court to commit legal error when they suggest that the patent claims must be construed to cover the precise percent weights in Plaintiffs' commercial product, Lynparza®. (Pls.Br. at 10.) The Federal Circuit has held that "claim construction . . . focuses on the recited limitations of the *claims*, not on the features of a commercial embodiment of the invention." *Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 15 (Fed. Cir. 2020). Even if that were not the law and Plaintiffs' unsupported attorney argument regarding the weight percentages of the ingredients in Lynparza® is correct, those percentages are covered by at least claim 10 of the '695 patent.

### 3. Plaintiffs ignore the prosecution history because it confirms Defendants' construction of "composition."

Plaintiffs ignore the prosecution history of the formulation patents, and with good reason. The file history of the '695 patent reveals that patentee deliberately amended the claims of that patent to clarify that the claimed weight percentages pertain to the "core composition" to overcome an indefiniteness rejection based on ambiguity as to whether the claims covered a weight percentage of "the tablet as a whole" or "other tablet constituents."[9] (Defs.Br. at 18-19 (quoting Ex. 11 ('695 FH), Jan. 18, 2024, Final Rejection at 3).) Plaintiffs just ignore this inconvenient intrinsic evidence, which confirms that where the claims recite "composition" they mean what they say: the claims cover the entire pharmaceutical composition including any core and coating.

---

[9] Prosecution history is relevant when construing all related patents, including those that issue before the statements in question are made. *E.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1307 (Fed. Cir. 2007) (holding file history disclaimer made during child application applies to parent).

The file history's distinction between "composition" and "core composition" differentiates the present case from the two Plaintiffs cite.  Unlike Plaintiffs' cases, the intrinsic evidence here demonstrates that the patentee used the two terms to have different meanings, not the same one. *See Nystrom v. TREX Co.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) (construing "board" to refer to wood where the "written description and prosecution history consistently use the term 'board' to refer to wood decking materials"); *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990) (holding claims that "refer to the sequence of natural HGH rather than to Figure 2" were nonetheless limited to the sequence of Figure 2 where the specification used "'Fig. 2' synonymously with 'HGH' throughout").  Plaintiffs have not and cannot overcome the presumption established by the precedent cited in Defendants' opening brief that "composition" and "core composition" have distinct meanings.  (*See* Defs.Br. at 16-17 (collecting cases).)

C.      **"at least one polymer chosen from . . ."**

| Disputed Claim Term | Plaintiffs' Position | Zydus's Position |
|---|---|---|
| "at least one polymer chosen from copovidone, povidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate" [10]<br><br>'001 patent, cl. 1-13<br><br>'695 patent, cl. 1-6, 8-10<br><br>'810 patent, cl. 1-8, 14-27 | Plain and ordinary meaning, which is:<br><br>"at least one polymer chosen from copovidone, ***povidone***, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate" (emphasis added) | "at least one polymer chosen from copovidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate" |

---

[10] Natco, Sandoz, and Cipla take no position on the construction of this claim term.

1.      **Plaintiffs' proposed construction is not supported by the intrinsic evidence.**

The intrinsic record of the formulation patents—the shared specification and prosecution histories—makes clear that the alleged invention does *not* include a polymer with high hygroscopicity or a polymer exhibiting poor stability when formulated in a solid dispersion with olaparib—both of which are properties of povidone by the patentees' own admission. Plaintiffs cannot now ignore the repeated statements in the intrinsic record that povidone *does not work* in the claimed invention based on the fact that claims recite (albeit, improperly) povidone. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys. Inc.,* 242 F.3d 1337, 1341-44 (Fed. Cir. 2001) (construing the claims to exclude a side-by-side lumen configuration where the specification, including the abstract, disadvantages of the prior art, and summary and descriptions of the invention, made clear a coaxial lumen configuration was a necessary element of the claims).

