Charles H. Chevalier
Michael V. Caracappa
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4611
cchevalier@gibbonslaw.com
mcaracappa@gibbonslaw.com

*Counsel for Plaintiffs AstraZeneca Pharmaceuticals LP,*
*AstraZeneca UK Limited, AstraZeneca AB, KuDOS Pharmaceuticals Limited,*
*The University of Sheffield, and MSD International Business GmbH*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA UK LIMITED, ASTRAZENECA AB, KUDOS PHARMACEUTICALS LIMITED, THE UNIVERSITY OF SHEFFIELD, AND MSD INTERNATIONAL BUSINESS GMBH,<br><br>*Plaintiffs,*<br><br>v.<br><br>NATCO PHARMA LIMITED, SANDOZ INC., CIPLA LIMITED, CIPLA USA, INC., ZYDUS PHARMACEUTICALS (USA) INC., AND ZYDUS LIFESCIENCES LIMITED,<br><br>*Defendants.* | Civil Action No. 23-cv-796 (RK)(TJB) (Consolidated) |

### PLAINTIFFS' RESPONSIVE *MARKMAN* BRIEF

**TABLE OF CONTENTS**

I.      Argument ...................................................................................................2

        A.      "Composition" Has Its Plain And Ordinary Meaning In The Formulation
                Patents. ...............................................................................................2

                1.      The Ordinary Meaning Of "Composition," As Used In The Claims
                        And Specification, Includes A Tablet Core. ..............................2

                2.      Defendants' Construction Is Inconsistent With The Specification
                        And Improperly Excludes Embodiments. ...................................7

                3.      The Prosecution History Does Not Support Defendants'
                        Construction. ...............................................................................9

                4.      Defendants' Construction, Not Plaintiffs', Makes "Composition" A
                        Moving Target. ...........................................................................10

        B.      The Group Of "At Least One Polymer Chosen From Copovidone,
                Povidone," And Other Polymers In Certain Formulation Patents Includes
                Povidone. ............................................................................................11

                1.      There Is No Basis To Limit The Claims Based On The Unrecited
                        Term "Matrix Polymer." .............................................................12

                2.      Zydus Cannot Show A Clear And Unmistakable Disclaimer Of
                        Povidone. .....................................................................................15

                3.      Any Disclaimer Of Povidone Was Rescinded By Prosecution Of
                        Claims Reciting Povidone ............................................................19

        C.      The Two "Identifying" Steps of the '562 Patent Must be Performed Before
                the "Administering" Step. ...................................................................20

                1.      The Claim Language And Basic Logic Support Plaintiffs'
                        Construction. ................................................................................20

                2.      The Specification Does Not Support Defendants' Construction. ..............25

                3.      The Prosecution History Supports Plaintiffs' Construction. .....................28

II.     Conclusion ...............................................................................................30

# TABLE OF AUTHORITIES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011)....................................................................................15

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)....................................................................................30

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003)...............................................................................21, 23

*Amgen Inc. v. Mylan Inc.*,
2018 WL 6061213 (W.D. Pa. Nov. 20, 2018) .........................................................20

*Augustine Med., Inc. v. Gaymar Indus., Inc.*,
181 F.3d 1291 (Fed. Cir. 1999).....................................................................................18

*Avidyne Corp. v. L-3 Commc'ns Avionics Sys., Inc.*,
2008 WL 4849894 (D. Mass. Nov. 7, 2008) .........................................................23

*Bayer AG v. Biovail Corp.*,
279 F.3d 1340 (Fed. Cir. 2002).....................................................................................13

*C-Cation Tech., LLC v. Time Warner Cable, Inc.*,
2015 WL 1849014 (E.D. Tex. Apr. 20, 2015)........................................................24

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum*,
849 F.2d 1430 (Fed. Cir. 1988) ...............................................................................3, 13

*Eli Lilly & Co. v. Teva Pharm. Int'l GmbH*,
8 F.4th 1331 (Fed. Cir. 2021) ...........................................................................20, 21, 28

*Hakim v. Cannon Avent Grp., PLC*,
479 F.3d 1313 (Fed. Cir. 2007).................................................................................19, 20

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
527 F.3d 1379 (Fed. Cir. 2008)......................................................................................5

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
687 F.3d 1300 (Fed. Cir. 2012).....................................................................................22

*Honeywell Inc. v. Victor Co. of Japan, Ltd*,
298 F.3d 1317 (Fed. Cir. 2002).....................................................................................14

*Hormone Rsch. Found., Inc. v. Genentech, Inc.*,
904 F.2d 1558 (Fed. Cir. 1990)......................................................................................5

*IBSA Institut Biochimique, S.A. v. Teva Pharm. USA, Inc.*,
966 F.3d 1374 (Fed. Cir. 2020)......................................................................................5

ii

*In re Gardner*,
427 F.2d 786 (C.C.P.A. 1970) ....................................................................2

*In re Katz Interactive Call Processing Pat. Litig.*,
639 F.3d 1303 (Fed. Cir. 2011).................................................................6

*Kaneka Corp. v. Xiamen Kingdomway Group Co.*,
790 F.3d 1298 (Fed. Cir. 2015).................................................................8

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)..................................................................14

*Merck Sharp & Dohme Corp. v. Actavis Labs. FL, Inc.*,
2017 WL 2784703 (D.N.J. June 27, 2017) .................................................3

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*,
435 F. App'x 927 (Fed. Cir. 2011) ............................................................2

*Moba, B.V. v. Diamond Automation, Inc.*,
325 F.3d 1306 (Fed. Cir. 2003).................................................................23

*N. Telecom, Inc. v. Datapoint Corp.*,
908 F.2d 931 (Fed. Cir. 1990)....................................................................3

*Nippon Steel & Sumitomo Metal Corp v. POSCO*,
2014 WL 2534929 (D.N.J. June 4, 2014) ..................................................16

*Nystrom v. TREX Co., Inc.*,
424 F.3d 1136 (Fed. Cir. 2005)..................................................................5

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008)..................................................................2

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003).................................................................30

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc).........................................5, 11, 18

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999).................................................................13

*Power Mosfet Techs., LLC v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004).................................................................20

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
438 F.3d 1123 (Fed. Cir. 2006).................................................................10

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001)......................................................................13, 14

*Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*,
  620 F.3d 1305 (Fed. Cir. 2010)............................................................................16

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002)............................................................................13

*Thorner v. Sony Comput. Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012).............................................................................4

*Trading Techs. Int'l v. Open E Cry, LLC*,
  728 F.3d 1309 (Fed. Cir. 2013)............................................................................18

*Tuna Processors, Inc. v. Hawaii Int'l Seafood, Inc.*,
  327 F. App'x 204 (Fed. Cir. 2009) ......................................................................24

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
  473 F.3d 1173 (Fed. Cir. 2006)............................................................................18

*VLSI Tech. LLC v. Intel Corp.*,
  53 F.4th 646 (Fed. Cir. 2022) ..............................................................................13

