Charles H. Chevalier
Michael V. Caracappa
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4611
cchevalier@gibbonslaw.com
mcaracappa@gibbonslaw.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA UK LIMITED, ASTRAZENECA AB, KUDOS PHARMACEUTICALS LIMITED, THE UNIVERSITY OF SHEFFIELD, AND MSD INTERNATIONAL BUSINESS GMBH, <br><br> *Plaintiffs,* <br><br> v. <br><br> NATCO PHARMA LIMITED, SANDOZ INC., CIPLA LIMITED, CIPLA USA, INC., ZYDUS PHARMACEUTICALS (USA) INC., AND ZYDUS LIFESCIENCES LIMITED, <br><br> *Defendants.* | Civil Action No. 23-cv-796 (RK)(TJB) (Consolidated) <br><br> **Motion Day:  November 3, 2025** |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO AMEND</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

TABLE OF EXHIBITS ...................................................................................... vi

I.    Background ............................................................................................3

      A.    Dr. Helleday's Groundbreaking Discovery Of The Synthetic Lethality Of PARP-1 Inhibitors On HR-Defective Cells. ........................................4

      B.    Dr. Curtin's Work With Her Proprietary PARP-1 Inhibitors. ................4

      C.    Dr. Helleday And Dr. Curtin's Respective Patents...................................5

      D.    Dr. Helleday Corrected Inventorship Of The Curtin Patents And The Patent Office Approved That Correction. ................................................6

      E.    Defendants Delayed For More Than A Year Proposing Their Amendment. ..........7

II.   Argument ...............................................................................................8

      A.    Defendants' Proposed Amendment Is Futile. ...........................................8

            1.    Defendants Have Failed To Plead Inequitable Conduct. ............................8

            2.    Defendants' Unclean Hands Claim Fails For The Same Reasons. ............18

            3.    Defendants Fail To Plead Any Antitrust Violation...............................21

      B.    Defendants' Prejudicial Undue Delay Separately Forecloses Amendment...........24

            1.    Defendants Have Unduly Delayed..........................................................25

            2.    Defendants' Delay Prejudices Plaintiffs. .................................................29

III.  Conclusion ...........................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Sandoz, Inc.*,
743 F.Supp.2d 762 (N.D. Ill.2010) ...........................................................................13

*Argus Chem. Corp. v. Fibre Glass-Evercoat Co., Inc.*,
812 F.2d 1381 (Fed. Cir. 1987)..................................................................................22

*Asahi Glass Co., Ltd. V. Guardian Industries Corp.*,
276 F.R.D. 417 (D. Del. 2011) ..................................................................................30

*Baxter Int'l, Inc. v. McGaw, Inc.*,
149 F.3d 1321 (Fed. Cir. 1998)............................................................................16, 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)....................................................................................................24

*Celgene Corp. v. Hetero Labs Ltd.*,
2021 WL 3701700 (D.N.J. June 15, 2021) ................................................................28

*Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*,
910 F.2d 804 (Fed. Cir. 1990), Br. 25...................................................................15, 18

*Daiichi Sankyo, Inc. v. Apotex, Inc.*,
2009 WL 1437815 (D.N.J. May 19, 2009) ................................................................22

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007)............................................................................21, 22

*Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*,
609 F. Supp. 2d 1090 (E.D. Cal. 2009)................................................................13, 14

*Eagle View Technologies, Inc. v. Xactware Solutions, Inc.*,
2018 WL 2464499 (D.N.J. May 31, 2018) ................................................................27

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009)..................................................................................10

*FMC Corp. v. Manitowoc Co.*,
835 F.2d 1411 (Fed. Cir. 1987)............................................................................21, 22

*Foman v. Davis*,
371 U.S. 178 (1962)....................................................................................................25

*Fox Indus., Inc. v. Structural Pres. Sys., Inc.*,
922 F.2d 801 (Fed. Cir. 1990).....................................................................................14

ii

*Gilead Scis., Inc. v. Merck & Co., Inc.*,
  888 F.3d 1231 (Fed. Cir. 2018)..................................................................................18, 19, 20

*Guardant Health, Inc. v. Found. Med., Inc.*,
  2020 WL 2461551 (D. Del. May 7, 2020)...............................................................................22

*Guardant Health, Inc. v. Found. Med., Inc.*,
  2020 WL 2477522 (D. Del. Jan. 7, 2020)................................................................9, 10, 14, 16

*Harrison Beverage Co. v. Dribeck Importers, Inc.*,
  133 F.R.D. 463 (D.N.J. 1990)............................................................................................25, 27

*Hum. Genome Scis., Inc. v. Genentech, Inc.*,
  2011 WL 7461786 (C.D. Cal. Dec. 9, 2011) ..........................................................................21

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)....................................................................................................8

*In re Certain Consol. Roflumilast Cases*,
  2017 WL 3816542 (D.N.J. Aug. 31, 2017) .............................................................................29

*In re Humira (adalimumab) Antitrust Litig.*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020) ......................................................................................23

*In re Rembrandt Techs. LP Pat. Litig.*,
  899 F.3d 1254 ..........................................................................................................................14

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
  2024 WL 2861865 (D.N.J. June 6, 2024) ...............................................................................23

*In re VerHoef*,
  888 F.3d 1362 (Fed. Cir. 2018)..................................................................................................2

*In re Wellbutrin XL Antitrust Litig.*,
  868 F.3d 132 (3d Circ. 2017)...................................................................................................23

*Inline Connection Corp. v. AOL Time Warner Inc.*,
  237 F.R.D. 361 (D. Del. 2006) ..........................................................................................27, 28

*Intel Corp. v. Future Link Sys., LLC*,
  268 F. Supp. 3d 605 (D. Del. 2017).........................................................................................20

*Lannett Co. v. KV Pharms.*,
  2008 WL 4974579 (D. Del. Nov. 21, 2008) ...........................................................................13

*Leased Optical Departments v. Opti–Center, Inc.*,
  120 F.R.D. 476 (D.N.J. 1988)..................................................................................................25

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
   2020 WL 4794576 (D. Del. Aug. 18, 2020) ................................................................25

*Luv n' Care, Ltd. v. Laurain*,
   98 F.4th 1081 (Fed. Cir. 2024) .................................................................................19

*Otsuka Pharm. Co. v. Torrent Pharm. Ltd.*,
   187 F. Supp. 3d 483 (D.N.J. 2016) ............................................................................24

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993)......................................................................................5

*Pharmacia Corp. v. Par Pharm., Inc.*,
   417 F.3d 1369 (Fed. Cir. 2005)........................................................................ *passim*

*Planet Bingo, LLC v. VKGS, LLC*,
   2012 WL 5511843 (W.D. Mich. Nov. 14, 2012)...................................................13

*Precision Instrument Mfg. Co. v. Auto. Maint. Machs. Co.*,
   324 U.S. 806 (1945)............................................................................................11, 14

*Sanders v. The Mosaic Co.*,
   418 F. App'x 914 (Fed. Cir. 2011) ..........................................................................15

*Shionogi & Co. v. Norwich Pharm., Inc.*,
   2024 WL 4495288 (D. Del. Sept. 23, 2024).....................................................10, 11

*SSIH Equip. S.A. v. ITC*,
   718 F.2d 365 (Fed. Cir. 1983)......................................................................13, 15, 19

*Stallings ex rel. Estate of Stallings v. IBM Corp.*,
   2009 WL 2905471 (D.N.J. Sep. 8, 2009) ................................................................29

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
   537 F.3d 1357 (Fed. Cir. 2008)...........................................................................13, 19

*Textron Fin'l-New Jersey, Inc. v. Herring Land Group, LLC*,
   2009 WL 690933 (D.N.J. Mar.11, 2009)................................................................29

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   649 F.3d 1276 (Fed. Cir. 2011) (en banc)............................................... *passim*

*TransWeb, LLC v. 3M Innovative Props. Co.*,
   812 F.3d 1295 (Fed. Cir. 2016)................................................................................24

*Ulead Sys. v. Lex Comput. & Mgmt. Corp.*,
   351 F.3d 1139 (Fed. Cir. 2003)................................................................................14

iv

*Wag Acquisition, LLC v. Gattyan Group S.a.r.l.*,
    2020 WL 5105194 (D.N.J. Aug. 31, 2020) .......................................................................26, 29

*Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*,
    382 U.S. 172 (1972)..................................................................................21, 22, 23, 24

## OTHER AUTHORITIES

37 C.F.R. § 1.324(a)...........................................................................................................................7

Federal Rule of Civil Procedure 15(a)(2) ......................................................................................25

Federal Rule of Civil Procedure 9(b).............................................................................................10

