**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA UK LIMITED, ASTRAZENECA AB, KUDOS PHARMACEUTICALS LIMITED, THE UNIVERSITY OF SHEFFIELD, AND MSD INTERNATIONAL BUSINESS GMBH, <br><br> *Plaintiffs,* <br><br> v. <br><br> NATCO PHARMA LIMITED, SANDOZ INC., CIPLA LIMITED, CIPLA USA, INC., ZYDUS PHARMACEUTICALS (USA) INC., AND ZYDUS LIFESCIENCES LIMITED, <br><br> *Defendants.* | Civil Action No. 23-cv-796 (RK)(TJB) (Consolidated) <br><br> *Document filed electronically* <br><br> ███████████ <br><br> **Motion Date: November 3, 2025** <br><br> **Oral Argument Requested** |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR LEAVE TO AMEND AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND INVALIDITY CONTENTIONS**

| | |
|---|---|
| James S. Richter <br> MIDLIGE RICHTER LLC <br> 645 Martinsville Road <br> Basking Ridge, New Jersey 07920 <br> *Counsel for Defendant* <br> *Natco Pharma Limited* <br><br> Theodora McCormick <br> Lauren B. Cooper <br> Alec Wong <br> BAKER, DONELSON, BEARMAN, CALDWELL <br> & BERKOWITZ, PC <br> Office One <br> 4365 Route South, Suite 301 <br> Princeton, New Jersey 08540 <br> *Counsel for Defendants Zydus Lifesciences* <br> *Ltd. and Zydus Pharmaceuticals (USA) Inc.* | Loly G. Tor. <br> William E. Antonides, III <br> K&L GATES LLP <br> One Newark Center, 10th Floor <br> Newark, New Jersey 07102 <br> *Counsel for Defendants Cipla USA, Inc. and* <br> *Cipla Limited* <br><br> Eric I. Abraham <br> William P. Murtha <br> Kristine L. Butler <br> HILL WALLACK LLP <br> 21 Roszel Road <br> Princeton, New Jersey 08540 <br> *Counsel for Defendant Sandoz, Inc.* |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...............................................................................................iv

TABLE OF EXHIBITS....................................................................................................vii

I.      INTRODUCTION ................................................................................................. 1

II.     TECHNICAL BACKGROUND............................................................................ 5

III.    FACTUAL BACKGROUND ................................................................................ 5

        A.    Dr. Helleday's collaboration with Nicola Curtin, named co-inventor on the '701 and '530 patents.................................................................... 6

        B.    All agree Dr. Helleday is the primary inventor of the '701 and '530 patents ................................................................................................................. 7

        C.    Prosecution of the '701, '530, and '562 patents ...................................... 8

        D.    Drs. Helleday and Curtin proudly advertised that Dr. Helleday was a joint inventor of the '701 and '530 patents ................................................... 10

        E.    Events leading to the inventorship change............................................11

IV.     PROCEDURAL BACKGROUND...................................................................... 14

V.      LEGAL STANDARDS........................................................................................ 16

        A.    Motion to Amend Pleadings................................................................... 16

        B.    Motion to Amend Contentions................................................................ 17

        C.    Inequitable Conduct............................................................................... 17

        D.    Unclean Hands........................................................................................ 19

        E.    Inventorship ........................................................................................... 19

        F.    Antitrust (*Walker Process*)..................................................................... 20

VI.     ARGUMENT...................................................................................................... 21

        A.    Justice requires leave to amend............................................................. 21

              1.    There is no unfair prejudice to Plaintiffs. ................................. 21

              2.    Defendants' proposed amendments would not be futile. .......... 23

              3.    There has been no undue delay. ................................................. 26

4.      There is no bad faith or dilatory motive behind Defendants' request. ........................................................................................ 28

B.      The Court should grant leave for Defendants to amend their invalidity contentions because their application was timely, good cause exists for the amendments, and Plaintiffs will not be unduly prejudiced. .................................. 28

VII.    CONCLUSION ....................................................................................................... 29

## TABLE OF AUTHORITIES

### Cases

*AS Am., Inc. v. Masco Corp. of Indiana*,
   No. CIV. 13-05 JBS/JS, 2013 WL 4084237 (D.N.J. Aug. 13, 2013) .................................. 17, 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 23

*Aurinia Pharms. Inc. v. Sun Pharm. Indus., Inc.*,
   No. 20-cv-19805, 2022 WL 3040950 (D.N.J. Aug. 2, 2022) ........................................... passim

*BearBox v. Lancium*,
   125 F.4th 1101 (Fed. Cir. 2025) ........................................................................ 20, 23

*Consol. Aluminum Corp. v. Foseco Int'l Ltd.*,
   910 F. 2d 804 (Fed. Cir. 1990) ........................................................................ 18, 25

*CR Bard, Inc. v. M3 Sys., Inc.*,
   157 F.3d 1340 (Fed. Cir. 1998) ........................................................................ 20, 21

*Cureton v. Nat'l Collegiate Athletic Ass'n*,
   252 F.3d 267 (3d Cir. 2001) .............................................................................. 26

*Dole v. Arco Chem. Co.*,
   921 F.2d 484 (3d Cir. 1990) ........................................................................ 16, 17

*Donovan v. W. R. Berkley Corp.*,
   566 F. Supp. 3d 224 (D.N.J. 2021) .................................................................. 16, 21

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
   575 F.3d 1312 (Fed. Cir. 2009) ............................................................................ 18

*Fennec Pharms. Inc. v. Cipla Ltd.*,
   No. CV 23-123 (JKS)(MAH), 2024 WL 4432773 (D.N.J. Oct. 7, 2024) ................................ 17

*Gilead Scis., Inc. v. Merck & Co.*,
   888 F.3d 1231 (Fed. Cir. 2018) ........................................................................ 19, 25

*Guardant Health, Inc. v. Found. Med., Inc.*,
   No. 17-cv-1616, 2020 WL 2477522 (D. Del. Jan. 7, 2020) ........................................ 18, 24, 25

*Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*,
   No. 03-cv-6220, 2006 WL 8462403 (D.N.J. Feb. 10, 2006) ........................................... 27

*Keystone Driller Co. v. Gen. Excavator Co.*,
   290 U.S. 240 (1933) .......................................................................................... 19

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
    973 F.2d 911 (Fed. Cir. 1992) ........................................................................ 20

*Long v. Wilson*,
    393 F.3d 390 (3d Cir. 2004) .......................................................................... 21

*Luv n' Care, Ltd. v. Laurain*,
    98 F.4th 1081 (Fed. Cir. 2024) ................................................................. 19, 25

*Microspherix LLC v. Merck Sharpe & Dohme Corp.*,
    No. 17-cv-3984, 2021 WL 2652009 (D.N.J. June 28, 2021) ....................................... 17

*Monsanto Co. v. Kamp,*
    269 F. Supp. 818 (D.D.C. 1967) ..................................................................... 20

*Moskowitz v. New Jersey*,
    No. 19-cv-12489, 2025 WL 1435717 (D.N.J. May 16, 2025) ...................................... 28

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998) ...................................................................... 20

*Sanders v. The Mosaic Co.*,
    418 F. App'x 914 (Fed. Cir. 2011) .......................................................... 18, 23, 24

*Stern v. Trs. of Columbia Univ. in City of New York*,
    434 F.3d 1375 (Fed. Cir. 2006) ...................................................................... 19

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) ...................................................................... 18

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
    382 U.S. 172 (1965) ........................................................................ 20, 25, 26

*Warner Chilcott Co., LLC v. Lupin, Ltd.*,
    No. 11-cv-7228, 2013 WL 4494949 (D.N.J. Aug. 19, 2013) ................................... 17, 28

*Wise v. Hickman*,
    No. 2:18-cv-12994, 2020 WL 6375788 (D.N.J. Oct. 30, 2020) ................................. 16, 21

**Statutes**

Sherman Antitrust Act, 15 U.S.C. § 2 ...................................................................... 20

**Other Authorities**

MANUAL OF PATENT EXAMINING PROCEDURE § 2109.01 ......................................................... 20

## Rules

FED. R. CIV P. 15(a)(2) ................................................................................................ 16

FED. R. CIV. P. 15(a) .................................................................................................... 16

L. CIV. R. 15.1 ............................................................................................................. 16

L. PAT. R. 3.7 ............................................................................................................... 17