In the abstract, the specification of the formulation patents states that "[t]he present invention relates to a pharmaceutical formulation comprising the drug [olaparib] in a solid dispersion with a matrix polymer that exhibits low hygroscopicity and high softening temperature, such as copovidone." (Ex. 4 ('001 patent) at Abstract.) In the summary and descriptions of the invention, the specification of the formulation patents likewise states that "[i]n particular, the present invention relates to a pharmaceutical formulation comprising [olaparib] in a solid dispersion with a matrix polymer that exhibits low hygroscopicity and high softening temperature. A particularly suitable matrix polymer being copovidone." (*Id.* at 1:28-33; *see also id.* at 1:28-43, 3:57-4:22, 4:32-44 (stating that the present invention relates to a pharmaceutical formulation comprising olaparib in a solid dispersion with a matrix polymer that exhibits low hygroscopicity and specifically relates to the use of copovidone).) When the patent describes the invention, it refers to copovidone, but never povidone, as the polymer capable of achieving the necessary

24

stability and bioavailability: "the invention relates to the use of copovidone in a solid dispersion composition with [olaparib] for increasing the bioavailability and/or stability of the [olaparib], or for treating cancer in a patient." (*Id.* at 1:37-43); *see Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) ("It is axiomatic that, where the specification 'describes the "present invention" as having [a] feature,' that representation may disavow contrary embodiments.") (alteration in original).

When discussing the disadvantages of prior art formulations, the patent states that those formulations were not able to provide sufficient dose loading, stability, and bioavailability of olaparib. (Ex. 4 ('001 patent) at 3:6-4:18, 24:19-33:22.) In Example 4, the patent concludes that povidone exhibits poor stability and dissolution in the solid dispersion (*id.* at 27:1-5), but that olaparib formulations comprising copovidone demonstrated improved dissolution and stability (*id.* at 31-33, Tables 18-19).

When listing "suitable matrix polymers" for the alleged invention, the specification not only excludes povidone but also distinguishes povidone from copovidone based on hygroscopicity:

> Suitable matrix polymers for use in the invention include: copovidone, hypromellose phthalate (hydroxypropylmeth-ylcellulose phthalate, HPMCP), hypromellose acetate suc-cinate (hydroxypropylmethylcellulose acetate succinate, HPMCAS), –2-hydroxypropyl-β-cyclodextrin (HPBCD), hypromellose (hydroxypropylmethylcellulose, HPMC), polymethacrylates (poly(methacrylic acid, methyl meth-acrylate 1:1; poly(methacrylic acid, ethyl acrylate) 1:1), hydroxypropyl cellulose (HPC), and cellulose acetate phtha-late (CAP).
>
> Copovidone is a synthetic, linear, random copolymer of N-vinyl-2-pyrrolidone (VP) and vinyl acetate (VA) with the chemical formula $(C_6H_9NO)_m$ $(C_4H_6O_2)_n$ where the VA content is nominally 40% (but may vary, for example between 35-41%). The addition of vinyl acetate to the vinylpyrrolidone polymer chain reduces hygroscopicity and glass transition temperature (Tg) of the polymer relative to Povidone (polyvinyl pyrrolidone, PVP homopolymer).

(*Id.* at 5:7-24.)

25

Povidone does not possess the necessary characteristics to be considered a matrix polymer according to the patentee's own definition of polymer: "a material that exhibits low hygroscopicity and high softening temperature." (*See id.* at 4:55-58, Table 4.) "While it is true that not every advantage of the invention must appear in every claim . . . it would be peculiar for the claims to cover prior art that suffers from precisely the same problems that the specification focuses on solving." *Lizardtech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1343-44 (Fed. Cir. 2005).

Plaintiffs confuse portions of the specification that are supposedly "replete with formulations that use povidone" with disclosures of povidone being tested as a potential polymer to impart stability to a solid dispersion of olaparib and improve its bioavailability—which it did not do. (*Compare* Ex. 4 ('001 patent) at Example 3, 21:22-25 (concluding that solid dispersions with copovidone at 25% drug loading were stable), *with id.* at Example 4, Tables 7, 12, 16 (no disclosure of povidone in a formulation).)

Plaintiffs' supposed support in the specification for their inclusion of povidone as a claimed polymer actually shows the opposite. For example, Plaintiffs cite to Table 12 in the '842 patent specification which states that "solid dispersions produced using the relatively hygroscopic polymer povidone tended to crystallise" and lead to a reduced dissolution rate. (Pls.Br. at 14-15; Ex. 10 ('842 patent) at 27:24-27.) The disclosure of povidone in the specification is insufficient to overcome the strong and consistent disclaimer of povidone in other portions of the specification and the prosecution histories, which shows that the patentees did not consider povidone to be an acceptable polymer in the claimed compositions.