*Wi-Lan, Inc. v. Apple, Inc.*,
  811 F.3d 455 (Fed. Cir. 2016)..............................................................................22

iv

**TABLE OF EXHIBITS**

| Ex. | Document |
|---|---|
| A | U.S. Patent No. 8,475,842 |
| B | U.S. Patent No. 11,633,396 (Excerpted) |
| C | U.S. Patent No. 11,975,001 (Excerpted) |
| D | U.S. Patent No. 12,048,695 (Excerpted) |
| E | U.S. Patent No. 12,144,810 (Excerpted) |
| F | U.S. Patent No. 12,178,816 (Excerpted) |
| G | U.S. Patent No. 8,859,562 |
| H | Heo, Y & Dhillon, S, *Olaparib Tablet: A Review in Ovarian Cancer Maintenance Therapy*, 13 TARGETED ONCOLOGY 801 (2018) |
| I | Moore, KN & Birrer, MJ, *Administration of the Tablet Formulation of Olaparib in Patients with Ovarian Cancer: Practical Guidance and Expectations*, 23 THE ONCOLOGIST 697 (2018) |
| J | Defendants' Invalidity Contentions for the Formulation Patents, October 18, 2024 (Excerpted) |
| K | U.S. Application No. 12/574,801, Non-Final Rejection, September 14, 2011 |
| L | U.S. Application No. 12/574,801, Claims, March 14, 2012 |
| M | U.S. Application No. 12/574,801, Applicant Remarks, March 14, 2012 |
| N | U.S. Application No. 12/574,801, Applicant Remarks, December 21, 2012 |
| O | U.S. Application No. 18/312,375, Preliminary Amendment, May 4, 2023 |
| P | U.S. Application No. 18/312,375, Requirement for Restriction/Election, August 7, 2023 |
| Q | U.S. Application No. 18/312,375, Response to Election/Restriction, August 28, 2023 |
| R | U.S. Application No. 18/312,333, Non-Final Rejection, November 30, 2023 |
| S | U.S. Application No. 18/312,333, Notice of Allowance, March 14, 2024 |
| T | Defendants' '562 Patent Invalidity Contentions, October 18, 2024 (Excerpted) |
| U | U.S. Application No. 10/555,507, Applicant Remarks, December 22, 2010 |
| V | U.S. Application No. 10/555,507, Examiner's Answer to Appeal Brief, June 3, 2011 (Excerpted) |
| W | U.S. Application No. 10/555,507, Patent Board Decision, March 27, 2014 (Excerpted) |
| X | U.S. Application No. 10/555,507, Reply Brief, August 3, 2011 (Excerpted) |

| Y | U.S. Application No. 10/555,507, Applicant's Appeal Brief, March 1, 2011 (Excerpted) |
| Z | U.S. Application No. 10/555,507, Applicant Remarks, March 29, 2010 (Excerpted) |
| AA | U.S. Application No. 10/555,507, Examiner's Answer to Appeal Brief, June 3, 2011 |

In an effort to manufacture non-infringement and/or invalidity positions where none exist, Defendants have raised three claim construction disputes. The first two relate to the Formulation Patents, which cover formulations of olaparib, including Plaintiffs' Lynparza® product. Defendants first contend that the Court should depart from the plain and ordinary meaning of the word "composition," which appears in certain claims directed to the weight percentages of olaparib and other ingredients in the claimed formulations, and instead construe the general term "composition" to refer solely to "the *entire* pharmaceutical composition including any core and coating." Not only does this construction violate the Federal Circuit's well-established prohibition on adding extraneous claim limitations—but also, indisputably, it would exclude every embodiment in the Formulation Patents' shared specification.

Defendants next contend that the Court should construe the list of polymers that appears in the claims of the '001, '695, '810, and '816 patents to exclude the polymer povidone, notwithstanding that the claims literally recite povidone. This argument, however, is both counter-textual (as it literally reads a claim term out of the claim), and requires the Court, impermissibly, to read the term "matrix polymer" that appears nowhere in the claim into the claim, and then construe that term to exclude povidone. Whether "matrix polymer" excludes povidone is irrelevant, as the claims that encompass povidone do not recite a "matrix polymer."

The third dispute relates to the '562 patent, which claims a method of treating certain cancers using PARP-1 inhibitors. To support a throw-away invalidity theory only outlined in two of their hundreds of pages of invalidity contentions, Defendants assert that the method steps of the '562 patent's claim can be performed in any order. This construction would contemplate physicians administering unknown compounds to random patients, in clear defiance of the language of the claim, the patent's specification and prosecution history, and common sense.

1

For the reasons explained below, the Court should adopt Plaintiffs' proposed constructions.

I.    **Argument**

A.    **"Composition" Has Its Plain And Ordinary Meaning In The Formulation Patents.**

Defendants' discussion of "composition" obscures the parties' "actual dispute regarding the proper scope of the[] claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  As explained in Plaintiffs' opening brief, the real dispute does not concern the meaning of "composition," but how to calculate the "weight percentage" limitations in certain claims of the Formulation Patents.  ECF No. 199 at 7–10 (Plaintiffs' Opening *Markman* Brief) (hereafter, "Pl. Br").  Defendants seek to improperly limit the claims reciting "composition" to require weight percentages to be determined solely based on the weight of the total coated tablet.  ECF No. 198 at 20 (Defendants' Opening *Markman* Brief) (hereafter "Def. Br.").

But the claims and specification are clear that "composition" is a broad term that can refer to the tablet core or a coated tablet and that the weight percentages should be calculated based on the weight of the tablet core, as Plaintiffs propose.  This is consistent with every example in the specification, which uniformly calculate weight percentages based on the core tablet weight.

1.    **The Ordinary Meaning Of "Composition," As Used In The Claims And Specification, Includes A Tablet Core.**

Defendants do not dispute that the plain and ordinary meaning of "composition" is broad and not limited to any particular form of a tablet.  As explained in Plaintiffs' opening brief, both this Court and the Federal Circuit have construed the phrase "pharmaceutical composition" to include any appropriate combination of active and inactive ingredients.  Pl. Br. at 5–6; *see, e.g.*, *Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 435 F. App'x 927, 934 (Fed. Cir. 2011) ("a composition that is suitable for treating medical conditions"); *In re Gardner*, 427 F.2d 786, 787

2

(C.C.P.A. 1970) (an active compound "in a suitable pharmaceutical carrier"); *Merck Sharp & Dohme Corp. v. Actavis Labs. FL, Inc.*, 2017 WL 2784703, *7 (D.N.J. June 27, 2017) (a "formulation of at least one active ingredient with a substance or collection of substances capable of being combined with the at least one active ingredient"). There is no basis whatsoever to depart from this settled understanding and precedent. A tablet core, comprising olaparib and other excipients, is a "composition" under these definitions. A coated tablet can be a composition as well. Contrary to Defendants' assertion, Def. Br. at 19–20, Plaintiffs do not urge a different meaning of "composition" in different claims; the same established, ordinary, judicially-recognized meaning of "composition" applies to every asserted claim.

Rather than construe the term "composition" as written, Defendants instead rewrite the claim to add the word "entire" to the word "composition" for purposes of calculating the claimed weight percentages, so that if a given tablet *has* a film coating, the film coating must be incorporated into the weight of the "composition." *See* Def. Br. at 15 ("'[C]omposition' refers to the entire pharmaceutical composition."). But the word "entire" appears nowhere in the claims, and to engraft it onto the term "composition" as Defendants suggest would violate the well-established tenet of claim construction prohibiting adding extraneous limitations into the claims. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum,* 849 F.2d 1430, 1433 (Fed. Cir. 1988). Simply put, because a tablet core is a "composition," as long as a tablet (whether film coated or not) *includes* a tablet core that meets the limitations of the percent weight claims—for example, the presence of 25% olaparib by weight in the tablet core—the product infringes the claims. *See, e.g., N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990) ("The addition of features does not avoid infringement, if all the elements of the patent claims have been adopted.").

Defendants advance two arguments to support their narrow redefinition of "composition," but they fail to identify any persuasive evidence for their interpretation, let alone the clear and unmistakable evidence required by the Federal Circuit. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012). *First*, Defendants suggest that the claims' reference to "immediate-release pharmaceutical composition" describes "the release profile of the drug as delivered to a patient," and that "[t]he *entire* drug product is delivered to the patient—not a component piece." Def. Br. at 15. This is a non sequitur. Nothing in the structure of any of the claims, which are not method claims, limits them to what is "delivered to the patient." But even were the claims so limited, the tablet core as a "component piece" *is delivered to the patient*, along with the tablet coating.