**TABLE OF EXHIBITS**

| Ex. | Document |
|-----|----------|
| 1 | Great Britain Patent Application No. 0408524.7, April 16, 2004 |
| 2 | Plaintiffs' Validity Contentions ('562 Patent), May 24, 2024 (excerpted) |
| 3 | Production Volume No. SHEFFIELD-003 Cover Email, Dec. 20, 2024 |
| 4 | Plaintiffs' Validity Contentions ('562 Patent), January 17, 2025 (excerpted) |
| 5 | Production Volume Nos. SHEFFIELD-001, SHEFFIELD-002 Cover Email, May 24, 2024 |
| 6 | T. Helleday, *PARP inhibitor receives FDA breakthrough therapy designation in castration resistant prostate cancer: beyond germline BRCA mutations*, 27 ANNALS OF ONCOLOGY 755 (2016) |
| 7 | May 2004 Email Chain with T. Helleday and D. Winstanley (excerpted from SHEFFIELD-0023117) |

Defendants' Motion to Amend seeks leave to inject into this patent litigation a claim foreclosed by consistent and controlling precedent:  that the asserted '562 patent can be rendered unenforceable due to purported fraud in correcting inventorship in *different* patents, owned by a different entity and not asserted in this case, years after the asserted patent issued.  Permitting Defendants' claim would contort the doctrine of inequitable conduct even if Defendants' baseless and defamatory theory that someone had concealed something from the Patent Office were true.  And the Patent Office undisputedly issued the patent-in-suit based on what Defendants contend was the *correct* inventorship, which Defendants allege the inventor later schemed to change.

The conduct Defendants complain about occurred, and was made public, more than a year ago.  In July 2024, the sole inventor of Plaintiffs' U.S. Patent No. 8,859,562, Dr. Thomas Helleday, filed petitions to correct two other patents (U.S. Patent Nos. 7,351,701 and 7,531,530) to remove himself as an inventor.  Plaintiffs do not own those patents, they do not cover Defendants' proposed generic products, and they are not asserted here.  Dr. Helleday's invention, claimed in the asserted '562 patent, is the use of compounds called PARP-1 inhibitors to treat a particular type of cancers, referred to as "HR-defective."  The inventions claimed in the other, earlier-expiring patents were not Dr. Helleday's—they involved proprietary PARP-1 inhibitors, different from Lynparza®, which Dr. Helleday never used or tested, whose chemical structures he did not know, and to which he did not even have access.  Dr. Nicola Curtin, a researcher at a different university who (unlike Dr. Helleday) researched and tested those compounds, courteously invited Dr. Helleday to be named as a co-inventor on her patent application.  When that courtesy jeopardized his patent, he fixed the mistake, and the Patent Office corrected inventorship.

This correction disappointed Defendants because it undermined their defense of obviousness-type double patenting ("ODP"), a doctrine under which a patent claim may be invalid

1

if its inventor holds other earlier-expiring patents with claims that render later-expiring claims anticipated or obvious. Because they are undisputedly owned by non-parties, the '701 and '530 patents can serve as invalidating double-patenting references only if Dr. Helleday was one of their inventors—which as his correction reflects, he was not.

Defendants' grievance against Dr. Helleday's actions does not confer upon them a legally cognizable claim or defense. Defendants allege that Dr. Helleday's declaration to the PTO correcting inventorship of the earlier-expiring '701 and '530 patents was false. But Defendants do not identify a single factual statement by Dr. Helleday that was false—the parties agree about the foundational facts regarding inventorship, including who performed which experiments and when and where they performed them. Defendants only dispute the legal conclusion that Dr. Helleday drew from those facts: that Dr. Helleday is not an inventor on Dr. Curtin's '701 and '530 patents, while Defendants reach a different legal conclusion based on the same operative facts. That Defendants disagree with Dr. Helleday's legal conclusion of inventorship, "one of the muddiest concepts in the muddy metaphysics of patent law," *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018), does not make it false, and it certainly does not make it intentionally false. It was not false, much less intentionally false.

But more importantly for present purposes, even (incorrectly) assuming its falsity, Dr. Helleday's 2024 correction of inventorship of the '701 and '530 patents cannot possibly render the asserted '562 patent unenforceable. The doctrine of inequitable conduct governs interactions between applicants and the PTO and guards against patents that were procured through fraud. Defendants' unprecedented claim asks this Court to render the '562 patent unenforceable even though Defendants do not even allege that the '701 and '530 patents were procured or maintained at the PTO through fraud. And even if they had been, while inequitable conduct in one patent can

2

"infect" *later* patents that arise from the same conduct, precedent uniformly forecloses Defendants' attempt to expand this doctrine to infect a patent, like the '562 patent, that issued *earlier* than the alleged conduct. The law is clear, and it mandates denial of Defendants' motion to amend: Alleged inequitable conduct in 2024 in connection with Dr. Curtin's patents cannot infect and render unenforceable the '562 patent, which "*had already issued*" before the alleged inequitable conduct occurred." *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1375 (Fed. Cir. 2005) (emphasis added). Defendants' allegations do not—and, as a matter of law and logic, cannot— demonstrate inequitable conduct as to the '562 patent. And precedent dictates that Defendants' related unclean hands and antitrust claims, founded on the same alleged conduct, likewise must fail for the same reasons as the inequitable conduct claims.

Separately, even if Defendants could state a new, non-futile claim, they delayed raising that claim for more than a year after the inventorship change became public, waiting even until after fact discovery closed. That undue delay prejudices Plaintiffs and independently mandates denial of leave to amend.

For all of these reasons, Defendants' motion should be denied.

## I.      Background

Defendants' proposed counterclaims scandalously and baselessly accuse individuals— including Dr. Helleday, an internationally-acclaimed scientist whose inventive work transformed the treatment of hereditary cancer and has saved thousands of lives—of making false statements and engaging in egregious misconduct. Though this motion, as the law requires, assumes that the proposed pleading's factual accusations are true, they are, in fact, outrageous calumnies. Defendants identify no false factual statement to the Patent Office—only what they allege to be an improper legal conclusion as to inventorship of unrelated and unasserted patents, the underlying facts of which they do not dispute. Because those undisputed facts are central to understanding

3

the allegations Defendants advance, and because the history of how Defendants' claims arose is pertinent to disposition of the instant motion, Plaintiffs clarify certain aspects of the record.

**A.    Dr. Helleday's Groundbreaking Discovery Of The Synthetic Lethality Of PARP-1 Inhibitors On HR-Defective Cells.**

In the early 2000s, Dr. Helleday's laboratory was working to better understand how cells repair their DNA and how DNA repair mechanisms can become disordered in cancerous cells. *See* Defs. Ex. Y at -15058. As part of that work, Dr. Helleday was conducting research on a known class of medicines that inhibit PARP-1, a protein involved in DNA repair. *Id.* Dr. Helleday, separately, also was researching cells that were defective in another kind of DNA repair, known as "homologous recombination" or "HR." *Id.*

It is undisputed that Dr. Helleday, without Dr. Curtin's involvement, found that PARP-1 inhibitors could selectively kill HR-defective cancer cells and invented a new method of using PARP-1 inhibitors to treat such cancers. *See id.* Defendants do not allege (nor could they) that Dr. Curtin was involved in the design and conduct of these experiments, which Dr. Helleday conducted alone, or in the conception of Dr. Helleday's new method of treatment. As Dr. Helleday contemporaneously memorialized in March 2003, he made this discovery using publicly available PARP-1 inhibitors and disclosed it to Dr. Curtin only after Dr. Helleday had the results and appreciated their import. *See id.* at -15059; *see also* Defs. Ex. J at -475–76.

**B.    Dr. Curtin's Work With Her Proprietary PARP-1 Inhibitors.**

At the same time Dr. Helleday was conducting his experiments, Dr. Curtin was conducting separate experiments in her laboratory at Newcastle University using specific PARP-1 inhibitors, including a compound known as AG14361, that she had access to via a collaboration with Agouron/Pfizer. *See* Defs. Ex. N. As Dr. Curtin explained to Dr. Helleday at the time, she was not permitted to send these compounds to Dr. Helleday. *See id.* Critically, Defendants do not

4

allege (nor could they, based on the undisputed record) that Dr. Helleday ever received Dr. Curtin's compounds or was provided any information about their chemical structure or properties.

Before Dr. Helleday performed his critical experiments in March 2003, Dr. Curtin separately became interested in the use of her PARP-1 inhibitors from Agouron to treat HR-defective cancer.  *See* Defs. Ex. J at -476.  After learning of Dr. Helleday's data with his publicly available PARP-1 inhibitors, without Dr. Helleday's involvement or participation, Dr. Curtin re-tested her proprietary compounds and discovered that they were particularly suitable for use in treating HR-defective cells.  *Id.*  After Dr. Curtin performed these experiments, she shared the results with Dr. Helleday.  *See* Defs. Ex. X.