# TABLE OF EXHIBITS

| **Exhibit** | **Description** |
|---|---|
| A | Natco's Proposed Amended Pleading (pursuant to L. Civ. R. 15.1(a)(1)) |
| B | Natco's Redlined Proposed Amended Pleading (pursuant to L. Civ. R. 15.1(a)(2)) |
| C | U.S. Patent No. 7,351,701 ("'701 patent") (DEFS-OLAP-812[1] to DEFS-OLAP-841) |
| D | U.S. Patent No. 7,531,530 ("'530 patent") (DEFS-OLAP-4977 to DEFS-OLAP-5005) |
| E | Defendants' Exhibit 44 from the Deposition of Thomas Helleday (SHEFFIELD-16602 to SHEFFIELD-16604) |
| F | Defendants' Exhibit 45 from the Deposition of Thomas Helleday (SHEFFIELD-17399 to SHEFFIELD-17401) |
| G | U.S. Patent Application Publication No. US 2005/0143370 (excerpted) |
| H | U.S. Patent No. 8,859,562 ("'562 patent") (AZ-LYNPARZA-75 to AZ-LYNPARZA-116) |
| I | Defendants' Exhibit 35 from the Deposition of Thomas Helleday (SHEFFIELD-1138 to SHEFFIELD-1139) |
| J | Nicola J. Curtin, *The Development of Rucaparib/Rubraca®: A Story of the Synergy Between Science and Serendipity*, 12 CANCERS 564 (2020) ("Curtin 2020") (DEFS-OLAP-469 to DEFS-OLAP-486) |
| K | Transcript of the Deposition of Thomas Helleday (August 15, 2025) (excerpted) |
| L | Defendants' Exhibit 36 from the Deposition of Thomas Helleday (SHEFFIELD-1251) |
| M | Defendants' Exhibit 37 from the Deposition of Thomas Helleday (SHEFFIELD-1439) |
| N | Defendants' Exhibit 38 from the Deposition of Thomas Helleday (SHEFFIELD-1444) |
| O | February 2002 email chain between Thomas Helleday and Nicola Curtin (SHEFFIELD-1492) |
| P | Defendants' Exhibit 49 from the Deposition of Thomas Helleday (SHEFFIELD-1871) |
| Q | April 2002 email chain between Thomas Helleday and Nicola Curtin (SHEFFIELD-1874 to SHEFFIELD-1875) |

[1] Throughout this document, leading zeros from Bates-numbered documents and document ranges have been omitted.

| R | July 2002 email between Thomas Helleday and Herbie Newell (SHEFFIELD-2127) |
|---|---|
| S | Defendants' Exhibit 40 from the Deposition of Thomas Helleday (SHEFFIELD-13339 to SHEFFIELD-13341) |
| T | October 2002 email chain between Thomas Helleday and Herbie Newell (SHEFFIELD-2473 to SHEFFIELD-2474) |
| U | October 2002 email chain between Thomas Helleday and Margaret Zdzienicka (SHEFFIELD-2455) |
| V | February 2003 email chain between Thomas Helleday and Nicola Curtin (SHEFFIELD-3348 to SHEFFIELD-3349) |
| W | February – April 2003 email chain between Thomas Helleday and Nicola Curtin (SHEFFIELD-4028 to SHEFFIELD-4029) |
| X | Defendants' Exhibit 48 from the Deposition of Thomas Helleday (SHEFFIELD-4317) |
| Y | Defendants' Exhibit 42 from the Deposition of Thomas Helleday (SHEFFIELD-15058 to SHEFFIELD-15060) |
| Z | Defendants' Exhibit 41 from the Deposition of Thomas Helleday (SHEFFIELD-15055) |
| AA | Defendants' Exhibit 43 from the Deposition of Thomas Helleday (SHEFFIELD-18281) |
| BB | Defendants' Exhibit 13 from the Deposition of Michelle O'Neill (SHEFFIELD-23304) |
| CC | Defendants' Exhibit 12 from the Deposition of Michelle O'Neill (SHEFFIELD-23266 to SHEFFIELD-23267) |
| DD | Defendants' Exhibit 9 from the Deposition of Michelle O'Neill (SHEFFIELD-62892 to SHEFFIELD-62941) |
| EE | File History of U.S. Patent Application No. 10/555,507, which issued as the '562 patent (excerpted) (excerpted ranges spanning AZ-LYNPARZA-60153 to AZ-LYNPARZA-62969) |
| FF | Transcript of the Deposition of Steven Walls (August 22, 2025) (excerpted) |
| GG | Curriculum Vitae of Thomas Helleday (2012) (SHEFFIELD-208542 to SHEFFIELD-208543) |
| HH | Inventorship change paperwork for the '701 patent (July – September 2024) (SHEFFIELD-18265 to SHEFFIELD-18280) |
| II | Inventorship change paperwork for the '530 patent (July – September 2024) (SHEFFIELD-17315 to SHEFFIELD-17330) |
| JJ | Defendants' Exhibit 111 from the Deposition of Steven Walls (AZ-LYNPARZA-532 to AZ-LYNPARZA-575) |

| KK | Defendants' Exhibit 119 from the Deposition of Steven Walls (AZ-LYNPARZA-468 to AZ-LYNPARZA-480) |
|---|---|
| LL | Agreement between The University of Sheffield and Thomas Helleday (November 27, 2019) (SHEFFIELD-253379 to SHEFFIELD-253398) |
| MM | Defendants' Exhibit 15 from the Deposition of Michelle O'Neill (SHEFFIELD-23240 to SHEFFIELD-23248) |
| NN | April – May 2004 emails from the files of Michelle O'Neill (SHEFFIELD-23201 to SHEFFIELD-23207) |
| OO | Helen E. Bryant et al., *Specific killing of BRCA2-deficient tumours with inhibitors of poly(ADP-ribose) polymerase*, 434 NATURE 913 (2005) *and* May 2007 Addendum (SHEFFIELD-148513 to SHEFFIELD-148518) |
| PP | Curriculum Vitae of Thomas Helleday (2010) (SHEFFIELD-155266 to SHEFFIELD-155292) |
| QQ | December 6, 2006 Email from NATURE Editor to Thomas Helleday (SHEFFIELD-58562) |
| RR | Curriculum Vitae of Thomas Helleday for the Göran Gustfasson Prize (2010) (SHEFFIELD-182476 to SHEFFIELD-182495) |
| SS | Curriculum Vitae of Thomas Helleday (2011) (SHEFFIELD-190339 to SHEFFIELD-190371) |
| TT | Curriculum Vitae of Thomas Helleday for the ARC Foundation Award (2014) (SHEFFIELD-240654 to SHEFFIELD-240664) |
| UU | Curriculum Vitae of Thomas Helleday (2014) (SHEFFIELD-237342 to SHEFFIELD-237345) |
| VV | Defendants' Exhibit 30 from the Deposition of Thomas Helleday (SHEFFIELD-22295 to SHEFFIELD-22297) |
| WW | July 1, 2024 Pfizer email chain (PFI3723 to PFI3724) |
| XX | July 12-21, 2024 Pfizer email chain (PFI3906 to PFI3910) |
| YY | July 12-22, 2024 Pfizer email chain (PFI3752 to PFI3756) |
| ZZ | Defendants' Exhibit 47 from the Deposition of Thomas Helleday (PFI3945.1 to PFI3945.13) |
| AAA | AstraZeneca's Annual Report (2024) (excerpted) |
| BBB | Defendants' Fourth Set of Requests for Production of Documents and Things (Nos. 116-133) (February 14, 2025) |

| CCC | Fed. R. Civ. P. 45 Document Subpoena to Pfizer Inc. (served February 19, 2025) (excerpted) |
|-----|---------------------------------------------------------------------------------------------|
| DDD | Thomas Helleday's Responses to Defendants' Fed. R. Civ. P. 45 Document Subpoena (August 29, 2025) |
| EEE | April 14-22, 2025 Email Chain between Defendants and Plaintiffs Regarding Deposition of Thomas Helleday |

## I.    INTRODUCTION

Defendants move for leave to amend their affirmative defenses, counterclaims, and invalidity contentions to raise claims based on new information learned in August about an unusual scheme to fraudulently maintain the extended life of asserted U.S. Patent No. 8,859,562 (the "'562 patent") until 2031, when the patent should have expired in 2024.  The new claims include allegations of inequitable conduct, unclean hands, and violations of the antitrust laws. [2]

Dr. Thomas Helleday is the sole named inventor of the single claim of the '562 patent. Plaintiffs contend that single patent claim prevents generic competition to their Lynparza® product until the '562 patent expires in 2031.  Defendants contend that any term of this patent after 2024 is invalid because its single claim is obvious over two other patents Dr. Helleday also invented but that undisputedly expired in 2024—U.S. Patent Nos. 7,351,701 (the "'701 patent") and 7,531,530 (the "'530 patent").  The fact that Dr. Helleday is an inventor of all these patents implicates the doctrine of obviousness-type double patenting ("OTDP").  The doctrine holds that the '562 patent cannot have a term longer than the '701 and '530 patents that expired in 2024.