### 2. The intrinsic record supports Zydus's proposed construction.

Zydus's proposed construction accords with the patentee's consistent use of the term "polymer" to refer to a polymer that has low hygroscopicity and imparts stability to an amorphous olaparib dispersion, such as copovidone but not povidone. (*See* Ex. 1 ('842 FH), Mar. 14, 2012,

26

Response to Non-Final Rejection at 2 (amending claim 1 to recite that "the matrix polymer is copovidone and exhibits low hygroscopicity and high softening temperature").) In addition to the evidence of disclaimer in the specification, the patentee clearly and unambiguously disclaimed povidone as a matrix polymer in the claimed formulation when it argued to the Examiner that povidone "is not utilized in the current formulation." (*Id.* at 6; *see also* Ex. 1 ('842 FH), Dec. 21, 2012, Response to Final Rejection at 9 (stating that povidone "failed to provide a stable solid dispersion formulation for olaparib").)

The intrinsic record of the formulation patent family shows that the patentee had more than a mere "preference" for copovidone over povidone, and it is evidence that the patentee considered the exclusion of povidone to be an important and essential feature of the formulation. Plaintiffs' opening brief provides no other reason why the patentee disavowed povidone during the prosecution of the '842 patent and excluded povidone from any mention of a description of the invention in the shared specification.

Plaintiffs miss the point when they argue that Zydus is "arbitrarily writing [povidone] out of the claim" (Pls.Br. at 13), because none of the cases relied upon by Plaintiffs concern disclaimer of claim scope. Instead, Plaintiffs' cited cases support Zydus's construction because these cases apply the well-established principle that claims must be construed in accordance with the specification. *See, e.g.*, *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (2001) (adopting construction that is in accordance with the actual invention described by the intrinsic evidence); *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (2005) (rejecting the district court's construction of the term "about" because the district court "construed the claim term in a manner inconsistent with the specification").

27

3.    **The patentee's positions taken in the prosecution history of the '842 patent limit the scope of later-issued claims in the formulation patent family.**

Plaintiffs concede that the patentee disclaimed povidone during the prosecution history of the '842 patent when the patentee amended the claims to recite "copovidone" as the claimed polymer to overcome prior art references Martin, Buhler, and Goetz. (*See* Ex. 1 ('842 FH), Mar. 14, 2012, Amendments to the Claims at 2.)  But Plaintiffs are wrong that the patentee's statements distinguishing the invention from the prior art during the prosecution of the '842 patent are limited to that patent alone.  It is well established by the Federal Circuit that "prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications."  *Omega Eng'g*, 334 F.3d at 1333.  The Federal Circuit has held that disclaimer on a claim limitation in an ancestor patent will attach to subsequent patent applications so long as the same claim limitation is at issue.  *Augustine Med. Inc. v. Gaymar Indus., Inc*, 181 F.3d 1291, 1300 (Fed. Cir. 1999); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation.").  Here, Plaintiffs do not dispute that the '842 patent is related to the '001, '695, '810, and '816 patents, and do not dispute that the '001, '695, '810, and '816 patents have the same claim limitation as the '842 patent.  Thus, the Court should presume that "the same claim term in the same patent or related patents carries the same construed meaning" and attach the patentee's disclaimer of povidone during the prosecution of the '842 patent to the subsequent patent claims in the same family.  *Omega Eng'g*, 334 F.3d at 1334; *see also Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) ("Thus, when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered.").

28

The patentee's disclaimer of povidone was not rescinded during the prosecution of the subsequent patent applications. In order to overcome the disclaimer of povidone in the '842 patent prosecution history, the patentee must have *affirmatively* rescinded the earlier disclaimer. *Hakim v. Cannon Avent Grp.*, 479 F.3d 1313, 1318 (Fed. Cir. 2007). Patentee's selection of povidone as a polymer following a restriction requirement or prosecution of a claim that includes povidone do not amount to a recission. To rescind a disclaimer and recapture the disclaimed scope, "the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to re-visited." *Id*. Here, when presenting claims that included povidone to the Examiner, the patentee did not mention that it previously distinguished its invention on the basis that it does not include povidone, nor indicate to the Examiner that prior art references, such as Martin and Buhler, may need to be revisited. Instead, the patentee argued that the prior art did not disclose the claimed *concentrations* of olaparib and polymer in the solid dispersion and that "[n]one of the cited references suggests such a minimum concentration of at least one polymer." (Ex. 13 ('001 FH), Feb. 28, 2024, Amendment/Request for Reconsideration at 8.) These actions are a far cry from an affirmative recission of the earlier disclaimer of povidone. *See Uship Intell. Props., LLC v. United States*, 714 F.3d 1311, 1315-16 (Fed. Cir. 2013) (excluding from claim scope certain embodiments based on prosecution disclaimer).