Moreover, as the extensive testing in the specification with both coated tablets and tablet cores demonstrates, both the cores and the coated tablets are immediate release compositions. *See, e.g.*, Ex. A ('842 patent) at 27:30–29:39, Table 13, Table 16.[1] Indeed, the claims of the '695 patent, which are directed to "immediate release pharmaceutical composition[s] . . . comprising . . . a core composition . . . and [] optionally a tablet coating," make clear that a tablet core *without* a coating nonetheless qualifies as an "immediate release pharmaceutical composition." Ex. D ('695 patent), claim 1.

*Second*, Defendants look to related patents across the Formulation Patent family to suggest that their construction is correct because the term "composition" must (a) mean something different than "core composition" and (b) have a consistent meaning across the patents. *See* Def. Br. at 15–17. Defendants first note that two of the Formulation Patents—the '396 and '695

---

[1]    Citations to "Ex. [X]" are to the exhibits submitted with Plaintiffs Opening *Markman* Brief, which are located at ECF No. 200 and its attachments, except for Exhibit AA, which is included as an exhibit to this Brief.

patents—include claims that use both the terms "composition" and "core composition."  Def. Br. at 15–17; *see, e.g.*, Ex. B ('396 patent), claim 1 ("An immediate-release pharmaceutical composition comprising: a core composition . . . wherein the total concentration of [olaparib] in the core composition is in the range of from 10% by weight to 40% by weight . . . .").  Defendants thus contend that "[t]he claims' use of the term 'core composition' indicates that 'composition' means something more than the naked core composition on its own."  Def. Br. at 15.

But there is no dispute that "composition" is broader than "core composition."  Plaintiffs agree that, where "composition" and "core composition" appear in the same claim—for example, in claim 1 of the '396 patent—the plain meaning of "composition" is broader than "core composition," since only the former can encompass both film-coated tablet compositions and tablet core compositions.  That is all that the cases cited by Defendants stand for—different claim terms used in the same claim often have different meanings.  Def. Br. at 15–16 (citing *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381–82 (Fed. Cir. 2008); *Bd. of Regents of the Univ. of Tex. Sys. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008); *IBSA Institut Biochimique, S.A. v. Teva Pharm. USA, Inc.*, 966 F.3d 1374, 1379 (Fed. Cir. 2020)).  And none of the cases Defendants cite suggest that different claim terms in separate patents in a family cannot cover *overlapping* (but not identical) subject matter, just as "composition" and "core composition" do here.  *See* Pl. Br. at 12; *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005); *Hormone Rsch. Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n. 15 (Fed. Cir. 1990).

Claim 1 of the '695 patent leaves no doubt that Plaintiffs' construction is correct.  Defendants agree that this claim, in which both "pharmaceutical composition" and "core composition" are recited, is relevant to the meaning of "pharmaceutical composition."  *See* Def. Br. at 15–16; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

5

That claim is directed to "[a]n immediate-release pharmaceutical composition . . . comprising . . . a core composition . . . and [] *optionally* a tablet coating."  *See* Ex. D ('695 patent), claim 1; Pl. Br. at 6.   While Defendants contend this claim structure means that "'composition' means something more than the naked core composition on its own," Def. Br. at 15, Defendants' construction defies the plain meaning and context of claim 1 of the '695 patent, which could not be clearer:  a pharmaceutical composition has a "core composition" and "optionally a tablet coating," and thus core compositions are pharmaceutical compositions when there is no coating.

Nor would it make sense for a core composition to cease to be a pharmaceutical composition once it is coated, contrary to the clear language of claim 1 of the '695 patent, which explicitly recites that a coating is "optional[]" in a pharmaceutical composition.  Plaintiffs' construction is consistent with claim 1 of the '695 patent—whether or not it has a coating, a tablet core is a pharmaceutical composition, and adding a coating does not make the core no longer a composition.

Defendants also invoke the "tenet of consistent usage," under which courts "interpret claims consistently across patents having the same specification."  Def. Br. at 16 (quoting *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011)).  This principle likewise does not assist Defendants, because under Plaintiffs' proposed construction the definition of "composition" is consistent across all of the patents because the term includes both coated tablets *and* tablet cores.  That consistent meaning of "composition" thus differs from the narrower term "core composition" that is recited in some of the asserted claims, including claim 1 of the '695 patent, which refers to a subset of the term "composition."

6

**2.      Defendants' Construction Is Inconsistent With The Specification And Improperly Excludes Embodiments.**

Defendants offer two arguments based on the shared specification of the Formulation Patents.  Def. Br. at 17–18.  *First*, Defendants note that the specification discusses the invention as an "immediate-release pharmaceutical composition," and repeat their contention that "'immediate-release' refers to the release profile of the drug as delivered to a patient."  Def. Br. at 17.  This argument fails for the reasons explained above, including that nothing limits the claim to what is "delivered to a patient" and because Defendants cite no evidence to contradict the patent's clear teaching that both the tablet cores *and* the coated tablets are immediate release compositions. *See supra*, § I.A.1.

*Second*, Defendants selectively highlight Table 17 of the shared specification to emphasize that the "Composition" disclosed in Table 17 includes both a tablet core and tablet coating.  Def. Br. at 17–18.  Remarkably, and dispositively for purposes of the present dispute, Defendants' highlighting (yellow highlighting in the figure from Defendants' brief reproduced below) ignores how the table calculates weight percentages—the very reason for the parties' dispute about the meaning of "composition."  Table 17 calculates the weight percentages based only on the core (as shown by the green highlighting added to Defendants' figure below).  Defendants do not—and cannot—argue otherwise.  Nor do Defendants dispute that the Table 17 calculations based on the core composition alone are recited in the claims, reflecting the proper calculation in view of the specification.  Pl. Br. at 7–10.  As explained in Plaintiffs' opening brief, Table 17 supports Plaintiffs' construction of "composition," not Defendants'.  Pl. Br. at 8–9.

TABLE 17

Composition of Compound 1/copovidone solid dispersion tablet

| Components | 25 mg tablet | 100 mg tablet | | Function |
|---|---|---|---|---|
| **Tablet core** | Quantity (mg per tablet) | | Quantity (% core weight) | |
| Compound 1 | 25.00 | 100.00 | 25.00 | Active pharmaceutical ingredient |
| Copovidone | 57.50 | 230.00 | 57.50 | Polymeric carrier |
| Colloidal silicon dioxide | 1.83 | 7.33 | 1.83 | Glidant |
| Mannitol | 14.67 | 58.67 | 14.67 | Soluble filler |
| Sodium stearyl fumarate | 1.00 | 4.00 | 1.00 | Lubricant |
| Core tablet weight | 100.00 | 400.00 | | |

| Tablet Coating | Quantity (mg per tablet) | | Quantity (% coating weight) | Function |
|---|---|---|---|---|
| Hypromellose (HPMC 2910) | 2.19 | 8.75 | 62.5 | Film former |
| Titanium dioxide (E171) | 0.88 | 3.51 | 25.05 | Opacifier |
| Macrogol/ PEG 400 | 0.22 | 0.88 | 6.25 | Plasticiser |
| Iron oxide yellow (E172) | 0.16 | 0.64 | 4.55 | Colouring agent |

Thus, there is no dispute that under Defendants' proposed construction, but not Plaintiffs' construction, the formulation in Table 17 falls *outside* of the scope of the disputed percent-by-weight claims. *See* Def. Br. at 20. Indeed, Defendants' construction also excludes every embodiment in the specification. Pl. Br. at 7–9. Such a construction is "rarely if ever, correct." *Kaneka Corp. v. Xiamen Kingdomway Group Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015); Pl. Br. at 7–9.