### C.     Dr. Helleday And Dr. Curtin's Respective Patents.

Dr. Helleday recognized the importance of his invention and sought to file a patent application on it.  *See* Defs. Ex. Y.  In the first patent filing in the Great Britain Patent Office in July 2003, Dr. Helleday included data from his laboratory, Defs. Ex. DD at -62916, -62918, and data from Dr. Curtin's laboratory, *Id.* at -62920.  Accordingly, this first patent application was filed on behalf of both The University of Sheffield (which owned Dr. Helleday's rights) and Newcastle University (which owned Dr. Curtin's).  *Id.* at -62896.

But the two universities soon thereafter decided to divide the original filing into two applications.  *See* Defs. Ex. MM at -23244.  As a result, a second Great British Patent Application was filed in April 2004, including only the data from Dr. Curtin's laboratory, without any of the results from Dr. Helleday's laboratory.  Pls. Ex. 1.[1]

After the 2004 filing of the second GB application, the rights to the two patents were

---

[1] Defendants studiously ignore this public patent application and did not attach a copy of it to their pleadings, but there is no dispute about its content, and the Court may take judicial notice of it. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993).

5

separated. Dr. Helleday and the University of Sheffield retained the rights to Dr. Helleday's initial July 2003 filing, which matured into the asserted '562 patent. The '562 patent undisputedly does not include any of the data from Dr. Curtin's laboratory. The claim of the '562 patent recites a method of treating cancer cells defective in homologous recombination with a PARP-1 inhibitor.

Dr. Curtin and Newcastle University's assignees received exclusive rights to the April 2004 application, which matured into Dr. Curtin's '701 and '530 U.S. patents that Defendants raised as double patenting references. These patents undisputedly do not include any data from Dr. Helleday's laboratory. Their claims are directed exclusively to the use of three specifically recited compounds that Dr. Curtin alone (not Dr. Helleday) had access to and tested for the treatment of certain types of cancer that are defective in homologous recombination.

Notably, as discussed further below, *infra* § II.A.1.b.2, the PTO rejected the application that led to the '562 patent for double patenting over the '701 and '530 Curtin patents. *See* Defs. Ex. EE at -62831–55. At that time, Dr. Helleday was a named inventor on both the '701 and '530 patents and the application that issued as the '562 patent, so the PTO analyzed whether double patenting applied. But the objection was overcome on the merits, and the PTO allowed the claim of the '562 patent over the '701 and '530 patents. *Id.* at -62867–69

### D.    Dr. Helleday Corrected Inventorship Of The Curtin Patents And The Patent Office Approved That Correction.

Defendants make much of an alleged conspiracy between Dr. Helleday and his lawyers to correct inventorship of the '701 and '530 Curtin patents. Dkt. No. 258 ("Br.") at 11–14. But the basic facts are simple and not disputed, and they simply show that Dr. Helleday was advised by counsel in connection with the correction of inventorship.

In preparing for this litigation, which was ongoing, Dr. Helleday met with counsel in December 2023. Defs. Ex. K at 187:8–192:25. After that meeting, Dr. Helleday retained another

6

law firm, Groombridge, Wu, Baughman & Stone, to represent him in connection with inventorship of the '701 and '530 patents. *Id.* at 235:18–236:18. That firm then negotiated with the current owners of the '701 and '530 patents, who consented to the correction of inventorship. Defs. Ex. HH at -18269, 18271; Defs. Ex. II at -17321, -17325. Likewise, Dr. Curtin spoke with Dr. Helleday and agreed that she had no disagreement with the change in inventorship. Defs. Ex. HH at -18270; Defs. Ex. II at -17320. Thus, on July 23, 2024, with the consent of all interested parties, Dr. Helleday filed petitions in the PTO pursuant to 37 C.F.R. § 1.324(a) to correct inventorship of the '701 and '530 patents. Defs. Ex. HH at -18267–8; Defs. Ex. II at -17315–6. On September 10, 2024, the PTO issued certificates of correction removing Dr. Helleday as an inventor. Defs. Ex. HH at -18278; Defs. Ex. II at -17330.

### E. Defendants Delayed For More Than A Year Proposing Their Amendment.

Contrary to Defendants' suggestions of a cover-up, Br. 11–14, Dr. Helleday could not have been more transparent in correcting inventorship. All of the relevant filings are public. The July 2024 filings contain the sole allegedly false statements that form the basis for all of Defendants' proposed amendments—Dr. Helleday's inventor oaths, Defs. Ex. HH at -18275; Defs. Ex. II at -17322—and Defendants thus have had notice of the facts that form the basis for the proposed amendments since then.

Likewise, the PTO's decisions granting the certificates of correction, in August 2024, were public, and the ultimate certificates were published on September 10, 2024. Defs. Ex. HH; Defs. Ex. II. Moreover, Plaintiffs repeatedly have advised Defendants that inventorship was incorrect in the Curtin patents, including in their May 2024 contentions. Pls. Ex. 2 at 20. And after inventorship was corrected, Plaintiffs produced the certificates of correction, in December 2024, and specifically cited them in contentions in January 2025. Pls. Ex. 3; Pls. Ex. 4 at 22–23. Further, in June 2025, Plaintiffs expressly argued that Defendants must attempt to plead the equitable

7

defenses they now seek to add to the case to be entitled to discovery related to those defenses.  Dkt. No. 214 at 6.  Defendants did not do so in the ensuing few months, and as Plaintiffs predicted, they still cannot do so because their new claims are not legally viable, as discussed further below.

While Defendants contend that they could not have been aware of these theories until Dr. Helleday's deposition, nothing they learned at that deposition underlies their fundamental claim— that Dr. Helleday lied in declaring he was not an inventor in his July 2024 submission to the PTO. That Dr. Helleday was advised by counsel in connection with correction of inventorship—an obvious necessity, given the legal nature of the inquiry—was not discovered at his deposition, since the July 2024 inventorship change was filed *by counsel*.  Likewise, that Dr. Helleday has a financial stake in his patents is irrelevant to Defendants' notice of their alleged defenses and, in any event, was known publicly long before his August 2025 deposition.  *See infra* pp. 27–28.

## II.  Argument

Even under a liberal standard, Defendants' motion to amend should be denied.  First, Defendants' proposed amendment fails to state a claim as a matter of law and is thus futile.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (leave to amend should be denied if amendment would be futile).  Second, Defendants' unjustified, long delay in seeking amendment and their associated attempt to obtain an effectively indefinite schedule extension to accommodate their belated theories significantly prejudice Plaintiffs and threaten the Court's ability to issue a post-trial decision prior to the expiration of the compound patent.  *See id.* (leave to amend should be denied because of "undue delay, bad faith [or] dilatory motive").

### A.  Defendants' Proposed Amendment Is Futile.

### 1.  Defendants Have Failed To Plead Inequitable Conduct.

Defendants' diatribe against Dr. Helleday, Br. 1–5, attempts to obscure the utter lack of legal support for its unprecedented and legally foreclosed theory of inequitable conduct, upon

which all of the proposed amendments rely, Br. 23–26. As Defendants themselves argue, inequitable conduct is a defense to a patent infringement claim in which a patent may be held unenforceable if, during prosecution of that patent, the applicant "misrepresented or omitted material information with the specific intent to deceive the PTO." Br. 17 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc)).

Here, the allegedly inequitable conduct undisputedly did not occur during prosecution of the '562 patent at issue in this case. The proposed amendments allege no misrepresentation or omission at all in connection with prosecution of the '562 patent. Rather, Defendants allege that Dr. Helleday made a misrepresentation when he corrected the inventorship of the '701 and '530 patents—patents that are assigned to unrelated third parties (Pfizer and Cancer Research UK) and that Plaintiffs do not (and have no rights to) assert in this case.

This poses a problem for Defendants: Only the patent during whose prosecution the fraudulent conduct occurred ordinarily can be unenforceable for inequitable conduct. *Pharmacia*, 417 F.3d at 1375. Defendants thus attempt to tie Dr. Helleday's supposed misdeeds back to the '562 patent-in-suit by recourse to the doctrine of "infectious unenforceability," through which, in certain narrow and unusual circumstances, an inequitable conduct finding as to one patent can infect or "taint" other patents. Br. 18 (quoting *Therasense*, 649 F.3d at 1288; *Guardant Health, Inc. v. Found. Med., Inc.*, 2020 WL 2477522, at *4 (D. Del. Jan. 7, 2020)).