Dr. Helleday and Plaintiffs know that the OTDP defense will eradicate the post-2024 term of the '562 patent, and Dr. Helleday readily acknowledges the "risk that the '701 or '530 Patent could invalidate my '562 Patent." (Ex. ZZ[3] at PFI3945.2; *see also* Ex. K at 246:4-247:20.).  He also acknowledged to Defendants that invalidation of his '562 patent would have enormous

---

[2] Defendants respective Proposed Amended Pleadings are being submitted concurrently with this brief and are attached as Exs. A, B to each of Declaration of James S. Richter (Natco), Kristine L. Butler (Sandoz), Declaration of Loly Tor (Cipla), and Declaration of Theodora McCormick (Zydus).  Defendants will serve their amended invalidity contentions should the Court grant this Motion.  Any such amendment will consist of cross-references to Defendants' amended pleadings.
[3] The exhibits cited herein are those attached to the Declaration of James S. Richter filed with this Motion. For ease of reference, exhibit cites to Defendants' Amended Pleading will be to Natco's Amended Pleading (Richter Decl., Ex. A). The counterclaims at issue in this Motion are nearly identical for each of Sandoz, Cipla, and Zydus, and thus any citation to Natco's Amended Pleading can apply equally to Sandoz's, Cipla's, and Zydus's Amending Pleading.

1

monetary consequences by removing the approximately £3.6 million in royalties he receives annually from sales of products alleged to be covered by the '562 patent. For Plaintiffs' part, they make massive profit and/or royalty revenue from the sale of products they alleged to be covered by the '562 patent. Dr. Helleday and Plaintiffs thus have strong incentive to extend the monopoly provided by the '562 patent as long as they can.

To protect that cash flow, Dr. Helleday in 2024 executed on a plan to remove himself as an inventor on the '701 and '530 patents, an act that Plaintiffs contend will kill the OTDP defense and allow them to block generic Lynparza® products until the '562 patent expires in 2031. Plaintiffs' counsel planted the seed in a December 2023 meeting about this litigation that Dr. Helleday might save the 2031 term of the '562 patent if he said he was *not* an inventor of the then-nearly expired '701 and '530 patents. Dr. Helleday agreed, and over the next several months, pressured the necessary parties to allow himself to reverse the course of the prior twenty years and deny he was an inventor of the '701 and '530 patents. Plaintiffs now contend that Defendants cannot pursue an OTDP defense because there is no "joint inventorship" between the '562, '701 and '530 patents.

But Dr. Helleday's inventorship change is a lie whose sole purpose is to fraudulently save the '562 patent term until 2031:

- The facts show that Dr. Helleday is an inventor. He was responsible for conceiving at least some of the subject matter claimed in the '701 and '530 patents. He knows he had the ideas and directed the testing that resulted in those claims. His co-inventor on the '701 and '530 patent claims—Dr. Nicola Curtin—even expressly wrote contemporaneously that Dr. Helleday "very nicely suggested [she] go on the patent too." (Ex. AA at SHEFFIELD-18281.)

2

- During prosecution of the '562 patent, the Patent Office challenged what eventually issued as the sole claim on OTDP grounds over the same '701 and '530 patents. At no time during years of patent prosecution—from 2004 until patent issuance in 2014—did Dr. Helleday or anyone else ever suggest that OTDP was unavailable because he was not a joint inventor.

- Drs. Helleday and Curtin publicly and proudly held themselves out as co-inventors of the '701 and '530 patents during the entire twenty-year term of those patents. Even in the face of academic dishonesty allegations for failure to disclose his financial interest in the invention, Dr. Helleday publicly stated he was an inventor.

- The first time Dr. Helleday *ever* thought about *not* being an inventor of the '701 and '530 patents was when Plaintiffs' counsel made the suggestion to him during a December 2023 meeting about how he might save his (and Plaintiffs') massive revenue stream from the extended term of the '562 patent.

- Dr. Helleday then extorted agreement to an inventorship change from the owner of the '701 and '530 patents—Pfizer. He threatened to sue Pfizer if they would not agree to remove him. Pfizer relented and allowed the inventorship change to take place on the day the patents expired —July 23, 2024—when they held zero value to Pfizer. The Patent Office, in an *ex parte* and administrative change, removed Dr. Helleday as an inventor of the '701 and '530 patents after they were already expired.

Dr. Helleday, with Plaintiffs' assistance, thus made affirmative misrepresentations of material fact and knowingly submitted false material information to the PTO regarding the inventorship of the '701 and '530 patents with the intent to deceive the PTO into removing him as an inventor and –under Plaintiffs' argument—saving the extended term of the '562 patent from an OTDP challenge. That misconduct has an immediate and necessary relationship to the equity that

3

Plaintiffs seek here—*i.e.*, enforcing the '562 patent, and obtaining injunctive relief as well as an order that the FDA not approve Defendants' ANDAs until after the '562 patent expires in 2031. The discovery in this case so far shows that the proposed amendments are not futile: Dr. Helleday *admits* he tried to change his inventorship for the sole purpose of saving the '562 patent and the revenue streams it generates, but the evidence fully supports that he knows he *is* an inventor of the subject matter of the '701 and '530 patent claims, as he maintained for the entire life of those patents.

This motion to amend and plead this conduct as inequitable conduct, unclean hands and antitrust claims is timely. Rather than trying to add a fraud-based claim with incomplete discovery immediately when they first saw the inventorship change, Defendants timely sought relevant discovery from Plaintiffs and others regarding the circumstances of the change. Plaintiffs initially refused to produce literally *any* information about the inventorship change, and Defendants filed the currently pending motion to compel further production. (*See* ECF 209-210). Cognizant of Plaintiffs' efforts to deny relevant discovery, Defendants also obtained relevant documents from a third party—Pfizer—via subpoena. Pfizer produced relevant documents just days before Dr. Helleday's deposition in mid-August. Defendants then deposed Dr. Helleday and other relevant witnesses on a schedule that Plaintiffs expressly agreed would not prejudice Defendants' right to make additional contentions based on deposition discovery from Dr. Helleday. As for Dr. Helleday, he has refused to personally search for or produce any relevant documents in response to a timely and properly served subpoena. Defendants filed this motion promptly after obtaining discovery they believe supports the fraud allegations they now allege.

Defendants' amendments will cause no prejudice to Plaintiffs. Plaintiffs have known all the facts supporting these amendments for much longer than Defendants, and there is sufficient

4

time in the schedule to address these new counterclaims and defenses in expert discovery and at trial. Justice requires that the Court grant Defendants leave to amend their respective pleadings and contentions.

## II.   TECHNICAL BACKGROUND

The '562 patent broadly covers methods of using compounds called PARP-1 inhibitors to treat a range of hereditary cancers. (*See* Ex. H at 37:26-38:28.) According to the '562 patent, these cancers are characterized by a genetic defect in homologous recombination ("HR"). (*See id.*) HR is a DNA repair pathway in the body. (*See, e.g.*, ECF 222-1 at 3, 17.) Various genes in our DNA carry instructions for performing HR in the body. (*See, e.g.*, *id.* at 4-6, 10.) Examples of such genes are the "BRCA1" and "BRCA2" genes. (*See, e.g.*, *id.* at 10, 18.) When these genes become defective, the HR DNA repair pathway may also become defective, which in turn can lead to the development of cancers such as breast and ovarian cancer. (*See, e.g.*, *id.* at 19; Ex. H at 1:14-16.)

PARP-1 is an enzyme in the body that is also involved in DNA repair. (*See, e.g.*, ECF 222-1 at 14-16.) PARP-1 can be inhibited by a class of compounds called PARP-1 inhibitors. (*Id.*) When PARP-1 is inhibited, it cannot perform its DNA repair function. (*Id.*)

## III.   FACTUAL BACKGROUND

According to the specifications of the '562, '701 and '530 patents, Dr. Helleday alone or with named co-inventor Nicola Curtin allegedly discovered "that cells deficient in homologous recombination (HR) are hypersensitive to PARP inhibitors as compared to wild type cells." (Ex. H at 2:8-10; *see also* Ex. C at 2:21-23; Ex. D at 2:8-10.) The claims of the '701 and '530 patents relate to the use of three particular PARP-1 inhibitors for the treatment of certain types of HR-defective cancer, including breast cancer caused by BRCA1 or BRCA2 defects. (Ex. C at 37:16-

38:20, 38:3-34; Ex. D at 37:14-62, 38:13-14.)  The single claim of the '562 patent relates to using *any* PARP-1 inhibitors to treat *any* hereditary HR-deficient cancers.  (Ex. H at 37:26-38:28.)

Defendants contend that Dr. Helleday was, at the very least, a co-inventor of the concept of using particular compounds recited in the claims of the '701 and '530 patents for the uses recited in those claims.  The evidence described below shows that he thought of the experiments leading to those claims, provided his co-inventor, Dr. Curtin, with the tests necessary to prove the claimed uses with respect to those compounds, and suggested the critical experimentation that he now argues was the "eureka" moment behind the invention of all three patents.