For all these reasons, the Court should reject Plaintiffs' proposed construction, and should adopt Defendants' proposed construction, because the patentee disclaimed and did not rescind the disclaimer of povidone as a polymer in the claimed pharmaceutical composition.

## III.   CONCLUSION

Defendants respectfully request that the Court adopt their proposed constructions.

*       *       *

29

Dated: May 23, 2025

By: /s/ *James S. Richter*
James S. Richter (jrichter@midlige-richter.com)
**MIDLIGE RICHTER LLC**
645 Martinsville Road
Basking Ridge, New Jersey 07920
(908) 626-0622 (telephone)

*Of Counsel:*
Kevin Warner (kwarner@rmmslegal.com)
Paul J. Molino (pmolino@rmmslegal.com)
William A. Rakoczy (wrakoczy@rmmslegal.com)
Nicholas D. Bortz (nbortz@rmmslegal.com)
**RAKOCZY MOLINO MAZZOCHI SIWIK LLP**
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 527-2157 (telephone)

*Attorneys for Defendant/Counterclaim-Plaintiff
Natco Pharma Limited*

Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
Kristine L. Butler (kbutler@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08540
T: (609) 924-0808
F: (609) 452-1888

Mark H. Remus (mremus@crowell.com)
Laura A. Lydigsen (llydigsen@crowell.com)
Mary E. LaFleur (mlafleur@crowell.com)
**CROWELL & MORING LLP**
455 North Cityfront Plaza Drive
NBC Tower, Suite 3600
Chicago, IL 60611
T: (312) 321-4200
F: (312) 321-4299

Ryan H. Seewald (rseewald@crowell.com)
**CROWELL & MORING LLP**
1601 Wewatta Street, Suite 815
Denver, CO 80202
T: (303) 524-8661

30

*Attorneys for Defendant Sandoz Inc.*

Loly G. Tor (loly.tor@klgates.com)
**K&L GATES LLP**
One Newark Center, 10th Floor
Newark, NJ
T: (973) 848-4026
F: (973) 848-4001

*Of Counsel:*
Anil H. Patel (anil.patel@klgates.com)
**K&L GATES LLP**
609 Main Street, Suite 4150
Houston, TX 77002
T: (713) 815-7300
F: (713) 815-7301

Elizabeth Weiskopf
(elizabeth.wesikopf@klgates.com)
Jenna Bruce (jenna.bruce@klgates.com)
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
T: (206) 623-7580
F: (206) 623-7022

*Attorneys for Defendants/Counterclaim-Plaintiffs*
*Cipla Limited and Cipla USA, Inc.*

Theodora McCormick
Lauren B. Cooper
Alec Wong
**BAKER, DONELSON, BEARMAN, CALDWELL &**
**BERKOWITZ, PC**
Office One
4365 Route 1 South, Suite 301
Princeton, New Jersey 08540
T: (609) 490-4860
F: (732) 242-8051
tmccormick@bakerdonelson.com
lcooper@bakerdonelson.com
twong@bakerdonelson.com

*Of Counsel:*
Michael J. Gaertner

31

James T. Peterka
Emily L. Savas
David M. Knapp
Hannah J. Thomas
**BUCHANAN INGERSOLL & ROONEY P.C.**
125 South Wacker Drive
Chicago, Illinois 60606
(312) 261-8777
michael.gaertner@bipc.com
james.peterka@bipc.com
emily.savas@bipc.com
david.knapp@bipc.com
hannah.thomas@bipc.com

*Attorneys for Zydus Pharmaceuticals (USA) Inc.
and Zydus Lifesciences Ltd.*

32