Defendants' argument about the wording of Table 17 also fails on its own terms. Defendants appear to suggest that because Table 17 refers to a film-coated tablet as a "composition," the core tablet is not a "composition." Not so. That coated tablets are compositions does not mean that core tablets are not also compositions; they are both compositions. Nothing in Table 17's use of the term "tablet core" to refer to part of the tablet excludes the tablet core from

8

the definition of "composition."  Thus, the Formulation Patents' shared specification, including Table 17, does not support Defendants' interpretation of "composition," but rather confirms Plaintiffs' construction.

### 3.     The Prosecution History Does Not Support Defendants' Construction.

In Defendants' opening brief, they cite a single exchange from the prosecution history of one of the six Formulation Patents—specifically, the '695 patent—to support their strained construction of "composition."  Def. Br. at 18–19.  In fact, this exchange, placed in proper context, supports Plaintiffs' construction rather than Defendants'.

In the initial version of the '695 patent's claims, the independent claim (claim 21) recited: "wherein the total concentration of [olaparib] is in the range of from 10% by weight to 50% by weight," without specifying that the concentration was "in the composition" or providing any other indication about the "denominator" of the percent-by-weight calculation.  *See* ECF No. 198-12 (Defs. Ex. 11) at 4 (Dec. 14, 2023, Claim Amendment).[2]  Thus, unlike the currently disputed weight-percentage claims, the initial version of the '695 patent's claims were not directed to weight percentages "in the composition."   Based on the absence of any language specifying the "denominator" of the weight percentages, the Examiner rejected this iteration of the claims as indefinite because they "raise[] the following query: *by weight of what?*"  *Id.* at 18 (Jan. 18, 2024, Final Office Action).  Plaintiffs then amended the claims to address this issue; the amended independent claim recited "wherein the total concentration of [olaparib] in the *core composition* is in the range of from 10% by weight to 50% by weight."  *Id.* at 37 (Apr. 16, 2024, Claim Amendment).  The Examiner allowed these claims.

---

[2]     Pincites to ECF No. 198-12 are to the page number appended by the EM/ECF system.

Defendants' suggestion that this exchange somehow introduces ambiguity into the word "composition" is entirely unsupported.  Def. Br. at 18–19.  Indeed, the Examiner had already *allowed* claims directed to the percent-by-weight of olaparib and other excipients "in the composition" in the '842 patent without raising any concerns or requiring further clarification. Nothing in the prosecution history cited by Defendants suggests that "composition" should be construed in the way Defendants suggest—to the contrary, at no point during prosecution of any of the patents did Plaintiffs or the Examiner calculate weight percentages in the way that Defendants suggest, Def. Br. at 18–19, again confirming the propriety of Plaintiffs' construction. But even if this exchange lends any support to Defendants' argument, it falls far short of the "clear and unmistakable" evidence required to use the prosecution history to depart from the ordinary meaning of a claim term.  *See, e.g.*, *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

### 4. Defendants' Construction, Not Plaintiffs', Makes "Composition" A Moving Target.

In Defendants' final argument regarding "composition," Defendants accuse Plaintiffs of turning "composition" into a moving target.  Def. Br. at 19–20.  But Plaintiffs' construction is consistent across the entire Formulation Patent family for the reasons explained above: where a claim recites a percent-by-weight limitation, the "denominator" is the weight of the tablet core. *See supra*, §§ I.A.1–3; Pl. Br. at 7–9.

By contrast, Defendants' construction creates inconsistencies.  As explained above, Defendants' construction would require claims that are manifestly directed to the same subject matter, claiming the exact same embodiment from Table 17 of the specification—like claim 7 of the '842 patent and claim 8 of the '695 patent, which both require 25% olaparib by weight—to mean different things.  Pl. Br. at 7–9.  Yet under Defendants' interpretation, only one of the two

claims would cover the embodiment disclosed in Table 17. *See id.* Because Defendants' construction would create a bizarre inconsistency among the claims of the Formulation Patent family, the Court should reject it.

## B. The Group Of "At Least One Polymer Chosen From Copovidone, Povidone," And Other Polymers In Certain Formulation Patents Includes Povidone.

The claims of the '001, '695, '810, and '816 patents could not be clearer: they require a "polymer" selected from a list that includes "povidone." Plaintiffs' construction gives meaning to the entirety of the "at least one polymer" claim term by including every polymer listed in that claim term in its construction. Zydus's construction, on the other hand, violates three of the most fundamental principles of claim construction—that courts should not rewrite claims, should not render words of the claim superfluous, and should not construe claims such that they do not cover embodiments in the specification. *See* Pl. Br. at 12–18.

Zydus attempts to justify these violations by arguing that the inventors disclaimed povidone. Def. Br. at 21–28. Zydus argues that Plaintiffs only discovered formulations containing what the patents refers to as "matrix polymers." As a result, Zydus argues, the claims must be limited to formulations that include a matrix polymer so as not to exceed the scope of the invention described in the patents. Zydus then argues that povidone does not meet the patents' definition of matrix polymer and, as a result, the disputed claims that unambiguously recite povidone as a polymer nevertheless do not actually cover povidone. *Id.*

This argument has multiple, fundamental flaws. As an initial matter, the argument is premised on claims that do not exist. Zydus reads into the claims the term "matrix polymer," which appears nowhere in the claims. To do so, Zydus must read a limitation from the specification into the claims and in doing so commits one of the "cardinal sins of patent law." *Phillips*, 415 F.3d at 1319–20. Regardless, nothing in the claims or the specification supports

11

excluding povidone from the claims—the specification provides ample data showing that povidone is a suitable polymer. And the statements that Zydus relies on from the prosecution history all relate to earlier pending claims that *did not recite* povidone and thus are irrelevant to construing the issued claims that all *expressly recite* povidone. And, finally, even if there were a clear and unmistakable disclaimer of povidone (which there is not), the explicit claims directed to povidone rescinded any possible disclaimer.

### 1. There Is No Basis To Limit The Claims Based On The Unrecited Term "Matrix Polymer."

Unable to justify its construction of the claims as they stand, Zydus chooses to argue its case against a set of claims that do not exist—claims to olaparib formulations that include a so-called "matrix polymer."[3] That is, Zydus is attempting to read *out* the term "povidone" from the claims by reading *in* the term "matrix polymer." The term "matrix polymer," however, does not appear anywhere in the claims of the '001, '695, '810, or '816 patents. The claims simply recite formulations that include "at least one *polymer*"—not at least one *matrix polymer*—"chosen from" a list that recites "povidone."

Many of the disclosed embodiments include olaparib formulated with a matrix polymer. *E.g.*, Ex. A ('842 patent) at 4:5–11. But that fact does not justify importation of the term "matrix polymer" into claims where it manifestly does not appear. The Federal Circuit repeatedly has explained that, while it is proper to consult the specification to interpret an unclear claim term, it is nevertheless "improper" to read limitations from the specification into the claims:

---

[3]      *See, e.g.*, Def. Br. at 21. ("The asserted claims should be construed to exclude povidone because the patentee . . . disclaimed povidone as a *matrix polymer* in the claimed formulation." (emphasis added)); *id.* at 21–24 (arguing that the shared specification excludes povidone from its definition of a *matrix polymer*); *id.* at 25–27 (arguing that "[d]uring prosecution of the parent '842 patent, the patentee disclaimed povidone as a *matrix polymer* in the claimed formulation" (emphasis added)).

> It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim. But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper. By "extraneous," we mean a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim. Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims.

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (citations and quotation marks omitted); *see also VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 652 (Fed. Cir. 2022) ("As we have repeatedly cautioned, claims should not be limited 'to preferred embodiments or specific examples in the specification.'" (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002))); *Phillips*, 415 F.3d at 1319–20 (characterizing "reading a limitation from the written description into the claims" as "one of the cardinal sins of patent law" (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001))); *Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002) ("[A] court may not read into a claim a limitation from a preferred embodiment, if that limitation is not present in the claim itself.").