Even on their own facts as pleaded, Defendants cannot demonstrate either half of this two-step theory—a predicate finding of inequitable conduct as to the Curtin patents and an infection spreading from there to the prosecution and issuance of the '562 patent. Their amendment thus would be futile for at least two independent reasons. *First*, Defendants' inequitable conduct theory cannot meet what they acknowledge is the applicable materiality standard: that the purportedly

9

fraudulent correction of inventorship somehow was the but-for cause of the Curtin patents' issuance. Those patents had issued years earlier, applying a list of inventors Defendants argue was *correct*. "Absent a predicate act of inequitable conduct, there is no plausible basis for a claim of infectious unenforceability." *Shionogi & Co. v. Norwich Pharm., Inc.*, 2024 WL 4495288, at *5 (D. Del. Sept. 23, 2024).

*Second*, the undisputed facts doom Defendants' infectious-unenforceability argument, which as a matter of law cannot reach the '562 patent long after it issued. Under the "infectious unenforceability doctrine," Br. 18, 24–25, "inequitable conduct that occurred [1] *earlier* in the chain of issued patents . . . [2] must be related to the targeted claims of the ultimately-issued patent or patents sought to be enforced," *Guardant Health*, 2020 WL 2477522, at *4 (cleaned up). Given that all relevant patents issued before the correction, Defendants cannot go backwards in time to allege that a later inventorship correction infected the previously issued '562 patent. *Pharmacia*, 417 F.3d at 1375. And given that the '562 patent issued under what Defendants claim was the *correct* inventorship, they cannot establish that this later alleged misconduct as to the Curtin patents has any relevance "to the targeted claims." *Guardant*, 2020 WL 2477522, at *4.

### a. Defendants Do Not Plead Any Inequitable Conduct During Prosecution Of The '562 Patent.

As Defendants concede, "as a general matter" and here, "the materiality required to establish inequitable conduct is but-for materiality," meaning that but for the applicant's conduct, the patent would not have issued. *Therasense*, 649 F.3d at 1291; Br. 24 (agreeing "but for" standard applies). Defendants therefore must allege that "the PTO would not have allowed" *the Curtin patents* (or at least one claim thereof) to issue but for that conduct. *See Therasense*, 649 F.3d at 1291. Defendants make no such allegation beyond a passing, obscure reference, Defs. Ex. A, Counterclaim ¶ 238, which fails to meet the particularity required under Rule 9(b), *Exergen*

10

*Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir. 2009).  That dooms their inequitable conduct claims:  Defendants have not alleged, and cannot allege, that the correction of the inventorship of the '701 and '530 patents somehow led to the issuance or continued viability of those patents when they otherwise would not have issued or survived, or indeed bolstered the validity of those patents at all.  According to Defendants, the inventorship had previously been correct and Dr. Helleday committed fraud to make it incorrect, a change that on Defendants' telling could, if anything, only undermine the Curtin patents' validity.  And without showing that one of those patents is unenforceable, there is no inequitable conduct that could infect the '562 patent-in-suit.  *See Shionogi*, 2024 WL 4495288, at *5 (D. Del. Sept. 23, 2024).

Nor would the amendment become any less futile if they (impermissibly) shift theories on Reply and assert (incorrectly) that but-for materiality is not the governing standard.  Their motion concedes, as it must, that but-for materiality is the standard.  *See* Br. 17–18, 23–26.  *Therasense* recognized a rare exception to but-for materiality "in cases of affirmative egregious misconduct," such as "perjury and suppression of evidence," "manufacture and suppression of evidence," and "bribery and suppression of evidence," 649 F.3d at 1292, 1293—conduct of a different nature from a purportedly incorrect inventorship conclusion.  But no case ever has applied these exceptions to render unenforceable, retroactively, a patent issued years before any misconduct, following an examination untainted by that misconduct.  The purpose of inequitable conduct is to fulfill the "paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct," *Precision Instrument Mfg. Co. v. Auto. Maint. Machs. Co.*, 324 U.S. 806, 816 (1945)—and the Curtin patents (and the '562 patent) undisputably did so.

### b.      Unenforceability Cannot Infect The '562 Patent.

Defendants' inequitable conduct claim against the '562 patent also fails as a matter of law, and the amendment is thus futile, for the independent reason that Defendants cannot demonstrate

11

that alleged misconduct in the Curtin patents—even if it rose to the level of inequitable conduct—infects the '562 patent. Defendants suggest that the mere fact that the correction of inventorship of the Curtin patents affects one of their litigation defenses provides the requisite "immediate and necessary relation" between the inequitable conduct they try to plead and the enforceability of the '562 patent. Br. 24. But no precedent allows unenforceability to "infect" patents that issued years before, where misconduct not only undisputedly did not have, but temporally *could not have*, any effect on proceedings before the PTO in the purportedly infected '562 patent. Defendants' novel rule, in fact, traduces the strict limits that precedent after precedent imposes on the infectious unenforceability doctrine: Infection does not travel backwards in time. And the PTO's issuance of the '562 patent while applying the very understanding of inventorship that Defendants claim Dr. Helleday lied to avoid, forecloses any argument that alleged inequitable conduct as to the Curtin patents bears the required relationship to the prosecution of the '562 patent.

### 1) Infectious Unenforceability Does Not Apply Retroactively.

As set forth above, Defendants allege no misconduct relating specifically to the asserted '562 patent, but rather at most allege misconduct with respect to the unasserted Curtin patents. Defs. Ex. A at 27 (Sixth Defense), Counterclaim ¶ 238. In its seminal *Therasense* decision, the *en banc* Federal Circuit noted that because "the remedy for inequitable conduct is the 'atomic bomb' of patent law," its promiscuous pleading had become a "plague" that the Court intended to stop. 649 F.3d at 1288–89. The Court did so by establishing important constraints on the inequitable conduct defense to eliminate non-viable claims at the pleading stage. *Id.* at 1290–92.

Defendants entirely ignore one such constraint fatal to their infectious unenforceability theory: As the Federal Circuit and numerous district courts have held uniformly over four decades, *later*-alleged misconduct cannot infect a patent that "had already issued" before "the [allegedly

12

wrongful] events" occurred. *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1370 n.10 (Fed. Cir. 2008); *Pharmacia*, 417 F.3d at 1375 (rejecting infectious inequitable conduct where patent "***had already issued*** before the inequitable conduct occurred" (emphasis added)); *Lannett Co. v. KV Pharms.*, 2008 WL 4974579, at \*3 (D. Del. Nov. 21, 2008) (at pleadings stage, striking defense and holding "[i]nequitable conduct ***cannot be imputed to the earlier prosecuted [patents]*** based upon alleged conduct ***relating to later prosecuted patents***." (emphasis added)); *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 609 F. Supp. 2d 1090, 1101 (E.D. Cal. 2009) (denying leave to amend in relevant part and holding that "an otherwise validly issued patent ***cannot be made unenforceable because of inequitable conduct occurring years later*** in connection with the issuance of other patents," notwithstanding "that the later issued patents may relate in subject matter" (emphasis added)); *Planet Bingo, LLC v. VKGS, LLC*, 2012 WL 5511843, at \*6 (W.D. Mich. Nov. 14, 2012) (similar, denying leave to amend); *Abbott Lab'ys v. Sandoz, Inc.*, 743 F.Supp.2d 762, 781 (N.D. Ill.2010) ("Federal Circuit precedent makes clear that ***inequitable conduct associated with the prosecution of a later patent does not affect the enforceability of an earlier patent***."); *see also SSIH Equip. S.A. v. ITC*, 718 F.2d 365, 378–79 (Fed. Cir. 1983) (rejecting "as a matter of law" theory that "all of the patents are so interrelated that [patentee's] 'unclean hands' with respect to the later patents renders the [earlier] patent unenforceable"). That rule, which Defendants neither cite nor attempt to distinguish, is dispositive here and forecloses Defendants' theory exclusively relying on alleged misconduct regarding the inventorship of the '701 and '530 patents that occurred ***a decade after*** the '562 patent issued.

There is no dispute that Defendants' proposed amendment rests on imputing later misconduct in connection with the Curtin patents to the '562 patent that had already issued. The '562 patent issued ***in 2014***. Defs. Ex. A, Answer ¶ 67. Defendants allege that "***on July 23, 2024,***"

13

Dr. Helleday "fraudulently filed inventorship change paperwork" to remove himself as an inventor of the '701 and '530 patents. Br. 24; Defs. Ex. A, Counterclaim ¶¶ 214–15. That conduct underlies Defendants' inequitable conduct claim, Defs. Ex. A, Counterclaim ¶ 238; Defendants allege no misconduct occurring during the prosecution of the '562 patent before (or after) issuance. That is fatal to their infectious inequitable conduct claim. *E.g.*, *Pharmacia*, 417 F.3d at 1375.[2]

Defendants argue that the alleged conduct "bears 'an immediate and necessary relation' to the enforcement of the '562 patent," Br. 24, but whether that separate requirement is satisfied is irrelevant to Defendants' flawed reliance on retroactive infectiousness. *See Duhn*, 609 F. Supp. 2d at 1100–02 (rejecting "immediate and necessary relation" where defendant relied on retroactive infectiousness). Applying infectiousness backwards in time, *contra* decades of precedent, violates the premise of the infectiousness doctrine: that the patentee should not be permitted to enjoy the fruits of later-prosecuted patents that "eventually issue" where they are tainted by misconduct "early in the prosecution." *Fox Indus., Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990); *see Precision Instrument Mfg.*, 324 U.S. at 816. And such extension would be particularly perverse here where the alleged later misconduct could not possibly have affected the '562 patent's issuance. *See infra* § II.A.1.b.2.