> **A.      Dr. Helleday's collaboration with Nicola Curtin, named co-inventor on the '701 and '530 patents**

The applications leading to the '562, '701 and '530 patent claims were the result of a years'-long collaboration between Dr. Helleday and Dr. Curtin.  (Ex. A ¶ 88.)  The collaboration began sometime after a presentation by Dr. Helleday to Dr. Curtin and her colleagues at University of Newcastle in January 2002.  (*See id.* ¶¶ 89-94.)  At Dr. Helleday's urging, he and Dr. Curtin sent each other materials, including samples of PARP inhibitors and cell lines, in order to conduct experiments that he devised and which, based on his ideas, led to the claims of the three patents at issue in this motion.  (*See id.* ¶¶ 92-96, 101-112, 122-130.)  This relationship is explained at length in Defendants' proposed amended pleading and is summarized here.

For example, on January 29, 2002, Dr. Helleday disclosed to Dr. Curtin data and "graphs on the killing of [a PARP-1 inhibitor called] NU1025 and other inhibitors in HR deficient cells." (*Id.* ¶ 93 (citing Ex. M at SHEFFIELD-1439).)  Dr. Helleday also suggested to Dr. Curtin that she assess whether another PARP-1 inhibitor that she had, called AG14361—eventually called Formula III in the '701 and '530 patents—would have the same effect on selectively killing HR-

6

defective cells. (*Id.* ¶ 95.) She obtained results similar to his and reported the same back to him. (*Id.* ¶¶ 96-98.)

Following these results, in February 2003, Dr. Helleday told Dr. Curtin about the work he was doing on BRCA2-deficient cells called VC-8. (*See id.* ¶ 102.) He tested the NU-1025 PARP-1 inhibitor in those cells and found that these cells were likewise hypersensitive to PARP-1 inhibition. (*See id.*) He then suggested that she do the same with her AG14361 PARP-1 inhibitor. (*Id.* ¶ 103.) As he explained to her, the "hypothesis" he wanted her to test "is that the BRCA2 deficient cells would be efficiently treated by . . . AG14631 alone, while the BRCA2 complimented cells would form tumours." (*Id.* ¶ 104.) Dr. Helleday disclosed his results in the VC-8 cell line to Dr. Curtin in early March 2003. (*Id.* ¶¶ 108-109.) He provided Dr. Curtin with VC-8 cells. (*Id.* ¶ 110.) Dr. Curtin then disclosed to Dr. Helleday the results of PARP inhibition experiments she ran using the VC-8 cell line that he provided to her with AG14361. (*Id.* ¶ 111.) In June 2003, he wrote to her: "Great news that the VC8 cells are so sensitive to your inhibitor. We found the VC8 cells more sensitive to NU1025 than the irs1SF cells. Anyhow, it still shows that the concept is working." (*Id.* ¶ 112; *see also id.* ¶ 109; Ex. K at 225:21-22 ("This is the eureka. That makes the difference.").)

**B.     All agree Dr. Helleday is the primary inventor of the '701 and '530 patents**

In an email dated May 1, 2003, Dr. Curtin mentioned that "[Dr. Helleday] has some really exciting results with BRCA2 mutant cells (BRCA2 mutations cause breast cancer) that the University of Sheffield technology transfer office think worth a patent. He has very nicely suggested I go on the patent too as I have had discussions with him about the work." (Ex. A ¶ 117.)

On November 10, 2003, Dr. Michelle O'Neill, the UK patent attorney who prepared the patent applications underlying the three U.S. Patents at issue in this motion, held a meeting with

7

Drs. Helleday and Curtin. (*Id.* ¶ 118.) In her summary of that meeting prepared and sent to Drs. Helleday and Curtin the next day, Dr. O'Neill stated that "Thomas Helleday's invention was conceived when he found that the inhibitor, NU1025, selectively killed BRCA1 and BRCA2 deficient cells." (*Id.* ¶ 119.) In response, Dr. Curtin stated the next day on November 12, 2003, "I'd just like to repeat that I totally agree that *the invention was Thomas' and that we repeated his experiments* here with [AG14]361 because we were not at liberty to send him the compound as it was jointly owned by us and Agouron/Pfizer and we thought Thomas had a very exciting idea." (*Id.* ¶ 120.)

### C. Prosecution of the '701, '530, and '562 patents

All three of the '701, '530 and '562 patents claim priority to Great Britain Patent Application No. 0317466.1, filed on July 25, 2003 ("GB'466 application"). (*Id.* ¶¶ 78, 80, 82.) The USPTO issued the '701 patent on April 1, 2008, listing Thomas Helleday as the first named inventor, and Nicola Curtin as the second named inventor. (*Id.* ¶ 79.) The USPTO issued the '530 patent on May 12, 2009, listing Thomas Helleday as the first named inventor, and Nicola Curtin as the second named inventor. (*Id.* ¶ 81.) The USPTO issued the '562 patent on October 14, 2014, listing Thomas Helleday as the sole named inventor. (*Id.* ¶ 83.)

Consistent with the common priority claim to the GB'466 application, the '701, '530, and '562 patents' specifications substantially overlap, disclosing the same type of PARP activity assays using overlapping cell lines in Table 1 of each specification. (*Id.* ¶ 84.) Further consistent with the common priority claim to the GB'466 application, the '701, '530, and '562 patents all claim and disclose methods of using PARP inhibitors to treat cancer cells defective in homologous recombination. (*Id.* ¶ 85.)

On August 20, 2004, Dr. Helleday signed an oath and declaration with respect to the '701 patent in which he stated under penalty of perjury that he was "an original, first and joint inventor

(if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled THERAPEUTIC COMPOUNDS." (*Id.* ¶ 86.)  On February 18, 2006, Dr. Helleday signed a similar oath and declaration with respect to the '530 patent. (*Id.* ¶ 87.)

At no time during the 20-year life of those patents did Dr. Helleday suggest to the PTO that those were incorrect statements.  And at no time during prosecution of the applications that issued as the '701 and '530 patents did Dr. Helleday attempt to remove himself as an inventor or make any known public statement that he did not consider himself an inventor.  Rather, during prosecution of the '562 patent, the applicant held Dr. Helleday out as an inventor of the '701 and '530 patents.  Throughout prosecution of the '562 patent, the applicant repeatedly referred to Dr. Helleday as a "common inventor" of what became the '562 patent on one hand and the '701 and '530 patents on the other hand. (*Id.* ¶ 134.)  The applicant for the '507 application (application leading to the '562 patent) also expressly referred to the '701 and '530 patents as the work of "co-inventors Thomas Helleday and Nicola Curtin." (*Id.* ¶ 135.)  At no point during the prosecution of the '562 patent did the applicant ever dispute that Dr. Helleday was an inventor of the '701 and '530 patents.  In fact, during prosecution of the '562 patent, the USPTO repeatedly rejected the pending claims as unpatentable based on OTDP in view of the '701 and '530 patents. (*Id.* ¶ 139.)  Neither Dr. Helleday nor anyone else involved in that prosecution ever once argued that the double patenting rejection should fail because he was not an inventor of the '701 and '530 patents.

On March 27, 2014, the Patent Trial and Appeal Board ("PTAB") held that it was persuaded that the "Examiner has not adequately explained how the claims of the '701 patent in combination with the cited reference would have made obvious instant claim 66.  Neither the claims of the '701 patent, nor any of the other cited references, discuss heritability of cancer susceptibility or a

9

familial predisposition to cancer." (*Id.* ¶ 141.)  The PTAB made a similar finding with respect to the OTDP rejection for claim 66 over the '530 patent.  (*Id.*)  The PTO eventually issued claim 1 of the '562 patent based on these findings.

**D.      Drs. Helleday and Curtin proudly advertised that Dr. Helleday was a joint inventor of the '701 and '530 patents**

Far from ever publicly denouncing Dr. Helleday's role as an inventor of the '701 and '530 patents during their terms, Drs. Helleday and Curtin made statements proclaiming that he was a joint inventor:

- Drs. Curtin and Helleday reported some of this work in a 2005 paper in the journal *Nature*, which Dr. Helleday later identified as his most important publication in the previous decade.  (*Id.* ¶ 194.)  *Nature* questioned whether Drs. Helleday and Curtin were truthful when they said they had no competing financial interest with the subject matter of the paper in light of the fact that they were both named as inventors on the U.S. patent application that led to the '701 patent.  (*Id.* ¶ 195.)   Rather than disavow inventorship, Drs. Helleday and Curtin submitted an addendum to the paper stating that they were "named inventors" on that application and that they had "possible competing financial interests" with respect to the inventions disclosed therein.  (*Id.* ¶ 196.)

- In his curriculum vitae, Dr. Helleday consistently held himself out as an inventor of the '701 and '530 patents.  (*Id.* ¶¶ 197-199.)

- In a 2020 article, Dr. Curtin discussed her "collaboration" with Dr. Helleday and explained how that collaboration resulted in filing of the patent application that led to the '530 patent.  (*Id.* ¶ 200.)