Here, there is no justification to import the term "matrix polymer" into the claims. There is no dispute about the meaning of the term "polymer" that requires analysis of whether it is limited to a matrix polymer; indeed, neither party ever suggested that "polymer" requires construction, much less that it somehow means "matrix polymer." *See* ECF No. 192 (Joint Claim Construction Statement). Rather, Zydus simply asserts that the claimed invention is one with a "matrix polymer." Def. Br. at 22. Tellingly, Zydus cites only to the specification, and not the claims, for this proposition. *Id.* (citing Ex. 4 ('001 patent) at 1:29–33; 4:11–22; 4:32–38); *see also Pitney*

13

*Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("The starting point for any claim construction must be the claims themselves.").

Zydus's only attempt to justify its improper importation of "matrix polymer" into the claim is via a citation to *SciMed Life Systems, Inc.*, 242 F.3d 1337. *See* Def. Br. at 21–22. Zydus does not attempt to compare the facts of *SciMed* to this case, and for good reason. In *SciMed*, the Federal Circuit construed a claim to cover only one structure that the specification described as the "structure for *all embodiments of the present invention contemplated and disclosed herein.*" 242 F.3d at 1343. The court concluded then that this "broad and unequivocal" language "defines SciMed's invention in a way that excludes" all other structures. *Id.* at 1343–44.

That is far from the case here. The shared specification contains no analogous statement that "all embodiments" of the inventions are matrix-polymer-containing formulations, making a finding of disclaimer here improper. *See Honeywell Inc. v. Victor Co. of Japan, Ltd*, 298 F.3d 1317, 1326 (Fed. Cir. 2002) (finding no disclaimer where "[t]here is no similar disclaimer [to the one in *SciMed*] of subject matter in the [challenged] patent"); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

Instead, the specification makes clear that the inventions encompass solid dispersion formulations using "particular types of polymers," not matrix polymers:

> Of the various formulation approaches available, the inventors discovered that solid dispersion formulations with *particular types of polymer* were a means of addressing one or more of the aims stated above. Furthermore, it was surprisingly found that the solid dispersion formulations of the *invention* increased the

14

bioavailability of Compound 1 compared to the lipidic gelucire formulation.

Ex. A ('842 patent) at 3:64–4:3 (emphases added).  Other portions of the shared specification disclose embodiments of the invention without limitation to whether the formulation contains a matrix polymer, Ex. A ('842 patent) at 4:34–42, and explicitly specify that the disclosures in the specification are not intended to be limiting, Ex. A ('842 patent) at 12:52–53.  Further confirming that the claims should not be limited only to formulations that include matrix polymers—and most certainly cannot be limited to exclude the explicitly recited povidone—are the facts that (1) the specification teaches multiple povidone-containing embodiments, *see* Pl. Br. at 14–15, and (2) Plaintiffs sought and obtained claims covering povidone formulations, reflecting that Plaintiffs understood and intended for their claims to cover povidone, *id.* at 16.  *See also Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011) ("[U]se of the phrase 'present invention' or 'this invention' is not always so limiting, such as where the references to a certain limitation as being the 'invention' are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent.").

Because Zydus's argument depends on importing the limitation "matrix polymer" into the claims, and there is no basis to do so based on the claims and specification, Zydus's construction should be rejected for that reason alone.

### 2.    Zydus Cannot Show A Clear And Unmistakable Disclaimer Of Povidone.

As explained in Plaintiffs' opening brief, there is not a "clear and unmistakable" statement disclaiming povidone-containing formulations from the claims of the '001, '695, '810, or '816 patents, all of which explicitly recite povidone.  Pl. Br. at 15–18.  The statements Zydus relies on in its opening brief from the patents' shared specification, *see* Def. Br. at 22–25, and from the prosecution history of the '842 patent, *see* Def. Br. at 25–27, do not change this conclusion.

15

###### a.    The Shared Specification Does Not Disclaim Povidone.

The majority of Zydus's argument is that povidone is not a matrix polymer.  *See* Def. Br. at 21–24 (arguing that povidone does not have one of the required physical properties (low hygroscopicity) to be considered a matrix polymer).  The Court need not consider, however, whether povidone is or is not a matrix polymer because, as explained above (*supra* § I.B.1), the claims are not limited to matrix polymers.

Zydus then argues that the specification disclaimed povidone because it "does not provide the stability and bioavailability that the patentee considered critical to the invention."  Def. Br. at 23.  But that argument is belied by the data in the specification itself, which show that multiple formulations of povidone were tested and displayed good stability and bioavailability.

Regarding stability of povidone formulations, Zydus points to the data in the stability study of Example 4.  Def. Br. at 24.  But the specification simply stated that the tested povidone formulations "tended to crystallise when stored at 40° C/75% relative humidity, leading to a reduction in dissolution rate."  Ex. A ('842 patent) at 27:26–27.  This statement merely reflects that some formulations, including one with povidone, performed less well than others under some, but not all, of the tested conditions.  Indeed, the rest of the data in Example 4, Table 12 show that povidone formulations exhibited no crystallization at most of the tested storage conditions.  Pl. Br. at 14–15.  Zydus identifies no statements in the specification demonstrating that the inventors considered povidone unsuitable or that the data in Example 4 place povidone clearly outside the scope of the claimed invention, let alone the type of clear and unmistakable statement required for disclaimer.  *See Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1315 (Fed. Cir. 2010) (holding that a specification's "active[] disparage[ement]" of an embodiment, "d[id] not rise to the level of an express disclaimer sufficient to limit the scope of the claims"); *Nippon Steel & Sumitomo Metal Corp v. POSCO*, 2014 WL 2534929, *3–4 (D.N.J. June 4, 2014)

16

(reference to a fiber laser as being the best mode while disparaging carbon dioxide lasers did not act as disclaimer of carbon dioxide lasers).

Regarding the bioavailability of povidone formulations, Example 6 demonstrates that the povidone solid formulations exhibited good bioavailability, especially relative to the conventional formulations upon which the inventors sought to improve. Ex. A ('842 patent) at 3:14–4:3 ("There is a desire, therefore, to find a formulation of [olaparaib] with improved bioavailability and drug loading relative to a conventional tablet[.]"); Ex. A ('842 patent) at Table 28; *see also* Pl. Br. at 15. Specifically, the inventors measured the amount of olaparib absorbed after administration of various formulations and found that the bioavailability of the povidone formulation was 4.5 times greater than the conventional formulations. Ex. A ('842 patent) at 40:45–41:59 and Table 28. These data show that povidone-containing formulations achieved the inventors' goal of making olaparib more bioavailable. Zydus does not even address these data in its brief, *see* Def. Br. at 24–25, let alone explain how they can be squared with the argument that povidone is outside the scope of the invention.

### b.    The '842 Patent's File History Relating To Copovidone Claims Does Not Disclaim Povidone From The Scope Of Later Claims.

Zydus also points to statements the inventors made during prosecution of the '842 patent to support its disclaimer argument. *See* Def. Br. at 25–27 (citing Ex. M ('842 patent File History, Applicant Remarks (Mar. 2012))); Ex. N ('842 patent File History, Applicant Remarks (Dec. 2012))). But as Plaintiffs explained previously, Pl. Br. at 16–17, the statements Zydus cites are examples of the inventors distinguishing the then-pending *copovidone* claims from prior art references discussing povidone. Zydus ignores that after the '842 patent issued, Plaintiffs sought and obtained new claims that recited a larger group of polymers *expressly including povidone*. Zydus provides no explanation for how statements relating to earlier claims directed to copovidone

17

alone (not povidone) could somehow disclaim povidone from later claims reciting povidone explicitly.