None of Defendants' cited cases endorsed a retroactive infectiousness theory. In *Guardant*

---

[2] Federal Circuit precedent extending inequitable conduct to the context of post-issuance maintenance fees is not to the contrary. In *Ulead Sys. v. Lex Comput. & Mgmt. Corp.*, 351 F.3d 1139, 1146 (Fed. Cir. 2003), for instance, the court concluded that a false declaration of small entity status was material for inequitable conduct purposes, because even though "the affidavit did not induce issuance of the patent, the misrepresentation that Lex qualified as a small entity was material to the PTO's acceptance of reduced maintenance fees[.]" *See also In re Rembrandt Techs. LP Pat. Litig.*, 899 F.3d 1254, 1273 n.** (Fed. Cir. 2018) (discussing *Ulead*). While these cases establish that lying to the PTO in conjunction with maintaining an issued patent can also be inequitable conduct as to that patent, they did not address infectious inequitable conduct or the consistent precedent prohibiting retroactive infectiousness. Accordingly, these cases do nothing to suggest that such conduct can ever reach backwards to infect a different, already issued patent.

14

*Health*, 2020 WL 2477522, at *7, Br. 24, the district court explained that the defendant presented allegations of misconduct "during the prosecution of *earlier*-prosecuted patent applications, which thus infects the patentee's ability to enforce a *later*-issued patent." (emphasis altered).  Rather than depart from the extensive precedent barring retroactive infectiousness, the court distinguished the scenario there from *Pharmacia* where—just like here—"there had been no inequitable conduct during the prosecution of the [asserted] patent, and because the [asserted] patent had already issued, ***then one could not utilize later-occurring inequitable conduct to render that patent retroactively unenforceable***." *Id.* (discussing *Pharmacia*, 417 F.3d at 1375) (emphasis added).

Likewise, in *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990), Br. 25, the Federal Circuit applied infectiousness only to patents prosecuted *after* the alleged misconduct.  Specifically, the patentee committed inequitable conduct during prosecution of the "'917 patent," *id.* at 808, and the Federal Circuit affirmed that this misconduct spread to the later-issuing patents asserted against the same defendant in the same case, *id.* at 809–11.  Those later patents incorporated results from tests "conducted with the same concealed" embodiment giving rise to inequitable conduct in the '917 patent, and one patent cited expressly to the '917 patent.  *Id.* at 809.  Again, the court specifically distinguished its earlier precedent rejecting an infectiousness theory where the relevant patent "issued three years before that [alleged] conduct occurred."  *Id.* at 812 (discussing *SSIH*, 718 F.2d at 378).  And Defendants' other cited inequitable conduct case—the non-precedential *Sanders v. The Mosaic Co.*, 418 F. App'x 914, 919 (Fed. Cir. 2011)—did not involve infectiousness at all, much less an effort to apply it retroactively.

Because the '562 patent "had already issued before the [alleged] inequitable conduct occurred," *Pharmacia*, 417 F.3d at 1375, Defendants' inequitable conduct claim fails as a matter of law.  In view of the Federal Circuit's repeated holdings, *supra* p. 13, the Court should reject

15

Defendants' unprecedented attempt to expand inequitable conduct and deny, on futility grounds, its motion to amend with respect to the inequitable conduct claims.

**2)      The Patent Office Examined And Allowed The '562 Patent Under The Inventorship Defendants Contend Was Correct.**

Separately, Defendants' own chronology refutes their outlandish claim that the subsequent inventorship correction of the Curtin patents somehow could have contributed or "relate to" to the earlier issuance of the '562 patent. *Guardant*, 2020 WL 2477522, at \*7. The Curtin patents are owned by third parties, not Plaintiffs, Defs. Ex. A, Counterclaim ¶ 155; are not related as continuations or divisionals; do not share the same specification, *id.* ¶ 84; and all of these patents issued before the correction of inventorship occurred. If ever there could be a case where later actions could somehow reach back in time and infect a separate, earlier-issued patent, this is not it. The issued claim of the '562 patent had "no relation to" the misconduct because it issued before the misconduct even occurred, based on inventorship Defendants consider proper. *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998).

According to Defendants, when the PTO examined the patentability of the '562 patent and concluded that it should issue, the inventorship stated on the face of the Curtin patents was correct. Only later, Defendants claim, Dr. Helleday fraudulently changed that inventorship. One therefore need not speculate how the PTO would have addressed the ODP question without Dr. Helleday's removal as a named inventor on the Curtin reference patents. ***The PTO did so***. As Defendants acknowledge, Dr. Helleday ***was listed as an inventor*** on those patents during prosecution of the '562 patent. Defs. Ex. A, Counterclaim ¶¶ 79, 81. The PTO issued the '562 patent, following an ODP rejection, under the assumption that he was an inventor. *Id.* ¶¶ 139–40. The PTO's decision to issue the '562 patent while recognizing what Defendants contend is the ***correct*** inventorship of the Curtin patents necessarily demonstrates that the allegedly ***incorrect*** inventorship recited in Dr.

16

Helleday's later, purportedly fraudulent submission was irrelevant to the '562 patent's issuance.

In fact, the ODP issue received careful scrutiny, not just from the Examiner, but on appeal within the PTO. The applicant appealed the Examiner's ODP rejection to the Patent Trial and Appeal Board ("Board") and argued that the Curtin '701 patent claims "are silent about hereditary cancers or the possibility of identifying patients who are predisposed to such cancers," as the '562 patent claim (then pending as claim 66) recites. Defs. Ex. EE at -841. The Board agreed:

> We agree with Appellant that the Examiner has not adequately explained how the claims of the '701 patent in combination with the cited references would have made obvious instant claim 66. Neither the claims of the '701 patent, nor any of the other cited references, discuss the heritability of cancer susceptibility or a familial predisposition to cancer.

*Id.*; Defs. Ex. A, Counterclaim ¶ 141. The Board held similarly with respect to the Curtin '530 patent. Defs. Ex. EE at -884; Defs. Ex. A, Counterclaim ¶ 141. The Examiner then allowed the claim, and the '562 patent issued. Defs. Ex. EE at -868; Defs. Ex. A, Counterclaim ¶ 145. Because the Board rejected ODP over the '701 and '530 patents—the only defense alleged to be relevant to the purported misconduct, Br. 24—***regardless of*** the inventorship of those patents, Defendants plainly cannot demonstrate the requisite connection between the alleged inequitable conduct regarding the Curtin patents and the '562 patent claim asserted here.

Defendants' other allegations amount to merely disagreeing with the Board's conclusion. Defs. Ex. A, Counterclaim ¶¶ 243–251. As a matter of law, this does not establish the requisite connection between the alleged misconduct in the Curtin patents and the '562 patent claim; that Defendants believe the Board erred is not in any way connected to Dr. Helleday's alleged misconduct a decade later. *Baxter*, 149 F.3d at 1332. Defendants mischaracterize the Board's decision as based on the Examiner's "failure to explain" the rejection, Defs. Ex. A, Counterclaim ¶ 244, but the Board's actual decision (1) expressly found that the reference claim did not teach

17

the limitations of the '562 patent, including regarding the "heritability of cancer susceptibility or a familial predisposition to cancer," Defs. Ex. EE at -841, and (2) agreed with the applicant that the POSA "would not perform a method which involved identifying a patient with a familial predisposition to said cancer and administering the PARP-1 inhibitor to the identified patient," *id.* at -884. While Defendants may disagree with those conclusions based on various prior art, Defs. Ex. A, Counterclaim ¶¶ 245–251, the Examiner and the Board already considered ODP based on what Defendants allege is the correct inventorship and upheld the claim.