- In 2022, an article regarding Dr. Curtin's career acknowledged that her "collaboration with Thomas Helleday" resulted in "their shared patent around tricyclic PARP inhibitors." (*Id.* ¶ 201.)

Even as of the date of this motion, Dr. Curtin's "staff profile" page on the Newcastle University website lists "Helleday T and Curtin NJ" as the inventors of the patent application leading to the '701 and '530 patents. (*Id.* ¶ 202.)

### E. Events leading to the inventorship change

Plaintiffs became aware that Defendants were raising an OTDP challenge to the '562 patent based on the '701 and '530 patents no later than December 2022, ███████████████. (*Id.* ¶ 204.) Neither Plaintiffs, Dr. Helleday, nor any other entity suggested to Defendants or the public during the next 18 months that Dr. Helleday was not properly named as an inventor or that the OTDP defense was unavailable because he was not a properly-named inventor on the '701 and '530 patents.

But Plaintiffs and Dr. Helleday were working together behind the scenes. Although not an employee of any Plaintiff, Dr. Helleday agreed to become a paid consultant for Plaintiffs' trial counsel at Williams & Connolly, as part of their representation of Plaintiffs in this litigation. (*Id.* ¶ 205.) Plaintiffs then flew Dr. Helleday to London for a full day meeting with their trial counsel in December 2023 during which he earned $800 per hour. (*Id.*) This meeting was the first time Dr. Helleday recalls having the thought that he was not an inventor on these claims of the '701 and '530 patents. (*Id.*) There is no indication at that time that anyone other than Plaintiffs and Dr. Helleday were aware of a theory that he was not an inventor—not Pfizer (the assignee of the '701 and '530 patents), and certainly not Dr. Curtin, who to this day still lists Dr. Helleday and herself as coinventors on the applications leading to the '701 and '530 patents.

Defendants re-raised the OTDP defense based on the '701 and '530 patents in their May 3, 2024 invalidity contentions.  (*Id.* ¶ 207.)  The first time Plaintiffs suggested that Dr. Helleday was not an inventor of the '701 and '530 patents was in Plaintiffs' May 24, 2024 responses to those contentions—just two months before those patents would expire.  (*Id.* ¶ 208.)  At that time, the only thing Plaintiffs said was the conclusory allegation that "Thomas Helleday is not an appropriate named inventor" on the '701 and '530 patents.  (*Id.*)  However, there had been no movement at that time to formally remove him as an inventor at the PTO.  And again, there is no indication that Pfizer or Dr. Curtin were aware of this argument or had been consulted.  This was purely a concoction of Plaintiffs—who have zero ownership or other interest in the '701 and '530 patents, except that they threaten the extended life of the '562 patent—and their paid consultant, Dr. Helleday.

Plaintiffs have produced no documents describing what happened in the months following the December 2023 meeting where they planted the seed that Dr. Helleday could change his inventorship in a bid to save the '562 patent.  But Defendants now know that in early July 2024, Williams & Connolly unsuccessfully tried to formally represent Dr. Helleday with respect to the question of whether he could be removed as an inventor, but apparently stopped short of doing so due to a conflict with Pfizer, which is the current assignee of the '701 and '530 patents.  (*Id.* ¶ 210.)  Williams & Connolly thus recommended that Dr. Helleday engage with a different law firm, Groombridge Wu.  (*Id.*)  Dr. Helleday agreed, but does not pay Groombridge Wu's attorney fees, and does not know who does—a fact he thinks is "strange."  (*Id.*)

The first time Pfizer—the owner of the '701 and '530 patents—heard anything about a possible inventorship change from Dr. Helleday's attorney at Groombridge Wu was on July 12, 2024.  (*Id.* ¶ 211.)  That was months *after* Plaintiffs alleged in this litigation that "Thomas Helleday

is not an appropriate named inventor" on the '701 and '530 patents, but only eleven days before the patents expired. (*Id.* ¶ 208.) Dr. Helleday went even so far as to have his attorney contact Pfizer advising them of a plan to sue Pfizer in district court if Pfizer and its development partner Pharma& (the maker of Rubraca®, a PARP inhibitor covered by the '701 and '530 patents) did not agree to sign necessary PTO inventorship change paperwork. (*Id.* ¶ 212.)

Dr. Helleday's threat of litigation worked, as Pfizer and Pharma& eventually caved in and consented to the inventorship correction for patents that would expire on July 23, 2024. (*Id.* ¶ 213.) Dr. Helleday also contacted Dr. Curtin in July 2024 and secured her agreement to let him withdraw as an inventor. (*Id.* ¶ 214.) With signed paperwork in hand and consent from Pfizer, Dr. Helleday filed all necessary inventorship change paperwork, and removed himself as an inventor of the '701 and '530 patents, on July 23, 2024—the day those patents expired. (*Id.*) The PTO formally changed the inventorship on September 10, 2024, months after the '701 and '530 patents had already expired. (*Id.* ¶ 215.) Notably, a request to correct inventorship at the PTO is a purely administrative, ministerial, non-adversarial process—*i.e.*, it does not require *any* factual proof to support the requested correction. Instead, all that was needed were signed "statements" from the inventors and assignees agreeing to the correction. (*Id.* ¶ 216.)

Dr. Helleday has now confirmed to Defendants that his motivation for the inventorship change was to protect his '562 patent from invalidation for OTDP over the '701 and '530 patents. (*Id.* ¶¶ 218, 233.) He also explained why he cares about whether the '562 patent remains valid until 2031, despite it having been an issued patent from October 2014 to the present: money. (*See id.* ¶¶ 153-165, 233.) Dr. Helleday receives approximately £3.6 million annually, and has been paid over £100 million total, on royalties from sales of products covered by the '562 patent— including Plaintiffs' Lynparza® and the Rubraca® product in which the active ingredient is one of

the three compounds disclosed in the claims of the '701 and '530 patents.  (*See id.* ¶¶ 159-160.)[4]

And, of course, the monetary motivation has always existed for Plaintiffs to maintain the life of

the '562 patent for as long as they can: their Lynparza® product brings in revenues of over $1

billion dollars annually.  (Ex. AAA.)

Tellingly, Dr. Helleday also confirmed that he thinks he is not an inventor on the European

counterpart patent of the '701 and '530 patents.  (Ex. A ¶ 217.)  Yet he has no plans to be honest

with the European patent office because "it doesn't matter," *i.e.*, he is not defending against a

double patenting challenge to the '562 patent counterpart in Europe.  (*Id.*)

## IV.    PROCEDURAL BACKGROUND

Plaintiffs produced the inventorship change documentation on January 17, 2025.

Defendants have diligently sought relevant discovery to understand the facts underlying that

change.  Plaintiffs have resisted any such discovery at every turn.  For example, on February 14,

2025, Defendants served a set of document requests specifically tailored to the issues surrounding

the inventorship change of the '701 and '530 patents.  (*See generally* Ex. BBB.)  In their March

17, 2025 Responses, Plaintiffs refused to produce any responsive documents other than those

already produced from the 2004 time period that supported the original decision to name Dr.

Helleday as a co-inventor with Dr. Curtin with respect to the subject matter ultimately claimed in

the '701 and '530 reference patents.  (*See generally* ECF 210-17.)  Defendants met and conferred

with Plaintiffs and exchanged correspondence, but Plaintiffs were unwilling to produce the

---

[4] Plaintiff University of Sheffield, assignee of the '562 patent, receives royalties from the sales of Lynparza and other PARP inhibitors on the market, with payments totaling £1-10 million per quarter.  (*Id.* ¶ 157.)  Helleday's share of royalties come from these University of Sheffield royalties.  (*Id.* ¶ 158.)

requested documents or agree to any reasonable compromise.[5]  (*See* ECF 209 at 5-6.)  Thus, Defendants filed a discovery application to compel production of the requested documents on June 6, 2025.  (*See generally id.*)  That application has been fully briefed and is currently pending before the Court.  (*See* ECF 209, 210, 214, 215, 217.)

During that same time, Defendants pursued discovery from relevant third parties.  On February 19, 2025, Defendants served a Rule 45 subpoena on Pfizer, Inc., requesting documents regarding the inventorship change of the '701 and '530 patents.  (*See generally* Ex. CCC.)  After lengthy back-and-forth, Pfizer produced relevant documents on August 5, 2025.  After Defendants' review of the same and a request for additional documents based on that review, Pfizer produced additional relevant documents on August 13, 2025, two days before Dr. Helleday's deposition.  Pfizer's documents started shedding light on the events that transpired regarding the inventorship change of the '701 and '530 patents and the motivation behind that change.  (*See, e.g.*, Exs. WW, XX, YY.)

On August 15, 2025, Defendants deposed Thomas Helleday and questioned him on the basis and motivation for his removal as an inventor from the '701 and '530 patents, which provided additional information about the inventorship change.  During the deposition, Defendants also served Helleday with a Rule 45 document subpoena.  On August 29, 2025, Dr. Helleday responded by refusing to search for or produce any responsive documents.  (*See generally* Ex. DDD.)