The cases cited by Zydus stand for the proposition that "the prosecution history of a parent application may limit the scope of a later application using *the same claim term.*" *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1300 (Fed. Cir. 1999) (emphasis added) (finding statements made regarding the term "self-erecting" in a prior application informed scope of the same term in child application); *see also Trading Techs. Int'l v. Open E Cry, LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013) ("In general, the prosecution history regarding a particular limitation in one patent is presumed to inform the later use of that *same limitation* in related patents." (emphasis added)); *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[T]he doctrine of prosecution disclaimer generally does not apply when the claim term [in the descendant patent uses different language."). None of these cases are relevant to the situation here, where the claims of the '842 patent, limited to copovidone, recite a completely different term from the later claims, which recite a genus of polymers including povidone. Zydus cites no case for the proposition that an alleged disclaimer from the scope of a claim term in a parent application can carry through to later claims reciting wholly different claim terms.

In fact, the prosecution of the later claims makes clear that Plaintiffs and the Examiner understood them to cover povidone, including 1) Plaintiffs' election of povidone as the polymer for the Examiner to consider during prosecution of the '695 patent; 2) Plaintiffs overcoming the Examiner's rejection of a povidone formulation claim during prosecution of the '001 patent; and 3) more generally the myriad of allowed claims that explicitly recite povidone across four patents. *See* Pl. Br. at 16–17. That understanding confirms that construing the claim to exclude povidone is wrong. *Phillips*, 415 F.3d at 1317 (explaining that "the prosecution history can often inform the

18

meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution" because "the prosecution history provides evidence of how the PTO and the inventor understood the patent").

### 3.    Any Disclaimer Of Povidone Was Rescinded By Prosecution Of Claims Reciting Povidone.

Finally, even if the statements made during the prosecution of the '842 patent amounted to a disclaimer of povidone from the '842 claims (which did not in any event cover povidone), any disclaimer was rescinded during later prosecution when Plaintiffs prosecuted and obtained claims reciting povidone in the '001, '695, '810, and '816 patents. A rescission of a disclaimer need only "be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited." *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1318 (Fed. Cir. 2007). This requirement is easily met here.

*First*, Plaintiffs alerted the Examiner that povidone formulations were within the scope of claims by prosecuting povidone-containing claims in the '001, '695, '810, and '816 patents and specifically electing povidone as the representative polymer during prosecution of the '695 patent. Indeed, it is hard to imagine how Plaintiffs could more clearly alert the Examiner to the scope of the patent than by explicitly reciting povidone as a limitation in the claim language and stating that povidone was representative of the claim as a whole.

*Second*, the same prior art at issue in the sections of the '842 prosecution relied on by Zydus—Martin and Buehler—was considered during prosecution of the '001 patent. *See* Ex. R ('001 patent File History, Non-Final Rejection) at 3–13; Def. Br. at 27 (noting that Plaintiffs "argued against the Examiner's obviousness rejection over the same prior art as in the prosecution of the '842 patent"). Thus, the Examiner was not only aware of the prior art to be "revisited," but in fact revisited that prior art. The Examiner was also aware of this prior art during prosecution of

19

the '695, '810, and '816 patents, because each of the four patents had the same primary and assistant Examiners, and the '001 patent was the first of the four to be filed and issue. The Examiner was thus necessarily aware of the prior art in question during prosecution of all four patents. *See Amgen Inc. v. Mylan Inc.*, 2018 WL 6061213, at *13 (W.D. Pa. Nov. 20, 2018) (distinguishing *Hakim* and finding no disclaimer where Examiner considered same art in allowing child application with broader claims).

### C.     The Two "Identifying" Steps of the '562 Patent Must be Performed Before the "Administering" Step.

Plaintiffs' construction of the '562 patent is consistent with the structure of (1) the claim and its preamble, (2) the specification, and (3) clear statements in the prosecution history indicating that Plaintiffs, the Examiner and the PTAB all understood the "identifying" steps to occur before the "administering" step. Accordingly, the claim requires the treating physician to identify the PARP inhibitor and the patient prior to administering the PARP inhibitor to the patient. None of Defendants' arguments to the contrary overcome these clear teachings.

### 1.     The Claim Language And Basic Logic Support Plaintiffs' Construction.

### a.     The Preamble Requires That The Two "Identifying" Steps Be Performed Before The "Administering" Step.

As explained in Plaintiffs' opening brief, the preamble of claim 1 of the '562 patent—which recites "[a] method of treatment of cancer cells defective in homologous recombination (HR)"—requires a physician practicing the claim to intend to treat HR-defective cancer cells. Pl. Br. at 21–24; *see also Eli Lilly & Co. v. Teva Pharm. Int'l GmbH*, 8 F.4th 1331, 1341 (Fed. Cir. 2021). Defendants' brief does not mention the claim preamble at all, violating the Federal Circuit's directive to consider a claim in its entirety when construing it. *See, e.g.*, *Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1408–09 (Fed. Cir. 2004) (requiring claims to be construed "as a whole"). The Federal Circuit repeatedly has explained that preambles that recite a method

of treating a particular disease are generally limiting and require an intent to treat the recited condition or disease, because they are "statements of the intentional purpose for which the method must be performed." *Eli Lilly & Co.*, 8 F.4th at 1342. Because the '562 patent's claim recites a "method of treatment of cancer cells defective in homologous recombination," a physician performing the claimed method must *intend* to treat HR-defective cancers. And a physician cannot have the intent to treat an HR-defective cancer without *knowledge* that the cancer is HR-defective. That knowledge comes from "identifying a human patient" as required by claim 1 of the '562 patent. And in the context of the claimed method, the intent to treat the HR-defective cancer also requires knowledge that the targeted HR-defective cancer can be treated with the administered compound. This, in turn, requires a physician to know that the compound to be administered is a PARP-1 inhibitor.

> **b.    The Recited Method Steps Require Performing The "Identifying" Steps Before The "Administering" Step.**

Defendants acknowledge that a set of recited method steps must be performed in order when "as a matter of logic or grammar, the [claimed steps] must be performed in the order written." Def. Br. at 9 (quoting *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003)). As explained in Plaintiffs' opening brief, Pl. Br. at 24–26, the grammar and logic of the '562 patent's method requires the identification steps to be performed first to avoid the bizarre result of a doctor administering an unknown drug to an unknown patient.

Defendants make three arguments to the contrary, but these arguments do not justify departing from the clear language of the claim. *First*, Defendants suggest that a physician could first administer a known PARP-1 inhibitor to a cancer patient not identified as having a familial predisposition to gene-linked hereditary cancer, and then subsequently, as part of the same treatment regimen, identify the patient as having a familial predisposition to gene-linked hereditary

cancer.  Def. Br. at 9.  This argument defies the language and structure of the claim, including the preamble and "administering" step, which require intentionally treating a patient identified as having a familial predisposition to gene-linked hereditary cancer, not a random patient with cancer as Defendants improperly suggest.  Nor does Defendants' hypothetical scenario make sense.  As an initial matter, Defendants do not even try to justify a scenario where the doctor administers the drug prior to identifying a PARP-1 inhibitor.  Nor do Defendants identify any actual examples of doctors administering PARP-1 inhibitors to unknown patients and subsequently identifying those patients as having a familiar predisposition to gene-linked hereditary cancer.  But even assuming *arguendo* the counterintuitive factual scenario of a physician administering the drug before identifying the patient, that physician *would not practice the claimed method* because the physician would lack the requisite intent to "treat[] cancer cells defective in homologous recombination (HR)" that is required by the preamble (and as discussed below, *infra* Sections I.C.2 and I.C.3, by the specification and file history).

*Second*, Defendants contend that the use of "said" in the administration step is not alone sufficient to require an ordering of the steps and cite a number of cases that purportedly support their position.  Def. Br. at 9–10.  But Plaintiffs have never argued that the use of "said" alone requires an ordering of the steps.  Instead, the use of "said" in the administration step *in combination with the rest of the claim* requires an ordering of the steps, because the administration step's references to "said human patient" and "said compound" find their antecedent basis in the identifying steps.  *See Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1311–12 (Fed. Cir. 2012); *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) (concluding that the use of "the" or "said" to refer to earlier recited claim terms can indicate a required ordering to the recited steps of a method claim); *see also* Pl. Br. at 24–25.