### 2. Defendants' Unclean Hands Claim Fails For The Same Reasons.

Defendants assert unclean hands based on the "same reasons" as inequitable conduct, Br. 25, and that defense therefore fails for the same reasons described above. *Supra* § II.A.1. Defendants cannot affix an "unclean hands" label to allegedly improper behavior before the PTO and thereby evade the infectious unenforceability and materiality limitations on inequitable conduct. As Defendants' own cited cases establish, "'inequitable conduct' is no more than the unclean hands doctrine applied to particular conduct before the PTO." *Consol. Aluminum*, 910 F.2d at 812. The Federal Circuit's precedent is clear: An unclean hands defense cannot somehow "override[] this court's inequitable-conduct standards governing unenforceability challenges based on prosecution communications with the PTO." *Gilead Scis., Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1240 n.3 (Fed. Cir. 2018). Here, the sole alleged misconduct involves Dr. Helleday's correction of inventorship "communication[] with the PTO," *id.*, and the inequitable conduct standards thus govern that correction.

### a. Infectious Unenforceability Does Not Apply.

Defendants' fundamental problem that the alleged fraud occurred in connection with different patents (the Curtin patents) long after the '562 patent issued is as fatal to their unclean hands defense as it is to their inequitable conduct claims. Under both doctrines, the Federal Circuit

18

squarely has rejected "as a matter of law" that "'unclean hands' with respect to [] later patents renders [an] [earlier] patent unenforceable." *SSIH*, 718 F.2d at 378; *see Pharmacia*, 417 F.3d at 1375 (same for inequitable conduct); *supra* § II.A.1.b.

Defendants' cited cases, Br. 25, are not to the contrary. They did not even involve PTO misconduct that the Federal Circuit has clarified (including in *Gilead*, 888 F.3d at 1240, n.3) must be governed by the requirements of inequitable conduct. *Luv n' Care, Ltd. v. Laurain* did not involve an unclean hands defense based on infectious unenforceability or conduct before the PTO, but rather litigation misconduct involving the patentee's assertion of the patent-in-suit, including "false testimony during depositions." 98 F.4th 1081, 1096 (Fed. Cir. 2024). Likewise, *Gilead* affirmed a finding of unclean hands based on "serious business misconduct" and "litigation misconduct" involving "intentional testimonial falsehoods" relating to the patentee's assertion of the relevant patent in litigation—again, not infectious unenforceability or alleged PTO misconduct. 888 F.3d at 1242, 1244. Indeed, the *Gilead* court expressly observed that the case did not "involv[e] alleged deficiencies in communications with the PTO during patent prosecution, for which this court's inequitable-conduct decisions, *e.g.*, [*Therasense*], set important limits on conclusions of enforceability through that doctrine." *Id.* at 1240. As set forth above, one of those "important limits" is that "[allegedly wrongful] events" before the PTO after a patent "had already issued" cannot retroactively infect the earlier patent and render it unenforceable. *Star Sci.*, 537 F.3d at 1370 n.10; *Pharmacia Corp.*, 417 F.3d at 1375; *supra* p. 13 (collecting cases). The unclean hands cases cited by Defendants, Br. 25, are fully consistent with that principle; indeed, as described above, *Gilead* explicitly cautioned that it was not sanctioning use of unclean hands to "override[]" inequitable conduct. 888 F.3d at 1240 n.3. The court could hardly have been clearer that it was not upsetting decades of consistent precedent foreclosing Defendants' retroactive

19

infectious unenforceability theory.

> **b.    Defendants Fail To Plead Any Litigation Misconduct.**

Defendants scurrilously accuse Plaintiffs' undersigned counsel of litigation misconduct, but an allegation that counsel "engaged in litigation misconduct by refusing to produce non-privileged discovery" comes nowhere close to the standard for "egregious misconduct" required for unclean hands.  Defs. Ex. A, Counterclaim ¶¶ 75, 259–264; *Therasense*, 649 F.3d at 1287.  The documents are subject to a still-pending motion to compel, which Plaintiffs opposed because, *inter alia*, the documents are irrelevant because they relate solely to Defendants' legally-deficient and woefully-belated claims that are the subject of this motion.  *See* Dkt. No. 214.  Because Defendants' motion to compel remains pending and should be denied for the same reasons as this motion to amend, Plaintiffs committed no misconduct by refusing to produce the documents.

Regardless, as explained above, "egregious" acts require misconduct on the order of "perjury," "manufacture and suppression of evidence," and "bribery," *Therasense*, 649 F.3d at 1293, and "intentional testimonial falsehoods," *Gilead*, 888 F.3d at 1244.  Even taken as true, the allegation that Plaintiffs here "refused to produce" certain documents of disputed relevance are in a different universe entirely.  Even if Plaintiffs had "withheld essential discovery" (a charitable reading for Defendants given the nature of the documents in dispute), such a run-of-the-mill discovery dispute would not rise to the required level to "shock[] the moral sensibilities." *Intel Corp. v. Future Link Sys., LLC*, 268 F. Supp. 3d 605, 623–24 (D. Del. 2017).

Moreover, Defendants cannot dispute Plaintiffs produced documents "relat[ing] to Dr. Helleday's change in inventorship," Defs. Ex. A ¶ 259, which Defendants themselves attach as exhibits to their proposed counterclaim, *see* Defs. Exs. GG, HH, II, LL, NN, O, OO, PP, Q, QQ, R, RR, SS, T, TT, U, UU, V, W.  And Plaintiffs offered to produce additional documents, including "communications during the past 24 months that refer to the '701 and '530 patents" between

multiple entities.  Defs. Ex. A, Counterclaim ¶ 263 (citing Dkt. No. 210-18).  No case has found unclean hands based on this sort of discovery dispute and negotiation, and suggesting it constitutes "egregious" misconduct makes a mockery of the *Therasense* constraints.  *See Hum. Genome Scis., Inc. v. Genentech, Inc.*, 2011 WL 7461786, at *8 (C.D. Cal. Dec. 9, 2011) (explaining egregious misconduct involved "paying witnesses to lie, publishing false articles under the names of industry experts, and engaging in a settlement with a known perjurer in a manner which suppressed the evidence of the perjury").  Defendants unsurprisingly cite no precedent in support of such theory and do not even mention litigation misconduct with respect to futility.  Accordingly, Defendants' allegations of litigation misconduct cannot rescue their unclean hands claim.

### 3.       Defendants Fail To Plead Any Antitrust Violation.

Defendants rest on the "same allegations of fraud" for their antitrust claims "under *Walker Process*," Br. 25, which fail both for the same reasons above regarding inequitable conduct, *supra* § II.A.1, and separately because Defendants fail to plead a cognizable antitrust injury.

#### a.       Defendants' Antitrust And Inequitable Conduct Claims Fail For The Same Reasons.

Defendants' antitrust claim is premised on alleged *Walker Process* fraud.  Br. 25.  "To demonstrate *Walker Process* fraud, a claimant must make ***higher threshold showings of both materiality and intent than are required to show inequitable conduct***."  *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007) (emphasis added); *see Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 177–78 (1972).  Put another way, "failure to establish inequitable conduct precludes a determination that [challenger] ha[s] borne its greater burden of establishing the fraud required to support its *Walker Process* claim."  *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1417 (Fed. Cir. 1987).  Because Defendants fail to state an inequitable-conduct claim, *supra* § II.A.1, they necessarily fail to state a *Walker Process* claim—

21

they "broke [their] *Walker Process* sword when [they] failed to establish inequitable conduct." *Id.* at 1418 (Fed. Cir. 1987); *Daiichi Sankyo, Inc. v. Apotex, Inc.*, 2009 WL 1437815, at *6 (D.N.J. May 19, 2009) ("*Walker Process* fraud can not be found in the absence of inequitable conduct."). Defendants do not assert that their antitrust claim can survive without an inequitable conduct claim.

Further, even were Defendants' inequitable conduct infectious unenforceability claim legally valid (it is not), its *Walker Process* claim still would fail as a matter of law. That is because *Walker Process* requires finding what Defendants do not allege: that the '562 patent itself was "**procured by** 'intentional fraud,'" *i.e.*, "knowingly and willfully misrepresenting facts to the Patent Office." *Argus Chem. Corp. v. Fibre Glass-Evercoat Co., Inc.*, 812 F.2d 1381, 1384 (Fed. Cir. 1987) (citations omitted); *see Dippin' Dots*, 476 F.3d at 1346 ("The first barrier for a *Walker Process* claimant to clear is the requirement that the patent be obtained through actual fraud upon the PTO."). Here, as explained above, there is no allegation of any fraud in procuring the '562 patent—to the contrary, Defendants' own allegations make clear that the PTO examined the '562 patent **based on the inventorship Defendants allege to be correct** for the '701 and '530 patents (that Dr. Helleday was a named inventor of all the patents). *Supra* § II.A.1.b.2. Accordingly, the '562 patent undisputably was not "procured by" fraud, and Defendants' *Walker Process* claim thus fails. *Argus*, 812 F.2d at 1384; *Dippin' Dots*, 476 F.3d at 1346.