---

[5]  Plaintiffs' proposed compromise was that Defendants agree to production of only communications between specific individuals and entities, excluding the Williams and Connolly and Groombridge Wu law firms.  This "compromise" would have required Defendants to forgo the very discovery they sought as the law firms acted as intermediaries for many of the communications related to inventorship.

Fact discovery closed on August 29, 2025. To date, neither Plaintiffs nor Dr. Helleday have made any subsequent production of any documents responsive to any of Defendants' discovery requests regarding the inventorship change of the '701 and '530 patents.

Expert discovery has just begun, with opening expert reports currently due October 17, 2025. Expert discovery closes on March 6, 2026. No trial date has been set, but the current schedule anticipates that the parties and the Court will be trial ready by June or July 2026. The 30-month stays in this litigation have expired or will expire before September 8, 2027, and Defendants are not currently seeking approval to market their ANDA products prior to expiration of an unasserted patent that expires September 8, 2027.

There is no deadline for amending pleadings in this case, and Defendants Sandoz, Cipla, and Zydus have not filed any amended pleadings previously. Defendant Natco previously filed an amended pleading on consent. (ECF 33, 35-36).

## V.    LEGAL STANDARDS

### A.    Motion to Amend Pleadings

Federal Rule of Civil Procedure 15(a) and Local Civil Rule 15.1 govern motions for leave to amend pleadings. These Rules state that any party seeking "leave to amend a pleading shall do so by motion," L. Civ. R. 15.1, and that "[t]he court should freely give leave when justice so requires," Fed. R. Civ P. 15(a)(2). "The standard to grant a motion for leave is liberal, . . . and there is a presumption in allowing the moving party to amend its pleadings." *Donovan v. W. R. Berkley Corp.*, 566 F. Supp. 3d 224, 229 (D.N.J. 2021). "This standard ensures that claims will be decided on their merits rather than on mere technicalities." *Wise v. Hickman*, No. 2:18-cv-12994, 2020 WL 6375788, at *5 (D.N.J. Oct. 30, 2020) (citing *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990)). Because Rule 15 "mandate[s] that amendments are to be granted freely in the interests of justice," the Third Circuit "require[es] that the District Court grant leave to amend in

the absence of (a) unfair prejudice, (b) futility of amendment, (c) undue delay, (d) bad faith, or (e) dilatory motive." *Id.* at *6. "Absent these factors, the motion for leave should be freely granted." *Id.*; *see also, e.g.*, *Aurinia Pharms. Inc. v. Sun Pharm. Indus., Inc.*, No. 20-cv-19805, 2022 WL 3040950, at *8 (D.N.J. Aug. 2, 2022).

## B. Motion to Amend Contentions

Local Patent Rule 3.7 governs amended contentions and provides that a party may obtain leave to amend "upon a timely application and showing of good cause." L. Pat. R. 3.7. "Accordingly, a court should permit an amendment where there is a timely application, a showing of good cause, and no undue prejudice to the adverse party." *Fennec Pharms. Inc. v. Cipla Ltd.*, No. CV 23-123 (JKS)(MAH), 2024 WL 4432773, at *2 (D.N.J. Oct. 7, 2024). "The key factor to look at to determine whether good cause exists is the diligence of the moving party." *AS Am., Inc. v. Masco Corp. of Indiana*, No. CIV. 13-05 JBS/JS, 2013 WL 4084237, at *2 (D.N.J. Aug. 13, 2013). Diligence requires a showing that the party seeking leave to amend acted promptly in moving to amend when new evidence is revealed in discovery. *Warner Chilcott Co., LLC v. Lupin, Ltd.*, No. 11-cv-7228, 2013 WL 4494949, at *2 (D.N.J. Aug. 19, 2013). In assessing prejudice, "the Court considers whether the amendments would (1) require the opposing party to expend significant additional resources; or (2) significantly delay resolution of the dispute." *Microspherix LLC v. Merck Sharpe & Dohme Corp.*, No. 17-cv-3984, 2021 WL 2652009, at *3 (D.N.J. June 28, 2021). Other factors courts will consider for good cause include "reason for the delay; importance of the information to be excluded; the danger of unfair prejudice; and the availability of a continuance and the potential impact of a delay on judicial proceedings." *Id.* at *2.

## C. Inequitable Conduct

A claim of inequitable conduct requires "that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton,*

17

*Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). "A counterclaim or affirmative defense of inequitable conduct sounds in fraud and therefore is subject to the heightened pleading standard of Fed. R. Civ. P. 9(b)." *Aurinia Pharms.*, 2022 WL 3040950, at *8. Therefore, "to plead inequitable conduct, the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Sanders v. The Mosaic Co.*, 418 F. App'x 914, 918 (Fed. Cir. 2011) (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318 (Fed. Cir. 2009)). "At the pleading stage the proponent of the inequitable conduct theory need only plead facts supporting a reasonable inference that a specific individual knew of the misrepresentation and had the specific intent to deceive the PTO." *Id.* at 919. "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290.

"[T]he taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Id.* at 1288. "This concept is what courts have referred to as the doctrine of 'infectious unenforceability.'" *Guardant Health, Inc. v. Found. Med., Inc.*, No. 17-cv-1616, 2020 WL 2477522, at *4 (D. Del. Jan. 7, 2020). "Pursuant to this infectious unenforceability doctrine, inequitable conduct associated with one patent may render a related patent unenforceable—so long as the inequitable conduct at issue bears 'an immediate and necessary relation' to the enforcement of the related patent." *Id.* at *5 (citing, *e.g.*, *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F. 2d 804, 810–11 (Fed. Cir. 1990)). Where an "immediate and necessary relation" exists between the inequitable conduct and the equity the patentee seeks, *i.e.*, enforcement of the patent-at-issue, the doctrine's requirements are satisfied. *Id.* at *6; *Consol. Aluminum*, 910 F. 2d at 810-11.

### D.    Unclean Hands

"A court may find unclean hands when the misconduct of a party seeking relief 'has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation ... for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'" *Luv n' Care, Ltd. v. Laurain*, 98 F.4th 1081, 1094 (Fed. Cir. 2024) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)). "[T]he 'immediate and necessary relation' standard, in its natural meaning, generally must be met if the conduct normally would enhance the claimant's position regarding legal rights that are important to the litigation if the impropriety is not discovered and corrected." *Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1240 (Fed. Cir. 2018). A court should look to "the totality of the evidence-supported misconduct" and not individual elements alone. *Luv n' Care*, 98 F.4th at 1094. If a court finds that the totality of the evidence demonstrates that a party engaged in misconduct rising to the level of unconscionable acts, enhancing that party's litigation positions and undermining those of the opposing party, and there are immediate and necessary connections between that party's misconduct and the relief it seeks from the court, a finding of unclean hands is warranted. *Id.* at 1096.

### E.    Inventorship

Conception is the touchstone of inventorship. *Stern v. Trs. of Columbia Univ. in City of New York*, 434 F.3d 1375, 1378 (Fed. Cir. 2006). "Conception is defined as the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention . . . ." *Id.* (internal quotation marks omitted). "Because conception is the touchstone of inventorship, each joint inventor must generally contribute to the conception of the invention." *Id.* (cleaned up). "The fact that each of the inventors play a different role and that the contribution of one may not be as great as that of another does not detract from the fact that the invention is joint, if each makes

19

some original contribution, though partial, to the final solution of the problem."  MPEP § 2109.01 (quoting *Monsanto Co. v. Kamp,* 269 F. Supp. 818, 824 (D.D.C. 1967)).  "These contributions must also arise from 'some element of joint behavior, such as collaboration or working under common direction' with the other inventor(s)."  *BearBox v. Lancium*, 125 F.4th 1101, 1118 (Fed. Cir. 2025) (quoting *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992)).  "All inventors, even those who contribute to only one claim or one aspect of one claim of a patent, must be listed on that patent." *Id.* at 1117.  "Patent issuance creates a presumption that the named inventors are the true and only inventors." *Id.*

### F.      Antitrust (*Walker Process*)

"Fraud in obtaining a United States patent is a classical ground of invalidity or unenforceability of the patent."  *CR Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1367 (Fed. Cir. 1998).   Under the Supreme Court's precedent in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965), "[a] patentee who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves . . . that the asserted patent was obtained through knowing and willful fraud . . . ."  *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998).   Where an asserted patent "was acquired by means of either a fraudulent misrepresentation or a fraudulent omission and . . . the party asserting the patent was aware of the fraud when bringing suit, such conduct can expose a patentee to liability under the antitrust laws." *Id.* at 1070.