Defendants' cases are not to the contrary.  Initially, many of the cases Defendants cite involve the use of "said" to refer to components of a mechanism used to perform a claimed method—components that exist, and perform the same function, irrespective of any order in which the method steps are performed.  The claims in these cases are thus unlike the '562 patent's claim, where the "*said* human patient" is an unknown patient, and the "*said* compound" an unknown molecule, until the "identifying" steps have been performed.  In other words, the identifying steps delineate what patient and compound meet the scope of the claimed treatment, requiring them, as a matter of basic logic, to be performed before the administration of the compound to the patient to effectuate the treatment.

Regardless, however, Defendants' cited cases are also readily distinguishable on their facts.  At most, these cases suggest that the use of "said" is not always independently sufficient to require an ordering to method steps.  *See Altiris, Inc.*, 318 F.3d at 1367–71 (discussing a claim directed to "[a] digital computer system programmed to perform the method of gaining control of the boot procedure of a digital computer," and a method step involving "said boot selection flag"; offering no specific discussion of the word "said" and citing expert testimony that "it was technologically possible to achieve the invention's purpose" irrespective of the ordering of steps); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1311–14 (Fed. Cir. 2003) (discussing a claim directed to a method of transferring eggs, one step of which involved the "said first conveyor" component of the mechanism; noting that the specification explicitly described simultaneous performance of claim steps); *Avidyne Corp. v. L-3 Commc'ns Avionics Sys., Inc.*, 2008 WL 4849894, at *2, *8 (D. Mass. Nov. 7, 2008) (holding "said" was not a "sequence-determining signal," and that two method steps could be performed simultaneously rather than sequentially, because (1) the specification described an embodiment where the disputed steps occurred simultaneously, (2) the

23

Examiner referenced simultaneous performance of the steps in the notice of allowance, and (3) expert testimony established that simultaneous performance was possible); *C-Cation Tech., LLC v. Time Warner Cable, Inc.*, 2015 WL 1849014, at *19 (E.D. Tex. Apr. 20, 2015) (discussing U.S. Patent No. 5,563,883, which featured a a claim directed to a "two way network communication system," not a method claim; concluding that the claimed series of steps did not have a required ordering because the specification taught that steps could be performed both before and after other steps).

*Third,* Defendants contend that the '562 patent's claim lacks "conditional language," "temporal language," "numbers" or "ordinals," or a "past participle." Def. Br. at 7–10. But while the *presence* of these markers may be indicative of a required order, Defendants cite no case holding that the *absence* of such language means that a claim's steps can be performed in any order where the logic and language and grammar of the claim dictate otherwise. To the contrary, the cases Defendants cite acknowledge that in some cases the "sequential nature of the claim steps is apparent from the plain meaning of the claim language." *See Tuna Processors, Inc. v. Hawaii Int'l Seafood, Inc.*, 327 F. App'x 204, 206–09 (Fed. Cir. 2009) (quotation omitted). In *Tuna Processors*, the Court considered the following claim:

> 1. A method for curing raw tuna meat by extra-low temperature smoking comprising the steps of:
> burning a smoking material at 250° to 400° C. and passing the produced smoke through a filter to remove mainly tar therefrom;
> cooling the smoke passed through the filter in a cooling unit to between 0° and 5° C. while retaining ingredients exerting highly preservative and sterilizing effects; and
> smoking the tuna meat at extra-low temperatures by exposure to the smoke cooled to between 0° and 5° C.

24

The court concluded that the steps of the claimed method had a logical order because one cannot practice a method of low temperature smoking without first cooling heated smoke. *See id.* at 209–10. So too here—a physician cannot intentionally treat a patient for HR-defective cancer with a PARP-1 inhibitor without first having knowledge that the cancer is HR-defective, and that the compound used is a PARP-1 inhibitor. Thus, even in the absence of any markers, the "sequential nature of the claim steps" in the '562 patent is evident from the claim's language and logic.

### 2.      The Specification Does Not Support Defendants' Construction.

Defendants argue that nothing in the specification "directly or implicitly *requires*" that the two "identifying" steps must always be performed before the "administering" step, and that "[t]he specification is completely silent as to *any* requirement for *any* order of *any* steps of the claimed method." Def. Br. at 11–12 (quotation omitted). Defendants mischaracterize the specification in at least two ways. *First*, Defendants incorrectly allege that there is no disclosure in the specification to support an ordering of the steps, but ignore the experiments disclosed in the '562 patent as well as other statements indicating that the "identifying" steps of the claimed method must be performed prior to the "administering" step. Def. Br. at 11. *Second*, Defendants focus on out-of-context statements in the specification about *prior art methods* of using PARP-1 inhibitors, but these statements do not support an argument that the *claimed method* could be performed out of order. Def. Br. at 12.

### a.      The Specification Discloses Experiments That Support Plaintiffs' Construction.

Defendants allege that the specification does not discuss the claim's steps together in any context that would suggest the steps require a particular order. Def. Br. at 11. But the specification discloses several experiments that involve identifying HR-defective cells, and then treating the HR-defective cells with a known PARP-1 inhibitor. *See* Ex G ('562 patent) at 6:20–10:45; Pl. Br.

at 27–28.  In one of these experiments, Dr. Helleday, the sole inventor, identified and chose to test HR-defective cancer cells with mutations in a gene called BRCA2, and then found that these cells were hypersensitive to treatment with PARP-1 inhibitors.  Ex. G ('562 patent) at 8:30–39, Fig. 4. In this example, Dr. Helleday tested cancer cells that already had been identified as being HR-defective (by virtue of being BRCA2 mutated) and showed they were sensitive to a compound that had already been identified as a PARP-1 inhibitor.  The specification does not describe testing random cells, which were only later discovered to be HR-defective, with random compounds, which were only later discovered to be PARP-1 inhibitors, which is what Defendants' construction would entail.  *See* Def. Br. at 11.  Dr. Helleday's experiments in the '562 patent's specification mirror Plaintiffs' proposed construction of claim 1.

Defendants also ignore multiple statements throughout the specification regarding the purpose of the invention, which establish that the "identifying" steps of the claimed method must be performed prior to the "administering" step.  The specification states that the invention relates to (1) "the use of an agent that inhibits the activity of an enzyme that mediates repair of a DNA strand break" (e.g., a PARP-1 inhibitor) and (2) "the treatment of diseases caused by a defect in a gene that mediates homologous recombination."  Pl. Br. at 26–28; Ex. G ('562 patent) at Abstract. The invention—a method of treating certain diseases using certain compound—thus requires (1) knowledge of the agent's inhibitory activity (defining the compounds to be used in the invention) and (2) knowledge of the presence of HR-defective cancer (defining the diseases treated in the invention) prior to the administration of the compound to the patient.  These two pieces of knowledge can only result from performing the "identifying" steps prior to the "administering" step.  Defendants also do not address statements made throughout the specification indicating that the purpose of the invention is to administer PARP-1 inhibitors to patients *who have been identified*

26

as having gene-linked hereditary cancer and HR-defective tumors.  *See, e.g.*, Ex. G ('562 patent) at 1:6–9; 2:37–44; 3:1–5; 3:18–22; 3:37–40.