Precedent has rejected attempts to extend infectious unenforceability to *Walker Process* claims, and Defendants cite no case where a court has upheld a *Walker Process* claim based on infectious unenforceability. *See, e.g.*, *Guardant Health, Inc. v. Found. Med., Inc.*, 2020 WL 2461551, at *10 n.18 (D. Del. May 7, 2020) (agreeing that infectious inequitable conduct "would not rise to the level of fraud on the PTO required for a *Walker Process* claim"). As Defendants' claims of misconduct undisputedly are premised on "infectious unenforceability," Br. 25, they

22

cannot state a claim for *Walker Process* fraud.

### b.    Defendants Fail To Plead Any Antitrust Injury.

Defendants' antitrust claim also fails to adequately plead antitrust injury, "that is, an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 164 (3d Circ. 2017). Defendants principally allege that they "may be delayed from entering the relevant market for olaparib," Defs. Ex. A, Counterclaim ¶ 304, but Defendants already are foreclosed from entering the market because they did not challenge the validity and infringement of the olaparib compound patent (U.S. Patent 7,449,464) and seek FDA approval of their applications only after its 2027 expiry, *see, e.g.*, Dkt. No. 255 at 2.  Defendants' failure to "take into account [the] blocking patent" is fatal to its antitrust claim; "[i]t is not enough for [Defendants] to show [they] want[] to launch [their] drug[s]; they must also show that the launch would have been legal." *Wellbutrin*, 868 F.3d at 165; *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *83 (D.N.J. June 6, 2024); *In re Humira (adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 844 (N.D. Ill. 2020) ("If a drug is not able to launch because launching would infringe even a single patent, then the injury (if it could still be called that)" is not caused by the alleged misconduct but rather "by the patent laws prohibiting the launch").  Because the '464 patent lawfully forecloses competition until 2027, Defendants cannot state a claim that they have suffered any antitrust harm.

Furthermore, any claim to future harm years from now would rest on speculation and is not ripe.  Even after the expiration of the '464 patent in September 2027, Plaintiffs assert infringement of patents on olaparib formulations—U.S. Patents 8,475,842, 11,633,396, 11,975,001, 12,048,695, 12,144,810, and 12,178,816—which do not expire until 2029, and likewise will lawfully block the approval of Defendants' generic products, even if they otherwise meet the standards for FDA approval, if Plaintiffs prevail at trial.  These separate bars to

23

commercialization of Defendants' products likewise foreclose any antitrust injury.

Defendants also allege harm through "paying attorney fees and costs" to defend this lawsuit, Defs. Ex. A, Counterclaim ¶ 306, but "individual incurrence of defense costs in this litigation" cannot constitute antitrust injury absent an allegation that these costs have prevented Defendants from entering the relevant market. *Otsuka Pharm. Co. v. Torrent Pharm. Ltd.*, 187 F. Supp. 3d 483, 486–87 (D.N.J. 2016). "The antitrust laws . . . were enacted for the protection of competition not competitors," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (cleaned up), and thus the standard costs of patent litigation cannot meet the high bar of invoking the antitrust laws, *Otsuka*, 187 F. Supp. 3d at 486, else every patent litigation would pose an antitrust injury. Just as in *Otsuka*, Defendants' counterclaim fails to "tether [their] payment of defense costs in this litigation . . . to harm borne by the market-at-large," and "does not allege that [patentee's] anticompetitive conduct has, through these costs of litigation, somehow harmed the competitive landscape, nor that these costs have prevented [Defendants] from pursuing [market] entry." *Id.* at 487. Thus, Defendants' unspecified "adverse financial effect" from litigating this case, with no connection to broader market harm, cannot constitute antitrust injury. *Id.*

Notably, the court in *Otsuka* distinguished *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1309–12 (Fed. Cir. 2016), explaining that *TransWeb* "addressed itself to the issue of recoverable antitrust <u>damages</u>." 187 F. Supp. 3d at 486 n.6. Unlike *TransWeb*, where the defendant suffered lost profits from the patentee's conceded *Walker Process* fraud, 812 F.3d at 1308–09, the defendant in *Otsuka* included no allegations that defense costs in any way prevented market entry or otherwise harmed competition, 187 F. Supp. 3d at 487. Defendants are similarly situated to the defendant in *Otsuka*, and *TransWeb* is thus inapposite for the same reasons.

**B.**     **Defendants' Prejudicial Undue Delay Separately Forecloses Amendment.**

Although the Scheduling Order does not include a deadline for amending pleadings, fact

24

discovery has long since concluded.  Thus, Defendants cannot reasonably rely on the liberal standard for amendment set out in Federal Rule of Civil Procedure 15(a)(2), nor do Defendants assert that they are entitled to do so.  The Court should deny a motion to amend the pleadings where there is "undue delay . . . [or] undue prejudice to the opposing party by virtue of allowance of the amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  A party seeking leave to amend must thus "demonstrate that its delay in seeking to amend is 'satisfactorily explained.'"  *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990) (quoting *Leased Optical Departments v. Opti–Center, Inc.,* 120 F.R.D. 476, 478 (D.N.J. 1988)).

### 1.       Defendants Have Unduly Delayed.

Generally, delay is undue when a motion to amend is filed "three months or more from the time the defendant obtained critical information relating to an inequitable conduct claim."  *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 2020 WL 4794576, at *4 (D. Del. Aug. 18, 2020).  Defendants have delayed far longer than three months here.  Defendants filed this motion for leave to amend over 14 months after Dr. Helleday submitted his public declaration to the PTO that forms the basis for all of Defendants' proposed amendments.  Defs. Ex. HH; Defs. Ex. II.  Defendants have been aware (or should have been aware) of Dr. Helleday's alleged fraud since no later than July 23, 2024, but they took no action.  And most of the other documents on which Defendants rely, from the original research work conducted at the University of Sheffield, were produced far earlier in the case—long before July 2024.[3]

On September 10, 2024, the PTO formally changed the inventorship of the Curtin patents.

---

[3]  The majority of the documents relating to Dr. Helleday's research and development that led to the inventions of the '562 patent were produced on May 24, 2024, as part of production volume nos. SHEFFIELD-001 and SHEFFIELD-002.  *See* Pls. Ex. 5.  Plaintiffs explained in their May 2024 contentions that the '562 patent was not invalid for double patenting because, *inter alia*, the inventorship of the Curtin patents was wrong, Pls. Ex. 2 at 20.

Defs. Ex. HH; Defs. Ex. II.  Still, Defendants stood idly by.  Then, on December 20, 2024, Plaintiffs produced the SHEFIELD-003 production volume, including complete file histories for the Curtin patents, which contained Dr. Helleday's declaration seeking a correction of inventorship and the certificates of correction issued by the PTO.  Pls. Ex. 3 (2024.12.20 Email from M. Accardi).[4]  If all of this was not enough, Plaintiffs followed up on this production on January 17, 2025, when they served their validity contentions expressly stating that inventorship had been changed.  Pls. Ex. 4 at 22–23.

Any party seeking to amend its pleadings to incorporate inequitable conduct allegations must take immediate action once a "red flag" indicating possible inequitable conduct has been raised.  *See Wag Acquisition, LLC v. Gattyan Group S.a.r.l.,* 2020 WL 5105194, at *4 (D.N.J. Aug. 31, 2020) (affirming magistrate judge's denial of motion to amend when discovery should have "raised a red flag, motivating [the defendant] to immediately pursue discovery regarding a potential claim of inequitable conduct").  Here, the supposed "red flag" giving rise to Defendants' claims was hoisted, in the broad daylight of the PTO's files accessible to everyone with an internet connection, as early as July 24, 2024.  Defendants could have and should have pursued leave to amend as soon as possible after learning about it.  *Id*.; *see also Therasense*, 649 F.3d at 1288. Delaying fourteen months after notice of the change indicates idleness rather than diligence.

Defendants argue that they were diligent because they pursued discovery in February 2025, received third-party discovery from Pfizer in August 2025, took Dr. Helleday's deposition in

---

[4] Perplexingly, Defendants claim that Plaintiffs did not produce documentation of the inventorship change until January 17, 2025.  Br. 14.  However, Plaintiffs produced the SHEFFIELD-003 production volume, which contains the relevant filings with the PTO, in December 2024. Nevertheless, the time periods that elapsed after document production and service of validity contentions regarding the change in inventorship—9 months and 8 months respectively—are both long enough to show that Defendants delayed unduly.

August 2025, and filed their motion to amend only a few weeks thereafter. Br. 26–27. They claim that they "took no more time than was necessary to investigate [the inventorship change] before making a fraudulent conduct charge with particularity." Br. 27.