Liability under *Walker Process* further requires a showing of the "additional elements of a violation of the antitrust laws." *Id.*  Under Section 2 of the Sherman Act, a claim of anticompetitive monopolization under *Walker Process* requires a showing that "the patentee has market power in

20

the relevant market, and has used its fraudulently obtained patent to restrain competition." *CR Bard*, 157 F.3d at 1367.

## VI.    ARGUMENT

### A.    Justice requires leave to amend.

Justice requires that the Court grant Defendants leave to amend their respective pleadings and contentions.  First, "there is a presumption in allowing the moving party to amend its pleadings." *Donovan*, 566 F. Supp. 3d at 229.  This presumption mandates that leave to amend "be granted freely" and "liberally allowed." *Wise*, 2020 WL 6375788, at *6; *Long v. Wilson*, 393 F.3d 390, 400–401 (3d Cir. 2004).  Here, there is no basis to depart from the mandated presumption the Defendants should be permitted to amend their respective pleadings.  There is no unfair prejudice to Plaintiffs, the amendments would not be futile, there has been no undue delay by Defendants, and there is no bad faith or dilatory motive behind Defendants' request for leave to amend. *Wise*, 2020 WL 6375788, at *6.  To the contrary, Defendants would suffer a great injustice were the Court to deny Defendants' request for leave to amend, as such a denial would effectively preclude Defendants from its double patenting invalidity defense and reward Dr. Helleday's and Plaintiffs' misconduct and fraud on the PTO.

### 1.    There is no unfair prejudice to Plaintiffs.

When assessing unfair prejudice, courts look to several factors, including whether amendment would: unfairly disadvantage or deprive a party of the opportunity to present facts or evidence, require expenditure of significant additional resources to conduct discovery and prepare for trial, or significantly delay the resolution of the dispute. *Aurinia Pharms.*, 2022 WL 3040950, at *13.  None of those factors are present here if the Court allows the amendment.  Plaintiffs will not be disadvantaged or deprived of any facts or evidence.  To the contrary, Plaintiffs and their trial counsel have been working with Dr. Helleday since early 2023 and were involved with the

inventorship change that was made in July 2024. (*See, e.g.*, Ex. A ¶ 205.) For months before the deposition of Dr. Helleday, Plaintiffs represented that Defendants already had all necessary, relevant information regarding the inventorship of the '701 and '530 patents, and refused to produce any relevant, contemporaneous documents or information regarding the July 2024 inventorship change for the '701 and '530 patents. (*See, e.g.*, ECF 210-17; ECF 214 at 1, 4-6; ECF 217 at 3.) Any "prejudice" resulting from the fact that Defendants are making this motion now is therefore of Plaintiffs own making.

Additionally, any delay to the current schedule would not be significant. Defendants anticipate that a one-to-two-month extension of the current deadlines may be necessary, which would not cause any prejudice to Plaintiffs. There is no looming 30-month stay deadline, and there will be time to try this case and have the Court provide a decision before the Defendants are first permitted to obtain final FDA approval in September 2027 when U.S. Patent No. 7,449,464 expires.

Nor will Plaintiffs need to expend any additional resources in response to Defendants' amendments, other than purely "incidental" resources (*e.g.*, responding to counterclaims, producing responsive discovery), which "is not a sufficient basis for denial of an amendment." *Aurinia Pharms.*, 2022 WL 3040950, at *13. Defendants' counterclaims are based on fact discovery that has already occurred, or is already being sought, and therefore, Defendants expect to proceed directly to expert discovery on the new counterclaims. Should Defendants find that additional discovery is warranted following resolution of either of the pending motions to compel (ECF 209, 214, 217, 246, 249, and 251), Defendants do not expect to further extend the schedule to address that discovery.

## 2. Defendants' proposed amendments would not be futile.

"The futility analysis on a motion to amend is essentially the same as a Rule 12(b)(6) motion." *Aurinia Pharms.*, 2022 WL 3040950, at \*8. "The proposed amended claim must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. "[G]iven the liberal standard for the amendment of pleadings, courts place a heavy burden on opponents who wish to declare a proposed amendment futile." *Aurinia Pharms.*, 2022 WL 3040950, at \*8 (alteration in original) (internal quotation marks omitted).

Here, Defendants' proposed amendments plausibly plead all facts necessary to allege inequitable conduct, unclean hands, and antitrust violations. Plaintiffs cannot overcome the "heavy burden" of arguing otherwise. *See id.* Defendants plausibly plead a claim for inequitable conduct by identifying "the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO" and Dr. Helleday's and Plaintiffs' specific intent to deceive the PTO to maintain the validity of the '562 patent based on those material misrepresentations. *See Sanders*, 418 F. App'x at 918-19. For example, Defendants plead the following facts showing that Dr. Helleday is *at least* a co-inventor of the subject matter disclosed and claimed in the '701 and '530 patents, and that he had no legitimate basis to remove himself from those patents:

- Extensive contemporaneous documentation showing Dr. Helleday's contribution to the conception of at least one aspect of one claim of each of those patents (*see, e.g.*, *BearBox*, 125 F.4th at 1118; Ex. A ¶¶ 88-130);

23

- Extensive contemporaneous statements and other communications between Drs. Helleday and Curtin confirming that Drs. Helleday and Curtin both believed Dr. Helleday is an inventor of the '701 and '530 patents (*see* Ex. A ¶¶ 131-152, 166-202);

- Dr. Helleday was a named inventor of the '701 and '530 patents during the entire lifetime of each patent (*see* Ex. XX; Ex. YY);

- Dr. Helleday and Plaintiffs knew that Dr. Helleday was a properly named inventor yet orchestrated a scheme to fraudulently change the inventorship of the '701 and '530 patents with the intent to deceive the PTO for the purpose of saving the '562 patent from invalidity for OTDP over those patents in this litigation. (*See* Ex. A ¶¶ 76-77, 153-165, 203-240.)

- But for Dr. Helleday's fraudulently filed inventorship change paperwork, the PTO would not have removed Dr. Helleday as an inventor on the '701 and '530 patents, and but-for that change in inventorship, Plaintiffs would have no credible defense to invalidity of the '562 patent for ODP over the '701 and '530 patents. (*See, e.g.*, *id.* ¶¶ 234-251.)

- Dr. Helleday's and Plaintiffs' inequitable conduct bears an immediate and necessary relation to the enforcement of the '562 patent in this litigation, rendering the '562 patent unenforceable. (*See, e.g.*, *id.* ¶¶ 252-254.)

At least these facts adequately support a reasonable inference that Dr. Helleday, alone or with advice and guidance from Plaintiffs, knowingly misrepresented to the PTO that he is not an inventor of the '701 and '530 patents, and had the specific intent to deceive the PTO based on that misrepresentation in order to improperly extend the life of the '562 patent. *See Sanders*, 418 F. App'x at 918-19. Furthermore, these facts adequately support a reasonable inference that Dr. Helleday's and Plaintiffs' misconduct bears "an immediate and necessary relation" to the enforcement of the '562 patent in this litigation. *See Guardant Health*, 2020 WL 2477522, at *5;

24

*Consol. Aluminum*, 910 F.2d at 810-11.  Their misconduct was specifically intended to prevent a finding of invalidity of the '562 patent for OTDP over the '701 and '530 patents, for purposes of the infectious unenforceability doctrine.  *See id.* at *3-5; *Consol. Aluminum*, 910 F. 2d at 810-11.  For at least these reasons, Defendants' proposed amendments regarding inequitable conduct are not futile.

For these same reasons, Defendants' proposed amendments regarding unclean hands are also not futile.  The same facts listed above adequately support a reasonable inference that Dr. Helleday's and Plaintiffs' misconduct has an immediate and necessary relation to the equity that Plaintiffs seek in this litigation.  *See Luv n' Care*, 98 F.4th at 1094.  If Plaintiffs' legal contention that the inventorship change eliminates the double patenting defense is correct, then their misconduct will improperly enhance their position regarding legal rights that are important to the litigation if that misconduct and impropriety is not corrected.  *See Gilead*, 888 F.3d at 1240.  For at least these reasons, Defendants' proposed amendments regarding unclean hands are not futile.

The same allegations of fraud by Dr. Helleday provide the foundation for Defendants' counterclaim for antitrust violations under *Walker Process*.  Before suing for infringement of the '562 patent, ███████████████████████ making them aware that the patent was invalid due to OTDP.  Plaintiffs nonetheless sought to maintain their monopoly via the '562 patent by scheming to have Dr. Helleday fraudulent remove himself as an inventor of the related '701 and '530 patents.  The Supreme Court stated in *Walker Process* that the question before it was "whether the maintenance and enforcement of a patent obtained by fraud on the Patent Office may be the basis of an action under § 2 of the Sherman Act."  382 U.S. at 172.  The Court answered that question in the affirmative.  *Id.* at 176-77.  Defendants' counterclaims allege the other elements

25

for a monopolization claim under *Walker Process*, including market power. Defendants' antitrust allegations are thus not futile.