            **b.**        **The Patent's Discussion Of Prior Art Uses Of PARP-1 Inhibitors Does Not Suggest The Method Steps Can Be Performed In Any Order.**

Defendants further argue that the specification contemplates performance of the "administering" step before the "identifying" steps, relying on a disclosure that PARP-1 inhibitors were used in combination with traditional radiotherapy and chemotherapy before the priority date without prior identification of a familial predisposition to gene-linked hereditary cancer.  Def. Br. at 12.  But Defendants gloss over the fact that the discussion of PARP-1 inhibitors and radiotherapy/chemotherapy in the specification on which Defendants rely is a characterization *of the prior art* and does not describe the invention of the '562 patent.  *See* Ex. G ('562 patent) at 1:62–2:7.

In the section the Defendants' selectively cite, the patent explains that "[i]nhibitors of PARP-1 activity *have been used* in combination with traditional anti-cancer agents," but then it proceeds to explain that "[s]uch treatments, however, are known to cause damage and death to non cancerous or 'healthy' cells and are associated with unpleasant side effects" and accordingly "[t]here is therefore a need for the treatment for cancer that is both effective and selective in the killing of cancer cells."  *Id.* (emphasis added).  These statements on which Defendants rely are *not* characterizing the invention of claim 1, but rather explaining the prior art that Dr. Helleday's method *improves upon* by permitting selective treatment of a specific set of patients with PARP-1 inhibitors.

The patent makes clear that these statements characterize the prior art and not the invention.  Immediately after the section that Defendants cite, Dr. Helleday explains that contrary to the prior art use of PARP-1 inhibitors, he "surprisingly found that cells deficient in homologous

recombination (HR) are hypersensitive to PARP inhibitors." Ex. G. at 2:8–14. The patent thus clearly differentiates Dr. Helleday's new, surprising discovery of the use of PARP-1 inhibitors in a specific identified type of patient from the description of the prior art use in combination with chemotherapy in undifferentiated patients. *Compare* Ex. G ('562 patent) at 1:62–2:7 *with id.* at 2:8–14.

Defendants further argue that a patient with the requisite HR-defective cancer could hypothetically be administered a PARP-1 inhibitor in conjunction with chemotherapy and/or radiation, and later identified as a patient with the claimed hereditary cancer, because claim 1 of the '562 patent is not limited to monotherapy. Def. Br. at 12; *see* ECF No. 192-1, at 6 (the parties' joint claim construction table). Defendants have never identified any actual example of such a patient. But even assuming such a patient existed, as discussed above in connection with the preamble, administering a PARP-1 inhibitor to the patient would not fall under the scope of claim 1: a physician administering a PARP-1 inhibitor without intending to *treat* the HR-defective cancer would lack the requisite intent to practice the method imposed by the preamble and the specification. *See supra*, §§ I.C.1.a, I.C.2.a; *Eli Lilly & Co.*, 8 F.4th at 1341–42.

### 3. The Prosecution History Supports Plaintiffs' Construction.

Defendants argue that nothing in the prosecution history establishes that Plaintiffs expressly relinquished or explicitly disclaimed claim scope necessary to limit the ordering of steps of the claimed method. Def. Br. at 12–13. This is wrong for at least two reasons. *First*, Defendants ignore entirely the repeated statements made throughout prosecution by Plaintiffs, the Examiner, and the PTAB establishing that the "identifying" steps of the claimed method must be performed prior to the "administering" step. *Second,* Defendants wrongly assume that disavowal of claim scope is necessary to reach Plaintiffs' construction. But that is untrue: the Court need not find a

disclaimer because other intrinsic evidence, including the claim itself and the specification, makes clear that the method requires a particular ordering of steps.

Defendants ignore statements made during prosecution establishing that the '562 patent's claim requires identifying a patient before administering a PARP-1 inhibitor.  *See* Pl. Br. at 28–30.  In comparing the pending claim that eventually issued as claim 1 of the '562 patent to the prior art, the Examiner stated *three* times that "treat[ing] the cancers . . . *first* requires identifying a mammal having a cancer that meets the claimed limitations," Ex. AA ('562 patent File History, Examiner Appeal Brief) at 11–12, 19–20, 30.  The repetition of this statement establishes that the Examiner understood the invention to require identifying a patient before administering the PARP-1 inhibitor.

Defendants also fail to address additional statements repeated by Plaintiffs, the Examiner, and the PTAB establishing that the "identifying" steps of the claimed method must be performed prior to the "administering" step.  *See* Pl. Br. at 28–30.  Specifically, Plaintiffs described "the invention" of the '562 patent as a method "which involved the step of *firstly* identifying a compound which inhibits PARP-1 and *secondly* administering the compound to an individual with a cancer defective an [sic] HR gene in order to treat cancer."  Pl. Br. at 28–30; Ex. U ('562 patent File History, Applicant Remarks (Dec. 2010)) at 7 (emphasis added).  Not only did Plaintiffs make this statement (thus reflecting the inventor's understanding of the invention), but both the Examiner and PTAB repeated the statement later in prosecution, establishing that they too understood that the PARP-1 compound must be identified prior to administering the compound to the individual to practice the claimed method.  Pl. Br. at 28–30; Ex. V ('562 patent File History, Examiner Appeal Brief) at 9–10, 17; Ex. W ('562 patent File History, PTAB Decision) at 17; Ex. X ('562 patent File History, Applicant Reply Brief); at 12–13; Ex. Y ('562 patent File History,

29

Applicant Appeal Brief) at 10–12; Ex. Z ('562 patent File History, Applicant Remarks (Mar. 2010)) at 14, 17.

Ignoring these clear statements in the prosecution history, Defendants instead focus on the alleged absence of a disclaimer of performing the administration step first. Def. Br. at 12–14. But these arguments miss the mark for several reasons. Initially, Defendants' argument assumes the conclusion, i.e., that the '562 patent's method steps can be performed in any order, and thus that a disclaimer is required to impose a specific order on the steps. But no disclaimer is needed here, because the claim's language and logic, the specification, and the prosecution history already establish that the two "identifying" steps must be performed before the "administering" step, so there is no alternative ordering to disclaim. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (stating that the purpose of disclaimer or disavowal is to "narrow[] the ordinary meaning of the claim"); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1091 (Fed. Cir. 2003) (stating that disclaimer of claim scope "limit[s] the term [] to something less than the scope of the plain language").

Regardless, the clear teachings of the specification, discussed above, *see supra*, § I.C.2, and the statements in the prosecution history that identification must be performed "firstly" and administration "secondly"—statements that Defendants outright ignore—clearly show the claim is limited to performing the identification steps before the administration step.

## II. Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court adopt Plaintiffs' constructions of the disputed claim terms.

Dated: May 23, 2025

Respectfully submitted,

*/s/ Charles H. Chevalier*

Charles H. Chevalier
Michael V. Caracappa
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4611
cchevalier@gibbonslaw.com
mcaracappa@gibbonslaw.com

*Of Counsel:*
David I. Berl
Elise Baumgarten
Kevin Hoagland-Hanson
Robert Hartsmith
Max C. Accardi
Nicholas G. Vincent
Falicia Elenberg
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
(202) 434-5000
dberl@wc.com
ebaumgarten@wc.com
khoagland-hanson@wc.com
rhartsmith@wc.com
maccardi@wc.com
nvincent@wc.com
felenberg@wc.com

*Counsel for Plaintiffs
AstraZeneca Pharmaceuticals
LP, AstraZeneca UK Limited,
AstraZeneca AB, KuDOS
Pharmaceuticals Limited, The
University of Sheffield, and
MSD International Business
GmbH*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2025, a copy of **PLAINTIFFS' RESPONSIVE** *MARKMAN* **BRIEF** was electronically served on all counsel of record via ECF and electronic mail.

Dated:  May 23, 2025                    /s/ Charles H. Chevalier

*Counsel for Plaintiffs AstraZeneca Pharmaceuticals LP,*
*AstraZeneca UK Limited, AstraZeneca AB,*
*KuDOS Pharmaceuticals Limited, The*
*University of Sheffield, and MSD International*
*Business GmbH*

32