But Defendants offer no adequate explanation as to *why* this discovery was necessary to assert their new invalidity theories. *See Eagle View Technologies, Inc. v. Xactware Solutions, Inc.*, 2018 WL 2464499, at *5 (D.N.J. May 31, 2018) (denying leave to amend when defendants offered no argument as to why more discovery was necessary to bring their claim); *Harrison Beverage Co.*, 133 F.R.D. at 471 (denying motion to amend where delay was "insufficiently and inconsistently unexplained"). Once a party has sufficient information to bring a claim, the party must seek leave to amend—it cannot delay seeking leave to amend based on a desire for further discovery. *See Inline Connection Corp. v. AOL Time Warner Inc.*, 237 F.R.D. 361, 368 (D. Del. 2006) ("It is not for a party to unilaterally determine that it may delay moving to amend its pleadings when it has access to the information necessary for such amendment."). Defendants do not identify any specific fact gleaned from later discovery to support their new claims, which all depend on the alleged falsity of Dr. Helleday's public declaration to the Patent Office in July 2024.

Defendants only cite *one* concrete piece of information that they received during Dr. Helleday's deposition—that Dr. Helleday receives royalties from the '562 patent—as relevant to their proposed amendments. Br. 27. Defendants do not explain how this anodyne fact relates to their inequitable conduct claim—patent inventors routinely receive royalties for sales of their invention. But regardless, the fact that Dr. Helleday "is inventor of a patent to use PARP inhibitors in homologous recombination defective cancers *and receives royalty* [sic] *from PARP inhibitor sales*" was publicly known since at least 2016. Pls. Ex. 6 at 757. And the University of Sheffield produced documents in December 2024 stating Dr. Helleday's share of the royalties from the '562

27

patent.  Pls. Ex. 7 at 1.  Defendants neither allege otherwise nor argue their failure to conduct basic diligence justifies their late amendment.

And while Defendants cite a host of facts they allegedly learned about the process of how inventorship was corrected, Br. 26–27, these facts were neither new nor necessary to Defendants' claim.  That Dr. Helleday met with his lawyers at various times and that there were negotiations with Pfizer in connection with the correction of inventorship should not have been revelations to Defendants at any time after July 2024, when they were on notice that Dr. Helleday was represented by counsel (who submitted the inventorship correction application) and that Pfizer had consented to the correction of inventorship.  *See* Defs. Ex. HH; Defs. Ex. II.  Regardless, Defendants do not tie these facts to any of their claims.  Defendants allege that only Dr. Helleday made a false statement to the PTO; they do not allege that any of Dr. Helleday's lawyers did so.

In *Inline Connection Corp.*, the court denied the defendants' motion for leave to add an inequitable conduct claim when they "had all the information they believed necessary to plead with particularity their inequitable conduct allegations," yet delayed moving to amend until they received a supplemental production of documents.  237 F.R.D. at 367.  Just as the delayed production of supplemental documents could not justify the failure of defendants in *Inline Connection Corp.* to move earlier, the cumulative information allegedly gleaned by Defendants from Pfizer and Dr. Helleday does not justify their delay in alleging inequitable conduct.

Relatedly, pursuant to the Local Patent Rules, should Defendants wish to assert new counterclaims or theories of invalidity, they must seek leave to "amend their [invalidity] contentions" accordingly.  *Celgene Corp. v. Hetero Labs Ltd.*, 2021 WL 3701700, at *2 (D.N.J. June 15, 2021).  Although inequitable conduct has been described as a theory of "unenforceability" rather than invalidity, courts in this district require parties to include inequitable conduct theories

28

in their invalidity contentions.  *See, e.g.*, *Wag Acquisition*, 2020 WL 5105194 at *3–5 (defendant failed to show diligence in moving "to amend its answer and invalidity contentions" to add an inequitable conduct defense).  This imposes an additional diligence requirement; "[a] party seeking to amend its contentions bears the burden of demonstrating diligence in discovering the basis for the proposed amendment as well as moving promptly to amend when new evidence is discovered." *In re Certain Consol. Roflumilast Cases*, 2017 WL 3816542, at *1 (D.N.J. Aug. 31, 2017) (citation omitted).  As explained above, Defendants failed to exercise reasonable diligence in pursuing the theories in their proposed amendment.

### 2.        Defendants' Delay Prejudices Plaintiffs.

Separately, even if Defendants could show diligence, their motion must be denied because allowing the amendment at this juncture would unduly prejudice Plaintiffs.  Undue prejudice may result "where the amendment will require the re-opening of discovery, would delay resolution of the matter, or would unnecessarily increase the cost of litigation."  *Stallings ex rel. Estate of Stallings v. IBM Corp.*, 2009 WL 2905471, at *17 (D.N.J. Sep. 8, 2009) (citing *Textron Fin'l-New Jersey, Inc. v. Herring Land Group, LLC*, 2009 WL 690933, at *5 (D.N.J. Mar.11, 2009)).

The delay here is significant and could jeopardize the Court's ability to try and decide this case in an orderly manner, without preliminary injunction proceedings.  Defendants concede that it is in all parties' and the Court's interest to have this case tried substantially before September 2027, when the unchallenged '464 patent expires. Dkt. No. 255 at 2.  But Defendants further admit that their amendment requires at least a two-month further delay ***of all of the deadlines in the case, including trial***. *Id.* at 2–3.  And Defendants ask that this Court permit amendment and adopt that extension as a pig in a poke, because Defendants are also seeking to reopen fact discovery on their newly-added theories, and Defendants do not even try to argue that this is the last extension they will seek.  *See* Dkt. No. 263 at 2–3.  Though their submission to the Court represented that they

29

do not intend to seek additional fact discovery, Br. 22, Defendants' ensuing statements suggest that they intend otherwise, Dkt. No. 263 at 3 ("If those withheld documents contain information important to Defendants' defenses and counterclaims, Defendants *may* seek further deposition testimony."). Reopening this case to permit Defendants to pursue their fantastical and legally-foreclosed allegations of fraud ineluctably will produce a cascade of extensions that undermine the statutory framework (and Plaintiffs' strong interest) to adjudicate the patents' validity and infringement before FDA approval of the generic applications.

Moreover, when a defendant moves to amend the pleadings after the close of fact discovery, "certain prejudice to the plaintiff is inherent." *Asahi Glass Co., Ltd. V. Guardian Industries Corp.*, 276 F.R.D. 417, 420 (D. Del. 2011). Here, fact discovery closed on August 29, 2025, after Plaintiffs produced hundreds of thousands of pages of documents and made their witnesses available for deposition. Plaintiffs also briefed Defendants' motion to compel documents related to the correction of inventorship of the Curtin patents, and in that briefing, Plaintiffs expressly informed Defendants that their motion was improper given their failure to plead the defenses they now seek to add to the case. Dkt. No. 214 at 4. Yet Defendants are now seeking to reopen document and deposition discovery based on their belated theories. *See* Dkt. No. 263 at 3. Plaintiffs should not be forced to bear the cost and expense of additional discovery now, based on a theory that could have been raised fourteen months ago, and thus addressed during the scheduled fact discovery period that has come and gone.

III.    **Conclusion**

For the foregoing reasons, Defendants' Motion to Amend should be denied.

Dated: October 20, 2025

Respectfully submitted,

*/s/ Charles H. Chevalier*

Charles H. Chevalier
Michael V. Caracappa
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4611
cchevalier@gibbonslaw.com
mcaracappa@gibbonslaw.com

*Of Counsel:*
David I. Berl
Elise Baumgarten
Kevin Hoagland-Hanson
Arthur J. Argall III
Robert Hartsmith
Max C. Accardi
Nicholas G. Vincent
Falicia Elenberg
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
(202) 434-5000
dberl@wc.com
ebaumgarten@wc.com
khoagland-hanson@wc.com
rhartsmith@wc.com
aargall@wc.com
maccardi@wc.com
nvincent@wc.com
felenberg@wc.com

*Counsel for Plaintiffs
AstraZeneca Pharmaceuticals
LP, AstraZeneca UK Limited,
AstraZeneca AB, KuDOS
Pharmaceuticals Limited, The
University of Sheffield, and
MSD International Business
GmbH*

31

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2025, a copy of Plaintiffs' Opposition to Defendants'

Motion to Amend was electronically served on all counsel of record via ECF and electronic mail.


Dated: October 20, 2025                    */s/ Charles S. Chevalier*


*Counsel for Plaintiffs AstraZeneca
Pharmaceuticals LP, AstraZeneca UK Limited,
AstraZeneca AB, KuDOS Pharmaceuticals
Limited, The University of Sheffield, and MSD
International Business GmbH*