### 3. There has been no undue delay.

"[T]he question of undue delay requires that [the Court] focus on the movant's reasons for not amending sooner." *Aurinia Pharms.*, 2022 WL 3040950, at *12 (alterations in original) (quoting *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001)). "Notably, delay alone is insufficient grounds to deny an amendment." *Id.* at *11.

Defendants have not unduly delayed. They diligently pursued discovery on the issue of the inventorship change of the '701 and '530 patents. Shortly after Plaintiffs served the inventorship change papers in January 2025, Defendants served requests for production in February directed to documents concerning the July 2024 inventorship change. (*See supra* § IV; Ex. BBB at 11-12.) Plaintiffs' response was: "Plaintiffs will not search for or produce documents in response to this request." (ECF 210-17 at 6-19.) Defendants continued to diligently pursue that discovery for months until finally being forced to move to compel production in June. (ECF 209, 210.) During that same time, the parties also began scheduling depositions. Notably, Plaintiffs agreed that they would not argue that the timing of Dr. Helleday's deposition in August would impact Defendants' right to make additional contentions based on deposition discovery from Dr. Helleday. (*See* Ex. EEE at 1-2.)

In February 2025, Defendants promptly also pursued third party discovery from Pfizer, one of the assignees of the '701 and '530 patents. (*See supra* § IV) Pfizer produced relevant documents on August 5, 2025, and again on August 13, 2025. (*See supra id.*) These confidential document productions provided Defendants with significant evidence supporting their earlier suspicions of litigation misconduct. Days later, on August 15, 2025, Defendants deposed Dr. Helleday and questioned him on the basis and motivation for his removal as an inventor from the

26

'701 and '530 patents. Dr. Helleday's sworn testimony corroborated the recently-produced documentary evidence and provided additional evidence supporting litigation misconduct, including that he makes about £3.6 million annually (and has been paid over $100 million total) on royalties from sales of products covered by the '562 patent, and will only continue to receive those royalties so long as the '562 patent is valid. (Ex. A ¶¶ 159, 162.) Defendants also served Dr. Helleday with a document subpoena on the day of his deposition, further exercising diligent pursuit of relevant discovery into Helleday's and Plaintiffs' litigation misconduct. However, consistent with Plaintiffs' discovery responses regarding the issue, Dr. Helleday refuses to produce any relevant documents. (*See generally* Ex. DDD.)

Once Defendants had enough evidence from Pfizer, Dr. Helleday, and other witnesses to understand that there was indeed misconduct involved in the July 2024 inventorship change, Defendants contacted Plaintiffs regarding their plans to request leave to amend on September 10, 2025—just over three weeks after the completion of Dr. Helleday's deposition. The parties met and conferred, and exchanged correspondence on the matter, but failed to reach an agreement, and this motion for leave to amend promptly followed.

Defendants' actions throughout discovery into this issue make clear that Defendants diligently pursued discovery and amendment without any undue delay. Any argument to the contrary is without merit. Defendants took no more time than was necessary to investigate this before making a fraudulent conduct charge with particularity, notwithstanding Plaintiffs' and Dr. Helleday's efforts to stop that investigation in its tracks. *See, e.g., Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*, No. 03-cv-6220, 2006 WL 8462403, at *2 n.5 (D.N.J. Feb. 10, 2006) ("Mylan responds that it cannot plead an inequitable conduct defense without the [requested discovery] because an inequitable conduct defense 'must be pled with particularity.' The Court agrees with

27

Mylan that the discovery is relevant to its planned inequitable conduct defense. If need be, Mylan may make a motion to amend its answer at a later date.") (internal citations omitted).

For at least the reasons stated above, there was no undue delay by Defendants in seeking leave to amend.

**4.      There is no bad faith or dilatory motive behind Defendants' request.**

Similar to undue delay, the question of bad faith or dilatory motive also focuses on "the movant's reasons for not amending sooner." *Moskowitz v. New Jersey*, No. 19-cv-12489, 2025 WL 1435717, at *3 (D.N.J. May 16, 2025). Engaging in "investigative efforts" serves as a "satisfactory" reason for not amending sooner. *Id.* As explained above, Defendants were engaged in such investigative efforts throughout the course of discovery prior to this request for leave to amend. Those investigative efforts were hindered by Plaintiffs' unreasonable refusal to produce inarguably relevant discovery. For at least these reasons, Defendants' diligent investigative efforts show that there is no bad faith or dilatory motive behind the timing of Defendants' request or the request itself.

**B.      The Court should grant leave for Defendants to amend their invalidity contentions because their application was timely, good cause exists for the amendments, and Plaintiffs will not be unduly prejudiced.**

The Court should grant Defendants' request for leave to amend their invalidity contentions for the same reasons as stated above regarding Defendants' request for leave to amend their respective pleadings. (*See supra* § VI.A.) First, Defendants' request is timely, as Defendants were diligent in seeking leave to amend. (*See supra* § VI.A.3.) Second, good cause exists for the requested amendment. "The key factor to look at to determine whether good cause exists is the diligence of the moving party." *AS Am., Inc.*, 2013 WL 4084237, at *2. Diligence requires "a showing that the party seeking leave to amend acted . . . promptly [in] moving to amend when new evidence is revealed in discovery." *Warner Chilcott*, 2013 WL 4494949, at *2 (alterations in

28

original) (internal quotation marks omitted).   As stated above, Defendants were diligent in requesting leave to amend.  (*See supra* § VI.A.3.)  Third, Plaintiffs will suffer no undue prejudice. (*See supra* § VI.A.1.)

## VII.    CONCLUSION

Defendants respectfully request that the Court grant leave for Defendants to amend their affirmative defenses, counterclaims, and invalidity contentions.

\*      \*      \*

Dated: September 29, 2025

By: /s/ *James S. Richter*
James S. Richter (jrichter@midlige-richter.com)
**MIDLIGE RICHTER LLC**
645 Martinsville Road
Basking Ridge, New Jersey 07920
(908) 626-0622 (telephone)

*Of Counsel:*
Kevin Warner (kwarner@rmmslegal.com)
Paul J. Molino (pmolino@rmmslegal.com)
William A. Rakoczy (wrakoczy@rmmslegal.com)
Nicholas D. Bortz (nbortz@rmmslegal.com)
**RAKOCZY MOLINO MAZZOCHI SIWIK LLP**
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 527-2157 (telephone)

*Attorneys for Defendant/Counterclaim-Plaintiff
Natco Pharma Limited*

By: /s/ *Kristine L. Butler*
Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
Kristine L. Butler (kbutler@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08540
T: (609) 924-0808
F: (609) 452-1888

Mark H. Remus (mremus@crowell.com)

29

Laura A. Lydigsen (llydigsen@crowell.com)
Mary E. LaFleur (mlafleur@crowell.com)
**CROWELL & MORING LLP**
455 North Cityfront Plaza Drive
NBC Tower, Suite 3600
Chicago, IL 60611
T: (312) 321-4200
F: (312) 321-4299

Ryan H. Seewald (rseewald@crowell.com)
**CROWELL & MORING LLP**
1601 Wewatta Street, Suite 815
Denver, CO 80202
T: (303) 524-8661

*Attorneys for Defendant Sandoz Inc.*

By:  */s/ Loly G. Tor*
Loly G. Tor (loly.tor@klgates.com)
William E. Antonides, III
(bill.antonidesIII@klgates.com)
**K&L GATES LLP**
One Newark Center, 10th Floor
Newark, NJ
T: (973) 848-4026
F: (973) 848-4001

*Of Counsel:*
Anil H. Patel (anil.patel@klgates.com)
**K&L GATES LLP**
609 Main Street, Suite 4150
Houston, TX 77002
T: (713) 815-7300
F: (713) 815-7301

Elizabeth Weiskopf
(elizabeth.wesikopf@klgates.com)
Jenna Bruce (jenna.bruce@klgates.com)
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
T: (206) 623-7580
F: (206) 623-7022

*Attorneys for Defendants/Counterclaim-Plaintiffs
Cipla Limited and Cipla USA, Inc.*

30

By: /s/ *Theodora McCormick*
Theodora McCormick
Lauren B. Cooper
Alec Wong
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
Office One
4365 Route 1 South, Suite 301
Princeton, New Jersey 08540
T: (609) 490-4860
F: (732) 242-8051
tmccormick@bakerdonelson.com
lcooper@bakerdonelson.com
twong@bakerdonelson.com

*Of Counsel:*
Michael J. Gaertner
James T. Peterka
Emily L. Savas
David M. Knapp
Hannah J. Thomas
**BUCHANAN INGERSOLL & ROONEY P.C.**
125 South Wacker Drive
Chicago, Illinois 60606
(312) 261-8777
michael.gaertner@bipc.com
james.peterka@bipc.com
emily.savas@bipc.com
david.knapp@bipc.com
hannah.thomas@bipc.com

*Attorneys for Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Ltd.*

31