# EXHIBIT A

Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
Kristine L. Butler (kbutler@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08540
T: (609) 924-0808
F: (609) 452-1888

Laura A. Lydigsen
Mark H. Remus
Mary E. LaFleur
**CROWELL & MORING LLP**
455 North Cityfront Plaza Drive
NBC Tower, Suite 3600
Chicago, IL 60611
T: (312) 321-4200
F: (312) 321-4299
llydigsen@crowell.com
mremus@crowell.com
mlafleur@crowell.com

Ryan Seewald
**CROWELL & MORING LLP**
1601 Wewatta Street, Suite 815
Denver, CO 80202
T: (303) 524-8660
rseewald@crowell.com

*Attorneys for Defendant Sandoz Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA UK LIMITED, KUDOS PHARMACEUTICALS LIMITED, THE UNIVERSITY OF SHEFFIELD and MSD INTERNATIONAL BUSINESS GMBH, <br><br> Plaintiffs, <br><br> v. | **CONFIDENTIAL** <br><br> Civil Action No.:  3:23-cv-796 <br> (Consolidated) |

NATCO PHARMA LIMITED and NATCO PHARMA, INC.,

    Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA UK LIMITED, KUDOS PHARMACEUTICALS LIMITED, THE UNIVERSITY OF SHEFFIELD, and MSD INTERNATIONAL BUSINESS GMBH,

    Plaintiffs,

      v.

SANDOZ INC.,

    Defendant.

Civil Action No.:  3:24-cv-641

## DEFENDANT SANDOZ INC.'S FIRST AMENDED ANSWER, DEFENSES, AND COUNTERCLAIMS TO PLAINTIFFS' COMPLAINT FOR PATENT INFRINGEMENT

Defendant Sandoz Inc. ("Sandoz") hereby files its First Amended Answer, Defenses, and Counterclaims in response to the Complaint for Patent Infringement ("Complaint") filed on February 2, 2024 by Plaintiffs AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, Kudos Pharmaceuticals Limited, The University of Sheffield, and MSD International Business GmbH (collectively, "Plaintiffs").

Plaintiffs' February 2, 2024 Complaint raises allegations of infringement for U.S. Patent Nos. 7,449,464 ("'464 patent"), 8,475,842 ("'842 patent"), 11,633,396 ("'396 patent"), and 8,859,562 ("'562 patent").  On or after February 2, 2024, Plaintiffs filed multiple additional suits against Sandoz raising allegations of infringement for additional patents, including U.S. Patent Nos. 11,970,530 ("'530 patent"), 11,975,001 ("'001 patent"), 12,048,695 ("'695 patent"), 12,144,810 ("'810 patent"), and 12,178,816 ("'816 patent"), which were consolidated along with

1

other litigation involving Plaintiffs' patent infringement claims relating to these patents. *See*

*AstraZeneca Pharms. L.P. et al. v. Natco Pharma Ltd. et al.*, No. 23-796 (consolidated), ECF

Nos. 59, 87, 108, 160, 208. The parties subsequently stipulated to the dismissal without

prejudice of Plaintiffs' infringement claims based on the '464 and '530 patents, as well as

Sandoz's Affirmative Defenses and Counterclaims related to those patents. *See AstraZeneca*

*Pharms. L.P. v. Natco Pharma Ltd.*, Civ. No. 23-796 (consolidated), ECF Nos. 70 and 120.

Sandoz's previously-filed Answers, Affirmative Defenses, and Counterclaims for the '001, '695,

'810, and '816 patents remain in effect. *See AstraZeneca Pharms. L.P. et al. v. Sandoz Inc.*, No.

24-5889, ECF No. 12; *AstraZeneca Pharms. L.P. et al. v. Natco Pharma Ltd. et al.*, No. 23-796

(consolidated), ECF Nos. 130, 166; *AstraZeneca Pharms. L.P. et al. v. Sandoz Inc.*, No. 25-231,

ECF No. 12.

## Nature of the Action

1.      This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 100 et seq., which arises out of the submission by Sandoz of an Abbreviated New Drug Application ("ANDA") to the United States Food and Drug Administration ("FDA") seeking approval to commercially manufacture, use, offer for sale, sell, and/or import a generic version of LYNPARZA® (olaparib) tablets, 100 mg and 150 mg, prior to the expiration of U.S. Patent No. 7,449,464 ("the '464 patent"); U.S. Patent No. 8,475,842 ("the '842 patent"); U.S. Patent No. 8,859,562 ("the '562 patent"); and U.S. Patent No. 11,633,396 ("the '396 patent"). These patents are referred to collectively herein as the "Patents-in-Suit."

**ANSWER:**

Paragraph 1 contains legal conclusions to which no response is required. To the extent a

response is required, Sandoz admits that Plaintiffs' Complaint purports to state an action for

infringement of U.S. Patent No. 7,449,464 ("'464 patent"),[1] U.S. Patent No. 8,475,842 ("'842

patent"), U.S. Patent No. 8,859,562 ("'562 patent"), and U.S. Patent No. 11,633,396 ("'396

---

[1] The '464 patent has since been dismissed from this litigation. *See AstraZeneca Pharms. L.P. v. Natco Pharma Ltd.*, Civ. No. 23-796 (consolidated), ECF No. 70.

patent") (collectively, "Patents-in-Suit") and that this action purports to arise under the patent laws of the United States, 35 U.S.C. § 100 *et seq*. Sandoz further admits that the action purports to relate to Abbreviated New Drug Application No. 217936 ("Sandoz's ANDA"), filed by Sandoz with the U.S. Food and Drug Administration ("FDA"), which seeks approval of olaparib tablets, 100 mg and 150 mg ("Sandoz's ANDA Product"). Sandoz further admits that it submitted ANDA No. 217936 to FDA seeking approval to market Sandoz's ANDA Product in the United States before the expiration of the Patents-in-Suit. Sandoz denies the remaining allegations of Paragraph 1.

2.      Sandoz notified Plaintiffs by letter dated December 29, 2023 ("Sandoz's Notice Letter") that it had submitted to FDA ANDA No. 217936 ("Sandoz's ANDA"), seeking approval from FDA to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of generic olaparib tablets, 100 mg and 150 mg, ("Sandoz's ANDA Product") prior to the expiration of the Patents-in-Suit.

**ANSWER:**

Sandoz admits that it sent Plaintiffs a Notice Letter ("Sandoz's Notice Letter"), dated December 29, 2023, that informed Plaintiffs that Sandoz's ANDA contains certifications pursuant to 21 U.S.C. § 355 (j)(2)(A)(vii)(IV) ("Paragraph IV Certification") to obtain FDA approval for Sandoz's ANDA Product before the expiration of the Patents-in-Suit. Sandoz denies the remaining allegations of Paragraph 2.

**The Parties**

3.      Plaintiff AstraZeneca Pharmaceuticals LP is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business at 1800 Concord Pike, Wilmington, Delaware 19803. AstraZeneca Pharmaceuticals LP is the holder of New Drug Application No. 208558 for the manufacture and sale of LYNPARZA® (olaparib) tablets.

3

**ANSWER:**

Sandoz lacks knowledge or information sufficient to form a belief about the truth of the

allegations in Paragraph 3 and on that basis denies these allegations.

4.      Plaintiff AstraZeneca UK Limited is a private company limited by shares organized and existing under the laws of England and Wales, whose registered office is at 1 Francis Crick Avenue, Cambridge Biomedical Campus, Cambridge CB2 0AA, United Kingdom.

**ANSWER:**

Sandoz lacks knowledge or information sufficient to form a belief about the truth of the

allegations in Paragraph 4 and on that basis denies these allegations.

5.      Plaintiff Kudos Pharmaceuticals Limited is a private company limited by shares organized and existing under the laws of England and Wales, whose registered office is at 1 Francis Crick Avenue, Cambridge Biomedical Campus, Cambridge CB2 0AA, United Kingdom.

**ANSWER:**

Sandoz lacks knowledge or information sufficient to form a belief about the truth of the

allegations in Paragraph 5 and on that basis denies these allegations.

6.      Plaintiff The University of Sheffield is a Royal Charter company organized and existing under the laws of England and Wales, whose address is Western Bank, Sheffield S10 2TN, United Kingdom.

**ANSWER:**

Sandoz lacks knowledge or information sufficient to form a belief about the truth of the

allegations in Paragraph 6 and on that basis denies these allegations.

7.      Plaintiff MSD International Business GmbH is a company with limited liability organized and existing under the laws of Switzerland, whose registered office is at Tribschenstrasse, 60, 6005 Lucerne, Switzerland.

**ANSWER:**

Sandoz lacks knowledge or information sufficient to form a belief about the truth of the

allegations in Paragraph 7 and on that basis denies these allegations.

4

8.    On information and belief, Defendant Sandoz is a corporation organized and existing under the laws of the State of Delaware having a principal place of business at 100 College Road West, Princeton, New Jersey 08540. On information and belief, Sandoz is in the business of, among other things, importing, manufacturing, and selling generic versions of branded pharmaceutical products for the U.S. market.

**ANSWER:**

Sandoz admits that it is a corporation organized and existing under the laws of Delaware

and maintains a place of business at 100 College Road West, Princeton, New Jersey 08540-6604.

Sandoz further admits that it markets pharmaceutical products, including in the United States.

Sandoz denies the remaining allegations of Paragraph 8.

9.    On information and belief, Sandoz knows and intends that upon approval of Sandoz's ANDA, Sandoz will manufacture Sandoz's ANDA Product and Sandoz will directly or indirectly market, sell, and distribute Sandoz's ANDA Product throughout the United States, including in New Jersey.

**ANSWER:**

Sandoz admits that it submitted ANDA No. 217936 to FDA seeking approval to market

Sandoz's ANDA Product in the United States. Sandoz denies the remaining allegations of

Paragraph 9.

**Jurisdiction**

10.    Plaintiffs incorporate each of the preceding paragraphs 1-9 as if fully set forth herein.

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding

paragraphs as if fully set forth herein.

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

5

**ANSWER:**

Paragraph 11 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz does not contest this Court's subject matter jurisdiction solely for the limited purposes of this action only, and expressly reserves the right to contest subject matter jurisdiction in any other case as to any party, including Plaintiffs.  Sandoz denies the remaining allegations of Paragraph 11.

12.    Based on the facts and causes alleged herein, and for additional reasons to be further developed through discovery if necessary, this Court has personal jurisdiction over Sandoz.

**ANSWER:**

Paragraph 12 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz does not contest this Court's personal jurisdiction over Sandoz solely for the limited purposes of this action only, and expressly reserves the right to contest personal jurisdiction in any other case as to any party, including Plaintiffs.  Sandoz denies the remaining allegations of Paragraph 12.

13.    Sandoz is subject to personal jurisdiction in New Jersey because Sandoz is a corporation with a principal place of business in New Jersey.  This Court also has personal jurisdiction over Sandoz because, *inter alia*, on information and belief, Sandoz has continuous and systematic contacts with the State of New Jersey, regularly conducts business in the State of New Jersey, either directly or through one or more wholly owned subsidiaries, agents, and/or alter egos, has purposefully availed itself of the privilege of doing business in the State of New Jersey, and intends to sell Sandoz's ANDA Product in the State of New Jersey after approval of ANDA No. 217936.

**ANSWER:**

Paragraph 13 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that it maintains a place of business in Princeton, New Jersey.  In addition, Sandoz does not contest this Court's personal jurisdiction over Sandoz solely for the limited purposes of this action only, and expressly reserves the right to contest personal

6

jurisdiction in any other case as to any party, including Plaintiffs. Sandoz denies the remaining allegations of Paragraph 13.

14. On information and belief, Sandoz is in the business of, *inter alia*, developing, manufacturing, obtaining regulatory approval, marketing, selling, and distributing generic copies of branded pharmaceutical products throughout the United States, including within the State of New Jersey, through its own actions and through the actions of its agents and subsidiaries, from which Sandoz derives a substantial portion of its revenue.

**ANSWER:**

Paragraph 14 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that it markets pharmaceutical products, including in the United States. Sandoz denies the remaining allegations of Paragraph 14.

15. On information and belief, Sandoz, through its own actions and through the actions of its agents and subsidiaries, has engaged in the research and development, and the preparation and filing, of Sandoz's ANDA, continues to engage in seeking FDA approval of this ANDA, intends to engage in the commercial manufacture, marketing, offer for sale, sale, or importation of Sandoz's ANDA throughout the United States, including within the State of New Jersey, and stands to benefit from the approval of Sandoz's ANDA.

**ANSWER:**

Paragraph 15 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that it submitted ANDA No. 217936 to FDA seeking approval to market Sandoz's ANDA Product in the United States. Sandoz denies the remaining allegations of Paragraph 15.

16. On information and belief, Sandoz, through its own actions and through the actions of its agents and subsidiaries, prepared and submitted Sandoz's ANDA with Paragraph IV Certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

**ANSWER:**

Sandoz admits that Sandoz's ANDA contains Paragraph IV Certifications to obtain approval for Sandoz's ANDA Product before the expiration of the Patents-in-Suit. Sandoz denies the remaining allegations of Paragraph 16.

7

17.    On information and belief, following FDA approval of Sandoz's ANDA, Sandoz intends to market, offer to sell, sell, or distribute Sandoz's ANDA Product throughout the United States, including within the State of New Jersey, that will, as explained below, infringe upon Plaintiffs' rights in the Patents-in-Suit protecting their LYNPARZA® products. On information and belief, following FDA approval of Sandoz's ANDA, Sandoz knows and intends that Sandoz's ANDA Product will be marketed, used, distributed, offered for sale, or sold in the United States, including within the State of New Jersey.

**ANSWER:**

Paragraph 17 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that it submitted ANDA No. 217936 to FDA seeking approval to market Sandoz's ANDA Product in the United States.  Sandoz denies the remaining allegations of Paragraph 17.

18.    On information and belief, Sandoz is registered to do business in the State of New Jersey under Entity Identification Number 0100097265 and is registered with the New Jersey Department of Health as a drug manufacturer and wholesaler under Registration Number 5003732.

**ANSWER:**

Sandoz admits that Sandoz Inc. is listed under the Entity Identification Number 0100097265 on the State of New Jersey's Business Records Service website.  Sandoz further admits that Sandoz Inc. is listed under Registration Number 5003732 on the State of New Jersey's Department of Health website.  Sandoz denies the remaining allegations of Paragraph 18.

19.    Sandoz has consented to personal jurisdiction in this Court in numerous recent actions arising out of its ANDA filings and has filed counterclaims in such cases. *See, e.g., Amgen Inc. v. Sandoz Inc.*, No. 18-cv-11026, ECF No. 18 (D.N.J. Sept. 25, 2018); *Allergan Sales, LLC v. Sandoz, Inc.*, No. 17-cv-10129, ECF No. 18 (D.N.J. Dec. 19, 2017); *Boehringer Ingelheim Pharms., Inc. v. Sandoz, Inc.*, No. 17-cv-08825, ECF No. 14 (D.N.J. Jan. 23, 2018); *Mitsubishi Tanabe Pharma Corp. v. MSN Lab'ys Priv. Ltd.*, No. 17-cv-05302, ECF No. 28 (D.N.J. Nov. 17, 2017).  Sandoz has purposefully availed itself of the rights and benefits of this Court by asserting counterclaims in this Court.

**ANSWER:**

Paragraph 19 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz does not contest this Court's personal jurisdiction over Sandoz solely for the limited purposes of this action only, and expressly reserves the right to contest personal jurisdiction in any other case as to any party, including Plaintiffs.  Sandoz further admits that it filed answers and counterclaims before this Court in the civil actions listed in Paragraph 19, and states that the filings in those cases speak for themselves.  Sandoz denies the remaining allegations of Paragraph 19.

20.     This Court also has personal jurisdiction over Sandoz at least because, *inter alia*, (a) Sandoz has filed an ANDA seeking approval to engage in the commercial manufacture, use, offer for sale, sale, or importation of Sandoz's ANDA Product in the United States, including in the State of New Jersey; (b) Sandoz, through its own actions and through the actions of its agents and subsidiaries, will market, distribute, offer to sell, or sell Sandoz's ANDA Product in the United States, including in the State of New Jersey and to residents of this Judicial District, upon approval of Sandoz's ANDA, and will derive substantial revenue from the use or consumption of Sandoz's ANDA Product in the State of New Jersey; and (c) Sandoz has purposefully availed itself of the privilege of doing business in the State of New Jersey by placing goods into the stream of commerce for distribution throughout the United States, including the State of New Jersey, and/or by selling, directly or through its agents, pharmaceutical products in the State of New Jersey.  On information and belief, if ANDA No. 217936 is approved, Sandoz's ANDA Product charged with infringing the Patents-in-Suit would, *inter alia*, be marketed, distributed, offered for sale, or sold in the State of New Jersey, prescribed by physicians practicing in New Jersey, dispensed by pharmacies located within New Jersey, and used by patients in New Jersey, all of which would have a substantial effect on New Jersey.

**ANSWER:**

Paragraph 20 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that it submitted ANDA No. 217936 to FDA seeking approval to market Sandoz's ANDA Product in the United States.  In addition, Sandoz does not contest this Court's personal jurisdiction over Sandoz solely for the limited purposes of this action only, and expressly reserves the right to contest personal jurisdiction in any other case as to any party, including Plaintiffs.  Sandoz denies the remaining allegations of Paragraph 20.

9

21.     This Court also has personal jurisdiction over Sandoz because Sandoz has committed, or aided, abetted, contributed to, and/or participated in the commission of, acts of patent infringement that will lead to foreseeable harm and injury to Plaintiffs, which manufacture LYNPARZA® drug products for sale and use throughout the United States, including in this Judicial District.  On information and belief, Sandoz filed Sandoz's ANDA with Paragraph IV Certifications, which was purposefully directed to the State of New Jersey, where Sandoz is located.  As a result, the consequences of Sandoz's actions were, and will be, suffered in the State of New Jersey.  Sandoz knew or should have known that the consequences of its actions were, and will be, suffered in the State of New Jersey.  At the time Sandoz sent notice of the Paragraph IV Certifications, it was reasonably foreseeable that Sandoz would be sued within 45 days in this Judicial District, where Sandoz is located.  On information and belief, Sandoz's actions will injure Plaintiffs by displacing at least some, if not all, of Plaintiffs' sales of LYNPARZA® drug products in this Judicial District, as well as resulting in price erosion and loss of goodwill with the purchasers and distributors of LYNPARZA® drug products in this Judicial District.

**ANSWER:**

Paragraph 21 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that Sandoz's ANDA contains Paragraph IV Certifications to obtain approval for Sandoz's ANDA Product before the expiration of the Patents-in-Suit.  In addition, Sandoz does not contest this Court's personal jurisdiction over Sandoz solely for the limited purposes of this action only, and expressly reserves the right to contest personal jurisdiction in any other case as to any party, including Plaintiffs.  Sandoz denies the remaining allegations of Paragraph 21.

22.     On information and belief, Sandoz has also engaged in substantial, systematic, and continuous contacts with New Jersey that satisfy due process and confer personal jurisdiction over Sandoz in New Jersey.

**ANSWER:**

Paragraph 22 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz does not contest this Court's personal jurisdiction over Sandoz solely for the limited purposes of this action only, and expressly reserves the right to contest personal jurisdiction in any other case as to any party, including Plaintiffs.  Sandoz denies the remaining allegations of Paragraph 22.

## Venue

23.    Plaintiffs incorporate each of the preceding paragraphs 1-22 as if fully set forth herein.

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding

paragraphs as if fully set forth herein.

24.    Venue is proper in this District under 28 U.S.C. § 1391 because Sandoz resides in this District and a substantial part of the events and injury giving rise to Plaintiffs' claims has and continues to occur in this District.

**ANSWER:**

Paragraph 24 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz admits that it maintains a place of business in Princeton, New

Jersey.  In addition, Sandoz does not contest venue in this judicial district solely for the limited

purposes of this action only, and expressly reserves the right to contest venue in any other case as

to any party, including Plaintiffs.  Sandoz denies the remaining allegations of Paragraph 24.

25.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1400(b), at least because, on information and belief, Sandoz has a principal place of business in New Jersey and has committed acts of infringement in New Jersey.  On information and belief, among other things, (1) Sandoz filed Sandoz's ANDA for the purpose of seeking approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Sandoz's ANDA Product in the United States, including New Jersey; and (2) upon approval of Sandoz's ANDA, Sandoz will market, distribute, offer for sale, sell, and/or import Sandoz's ANDA Product in the United States, including in New Jersey, and will derive substantial revenue from the use or consumption of Sandoz's ANDA Product in New Jersey.

**ANSWER:**

Paragraph 25 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz admits that it maintains a place of business in Princeton, New

Jersey.  Sandoz further admits it submitted ANDA No. 217936 to FDA seeking approval to

market Sandoz's ANDA Product in the United States.  In addition, Sandoz does not contest

11

venue in this judicial district solely for the limited purposes of this action only, and expressly reserves the right to contest venue in any other case as to any party, including Plaintiffs. Sandoz denies the remaining allegations of Paragraph 25.

26.    Venue is proper in this District as to Sandoz because Sandoz (a) engages in patent litigation concerning Sandoz's ANDA Products in this District, and (b) does not contest that venue is proper in this District.

**ANSWER:**

Paragraph 26 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz does not contest venue in this judicial district solely for the limited purposes of this action only, and expressly reserves the right to contest venue in any other case as to any party, including Plaintiffs. Sandoz denies the remaining allegations of Paragraph 26.

**Factual Background**

27.    LYNPARZA® is approved by FDA for the treatment of certain ovarian, breast, pancreatic, and prostate cancers. The active pharmaceutical ingredient in LYNPARZA® is olaparib, a poly (ADP-ribose) polymerase (PARP) inhibitor.

**ANSWER:**

Paragraph 27 contains legal conclusions to which no response is required. To the extent an answer is required, Sandoz admits that the package insert for LYNPARZA® dated 11/2023 available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/208558s028lbl.pdf lists certain types of ovarian, breast, pancreatic, and prostate cancer under the section titled "1 Indications and Usage." Sandoz further admits that the package insert states under the section titled "12.1 Mechanism of Action" that "Olaparib is an inhibitor of poly (ADP-ribose) polymerase (PARP) enzymes . . . ." Sandoz denies the remaining allegations in Paragraph 27.

28.    In Sandoz's Notice Letter, Sandoz stated that the subject of Sandoz's ANDA is olaparib tablets, 100 mg and 150 mg. In Sandoz's Notice Letter, Sandoz states that Sandoz's ANDA was submitted under 21 U.S.C. § 355(j)(1) and § 355(j)(2)(A) and contends that its

ANDA contains bioavailability and/or bioequivalence studies for Sandoz's ANDA Product. On information and belief, Sandoz's ANDA Product is a generic version of LYNPARZA®.

**ANSWER:**

Paragraph 28 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that it submitted ANDA No. 217936 to FDA seeking approval to market Sandoz's ANDA Product in the United States. Sandoz's Notice Letter speaks for itself. Sandoz denies the remaining allegations of Paragraph 28.

29.    In Sandoz's Notice Letter, Sandoz stated that it had submitted Paragraph IV Certifications to FDA alleging that the '464, '842, '562, and '396 patents were invalid, unenforceable, and/or not infringed, and that Sandoz is seeking approval to engage in the commercial manufacture, use, sale, offer for sale, and/or importation of Sandoz's ANDA Product prior to the expiration of the '464, '842, '562, and '396 patents.

**ANSWER:**

Sandoz admits that Sandoz's ANDA contains Paragraph IV Certifications to obtain approval for Sandoz's ANDA Product before the expiration of the Patents-in-Suit. Sandoz's Notice letter speaks for itself. Sandoz denies the remaining allegations of Paragraph 29.

30.    The purpose of Sandoz's submission of Sandoz's ANDA was to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Sandoz's ANDA Product prior to the expiration of the Patents-in-Suit.

**ANSWER:**

Paragraph 30 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that it submitted ANDA No. 217936 to FDA seeking approval to market Sandoz's ANDA Product in the United States. Sandoz further admits that Sandoz's ANDA contains Paragraph IV Certifications to obtain approval for Sandoz's ANDA Product before the expiration of the Patents-in-Suit. Sandoz denies the remaining allegations of Paragraph 30.

13

31.     In an exchange of correspondence, counsel for Plaintiffs and counsel for Sandoz discussed the terms of Sandoz's Offer of Confidential Access.  The parties did not agree on terms under which Plaintiffs could review, among other things, Sandoz's ANDA and any Drug Master File referred to therein, and Sandoz refused to produce samples of Sandoz's ANDA Product and other internal documents and material relevant to infringement.

**ANSWER:**

Sandoz admits that Sandoz's Notice Letter included an "Offer of Confidential Access" pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III).  Sandoz further admits that the parties did not reach an agreement regarding access to Sandoz's ANDA because Plaintiffs refused the terms proposed with Sandoz's Notice Letter and instead made unreasonable demands for materials beyond those properly within scope of an Offer of Confidential Access under section 355(j)(5)(C)(i)(iii).  Sandoz denies the remaining allegations of Paragraph 31.

32.     This action is being commenced within 45 days from the date Plaintiffs received Sandoz's Notice Letter.

**ANSWER:**

Paragraph 32 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that Sandoz's Notice Letter was dated December 29, 2023 and that Plaintiffs' Complaint was filed on February 2, 2024.  Sandoz denies the remaining allegations of Paragraph 32.

**Count I – Infringement of the '464 Patent Under 35 U.S.C. § 271(e)(2)**

33.     Plaintiffs incorporate each of the preceding paragraphs 1-32 as if fully set forth herein.

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding paragraphs as if fully set forth herein.

34.     On November 11, 2008, the United States Patent and Trademark Office (the "USPTO") duly and lawfully issued the '464 patent, entitled "Phthalazinone Derivatives."  A copy of the '464 patent is attached hereto as Exhibit A.

**ANSWER:**

Paragraph 34 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that Exhibit A of Plaintiffs' Complaint purports to be a copy of the '464 patent. Sandoz further admits that the face of the '464 patent states that the '464 patent purports to have been issued on November 11, 2008. Sandoz further admits on its face, the '464 patent is titled "Phthalazinone Derivatives." Sandoz denies the remaining allegations of Paragraph 34.

35.    Plaintiff Kudos Pharmaceuticals Limited is the assignee of the '464 patent. Plaintiffs Kudos Pharmaceuticals Limited, AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, and MSD International Business GmbH collectively possess all exclusive rights and interests in the '464 patent.

**ANSWER:**

Paragraph 35 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that the online records of the U.S. Patent and Trademark Office ("USPTO") list Kudos Pharmaceuticals Limited as the assignee of the '464 patent. Sandoz lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 35 and on that basis denies these allegations.

36.    The '464 patent claims, *inter alia*, a compound of Formula III, shown below, or isomers, salts, or solvates thereof.

15

**ANSWER:**

Paragraph 36 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz states that the claims of the '464 patent speak for themselves. Sandoz denies the remaining allegations of Paragraph 36.

37.    The compound of Formula III is the compound that is known by the international nonproprietary name olaparib.  LYNPARZA® contains olaparib as its active pharmaceutical ingredient.

**ANSWER:**

Paragraph 37 contains legal conclusions to which no response is required.  To the extent an answer is required, Sandoz admits that the package insert for LYNPARZA® dated 11/2023 available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/208558s028lbl.pdf indicates that the active ingredient in LYNPARZA® is olaparib.  Sandoz further admits that Section 11 of the package insert provides the same chemical structure for olaparib as the compound of Formula III.  Sandoz lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 37 and on that basis denies these allegations.

38.    LYNPARZA® is covered by Claims 1 and 2 of the '464 patent, and the '464 patent has been listed in connection with LYNPARZA® in the FDA's Orange Book.

**ANSWER:**

Paragraph 38 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that the FDA's publication *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") lists the '464 patent in connection with NDA No. 208558 for LYNPARZA®.  Sandoz denies the remaining allegations of Paragraph 38.

39.    Sandoz's submission of Sandoz's ANDA for the purpose of obtaining approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Sandoz's

16

ANDA Product prior to the expiration of the '464 patent was an act of infringement of the '464 patent under 35 U.S.C. § 271(e)(2)(A).

**ANSWER:**

Paragraph 39 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz does not contest this Court's subject matter jurisdiction solely for the alleged infringement of the '464 patent under 35 U.S.C. § 271(e)(2), and expressly reserves the right to contest subject matter jurisdiction as to other allegations. Sandoz denies the remaining allegations of Paragraph 39.

40. On information and belief, Sandoz's ANDA Product contains olaparib.

**ANSWER:**

Sandoz admits the allegations of Paragraph 40.

41. On information and belief, the manufacture, use, offer for sale, sale, marketing, distribution, and/or importation of Sandoz's ANDA Product would infringe Claims 1 and 2 of the '464 patent, either literally or under the doctrine of equivalents.

**ANSWER:**

Paragraph 41 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 41.

42. On information and belief, the use of Sandoz's ANDA Product in accordance with and as directed by Sandoz's proposed labeling for that product would infringe Claims 1 and 2 of the '464 patent.

**ANSWER:**

Paragraph 42 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 42

43. On information and belief, Sandoz plans and intends to, and will, actively induce infringement of the '464 patent when Sandoz's ANDA is approved, and plans and intends to, and will, do so after approval.

17

**ANSWER:**

Paragraph 43 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 43.

44.     On information and belief, Sandoz knows that Sandoz's ANDA Product and its proposed labeling are especially made or adapted for use in infringing the '464 patent and that Sandoz's ANDA Product and its proposed labeling is not suitable for substantial non-infringing use. On information and belief, Sandoz plans and intends to, and will, contribute to infringement of the '464 patent after approval of Sandoz's ANDA.

**ANSWER:**

Paragraph 44 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 44.

45.     The foregoing actions by Sandoz constitute and/or will constitute infringement of the '464 patent, active inducement of infringement of the '464 patent, and contribution to the infringement by others of the '464 patent.

**ANSWER:**

Paragraph 45 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 45.

46.     On information and belief, Sandoz has acted with full knowledge of the '464 patent and without a reasonable basis for believing that it would not be liable for infringing the '464 patent, actively inducing infringement of the '464 patent, and contributing to the infringement by others of the '464 patent.

**ANSWER:**

Paragraph 46 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 46.

47.     In Sandoz's Notice Letter, Sandoz did not contest infringement of Claims 1 and 2 of the '464 patent on any basis other than the alleged invalidity of those claims.

18

**ANSWER:**

Paragraph 47 contains legal conclusions to which no response is required.  Sandoz's

Notice Letter speaks for itself.  To the extent a response is required, Sandoz denies the

allegations of Paragraph 47.

48.     Unless Sandoz is enjoined from infringing the '464 patent, actively inducing infringement of the '464 patent, and contributing to the infringement by others of the '464 patent, Plaintiffs will suffer irreparable injury.  Plaintiffs have no adequate remedy at law.

**ANSWER:**

Paragraph 48 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 48.

**Count II – Declaratory Judgment of Infringement of the '464 Patent**

49.     Plaintiffs incorporate each of the preceding paragraphs 1-48 as if fully set forth herein.

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding

paragraphs as if fully set forth herein.

50.     The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case or actual controversy between Plaintiffs on the one hand and Sandoz on the other regarding validity and/or infringement of the '464 patent.

**ANSWER:**

Paragraph 50 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz admits that Plaintiffs' Complaint purports to state an action that

arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Sandoz denies the

remaining allegations of Paragraph 50.

51.     The Court should declare that the commercial manufacture, use, sale, offer for sale, or importation of Sandoz's ANDA Product with its proposed labeling, or any other Sandoz drug product that is covered by or whose use is covered by the '464 patent, will infringe, induce

19

the infringement of, and contribute to the infringement by others of the '464 patent, and that the claims of the '464 patent are valid.

**ANSWER:**

Paragraph 51 contains legal conclusions to which no response is required. To the extent a

response is required, Sandoz denies the allegations of Paragraph 51.

## Count III – Infringement of the '842 Patent Under 35 U.S.C. § 271(e)(2)

52.    Plaintiffs incorporate each of the preceding paragraphs 1-51 as if fully set forth herein.

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding

paragraphs as if fully set forth herein.

53.    On July 2, 2013, the USPTO duly and lawfully issued the '842 patent, entitled "Immediate Release Pharmaceutical Formulation of 4-[3-(4-Cyclopropanecarbonyl-Piperazine-1-Carbonyl)-4-Fluoro-Benzyl]-2H-Phthalazin-1-One." A copy of the '842 patent is attached hereto as Exhibit B.

**ANSWER:**

Paragraph 53 contains legal conclusions to which no response is required. To the extent a

response is required, Sandoz admits that Exhibit B of Plaintiffs' Complaint purports to be a copy

of the '842 patent. Sandoz further admits that the face of the '842 patent states that the '842

patent purports to have been issued on July 2, 2013. Sandoz further admits on its face, the '842

patent is titled "Immediate Release Pharmaceutical Formulation of 4-[3-(4-

Cyclopropanecarbonyl-Piperazine-1-Carbonyl)-4-Fluoro-Benzyl]-2H-Phthalazin-1-One."

Sandoz denies the remaining allegations of Paragraph 53.

54.    Plaintiff Kudos Pharmaceuticals Limited is the assignee of the '842 patent. Plaintiffs Kudos Pharmaceuticals Limited, AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, and MSD International Business GmbH collectively possess all exclusive rights and interests in the '842 patent.

20

**ANSWER:**

Paragraph 54 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that the online records of the USPTO list Kudos Pharmaceuticals Limited as the assignee of the '842 patent. Sandoz lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54 and on that basis denies these allegations.

55. The '842 patent claims, *inter alia*, an immediate-release pharmaceutical composition in the form of a solid dispersion comprising olaparib and certain excipients.

**ANSWER:**

Paragraph 55 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz states that the claims of the '842 patent speak for themselves. Sandoz denies the remaining allegations of Paragraph 55.

56. LYNPARZA® is covered by one or more claims of the '842 patent, including at least claims 1 and 7 of the '842 patent, and the '842 patent has been listed in connection with LYNPARZA® in the FDA's Orange Book.

**ANSWER:**

Paragraph 56 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that one or more of Plaintiffs caused the FDA to list the '842 patent in the Orange Book in connection with NDA No. 208558 for LYNPARZA®. Sandoz denies the remaining allegations of Paragraph 56.

57. Sandoz's submission of Sandoz's ANDA for the purpose of obtaining approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Sandoz's ANDA Product prior to the expiration of the '842 patent was an act of infringement of the '842 patent under 35 U.S.C. § 271(e)(2)(A).

**ANSWER:**

Paragraph 57 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz does not contest this Court's subject matter jurisdiction solely for

21

the alleged infringement of the '842 patent under 35 U.S.C. § 271(e)(2), and expressly reserves

the right to contest subject matter jurisdiction as to other allegations.  Sandoz denies the

remaining allegations of Paragraph 57.

58.    On information and belief, the manufacture, use, offer for sale, sale, marketing, distribution, and/or importation of Sandoz's ANDA Product would infringe at least claims 1 and 7 of the '842 patent, recited above, either literally or under the doctrine of equivalents.

**ANSWER:**

Paragraph 58 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 58.

59.    On information and belief, the use of Sandoz's ANDA Product in accordance with and as directed by Sandoz's proposed labeling for that product would infringe at least claims 1 and 7 of the '842 patent.

**ANSWER:**

Paragraph 59 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 59.

60.    On information and belief, Sandoz plans and intends to, and will, actively induce infringement of the '842 patent when Sandoz's ANDA is approved, and plans and intends to, and will, do so after approval.

**ANSWER:**

Paragraph 60 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 60.

61.    On information and belief, Sandoz knows that Sandoz's ANDA Product and its proposed labeling are especially made or adapted for use in infringing the '842 patent and that Sandoz's ANDA Product and its proposed labeling is not suitable for substantial non-infringing use.  On information and belief, Sandoz plans and intends to, and will, contribute to infringement of the '842 patent after approval of Sandoz's ANDA.

**ANSWER:**

Paragraph 61 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 61.

62.     The foregoing actions by Sandoz constitute and/or will constitute infringement of the '842 patent, active inducement of infringement of the '842 patent, and contribution to the infringement by others of the '842 patent.

**ANSWER:**

Paragraph 62 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 62.

63.     On information and belief, Sandoz has acted with full knowledge of the '842 patent and without a reasonable basis for believing that it would not be liable for infringing the '842 patent, actively inducing infringement of the '842 patent, and contributing to the infringement by others of the '842 patent.

**ANSWER:**

Paragraph 63 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 63.

64.     Unless Sandoz is enjoined from infringing the '842 patent, actively inducing infringement of the '842 patent, and contributing to the infringement by others of the '842 patent, Plaintiffs will suffer irreparable injury.  Plaintiffs have no adequate remedy at law.

**ANSWER:**

Paragraph 64 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 64.

### Count IV – Declaratory Judgment of Infringement of the '842 Patent

65.     Plaintiffs incorporate each of the preceding paragraphs 1-64 as if fully set forth herein.

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding

paragraphs as if fully set forth herein.

66.     The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case or actual controversy between Plaintiffs on the one hand and Sandoz on the other regarding validity and/or infringement of the '842 patent.

23

**ANSWER:**

Paragraph 66 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that Plaintiffs' Complaint purports to state an action that arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Sandoz denies the remaining allegations of Paragraph 66.

67.    The Court should declare that the commercial manufacture, use, sale, offer for sale, or importation of Sandoz's ANDA Product with its proposed labeling, or any other Sandoz drug product that is covered by or whose use is covered by the '842 patent, will infringe, induce the infringement of, and contribute to the infringement by others of the '842 patent, and that the claims of the '842 patent are valid.

**ANSWER:**

Paragraph 67 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz denies the allegations of Paragraph 67.

**Count V – Infringement of the '396 Patent Under 35 U.S.C. § 271(e)(2)**

68.    Plaintiffs incorporate each of the preceding paragraphs 1-67 as if fully set forth herein.

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding paragraphs as if fully set forth herein.

69.    On April 25, 2023, the USPTO duly and lawfully issued the '396 patent, entitled "Immediate Release Pharmaceutical Formulation of 4-[3-(4-Cyclopropanecarbonyl-Piperazine-1-Carbonyl)-4-Fluoro-Benzyl]-2H-Phthalazin-1-One."  A copy of the '396 patent is attached hereto as Exhibit C.

**ANSWER:**

Paragraph 69 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that Exhibit C of Plaintiffs' Complaint purports to be a copy of the '396 patent.  Sandoz further admits that the face of the '396 patent states that the '396 patent purports to have been issued on April 25, 2023.  Sandoz further admits on its face, the

24

'396 patent is titled "Immediate Release Pharmaceutical Formulation of 4-[3-(4-Cyclopropanecarbonyl-Piperazine-1-Carbonyl)-4-Fluoro-Benzyl]-2H-Phthalazin-1-One."

Sandoz denies the remaining allegations of Paragraph 69.

70.    Plaintiff Kudos Pharmaceuticals Limited is the assignee of the '396 patent. Plaintiffs Kudos Pharmaceuticals Limited, AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, and MSD International Business GmbH collectively possess all exclusive rights and interests in the '396 patent.

**ANSWER:**

Paragraph 70 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that the online records of the USPTO list Kudos Pharmaceuticals Limited as the assignee of the '396 patent. Sandoz lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 70 and on that basis denies these allegations.

71.    The '396 patent claims, *inter alia*, an immediate-release pharmaceutical composition in the form of a solid dispersion comprising olaparib and certain excipients.

**ANSWER:**

Paragraph 71 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz states that the claims of the '842 patent speak for themselves. Sandoz denies the remaining allegations of Paragraph 71.

72.    LYNPARZA® is covered by one or more claims of the '396 patent, including at least claim 1 of the '396 patent, and the '396 patent has been listed in connection with LYNPARZA® in the FDA's Orange Book.

**ANSWER:**

Paragraph 72 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that one or more of Plaintiffs caused the FDA to list the '396 patent in the Orange Book in connection with NDA No. 208558 for LYNPARZA®.  Sandoz denies the remaining allegations of Paragraph 72.

73.     Sandoz's submission of Sandoz's ANDA for the purpose of obtaining approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Sandoz's ANDA Product prior to the expiration of the '396 patent was an act of infringement of the '396 patent under 35 U.S.C. § 271(e)(2)(A).

**ANSWER:**

Paragraph 73 contains legal conclusions to which no response is required.  Sandoz does not contest this Court's subject matter jurisdiction solely for the alleged infringement of the '396 patent under 35 U.S.C. § 271(e)(2), and expressly reserves the right to contest subject matter jurisdiction as to other allegations.  To the extent a response is required, Sandoz denies the remaining allegations of Paragraph 73.

74.     On information and belief, the manufacture, use, offer for sale, sale, marketing, distribution, and/or importation of Sandoz's ANDA Product would infringe at least claim 1 of the '396 patent, recited above, either literally or under the doctrine of equivalents.

**ANSWER:**

Paragraph 74 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz denies the allegations of Paragraph 74.

75.     On information and belief, the use of Sandoz's ANDA Product in accordance with and as directed by Sandoz's proposed labeling for that product would infringe at least claim 1 of the '396 patent.

**ANSWER:**

Paragraph 75 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz denies the allegations of Paragraph 75.

76.     On information and belief, Sandoz plans and intends to, and will, actively induce infringement of the '396 patent when Sandoz's ANDA is approved, and plans and intends to, and will, do so after approval.

**ANSWER:**

Paragraph 76 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz denies the allegations of Paragraph 76.

26

77.     On information and belief, Sandoz knows that Sandoz's ANDA Product and its proposed labeling are especially made or adapted for use in infringing the '396 patent and that Sandoz's ANDA Product and its proposed labeling is not suitable for substantial non-infringing use.  On information and belief, Sandoz plans and intends to, and will, contribute to infringement of the '396 patent after approval of Sandoz's ANDA.

**ANSWER:**

Paragraph 77 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 77.

78.     The foregoing actions by Sandoz constitute and/or will constitute infringement of the '396 patent, active inducement of infringement of the '396 patent, and contribution to the infringement by others of the '396 patent.

**ANSWER:**

Paragraph 78 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 78.

79.     On information and belief, Sandoz has acted with full knowledge of the '396 patent and without a reasonable basis for believing that it would not be liable for infringing the '396 patent, actively inducing infringement of the '396 patent, and contributing to the infringement by others of the '396 patent.

**ANSWER:**

Paragraph 79 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 79.

80.     Unless Sandoz is enjoined from infringing the '396 patent, actively inducing infringement of the '396 patent, and contributing to the infringement by others of the '396 patent, Plaintiffs will suffer irreparable injury.  Plaintiffs have no adequate remedy at law.

**ANSWER:**

Paragraph 80 contains legal conclusions to which no response is required.  To the extent a

response is required, Sandoz denies the allegations of Paragraph 80.

**Count VI – Declaratory Judgment of Infringement of the '396 Patent**

81.     Plaintiffs incorporate each of the preceding paragraphs 1-80 as if fully set forth herein.

27

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding paragraphs as if fully set forth herein.

82.    The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case or actual controversy between Plaintiffs on the one hand and Sandoz on the other regarding validity and/or infringement of the '396 patent.

**ANSWER:**

Paragraph 82 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that Plaintiffs' Complaint purports to state an action that arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Sandoz denies the remaining allegations of Paragraph 82.

83.    The Court should declare that the commercial manufacture, use, sale, offer for sale, or importation of Sandoz's ANDA Product with its proposed labeling, or any other Sandoz drug product that is covered by or whose use is covered by the '396 patent, will infringe, induce the infringement of, and contribute to the infringement by others of the '396 patent, and that the claims of the '396 patent are valid.

**ANSWER:**

Paragraph 83 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 83.

**Count VII – Infringement of the '562 Patent Under 35 U.S.C. § 271(e)(2)**

84.    Plaintiffs incorporate each of the preceding paragraphs 1-83 as if fully set forth herein.

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding paragraphs as if fully set forth herein.

85.    On October 14, 2014, the USPTO duly and lawfully issued the '562 patent, entitled "Use of RNAi Inhibiting PARP Activity for the Manufacture of a Medicament for the Treatment of Cancer." A copy of the '562 patent is attached hereto as Exhibit D.

28

**ANSWER:**

Paragraph 85 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that Exhibit D of Plaintiffs' Complaint purports to be a copy of the '562 patent.  Sandoz further admits that the face of the '562 patent states that the '562 patent purports to have been issued on October 14, 2014.  Sandoz further admits on its face, the '562 patent is titled "Use of RNAi Inhibiting PARP Activity for the Manufacture of a Medicament for the Treatment of Cancer."  Sandoz denies the remaining allegations of Paragraph 85.

86.    Plaintiff The University of Sheffield is the assignee of the '562 patent.  Plaintiffs The University of Sheffield, AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, Kudos Pharmaceuticals Limited, and MSD International Business GmbH collectively possess all exclusive rights and interests in the '562 patent.

**ANSWER:**

Paragraph 86 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that the online records of the USPTO list The University of Sheffield as the assignee of the '562 patent. Sandoz lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 86 and on that basis denies these allegations.

87.    The '562 patent claims, *inter alia*, a method of treatment of cancer cells defective in homologous recombination (HR).

**ANSWER:**

Paragraph 87 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz states that the claims of the '562 patent speak for themselves. Sandoz denies the remaining allegations of Paragraph 87.

88.    Methods of using LYNPARZA® are covered by Claim 1 of the '562 patent, and the '562 patent has been listed in connection with LYNPARZA® in the FDA's Orange Book.

29

**ANSWER:**

Paragraph 88 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz admits that the Orange Book lists the '562 patent in connection with NDA No. 208558 for LYNPARZA®. Sandoz denies the remaining allegations of Paragraph 88.

89.    Sandoz's submission of Sandoz's ANDA for the purpose of obtaining approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Sandoz's ANDA Product prior to the expiration of the '562 patent was an act of infringement of the '562 patent under 35 U.S.C. § 271(e)(2)(A).

**ANSWER:**

Paragraph 89 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz does not contest this Court's subject matter jurisdiction solely for the alleged infringement of the '562 patent under 35 U.S.C. § 271(e)(2), and expressly reserves the right to contest subject matter jurisdiction as to other allegations. Sandoz denies the remaining allegations of Paragraph 89.

90.    On information and belief, the use of Sandoz's ANDA Product in accordance with and as directed by Sandoz's proposed labeling for that product would infringe Claim 1 of the '562 patent.

**ANSWER:**

Paragraph 90 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 90.

91.    On information and belief, Sandoz plans and intends to, and will, actively induce infringement of the '562 patent and that Sandoz's ANDA Product and its proposed labeling is not suitable for substantial non-infringing use. On information and belief, Sandoz plans and intends to, and will, contribute to infringement of the '562 patent after approval of Sandoz's ANDA.

**ANSWER:**

Paragraph 91 contains legal conclusions to which no response is required. To the extent a response is required, Sandoz denies the allegations of Paragraph 91.

92.    The foregoing actions by Sandoz constitute and/or will constitute infringement of the '562 patent, active inducement of infringement of the '562 patent, and contribution to the infringement by others of the '562 patent.

**ANSWER:**

Paragraph 92 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz denies the allegations of Paragraph 92.

93.    On information and belief, Sandoz has acted with full knowledge of the '562 patent and without a reasonable basis for believing that it would not be liable for the infringing of the '562 patent, and contributing to the infringement by others of the '562 patent.

**ANSWER:**

Paragraph 93 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz denies the allegations of Paragraph 93.

94.    In Sandoz's Notice Letter, Sandoz did not contest infringement of Claim 1 of the '562 patent on any basis other than the alleged invalidity of that claim.

**ANSWER:**

Paragraph 94 contains legal conclusions to which no response is required.  Sandoz's Notice Letter speaks for itself.  To the extent a response is required, Sandoz denies the allegations of Paragraph 94.

95.    Unless Sandoz is enjoined from infringing the '562 patent, actively inducing the infringement of the '562 patent, and contributing to the infringement by others of the '562 patent, Plaintiffs will suffer irreparable injury.  Plaintiffs have no adequate remedy at law.

**ANSWER:**

Paragraph 95 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz denies the allegations of Paragraph 95.

## Count VIII – Declaratory Judgment of the '562 Patent

96.    Plaintiffs incorporate each of the preceding paragraphs 1-95 as if fully set forth herein.

31

**ANSWER:**

Sandoz repeats and incorporates by reference its responses in each of the preceding paragraphs as if fully set forth herein.

97.    The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case or actual controversy between Plaintiffs on the one hand and Sandoz on the other regarding infringement and/or invalidity of the '562 patent.

**ANSWER:**

Paragraph 97 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz admits that Plaintiffs' Complaint purports to state an action that arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Sandoz denies the remaining allegations of Paragraph 97.

98.    The Court should declare that the commercial manufacture, use, sale, offer for sale, or importation of Sandoz's ANDA Product with its proposed labeling, or any other Sandoz drug product that is covered by or whose use is covered by the '562 patent, will infringe, induce the infringement of, and contribute to the infringement by others of the '562 patent, and that the claims of the '562 patent are valid.

**ANSWER:**

Paragraph 98 contains legal conclusions to which no response is required.  To the extent a response is required, Sandoz denies the allegations of Paragraph 98.

**RESPONSES TO PRAYER FOR RELIEF**

All remaining allegations not specifically admitted herein are denied.  Sandoz further denies that Plaintiffs are entitled to any of the relief set forth in their "Prayer for Relief" or to any relief whatsoever.

32

## DEFENSES

Without any admission or implication as to burden of proof and expressly reserving its right to assert any additional defenses or counterclaims that discovery may reveal, Sandoz asserts the following defenses:

### FIRST DEFENSE
### (NON-INFRINGEMENT OF THE PATENTS-IN-SUIT)

The manufacture, use, sale, offer for sale, and/or importation of Sandoz's ANDA Product does not and will not infringe, induce infringement of, or contribute to the infringement of any valid and/or enforceable claims of the '842, '396, and '562 patents, either literally or by the doctrine of equivalents. For example, without limitation, the manufacture, use, sale, offer for sale, or importation of the products described in ANDA No. 217936 has not infringed, does not infringe, and would not infringe any valid claim of the Patents-in-Suit for at least the reasons set forth in Sandoz's Notice Letter dated December 29, 2023.

### SECOND DEFENSE
### (INVALIDITY OF THE PATENTS-IN-SUIT)

One or more claims of the '842, '396, and '562 patents are invalid for failure to comply with one or more of the conditions for patentability set forth in Title 35 of the United States Code, including without limitation, one or more of sections 101, 102, 103, and/or 112, and/or the doctrine of obviousness-type double-patenting and/or any other judicially created requirements for patentability and enforceability of patents. For example, without limitation, the Patents-in-Suit are invalid for at least the reasons set forth in Sandoz's Notice Letter dated December 29, 2023.

### THIRD DEFENSE
### (FAILURE TO STATE A CLAIM FOR DIRECT INFRINGEMENT)

33

Plaintiffs have failed to state a claim upon which relief can be granted with respect to purported direct infringement of the '842, '396, and '562 patents.  The Complaint contains only conclusory allegations including that "the manufacture, use, offer for sale, sale, marketing, distribution, and/or importation of Sandoz's ANDA Product would infringe [the Patents-in-Suit], either literally or under the doctrine of equivalents."  As such, Plaintiffs' Complaint fails to state a claim for direct infringement.

## FOURTH DEFENSE
### (FAILURE TO STATE A CLAIM FOR INDIRECT INFRINGEMENT)

Plaintiffs have failed to state a claim upon which relief can be granted with respect to purported indirect infringement of the '842, '396, and '562 patents.  The Complaint contains only conclusory allegations including that "actions by Sandoz constitute and/or will constitute infringement of the [Patents-in-Suit], active inducement of infringement of the [Patents-in-Suit], and contribution to the infringement by others of the [Patents-in-Suit]."  As such, Plaintiffs' Complaint fails to state a claim for either induced infringement or contributory infringement.

## FIFTH DEFENSE
### (LACK OF SUBJECT MATTER JURISDICTION UNDER 35 U.S.C. § 271(a), (b), (c))

The Court lacks subject matter jurisdiction over any and all claims asserted under 35 U.S.C. § 271(a), (b), and (c) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2022.

## SIXTH DEFENSE
### (NOT AN EXCEPTIONAL CASE)

Sandoz's actions in defending this case do not constitute an exceptional case under 35 U.S.C. § 285.

## SEVENTH DEFENSE
### (SAFE HARBOR UNDER 35 U.S.C. § 271(e)(1))

Pursuant to 35 U.S.C. § 271(e)(1), Sandoz's actions do not constitute infringement.

34

## EIGHTH DEFENSE
## (ADDITIONAL DEFENSES DISCOVERY MAY REVEAL)

Any additional defenses that discovery may reveal.

## NINTH DEFENSE
## (INEQUITABLE CONDUCT RENDERS THE '562 PATENT UNENFORCEABLE)

The '562 patent is unenforceable based on inequitable conduct that occurred in the form of fraudulent conduct with respect to the '562 patent to preserve its validity by falsely changing the inventorship of U.S. Patent Nos. 7,351,701 ("'701 patent") and 7,531,530 ("'530 patent") before the United States Patent & Trademark Office. The allegations that form the basis for this Affirmative Defense are set forth in the Counterclaim below, which are hereby incorporated by reference.

## TENTH DEFENSE
## (UNCLEAN HANDS RENDERS THE '562 PATENT UNENFORCEABLE AND EQUITABLE RELIEF UNAVAILABLE)

The '562 patent is unenforceable, and Plaintiffs are not entitled to any equitable relief related to that patent, due to unclean hands as a result of fraudulent conduct that occurred with respect to the '562 patent to preserve its validity by falsely changing the inventorship of the '701 and '530 patents before the United States Patent & Trademark Office. The allegations that form the basis for this Affirmative Defense are set forth in the Counterclaim below, which are hereby incorporated by reference.

## RESERVATION OF DEFENSES

Sandoz hereby reserves any and all defenses that are available under the Federal Rules of Civil Procedure, Local Patent Rules and the U.S. Patent Law and any other defenses, at law or in

35

equity, that may now exist or become available later as a result of discovery and further factual investigation during this litigation, including unenforceability.

## FIRST AMENDED COUNTERCLAIMS OF SANDOZ INC.

Defendant/Counterclaim-Plaintiff Sandoz Inc. ("Sandoz") brings the following First Amended Counterclaims against Plaintiffs/Counterclaim-Defendants AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, Kudos Pharmaceuticals Limited, The University of Sheffield, and MSD International Business GmbH (collectively, "Plaintiffs"), and states as follows:

### NATURE OF THE ACTION

1. These counterclaims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*; and/or 21 U.S.C. § 355(j)(5)(C), based on an actual controversy between the parties to declare that Sandoz is free to continue to seek approval of its Abbreviated New Drug Application ("ANDA") No. 217936, and upon approval by the U.S. Food and Drug Administration ("FDA") to engage in commercial manufacture, importation, sale, and/or offer for sale of the products described in ANDA No. 217936.

### THE PARTIES

2. Defendant/Counterclaim-Plaintiff Sandoz is a corporation organized and existing under the laws of Delaware, with a place of business at 100 College Road West, Princeton, New Jersey 08540-6604, United States.

3. Plaintiff/Counterclaim-Defendant AstraZeneca Pharmaceuticals LP purports to be a limited partnership organized and existing under the laws of the state of Delaware, having its principal place of business at 1800 Concord Pike, Wilmington, Delaware 19803.

36

4.    Plaintiff/Counterclaim-Defendant AstraZeneca UK Limited purports to be a private company limited organized and existing under the laws of laws of England and Wales, having a registered office at 1 Francis Crick Avenue, Cambridge Biomedical Campus, Cambridge CB2 0AA, United Kingdom.

5.    Plaintiff/Counterclaim-Defendant Kudos Pharmaceuticals Limited purports to be a private company limited organized and existing under the laws of England and Wales, having a registered office at 1 Francis Crick Avenue, Cambridge Biomedical Campus, Cambridge CB2 0AA, United Kingdom.

6.    Plaintiff/Counterclaim-Defendant The University of Sheffield purports to be a Royal Charter company organized and existing under the laws of England and Wales, having its address at Western Bank, Sheffield S10 2TN, United Kingdom.

7.    Plaintiff/Counterclaim-Defendant MSD International Business GmbH purports to be a company with limited liability organized and existing under the laws of Switzerland, having a registered office at Tribschenstrasse, 60, 6005 Lucerne, Switzerland.

8.    Plaintiff Kudos Pharmaceuticals Limited purports to be the assignee of U.S. Patent No. 8,475,842 ("'842 patent"), U.S. Patent No. 8,859,562 ("'562 patent"), and U.S. Patent No. 11,633,396 ("'396 patent") (collectively, "Patents-in-Suit").

9.    Plaintiffs Kudos Pharmaceuticals Limited, AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, and MSD International Business GmbH purport to possess all exclusive rights and interests in the Patents-in-Suit.

10.   AstraZeneca Pharmaceuticals LP purports to be the holder of New Drug Application No. 208558 for the manufacture and sale of LYNPARZA® (olaparib) tablets.

37

**JURISDICTION AND VENUE**

11.    These Counterclaims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*; and/or 21 U.S.C. § 355(j)(5)(C).

12.    This Court has original jurisdiction over the subject matter of these Counterclaims under 28 U.S.C. §§ 1331, 1337(a) and 1338(a); under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and under 21 U.S.C. § 355(j)(5)(C).

13.    This Court has personal jurisdiction over Plaintiffs/Counterclaim-Defendants because Plaintiffs/Counterclaim-Defendants have availed themselves of the rights and privileges and subjected themselves to the jurisdiction of this forum by suing Sandoz in this District, and/or because Plaintiffs/Counterclaim-Defendants conduct substantial business in, and have regular systemic contact with, this District.

14.    Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400 and 21 U.S.C. § 355(j)(5)(C).

**BACKGROUND**

15.    On February 2, 2024, Plaintiffs/Counterclaim-Defendants filed a Complaint for Patent Infringement ("Complaint") in this Court alleging that the commercial manufacture, use, offer for sales, sale, and/or importation of Sandoz's Proposed ANDA Product before the expiration of the Patents-in-Suit would constitute infringement of the '842, '396, and '562 patents, either literally or under the doctrine of equivalents.  Plaintiffs/Counterclaim-Defendants further alleged that Sandoz will actively induce infringement of, and/or contribute to infringement by others of the Patents-in-Suit.

16.     By virtue of Plaintiffs' Complaint, an immediate and justiciable controversy exists between Sandoz, on the one hand, and Plaintiffs, on the other, regarding whether the products described in Sandoz's ANDA No. 217936 ("Sandoz's ANDA Product") infringe any valid and enforceable claim of the Patents-in-Suit.

## PATENTS-IN-SUIT

17.     The face of the '842 patent indicates it was issued by the USPTO on or about July 2, 2013.

18.     The face of the '396 patent indicates it was issued by the USPTO on or about April 25, 2023.

19.     The face of the '562 patent indicates it was issued by the USPTO on or about October 14, 2014.

20.     Plaintiffs/Counterclaim-Defendants purport and claim to have the right to enforce the Patents-in-Suit.

21.     On information and belief, one or more of Plaintiffs/Counterclaim-Defendants caused the FDA to publish the Patents-in-Suit in the FDA's publication, *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book"), in connection with NDA No. 208558 for LYNPARZA®.

22.     By maintaining the listing of the Patents-in-Suit in the Orange Book for NDA No. 208558 for LYNPARZA®, Plaintiffs/Counterclaim-Defendants have represented that the Patents-in-Suit cover olaparib tablets, and that a claim of patent infringement may reasonably be asserted against any ANDA applicant, including Sandoz, that is not licensed by Plaintiffs/Counterclaim-Defendants and files an ANDA seeking approval to market olaparib tablets before the expiration of the Patents-in-Suit.

39

## SANDOZ'S ANDA NO. 217936

23.     Sandoz submitted ANDA No. 217936 with FDA seeking approval to engage in the commercial marketing of Sandoz's ANDA Product before the expiration of the Patents-in-Suit.

24.     In accordance with the requirements of 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.52(c), Sandoz sent Plaintiffs/Counterclaim-Defendants a notice letter dated December 29, 2023 ("Sandoz's Notice Letter"), stating that Sandoz's ANDA No. 217936 included certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV Certifications"), alleging that the Patents-in-Suit are invalid, unenforceable, and will not be infringed by the commercial manufacture, use or sale of Sandoz's ANDA Product.

25.     Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), Sandoz's Notice Letter included an Offer of Confidential Access ("OCA") to ANDA No. 217936 for the holder of NDA No. 208558 and owners of the Patents-in-Suit so that each could determine whether Sandoz's ANDA Product infringes any valid claim of the Patents-in-Suit.

26.     Sandoz's OCA to its ANDA No. 217936 complied with the requirements of 21 U.S.C. § 355(j)(5)(C)(i)(III), which states in relevant part that the offer shall be for "confidential access to the application that is in the custody of the applicant under paragraph (2) for the purpose of determining whether an action referred to in subparagraph (B)(iii) should be brought. The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information."

40

27.     Pursuant to 21 U.S.C. § 355(j)(2)(B)(iv)(II) of the Federal Drug and Cosmetic Act, Sandoz attached to its Notice Letter a detailed statement of the factual and legal bases for Sandoz's Paragraph IV Certifications ("Sandoz's Detailed Statement").

28.     Sandoz's Notice Letter initiated a 45-day statutory period during which Plaintiffs/Counterclaim-Defendants had the opportunity to file an action for patent infringement.

29.     By letter dated January 11, 2024, Plaintiffs demanded revisions to Sandoz's OCA that would have removed many of the restrictions placed by the OCA on access to Sandoz's confidential information.  Plaintiffs' letter also demanded Sandoz's confidential documents and things other than a copy of Sandoz's ANDA.

30.     Sandoz responded to Plaintiffs' demands by letter dated January 19, 2024 and Sandoz's counsel spoke with Plaintiffs' counsel on January 25, 2024 to discuss potential resolution over the parties' dispute over the terms of the OCA.  During the January 25 discussion, Plaintiffs' counsel indicated Plaintiffs were unlikely to negotiate further with respect to the terms of the OCA.

31.     On February 2, 2024, Plaintiffs/Counterclaim-Defendants filed this infringement action under 35 U.S.C. § 271(e)(2), asserting the Patents-in-Suit against Sandoz.

## FIRST COUNTERCLAIM
## (DECLARATION OF NON-INFRINGEMENT OF THE '842 PATENT)

32.     Sandoz realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

33.     This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*; and/or 21 U.S.C. § 355(j)(5)(C).  A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of

41

rights by this Court exists between Plaintiffs/Counterclaim-Defendants and Sandoz concerning the infringement of the claims of the '842 patent.

34.    Sandoz seeks a declaration that no valid or enforceable claim of the '842 patent has been infringed or will be infringed, directly and/or indirectly, by the manufacture, use, importation, sale, or offer for sale of products described in Sandoz's ANDA No. 217936.

35.    In accordance with 21 U.S.C. § 355(j)(2)(B)(iv)(II), Sandoz's Detailed Statement provides factual and legal bases for why Sandoz has not infringed, is not infringing, and will not infringe any valid and enforceable claim, directly, indirectly, literally, or under the doctrine of equivalents, of the '842 patent.

36.    In Sandoz's Detailed Statement, Sandoz expressly reserved the right to assert additional grounds of non-infringement, invalidity, and unenforceability beyond those provided in Sandoz's Detailed Statement.

37.    Because Plaintiffs/Counterclaim-Defendants maintain that the commercial manufacture, use, offer for sale, or sale of the products described in ANDA No. 217936 would infringe the '842 patent, a declaration of rights between the parties is appropriate and necessary to establish that the commercial manufacture, use, importation, offer for sale, or sale of the products described in Sandoz's ANDA No. 217936 within the United States has not infringed and will not infringe, directly and/or indirectly, the '842 patent.

38.    Sandoz is entitled to a declaration that the manufacture, use, importation, offer for sale and/or sale of products described in ANDA No. 217936 has not infringed and will not infringe, directly and/or indirectly, any valid and enforceable claim of the '842 patent.

42

## SECOND COUNTERCLAIM
### (DECLARATION OF INVALIDITY OF THE '842 PATENT)

39.      Sandoz realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

40.      This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*; and/or 21 U.S.C. § 355(j)(5)(C) and seeks a declaration that the claims of the '842 patent are invalid.  A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of rights by this Court exists between Plaintiffs/Counterclaim-Defendants and Sandoz concerning the invalidity of the claims of the '842 patent.

41.      Because Plaintiffs/Counterclaim-Defendants maintain and Sandoz denies that the '842 patent and the claims thereof are valid, a declaration of rights between the parties is appropriate and necessary to establish that the '842 patent and the claims thereof are invalid for failure to comply with one or more of the conditions for patentability set forth in Title 35 of the United States Code, including §§ 101, 102 103, and/or 112, and/or the doctrine of obviousness-type double-patenting and/or any other judicially created requirements for patentability and enforceability of patents.

42.      Sandoz is entitled to a declaration that the claims of the '842 patent are invalid.

## THIRD COUNTERCLAIM
### (DECLARATION OF NON-INFRINGEMENT OF THE '396 PATENT)

43.      Sandoz realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

44.      This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*; and/or 21 U.S.C. §

43

355(j)(5)(C).  A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of rights by this Court exists between Plaintiffs/Counterclaim-Defendants and Sandoz concerning the infringement of the claims of the '396 patent.

45.    Sandoz seeks a declaration that no valid or enforceable claim of the '396 patent has been infringed or will be infringed, directly and/or indirectly, by the manufacture, use, importation, sale, or offer for sale of products described in Sandoz's ANDA No. 217936.

46.    In accordance with 21 U.S.C. § 355(j)(2)(B)(iv)(II), Sandoz's Detailed Statement provides factual and legal bases for why Sandoz has not infringed, is not infringing, and will not infringe any valid and enforceable claim, directly, indirectly, literally, or under the doctrine of equivalents, of the '396 patent.

47.    In Sandoz's Detailed Statement, Sandoz expressly reserved the right to assert additional grounds of non-infringement, invalidity, and unenforceability beyond those provided in Sandoz's Detailed Statement.

48.    Because Plaintiffs/Counterclaim-Defendants maintain that the commercial manufacture, use, offer for sale, or sale of the products described in ANDA No. 217936 would infringe the '396 patent, a declaration of rights between the parties is appropriate and necessary to establish that the commercial manufacture, use, importation, offer for sale, or sale of the products described in Sandoz's ANDA No. 217936 within the United States has not infringed and will not infringe, directly and/or indirectly, the '396 patent.

49.    Sandoz is entitled to a declaration that the manufacture, use, importation, offer for sale and/or sale of products described in ANDA No. 217936 has not infringed and will not infringe, directly and/or indirectly, any valid and enforceable claim of the '396 patent.

44

**FOURTH COUNTERCLAIM**
**(DECLARATION OF INVALIDITY OF THE '396 PATENT)**

50.     Sandoz realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

51.     This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*; and/or 21 U.S.C. § 355(j)(5)(C) and seeks a declaration that the claims of the '396 patent are invalid.  A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of rights by this Court exists between Plaintiffs/Counterclaim-Defendants and Sandoz concerning the invalidity of the claims of the '396 patent.

52.     Because Plaintiffs/Counterclaim-Defendants maintain and Sandoz denies that the '396 patent and the claims thereof are valid, a declaration of rights between the parties is appropriate and necessary to establish that the '396 patent and the claims thereof are invalid for failure to comply with one or more of the conditions for patentability set forth in Title 35 of the United States Code, including §§ 101, 102 103, and/or 112, and/or the doctrine of obviousness-type double-patenting and/or any other judicially created requirements for patentability and enforceability of patents.

53.     Sandoz is entitled to a declaration that the claims of the '396 patent are invalid.

**FIFTH COUNTERCLAIM**
**(DECLARATION OF NON-INFRINGEMENT OF THE '562 PATENT)**

54.     Sandoz realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

55.     This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*; and/or 21 U.S.C. §

45

355(j)(5)(C).  A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of rights by this Court exists between Plaintiffs/Counterclaim-Defendants and Sandoz concerning the infringement of the claims of the '562 patent.

56.    Sandoz seeks a declaration that no valid or enforceable claim of the '562 patent has been infringed or will be infringed, directly and/or indirectly, by the manufacture, use, importation, sale, or offer for sale of products described in Sandoz's ANDA No. 217936.

57.    In accordance with 21 U.S.C. § 355(j)(2)(B)(iv)(II), Sandoz's Detailed Statement provides factual and legal bases for why Sandoz has not infringed, is not infringing, and will not infringe any valid and enforceable claim, directly, indirectly, literally, or under the doctrine of equivalents, of the '562 patent.

58.    In Sandoz's Detailed Statement, Sandoz expressly reserved the right to assert additional grounds of non-infringement, invalidity, and unenforceability beyond those provided in Sandoz's Detailed Statement.

59.    Because Plaintiffs/Counterclaim-Defendants maintain that the commercial manufacture, use, offer for sale, or sale of the products described in ANDA No. 217936 would infringe the '562 patent, a declaration of rights between the parties is appropriate and necessary to establish that the commercial manufacture, use, importation, offer for sale, or sale of the products described in Sandoz's ANDA No. 217936 within the United States has not infringed and will not infringe, directly and/or indirectly, the '562 patent.

60.    Sandoz is entitled to a declaration that the manufacture, use, importation, offer for sale and/or sale of products described in ANDA No. 217936 has not infringed and will not infringe, directly and/or indirectly, any valid and enforceable claim of the '562 patent.

46

**SIXTH COUNTERCLAIM**
**(DECLARATION OF INVALIDITY OF THE '562 PATENT)**

61.     Sandoz realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

62.     This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*; and/or 21 U.S.C. § 355(j)(5)(C) and seeks a declaration that the claims of the '562 patent are invalid.  A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of rights by this Court exists between Plaintiffs/Counterclaim-Defendants and Sandoz concerning the invalidity of the claims of the '562 patent.

63.     Because Plaintiffs/Counterclaim-Defendants maintain and Sandoz denies that the '562 patent and the claims thereof are valid, a declaration of rights between the parties is appropriate and necessary to establish that the '562 patent and the claims thereof are invalid for failure to comply with one or more of the conditions for patentability set forth in Title 35 of the United States Code, including §§ 101, 102 103, and/or 112, and/or the doctrine of obviousness-type double-patenting and/or any other judicially created requirements for patentability and enforceability of patents.

**64.**     Sandoz is entitled to a declaration that the claims of the '562 patent are invalid.

**SEVENTH COUNTERCLAIM –**
**(DECLARATION OF '562 PATENT**
**UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT)**

65.     Defendants reallege Paragraphs 1-64 as though fully set forth herein.

47

66. The claims of the ’562 patent are unenforceable due to inequitable conduct and unclean hands before the United States Patent & Trademark Office (“PTO”) by Dr. Thomas Helleday alone or in conjunction with one or more Plaintiffs.

67. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the PTO. *See* 37 C.F.R. § 1.56.

68. As a named inventor of the ’701 and ’530 patents, Dr. Helleday had a duty of candor and good faith in dealing with the PTO in connection with those patents. *See* 37 C.F.R. § 1.56. True and correct copies of the ’701 and ’530 patents are attached as Exs. C-D.[2]

69. Dr. Helleday was aware of, and expressly acknowledged, his duty of candor with respect to the ’701 and ’530 patents. On February 18, 2006, Helleday swore to the PTO, in connection with the patent applications that eventually issued as the ’530 patent: “I acknowledge the duty to disclose information which is material to patentability as defined in Title 37, Code of Federal Regulations, § 1.56.” (Ex. E at SHEFFIELD-16603[3].)

70. On August 20, 2004, Helleday swore to the PTO, in connection with the patent applications that eventually issued as the ’701 patent: “I acknowledge the duty to disclose information which is material to patentability as defined in Title 37, Code of Federal Regulations, § 1.56.” (Ex. F at SHEFFIELD-17400.)

71. In violation of his duty of candor and good faith to the PTO, Dr. Helleday engaged in affirmative egregious misconduct that was part of a deliberately planned and carefully executed scheme to defraud the PTO into changing the inventorship of the ’701 and

---

[2] Exhibits referenced hereinafter refer to the Exhibits attached to the Richter Declaration, filed contemporaneously herewith.

[3] Throughout this document, leading zeros from Bates-numbered documents and document ranges have been omitted.

'530 patents in order to prevent a finding of invalidity for another, related patent for which Dr. Helleday is a named inventor, the '562 patent.

72.    In violation of his duty of candor and good faith, Dr. Helleday intentionally and, in bad faith, made affirmative misrepresentations to the PTO that were highly relevant and material to the patentability of the '562 patent.

73.    Upon information and belief, one or more of Plaintiffs, acting directly or through counsel, knowingly and intentionally facilitated Dr. Helleday's misconduct as described further below.

### A.    Prosecution of the '701, '530 and '562 Patents

74.    The '701 patent issued from U.S. Pat. App. No. 10/898,653 ("'653 application"). The '653 application was filed on July 23, 2004, and claims priority to Great Britain Application No. 0317466.1, filed on July 25, 2003 ("GB'466 application") (Ex. C at DEFS-OLAP-812; Ex. G at cover page.)

75.    The PTO issued the '701 patent on April 1, 2008, listing Thomas Helleday as the first named inventor and Nicola Curtin as the second named inventor.  (Ex. C at DEFS-OLAP-812.)

76.    The '530 patent issued from U.S. Pat. Application No. 10/565,308 ("'308 application").  The '308 application claims priority to PCT Application No. PCT/GB2004/003183 filed on July 23, 2004, which in turn claims priority to the GB'466 application.  (Ex. D at DEFS-OLAP-4977.)

77.    The PTO issued the '530 patent on May 12, 2009, listing Thomas Helleday as the first named inventor and Nicola Curtin as the second named inventor.  (*Id.*)

49

78.     The '562 patent issued from U.S. Pat. App. No. 10/555,507 ("'507 application"). The '507 application claims priority to PCT Application No. PCT/GB2004/003235 filed on July 23, 2004, which in turn claims priority to the GB'466 application.  (Ex. H at AZ-LYNPARZA-76).

79.     The PTO issued the '562 patent on October 14, 2014, listing Thomas Helleday as the sole named inventor.  (*Id.*)

80.     Consistent with the common priority claim to the GB'466 application, the '701, '530, and '562 patents' specifications substantially overlap, disclosing the same type of PARP activity assay using common cell lines in Table 1 of each specification.  (*Compare* Ex. C at DEFS-OLAP-825; Ex. D at DEFS-OLAP-4990; Ex. H at AZ-LYNPARZA-102.)

81.     Further consistent with the common priority claim to the GB'466 application, the '701, '530, and '562 patents all claim and disclose methods of using PARP inhibitors to treat cancer cells defective in homologous recombination. (*See generally* Exs. C, D, and H.)

82.     On August 20, 2004, Dr. Helleday signed an oath and declaration with respect to the '701 patent in which he stated under penalty of perjury as follows: "I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled Therapeutic Compounds . . . ."  (Ex. F at SHEFFIELD-17399.)  Dr. Helleday further stated that "I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above."  (*Id.*)

83.     On February 18, 2006, Dr. Helleday signed an oath and declaration with respect to the '530 patent in which he stated under penalty of perjury as follows: "I believe I am the

original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled THERAPEUTIC COMPOUNDS . . . ." (Ex. E at SHEFFIELD-16602.) Dr. Helleday further stated that "I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above." (*Id*.)

**B.    The '701 and '530 Patents Are the Result of A Collaboration Between Thomas Helleday and Nicola Curtin**

84.    The application for the '701 and '530 patent claims were the result of a years'-long collaboration between Dr. Helleday and Dr. Nicola Curtin wherein Dr. Helleday designed and conducted experiments using materials available to him, and then instructed Dr. Curtin to conduct similar experiments using materials known to him and available to her. That work is why Dr. Helleday was named as an inventor of the '701 and '530 patents and remained a named inventor for their entire existence.

**1.    The Inventors' Contemporaneous Communications Indicate that They Collaborated to Arrive at the Subject Matter Claimed in the '530 and '701 Patents**

85.    Dr. Helleday and Curtin had multiple discussions regarding the use of PARP inhibitors to treat cancer beginning no later than 2001.

86.    For instance, Drs. Helleday and Curtin corresponded about the PARP inhibitor NU1025 in late 2001. (*See, e.g.*, Ex. I at SHEFFIELD-1138.)

87.    Dr. Helleday was then invited to give a presentation to Dr. Curtin and colleagues at the University of Newcastle in January 2002. (Ex. J at DEFS-OLAP-475; *see also* Ex. K at 110:14 – 113:19; Ex. L at SHEFFIELD-1251; Ex. M at SHEFFIELD-1439.)

88. During and after that presentation, Dr. Helleday discussed with Dr. Curtin results he had testing the PARP inhibitor NU1025—provided to him by Dr. Curtin —in the cell lines irs1 and irs1SF, both of which are deficient in homologous recombination. (*See, e.g.*, Ex. J at DEFS-OLAP-476 (describing IRS1 and irs1SF cells as "defective in HRR"); Ex. I at SHEFFIELD-1138 (Helleday to Curtin: "thank you for sending me some of your NU1025.").)

89. Dr. Helleday "tested his hypothesis in cells defective in HRR (irs1 lacking XRCC2 and irs1SF lacking XRCC3), which were killed by concentrations of NU1025 that did not kill wt or XRCC2/3 corrected cells." (Ex. J at DEFS-OLAP-476; Ex. M at SHEFFIELD-1439 (January 29, 2002, Helleday: "Also, I have attached graphs on the killing of NU1025 and other inhibitors in HR deficient cells."); Ex. N at SHEFFIELD-1444 (January 29, 2002, Curtin: "Many thanks for sending the data on the cells and PARP inhibitors.").)

90. Following his meetings in January 2002 with Dr. Curtin at the University of Newcastle, Dr. Helleday also sent the HR-deficient cell line irs1SF to Dr. Curtin in February 2002. (*See, e.g.*, Ex. K at 222:8-19; Ex. O at SHEFFIELD-1492 (Helleday: "You should have the irs1SF . . . tomorrow . . . ."; Curtin: "The cells have arrived, thanks very much.").)

91. Dr. Helleday suggested to Dr. Curtin that "[u]sing this system [of irs and irs1SF cell lines] the molecular mechanism of [AG14]361 killing may be resolved." (Ex. M at SHEFFIELD-1439.)

92. Dr. Curtin then tested those cell lines with the PARP inhibitor AG14361 in April 2002 and showed that AG14361 selectively killed those cells as compared to wild-type, not HR-defective cells. (*See* Ex. K at 223:7-16; Ex. J at DEFS-OLAP-476 ("However, experiments that had been conducted 3 to 4 months previously [to July 2002] in wt (AA8) and the HRD derivative (XRCC3 mutant: irs1SF) Chinese hamster ovary cells had indeed shown a very marked

52

difference in the sensitivity of the wt and HRD cells (Figure 3).”); Ex. P at SHEFFIELD-1871 (Helleday: “I hope that you have had some use of the cells that I sent you.  Do you have any preliminar [sic] results obtained with these cells so far?”; Curtin: “[A]s you can see from the attached graph it had the predicted effect!  Clearly there is something going on with PARP in HR-deficient cells.  Very exciting.”); Ex. Q at SHEFFIELD-1874 (Helleday: “The results you have looks [sic] very nice and are similar to the results we got on your NU1025.”).)

93.    The compound referred to as “Formula III” in the ’701 and ’530 patents is the same compound as the one referred to as “AG14631” in the GB’466 application and by Drs. Helleday and Curtin in their correspondence leading to the GB’466 application.

94.    Drs. Helleday and Curtin considered these efforts to be part of a collaboration between at least Dr. Helleday and Dr. Curtin in which Dr. Curtin used AG14361 in PARP inhibition experiments in HR-deficient cells as suggested by Dr. Helleday.  (*See, e.g.*, Ex. N at SHEFFIELD-1444 (“Here’s to a happy collaboration . . . .”); Ex. R at SHEFFIELD-2127 (July 18, 2002, Helleday to Newell (“We have shown that cells deficient in HR are hypersensitive to inhibitors of PARP-1 . . . and in association with Nicola Curtin and Herbie Newell, they have shown that HR deficient cells are sensitive also to their [AG14361].”); Ex. S at SHEFFIELD-13340 (Curtin: “Herbie [Newell] says we have to consult with Agouron about supply of [AG14361] though.  However, after our last meeting with you I was under the impression that we would collaborate and with this in mind we have probably generated at least some of the data you want.”).)

95.    Dr. Curtin at this time asked for further guidance from Dr. Helleday on PARP inhibitors so she could “get to grips with homologous recombination” because she “still can’t

understand how the PARP inhibitors block the double strand breaks." (Ex. N at SHEFFIELD-1444.)

96.     Dr. Newell, with whom Dr. Curtin worked, expressly acknowledged Dr. Helleday's contribution to their work with AG14361 in cells he provided to them. (Ex. T at SHEFFIELD-2473 ("Would you be happy for me to show the data we generated up here on [AG14361] in the . . . XRCC3-deficient [irs1SF] . . . cells that you kindly suppied [sic] us with? . . . [A]nd I will of course amply acknowledge your contribution.").)

97.     Following these results in at least irs1SF cells, Drs. Helleday and Curtin continued their collaboration by studying the effects of PARP inhibitors on BRCA gene deficient cell lines. (Ex. U at SHEFFIELD-2455 (Helleday requesting V-C8 cells).)

98.     Dr. Helleday told Dr. Curtin in February 2003 about the work he was doing in BRCA2 deficient cells called V-C8. (Ex. S at SHEFFIELD-13340 ("Of course I would be very happy to collaborate with you as we spoke about!  There is a new BRCA2 deficient cell line that we have in the lab (VC-8) and we are currently testing if these cells are also sensitive to NU1025.  I think this is much more relevant and more interesting than using the XRCC3 deficient irs1SF cell line.  We have started these experiments here . . . . ").)

99.     He then suggested to her that he could send her the same cells for her continued experiments. (*Id.* ("I would be happy to send you the VC-8 cells (and complimented ones) to use in mouse xenografts.").)

100.    He then explained his hypothesis about the AG14631 compound to her: "The hypothesis is that the BRCA2 deficient cells would be efficiently treated by . . . AG14631 alone, while the BRCA2 complimented cells would form tumours." (*Id.*)  He also indicated to her what he viewed as the potential clinical implications: "The clinical implications are massive, since

54

PARP-1 inhibitors would target BRCA2 tumours without being toxic to any other cell type in the body since they are BRCA2 +/-.").  (*Id*.)

101.   Dr. Curtin said in response that "[w]e are willing to have a go with the VC-8s." (Ex. V at SHEFFIELD-3348.)

102.   In March 2003, Dr. Curtin also indicated that she was interested in conducting experiments in BRCA1 deficient cells "along the same lines as your [Helleday's] BRCA2 cells." (Ex. W at SHEFFIELD-4028.)  She continued: "I think these studies should nicely complement each other and if they work could lead us down some very interesting avenues, don't you think." (*Id*.)

103.   Dr. Curtin expressly acknowledged that the ideas for these experiments were Dr. Helleday's: "I wanted to keep you in the picture about the proposed studies as I wouldn't like you to think we are going behind your back or exploiting your ideas."  (*Id*.)

104.   Dr. Helleday disclosed his results in the VC-8 cell line to Dr. Curtin in early March 2003.  (*Id.* ("Regarding the NU1025 in BRCA2 deficient cells we now have (very preliminary) experiments indicating that they are as sensitive as other HR deficient cells.").)

105.   Dr. Helleday believes these tests that he initiated in VC-8 cells were his "eureka" moment with respect to the concept of using PARP inhibitors to treat cancers such as breast cancers caused by HR-deficient cells.  He said these were results in a cell line with the "breast cancer gene" suggesting that "the cancer will die . . . while the normal cells will just survive." (*See* Ex. K at 225:15-22.)

106.   Dr. Helleday provided Dr. Curtin with VC-8 cells so that she could conduct testing with PARP inhibitors in her laboratory.  (Ex. J at DEFS-OLAP-476 ("By Spring 2003, he had obtained the VC8 BRCA2 mutant derivatives . . . which he later shared with us.").)

55

107. Dr. Curtin then disclosed to Dr. Helleday the results of PARP inhibition experiments she ran using the VC-8 cell line with AG14631 after he disclosed his data and provided them with the same cell line with which to test AG14361.  She wrote to him: "Just thought you'd like to know that the VC8 are hypersensitive to our inhibitor [AG14631], on the basis of the first expt they would seem to be about the same as IRS with only 20% survival at 1 μM."  (Ex. X at SHEFFIELD-4317.)

108. Dr. Helleday responded: "Great news that the VC8 cells are so sensitive to your inhibitor.  We found the VC8 cells more sensitive to NU1025 than the irs1SF cells.  Anyhow, it still shows that the concept is working."  (*Id*.)

109. Based at least on the above facts, Dr. Helleday is properly named as an inventor of the subject matter described in the claims of the '701 and '530 patents, including at least those claims that cover the use of Formula III/AG14361 to treat BRCA-mutated breast cancers.[4]

### 2. Dr. Helleday Seeks Patents Based On The Work He Conducted And Suggested, And Invited Dr. Curtin To Be A Co-Inventor

110. In March 2003, Dr. Helleday disclosed to those at the University of Sheffield responsible for evaluating the patentability of new discoveries that: "Using one of these and other PARP-1 inhibitors, *I have discovered* that cells that are deficient in homologous recombination die at very low dose of inhibitors."  (Ex. Y at SHEFFIELD-15058 (emphasis added).)

111. Dr. Helleday responded to a request about his alleged invention to "List anyone from outside the University who has been involved in any way" including "eg. collaborator."

---

[4] Defendants do not concede that the subject matter of those claims is inventive under the patentability provisions of 35 U.S.C. §§ 101, 102, 103, 112 or under the doctrine of non-statutory double patenting.

(*Id.* at SHEFFIELD-15059.) Dr. Helleday identified Dr. Curtin in response. (*Id.*) He described how he had discussed "future collaboration" with Dr. Newell at Newcastle in November 2001, then sent cells and discussed results with Dr. Curtin at Newcastle, and worked with Dr. Curtin to confirm sensitivity to PARP using her "more potent inhibitor [AG14]361." (*See id.*)

112.    In a similar email disclosing his alleged invention to the University of Sheffield in March 2003, Dr. Helleday referred to Dr. Curtin and her group at the University of Newcastle as a "collaborative group in Newcastle." (Ex. Z at SHEFFIELD-15055.)

113.    In an email dated May 1, 2003, Dr. Curtin indicated that Dr. Helleday was one of her "academic collaborators." (Ex. AA at SHEFFIELD-18281). In that same email, Dr. Curtin mentioned that "[Dr. Helleday] has some really exciting results with BRCA2 mutant cells (BRCA2 mutations cause breast cancer) that the University of Sheffield technology transfer office think worth a patent. He has very nicely suggested I go on the patent too as I have had discussions with him about the work." (*Id.*)

114.    On November 10, 2003, Dr. Michelle O'Neill, the UK patent attorney who prepared the GB'466 application, held a meeting that included Drs. Helleday and Curtin and others in which they "discuss[ed] the issues surrounding UK patent application No. 0317466.1," *i.e.*, the GB'466 application. (Ex. BB at SHEFFIELD-23304.)

115.    In her summary of that meeting prepared and sent to Drs. Helleday and Curtin the next day, Dr. O'Neill stated that "Thomas Helleday's invention was conceived when he found that the inhibitor, NU1025, selectively killed BRCA1 and BRCA2 deficient cells." (Ex. BB at SHEFFIELD-23304; Ex. CC at SHEFFIELD-23267.)

116.    In response, Dr. Curtin stated the next day on November 12, 2003, "I'd just like to repeat that I totally agree that *the invention was Thomas' and that we repeated his experiments*

57

here with [AG14]361 because we were not at liberty to send him the compound as it was jointly owned by us and Agouron/Pfizer and we thought Thomas had a very exciting idea." (Ex. BB at SHEFFIELD-23304 (emphasis added).)

117. The "Thomas" referred to in Dr. Curtin's November 12, 2003 email is Dr. Helleday.

118. The results of the above-described experiments that Dr. Helleday conducted in irs and irs1SF cells are reported in GB'466 at Figure 1. The results of those experiments are reported in Figure 1 of the '562 patent. (Ex. H. at AZ-LYNPARZA-78; Ex. DD at AZ-LYNPARZA-62916.)

119. In both GB'466 and the '562 patent, this data is described as "a graph demonstrating that HR deficient cells are hypersensitive to the toxic effect caused by inhibition of PARP-1." (Ex. H at AZ-LYNPARZA-100; Ex. DD at AZ-LYNPARZA-62905.) The specification for both the '562 patent and GB'466 states that "[t]he present inventors have surprisingly found that cells deficient in homologous recombination (HR) are hypersensitive to inhibitors of PARP-1 as compared to wild-type cells." (Ex. DD at AZ-LYNPARZA-62899; *see also* Ex. H at AZ-LYNPARZA-98.)

120. The results of the above experiments that Dr. Curtin conducted in irs and/or irs1SF cells after seeing Dr. Helleday's results in January 2002 are reported in Figure 1 of the '701 and '530 patents. (*See* Ex. C at DEFS-OLAP-813; Ex. D at DEFS-OLAP-4978.)

121. Similar to statements quoted above from GB'466 and the '562 patent, the '701 and '530 patents state that "[s]urprisingly it has been found that cells deficient in homologous recombination (HR) are hypersensitive to PARP inhibitors relative to wild type cells." (Ex. C at DEFS-OLAP-821; Ex. D at DEFS-OLAP-4986.) Figure 1 of those patents is described as

showing "the percentage survival of AA8, IrS ISF and CXR3 cell lines when treated with various concentrations of the compound of formula III [AG14361]. Formula III [AG14361] was found to be most active against IrS ISF, which lacks XRCC3, having an $LC_{50}$ (the concentration of the active component that kills 50% of the cells) of 100 nM." (Ex. C at DEFS-OLAP-824; Ex. D at DEFS-OLAP-4989.)

122.    The results of the above experiments that Dr. Helleday conducted in the VC-8 cell line are reported in GB'466 at Figure 2. The results of those experiments are reported in Figure 2 of the '562 patent. (Ex. H. at AZ-LYNPARZA-79; Ex. DD at AZ-LYNPARZA-62918.)

123.    In both GB'466 and the '562 patent, this data is described as "a graph showing cell survival in the presence of PARP inhibitor NU1025 in . . . BRCA2 deficient VC-8 cells . . . ." (Ex. H at AZ-LYNPARZA-100; Ex. DD at AZ-LYNPARZA-62906.)

124.    The results of the above experiments that Dr. Curtin conducted using VC-8 cells after learning of Dr. Helleday's results in VC-8 cells are reported in Figure 3 of the GB'466 application and Figure 2 of the 701 and 530 patents. (Ex. DD at AZ-LYNPARZA-62920; Ex. C at DEFS-OLAP-814; Ex. D at DEFS-OLAP-4979.)

125.    In the GB'466 application, this data is described as "a graph showing cell survival in the presence of PARP inhibitor AG14361 in . . . BRCA2 deficient VC-8 cells . . . ." (Ex. DD at AZ-LYNPARZA-62906.)

126.    In the '701 and '530 patents, this data is described as showing "the percentage survival of V79-Z, VC8 and VC8B2 cell lines when treated with various concentrations of the compound of formula III [AG14361]. Formula III [AG14361] was found to be most effective against the VC8 cell line, which lacks BRCA2, having an $LC_{50}$ value of 43 nM and an $LC_{90}$

59

(concentration of active component that kills 90% of the cells) was 1200 nM." (Ex. C at DEFS-OLAP-824; *see also* Ex. D at DEFS-OLAP-4989.)

### 3. Dr. Helleday Was Repeatedly Characterized As An Inventor Of The '701 And '530 Patents Throughout Prosecution Of The Applications That Issued As The '701, '530 And '562 Patents

127. Dr. Helleday signed oaths and declarations stating that he was an inventor of the applications that issued as the '701 and '530 patents on August 20, 2004 and February 18, 2006, respectively, which were submitted to the PTO in connection with those applications. (*See supra*, at ¶¶82–83.)

128. At no time during prosecution of the applications that issued as the '701 and '530 patents did Dr. Helleday attempt to remove himself as an inventor or make any known public or private statement that he did not consider himself an inventor.

129. On the other hand, during prosecution of the '507 application, which issued as the '562 patent, the applicant, University of Sheffield, held Dr. Helleday out as an inventor of the '701 and '530 patents.

130. Throughout the file history for the '507 application, the applicant repeatedly referred to Dr. Helleday as a "common inventor" between the '507 application on one hand and the '530 and '701 patents on the other hand. (*E.g.*, Ex. EE at AZ-LYNPARZA-61882, AZ-LYNPARZA-62346, AZ-LYNPARZA-62363-64.)

131. The applicant for the '507 application also expressly referred to the '530 and '701 patents as the work of "co-inventors Thomas Helleday and Nicola Curtin." (*Id.* at AZ-LYNPARZA-62362, AZ-LYNPARZA-62806.)

132. Throughout the prosecution of the '507 application, the applicant never disputed that Dr. Helleday was an inventor of the '530 and '701 patents.

133.    On information and belief, prosecuting counsel for the '507 application kept University of Sheffield and Dr. Helleday informed regarding the submissions made to the PTO during prosecution.  (*E.g.*, Ex. FF at 69:17 – 70:1; 133:8–19.)

134.    On further information and belief, Dr. Helleday was employed full-time by the University of Sheffield until sometime in 2006 and has remained in contact with the university since then, including, but not limited to, for purposes of assisting with prosecution of patent applications for which he is named as an inventor and being employed as a visiting professor at the university currently.  (Ex. K at 36:1-40:13; Ex. GG at SHEFFIELD-208542.)

135.    During prosecution of the '507 application, which issued as the '562 patent, the PTO repeatedly rejected the pending claims as unpatentable based on obviousness-type double patenting ("OTDP") in view of the '701 and '530 patents.  (*E.g.*, Ex. EE at AZ-LYNPARZA-61686, AZ-LYNPARZA-62315, AZ-LYNPARZA-62314 to -20.)

136.    Dr. Helleday—the sole named inventor of the '562 patent—overcame both the '701 and '530-based OTDP rejections by amending then pending claim 66 to recite that the cancer be "gene-linked hereditary cancer" and required the step of "identifying a patient with a familial predisposition to said cancer and administering said compound to said patient."  (*Id.* at AZ-LYNPARZA-62841.)

137.    On March 27, 2014, the Patent Trial and Appeal Board ("PTAB") held that it was persuaded that the "Examiner has not adequately explained how the claims of the '701 patent in combination with the cited reference would have made obvious instant claim 66.  Neither the claims of the '701 patent, nor any of the other cited references, discuss heritability of cancer susceptibility or a familial predisposition to cancer." (*Id.*)  The PTAB made a similar finding

61

with respect to the OTDP rejection for claim 66 over the '530 patent. (*Id.* at AZ-LYNPARZA-62850.) Based on these findings, claim 66 of the '507 application survived the OTDP rejections.

138. Notably, in its March 27, 2014 decision, the PTAB made no finding that the subject matter of claim 66 of the '507 application was valid over the '701 and '530 patent claims. Instead, claim 66 survived the March 27, 2014 PTAB decision due to the examiner failing to "adequately explain[]" the connection between the subject matter claimed in the '701 and '530 patents and familial predisposition to cancer. (*Id.* at AZ-LYNPARZA-62841)

139. The PTAB held all the other claims of the '507 applicant besides claim 66 unpatentable based on OTDP based on one or more claims of either the '701 or '530 patents. (*Id.* at AZ-LYNPARZA-62854.)

140. In the PTAB's discussion of the OTDP analysis for other claims besides claim 66 of the '507 application, the PTAB found that "[t]he claims of the '701 patent . . . disclose BRCA1 and BRCA2." (*Id.* at AZ-LYNPARZA-62842–43; *see also id.* at AZ-LYNPARZA-62836, -62840.)

141. On April 24, 2014, the applicant amended claim 66 of the '507 application to put it into independent form. (*Id.* at AZ-LYNPARZA-0062858–59.) The examiner allowed claim 66 on June 3, 2014 without further rejection. (*Id.* at AZ-LYNPARZA-62863–64.)

142. Following an examiner's amendment, claim 66 of the '507 application issued as claim 1 of the '562 patent. (*Id.* at AZ-LYNPARZA-0062868.)

143. Between the March 27, 2014 PTAB decision and the June 3, 2014 allowance of claim 66 of the '507 application, the examiner made no effort to explain the connection between BRCA1 and BRCA2 and familiar predisposition to cancer.

62

144.   The applicant could have appealed the PTAB's March 27, 2014 decision holding all the pending claims besides claim 66 of the '507 application unpatentable to the U.S. Court of Appeals for the Federal Circuit, but did not.

145.   There is no record in the file history of the '507 application indicating that the applicant stated disagreement with the PTAB's decision holding all claims of the '507 application besides claim 66 unpatentable due to OTDP.  Nor is there any record that the applicant disputed any of the PTAB's underlying reasoning for that holding.

146.   The applicant for the '507 application thus acquiesced to the unpatentability of all pending claims of the '507 application besides claim 66 due to OTDP based on one or more the '701 and '530 patents.

147.   At no time during prosecution of the '562 patent did Dr. Helleday or anyone acting on his behalf or on behalf of any Plaintiff argue that the OTDP rejection was improper because he was not a properly named inventor on the '701 and '530 patents.

148.   Plaintiffs in this case contend that the removal of Dr. Helleday as an inventor on the '701 and '530 patents means that Defendants cannot pursue a double patenting defense using either the '701 and '530 patents as reference patents to the '562 patent.

**C.    Helleday Has A Multi-Million Dollar Interest In The '562 Patent**

149.   At the time of the alleged inventions in 2003, Dr. Helleday was a professor at the University of Sheffield. (Ex. GG at SHEFFIELD-208542.)

150.   Dr. Helleday assigned his rights in the '562 patent to the University of Sheffield.

151.   On their face, the '701 and '530 patents state that they are each owned by Pfizer Inc. and Cancer Research Technology Limited.  (Ex. C at DEFS-OLAP-812; Ex. D at DEFS-OLAP-4977.)

63

152.    Upon information and belief, Pfizer Inc. retained an ownership interest in the '701 and '530 patents until their expiration on July 23, 2024.  (Ex. HH at SHEFFIELD-18269; Ex. II at SHEFFIELD-17325.)

153.    Upon information and belief, the University of Sheffield licensed the '562 patent to Plaintiff KuDOS who then sublicensed it to Plaintiff AstraZeneca.  Under the terms of that license, KuDOS pays the University of Sheffield a royalty based on the sales of drugs purportedly covered by, *inter alia*, the '562 patent.  Upon information and belief, those royalties are paid quarterly with each payment being between £1-10 million.  (Ex. FF at 63:22 – 67:25; *see generally* Ex. JJ; Ex. KK.)

154.    The University of Sheffield pays Dr. Helleday a portion of the licensing revenue it receives for the '562 patent in the form of a quarterly bonus.  (Ex. LL at SHEFFIELD-253385 ("The University shall pay to TH 25% (twenty-five per cent) of the Net Income (the "Consideration"), in accordance with this clause 2."); Ex. K at 251:4–21.)

155.    In the most recent quarter prior to the filing of this counterclaim, Dr. Helleday's bonus was £900,000 and the total bonus on an annual basis is approximately £3,600,000.  Dr. Helleday estimates that he has been paid over $100 million in bonuses from the University of Sheffield as his share of licensing revenue.  (Ex. K at 252:11–18, 258:11 – 259:6.)

156.    The royalties paid to Dr. Helleday included money from the sale of Rubraca® (Ex. K, Helleday Tr. 257:19 – 258:10), which, upon information and belief, is the brand name under which Pfizer sells a drug containing the compound depicted as "Formula I" in the claims of the '701 and '530 patents and which is a compound to which Dr. Helleday claims he did not have access at the time of the filing of the GB'466 application.

157.   Upon information and belief, the amount of the royalty paid to University of Sheffield, and thus the bonus paid to Dr. Helleday, would decrease significantly if the '562 patent is invalidated and Lynparza sales decreased due to generic competition.

158.   Upon information and belief, Dr. Helleday was motivated to maintain his royalty payments by avoiding the possibility of invalidation of the '562 patent.

159.   The FDA's publication *Approved Drug Products and Therapeutic Equivalence Evaluations* ("Orange Book") states that the '562 patent expires on August 4, 2031.

160.   Upon information and belief, Dr. Helleday expects to receive tens of millions of pounds more in the form of quarterly bonuses from University of Sheffield if the '562 patent remains in force until August 4, 2031.

161.   The '562 patent would have naturally expired on July 24, 2024, along with the '701 and '530 patents.  The '562 patent obtained Patent Term Adjustment that extended its expiration date until 2031.  (Ex. EE at AZ-LYNPARZA-62969.)  That adjusted portion of the term of the '562 patent is subject to a double patenting challenge.  *In re Cellect, LLC*, 81 F.4th 1216, 1228-29 (Fed. Cir. 2023); *see also*, *e.g.*, *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1210 (Fed. Cir. 2014).

**D.   Prior to 2024, Dr. Helleday Consistently Took The Position That His Invention Includes All PARP Inhibitors, Including The Specific Compounds Recited In The Claims Of The '701 And '530 Patents**

162.   Dr. Helleday worked with Dr. Michelle O'Neill, a patent attorney licensed in the United Kingdom, to file the GB'466 application on July 25, 2003.  (Ex. DD at AZ-LYNPARZA-62897.)

163.   As originally filed, GB'466 included data and discussion specific to a compound known as AG14361.  (*E.g.*, Ex. DD at AZ-LYNPARZA62906, -62920.)

164.   The chemical structure of AG14361 is depicted below:

165.    As noted previously, AG14361 is described in the '701 and '531 patents as "formula III." (*E.g.*, Ex. C at DEFS-OLAP-814, -824; Ex. D at DEFS-OLAP-4979, -4989.)

166.    As noted in Paragraph 114, on November 10, 2003, Drs. Helleday and Curtin met with Dr. O'Neill to discuss issues surrounding the GB'466 application. Also present at that meeting were representatives from the University of Sheffield and Cancer Research Technology. (Ex. BB at SHEFFIELD-23304; Ex. CC, at SHEFFIELD-23266-67.)

167.    On the day following the November 10 meeting, Dr. O'Neill circulated an email laying out a plan to file "2 further patent applications both claiming the benefit of the priority date of UK 0317466.1, ie. 25 July 03." (Ex. CC at SHEFFIELD-23267.) As outlined in O'Neill's November 11 email, the two applications were to be identical except that one "will [include] a set of claims directed to the use of PARP inhibitors in treating cancer and explicitly disclaiming AG14361" while in the other, "the claims will be directed to the use of AG14361 only." (*Id.*)

168.    A few months later, in March 2004, the applicants decided to change course and have the first application cover PARP inhibitors generally *without* any disclaimer for AG14361. (Ex. MM at SHEFFIELD-23240.)

169.    On July 23, 2004, one or more attorneys retained by the University of Sheffield filed PCT/GB2004/003235, which claims priority to GB'466.

170.    PCT/GB2004/003235 contains no disclaimer of AG14361.

171.   The claims filed in PCT/GB2004/003235 cover methods of using all PARP inhibitors, including AG14361.

172.   The '562 patent issued from a U.S. national phase filing for PCT/GB2004/003235.

173.   Like the claims filed with PCT/GB2004/003235, claim 1 of the '562 patent purports to cover a method of using all PARP inhibitors, including AG14361.

174.   Dr. O'Neill has acknowledged that claim 1 of the '562 patent, on its face, covers all PARP inhibitors, including AG14361.

175.   Because Dr. Helleday is the sole named inventor of the '562 patent and the sole claim of that patent covers methods for using AG14361 to treat cancer cells deficient in homologous recombination, Dr. Helleday necessarily is also an inventor of the subject matter recited in the claims of the '701 and '530 patents, including at least that subject matter related to the use of Formula III/AG14361.

176.   Dr. Helleday's actions after filing GB'466 in July 2003 indicate that he understood himself to be an inventor of methods of using AG14361 to treat certain cancers.

177.   Following the filing of GB'466 in July 2003, Dr. Helleday remained interested in further experiments with AG14361.  On May 6, 2004, he wrote to David Winstanley at the University of Sheffield to inquire about a material transfer agreement ("MTA") with Pfizer, which was the owner of AG14361 at that time, so that he could obtain some AG14361.  (Ex. NN at SHEFFIELD-23201.)  Dr. Helleday wrote, "I realise that this compound would be useful for some of the basic studies I propose to do."  (*Id.*)

178.   Dr. Helleday and the University of Sheffield spent months negotiating an MTA to obtain AG14361.

67

179. Ultimately, the University of Sheffield's negotiations with Pfizer did not result in an MTA for AG14361.

180. Upon information and belief, one of the reasons that the University of Sheffield did not agree to the MTA was because Dr. Helleday "was unhappy to sign the Pfizer MTA due to IP rights Pfizer would receive." (*Id.* at SHEFFIELD-23205.) Upon information and belief, Dr. Helleday's unhappiness was a result of his view that all IP rights related to using AG14361 in his experiments were his inventions – not Pfizer's.

181. Dr. Helleday's actions in collecting royalties connected to PARP inhibitors other than Lynparza® further evidence his belief that the invention claimed in the '562 patent covers all PARP inhibitors, including AG14361.

182. AstraZeneca holds license agreements with makers of other FDA-approved PARP inhibitors under which those makers pay royalties which are due at least in part to the '562 patent.

183. Products covered by AstraZeneca's license agreements include at least the PARP inhibitors sold in the United States under the names Zejula®, Rubraca®, and Talzenna®.

184. Upon information and belief, AstraZeneca has received royalty payments from GlaxoSmithKline plc or its affiliates for sales of Zejula®, which are at least in part attributable to the '562 patent.

185. Upon information and belief, AstraZeneca has received royalty payments from Pfizer Inc., Pharma&, Clovis Oncology, Inc., and/or their affiliates for sales of Rubraca®, which are at least in part attributable to the '562 patent.

68

186.    Upon information and belief, AstraZeneca has received royalty payments from Pfizer Inc. or its affiliates for sales of Talzenna®, which are at least in part attributable to the '562 patent.

187.    AstraZeneca in turn pays a portion of its royalties related to Zejula®, Rubraca®, and Talzenna® to the University of Sheffield as part of its license for the '562 patent.  The University of Sheffield then pays a portion to Dr. Helleday.

188.    Dr. Helleday has thus received royalties from the sales of at least one PARP inhibitor recited in one or more claims of the '701 and '530 patents.  (Ex. K, Helleday Tr. at 251:4-254:6.)  On information and belief, Dr. Helleday has never sought to return the portion of the money paid to him attributable to the subject matter claimed in the '701 and '530 patents.

189.    In sum, Dr. Helleday has held himself out as an inventor of methods of using PARP inhibitors covered by the claims of the '701 and '530 patents, including Rubraca®, so long as it benefited him financially.

190.    In 2005, Drs. Helleday and Curtin were co-authors on a paper describing their work with the NU1025 and AG14361 inhibitors in the journal *Nature*.  (Ex. OO at SHEFFIELD-148513.)  Dr. Helleday in 2010 identified that paper as his most important publication in the previous decade.  (Ex. PP, SHEFFIELD-0155266-92, at SHEFFIELD-155278.)

191.    Yet *Nature* later questioned whether Drs. Helleday and Curtin were truthful in that article when they said they had no competing financial interest with the subject matter of the paper, specifically in light of the fact that they were both named as inventors on the US 2005/0143370 application that led to the '701 patent.  (Ex. QQ at SHEFFIELD-58562.)

192.    Rather than disavow inventorship, Drs. Helleday and Curtin submitted an addendum to the paper stating that they were "named inventors" on that application and that they

69

had "possible competing financial interests" with respect to the inventions disclosed therein—including work with AG14361.  (Ex. OO at SHEFFIELD-148518.)

193.    In his curriculum vitae, Dr. Helleday consistently held himself out as an inventor of the '701 and '530 patents, representing that his "Patents last 10 years" included "Helleday T and Curtin NJ (2004) Therapeutic Compounds," which is the application that led to the '701 and '530 patents.  (*See, e.g.*, Ex. PP at SHEFFIELD-155287; Ex. RR at SHEFFIELD-182477; Ex. SS at SHEFFIELD-190361; Ex. TT at SHEFFIELD-240663.)

194.    One such curriculum vitae was submitted in pursuit of the "Goran Gustfasson Prize," which Helleday eventually won.  (*See* Ex. RR at SHEFFIELD-182476; Ex. UU at SHEFFIELD-237342.)

195.    Dr. Helleday's CV from 2010 also lists Dr. Curtin as a member of his "collaborative project" concerning "PARP as therapeutic target in breast cancer."  (Ex. PP at SHEFFIELD-155282.)

196.    In her 2020 article, Dr. Curtin discussed her "collaboration" with Dr. Helleday and explained how that collaboration resulted in filing of the patent application that led to the '530 patent.  "Understanding the importance of the synthetic lethality of PARPi in HRD cancers, Thomas Helleday was keen to patent our findings before publication.  Following meetings with Cancer Research Technology, we undertook work to protect rucaparib and these data were included in the patent (WO 2005/012305 A2) filed 16th April 2004."  (Ex. J at DEFS-OLAP-477.)

197.    In 2022, an article regarding Dr. Curtin's career acknowledged that her "collaboration with Thomas Helleday" resulted in "their shared patent around tricyclic PARP inhibitors."  (ECF 210-6 at 4.)

70

198.    As of the date of this pleading, Dr. Curtin's "staff profile" page on the Newcastle University website still lists "Helleday T and Curtin NJ" as the inventors of the patent application leading to the '701 and '530 patents.  (*See* ECF 210-15.)

**E.      Dr. Helleday Alone Or With Plaintiffs, Orchestrated A Scheme To Fraudulently Change The Inventorship of the '701 and '530 Patents In Order To Preserve His Royalty Stream From the '562 Patent**

199.    Upon information and belief, Plaintiffs do not have and never did have any ownership or other interest in the '701 and '530 patents.

200.    Plaintiffs became aware that Defendants were raising an OTDP challenge to the '562 patent based on the '701 and '530 patents no later than December 2022, ▆▆▆▆▆▆ ▆▆▆.  (ECF 209-2.)  Neither Plaintiffs, Dr. Helleday, nor any other entity suggested to Defendants or the public during the next 18 months that Dr. Helleday was not properly named as an inventor or that the OTDP defense was unavailable because he was not a properly-named inventor on the '701 and '530 patents.

201.    Although not an employee of any Plaintiff, Dr. Helleday agreed to become a paid consultant for Plaintiffs' trial counsel at Williams & Connolly, as part of their representation of Plaintiffs in this litigation.  (Ex. VV at SHEFFIELD-22295-97.)  Plaintiffs then flew Dr. Helleday to London for a full day meeting with their trial counsel in December 2023 during which he earned $800 per hour.  This meeting was the first time he recalls having the thought that he was not an inventor on the claims of the '701 and '530 patents.  (*See id*.; Ex. K, Helleday Tr. at 187:3-18.)

202.    There is no indication at that time that anyone other than Plaintiffs and Dr. Helleday were aware of a theory that he was not an inventor—not Pfizer (the assignee of the '701 and '530 patents), and not Dr. Curtin, his listed co-inventor.

203.    On May 3, 2024, Defendants Natco and Sandoz disclosed their invalidity contentions for the '562 patent to Plaintiffs.  Those contentions contained an allegation that the '562 patent was invalid for obviousness-type double patenting over the '701 and/or '530 patents. (ECF 209 at 4; ECF 219-16).  That OTDP defense was premised in part on Dr. Helleday being a named inventor on all three patents.

204.    The first time Plaintiffs suggested to Defendants that Dr. Helleday was not an inventor of the '701 and '530 patents was in Plaintiffs' May 24, 2024 responses to those contentions—just two months before those patents would expire.  At that time, the only thing Plaintiffs said was the conclusory allegation that "Thomas Helleday is not an appropriate named inventor" on the '701 and '530 patents.  (ECF 209 at 4; ECF 209-3.)

205.    As of that date, there had been no movement to formally remove him as an inventor on the '701 and '530 patents at the PTO.

206.    In early July 2024, Williams & Connolly unsuccessfully tried to formally advise Dr. Helleday with respect to the question of whether he could be removed as an inventor, apparently because that firm has a conflict with Pfizer, who is the current assignee of the '701 and '530 patents.  (Ex. WW at PFI00003723.)  Williams & Connolly thus recommended that Dr. Helleday engage with a different law firm, Groombridge Wu.  (Ex. K, Helleday Tr. at 194:24-195:22.)  Dr. Helleday agreed, but does not pay Groombridge Wu's attorney fees, and does not know who does—a fact he thinks is "strange."  (*Id.* at 196:11-21, 236:10-12.)

207.    Upon information and belief, the first time Pfizer—the owner of the '701 and '530 patents—heard anything about a possible inventorship change from Dr. Helleday's attorney at Groombridge Wu was on July 12, 2024.  (Ex. XX at PFI00003908-09.)

72

208.	Dr. Helleday's attorney contacted Pfizer advising them of a plan to sue Pfizer in district court if Pfizer and its development partner Pharma& (the maker of Rubraca®, a PARP inhibitor covered by the '701 and '530 patents) did not agree to sign necessary PTO inventorship change paperwork. (*Id.* at PFI00003907-09; Ex. YY at PFI00003753-55.)

209.	Dr. Helleday's threat of litigation worked, as Pfizer and Pharma& eventually caved in and consented to the inventorship correction for patents that would expire on July 23, 2024. (*See* Ex. XX at PFI00003906-09; Ex. YY at PFI00003752.)

210.	Dr. Helleday also contacted Dr. Curtin in July 2024 and secured her agreement to let him withdraw as an inventor. (Ex. K, Helleday Tr. at 200:2-205:1.) With signed paperwork in hand and consent from Pfizer, Dr. Helleday filed all necessary inventorship change paperwork, and removed himself as an inventor of the '701 and '530 patents, on July 23, 2024—the day those patents expired. (*See* Ex. HH at SHEFFIELD-18265-75; Ex. II at SHEFFIELD-17315-25.)

211.	The PTO formally changed the inventorship on September 10, 2024, months after the '701 and '530 patents had already expired. (*See* Ex. II, SHEFFIELD-17326-30; Ex. HH, SHEFFIELD-18276-80.)

212.	A request to correct inventorship at the PTO is a purely administrative, ministerial, non-adversarial process. It does not require any factual proof to support the requested correction. Instead, all that was needed were signed "statements" from the inventors and assignees agreeing to the correction. (*See generally* Ex. HH; Ex. II.)

213.	Dr. Helleday thinks he is not an inventor on the European counterpart patent of the '701 and '530 patents. Yet he has no plans to tell that to the European patent office because

"it doesn't matter," *i.e.*, he is not defending against a double patenting challenge to the '562 patent counterpart in Europe. (Ex. K, Helleday Tr. at 274:5-9.)

214. As part of his threat to bring litigation, Dr. Helleday prepared a declaration "to explain why I am not truly an inventor on [the '701 and '530] patents as the law has been explained to me, as well as to explain why I am doing this now." (Ex. ZZ at PFI3945.2.) In that declaration, Helleday expressly admitted that the Federal Circuit's August 28, 2023 decision in *In re Cellect* "creates risk that the '701 or '530 Patent could invalidate my '562 Patent" and "the risk created by *In re Cellect* is the motivation for my now seeking to be removed as an inventor from the '701 and '530 Patents." (*Id.*)

215. Dr. Helleday admits that Dr. Curtin was a "former collaborator" and that they "collaborated prior to the filing of the applications that ultimately issued as [the '701 and '530] patents . . . ." (*Id.*; *see also id.* at PFI3945.3-6 ("My collaboration with Dr. Nicola Curtin").)

216. Contrary to the contemporaneous communications between Drs. Helleday and Curtin, Dr. Helleday falsely alleged that Dr. Curtin independently came up with the idea to use the Agouron compounds, such as AG014361, in HR deficient cells. (*Compare id. with supra* at ¶¶85–109.)

217. Dr. Helleday knew no later than February 2003 that Dr. Curtin had conducted PARP inhibition tests on BRCA2 deficient Capan-1 cells and knew that she concluded that they "are not hypersensitive to [AG14631]." (Ex. V at SHEFFIELD-3348.)

218. Contrary to the contemporaneous communications between Drs. Helleday and Curtin, Dr. Helleday now alleges that it was Dr. Curtin that asked him "whether [he] wanted to be an inventor with her on her patents." (*Compare* Ex. ZZ *with supra* at ¶¶110–126.)

74

219.    In contrast to the contemporaneous communications to the Patent Office, Dr. Helleday now alleges that he is not an inventor of the '701 and '530 patents.  (*Compare* Ex. ZZ *with supra* at ¶¶127–148.)

220.    The '701 and '530 patents expired on July 23, 2024.

221.    Pfizer Inc. acquiesced to the threat of litigation and agreed to the change of inventorship on July 23, 2024, the very last day of the term of the '701 and '530 patents.  As a result, Helleday was a named inventor on the '701 and '530 patents for their full term.

222.    The petition to correct inventorship of the '701 patent was granted on August 14, 2024, via a 1-page form and a certificate of correction issued on September 10, 2014 – after the expiration of the '701 patent.

223.    Similarly, the petition to correct inventorship of the '530 patent was granted on August 14, 2024, via a 1-page form and a certificate of correction issued on September 10, 2014 – after the expiration of the '530 patent.

224.    Helleday implemented a strategy designed to save his '562 patent and corresponding royalty stream by changing the inventorship of the '701 and '530 patents in an attempt to remove the references as OTDP references to the '562 patent.

225.    Because Helleday did not petition to change the inventorship of the '701 and '530 patents until the very last day of their patent term, Helleday profited from the benefits of multiple patents covering the same invention for the full term of the '701 and '530 patents.

226.    At no point prior to July 23, 2024, did Helleday question or challenge the inventorship of the '701 or '530 patents.

227.    Helleday did not seek to change the inventorship of the '701 and '530 patents until the day those patents expired.  As a result, Helleday enjoyed the full term of multiple

75

patents that cover the same invention and the change in inventorship did not cost Helleday any patent term or associated royalty.

228.    In his "Statement Person Being Deleted As An Inventor (37 C.F.R. § 1.324(b)(1))" signed and submitted on July 23, 2024 in connection with each of the '701 and '530 patents, Helleday stated, "I have been erroneously named as an inventor of the subject application, and the inventorship of this patent should be changed to omit my name.  This error in inventorship occurred without any deceptive intent on my part."  (Ex. HH at SHEFFIELD-18275; Ex. II at SHEFFIELD-17322.)

229.    Dr. Helleday's statements in his July 23, 2024 declarations are false and misleading, and Dr. Helleday knew they were false and misleading at the time he made the statements.  These statements were made with the intent to deceive and defraud the USPTO into changing the inventorship of the '701 and '530 patents.  Dr. Helleday knew that he was properly named as an inventor of the '530 and '701 patents and made the change solely to save the '562 patent from risk of invalidity and protect his multi-million-pound royalty stream.

230.    Dr. Helleday concealed his true intent in filing the change of inventorship.

231.    Dr. Helleday understood, expected, and indeed intended, that the Patent Office would rely on the misrepresentations concerning the inventorship of the '701 and '530 patents.

232.    But for the acts, omissions, and misrepresentations as set forth above, and had the Patent Office known the truth about the inventorship, the Patent Office would not have allowed the change in inventorship.

233.    But for the acts, omissions, and misrepresentations as set forth above, and had the Patent Office known the truth about the inventorship, Plaintiffs in this action would not be able

76

to contend that the '701 and '530 patents are unavailable as double patenting references to the '562 patent based on lack of common inventorship between those three patents.

234.    The inequitable conduct engaged in by Dr. Helleday with respect to the '701 and '530 patents renders the '562 patent unenforceable.

235.    Contrary to Dr. Helleday's representations, which he knew were false and misleading, he was a properly named inventor of the '701 and '530 patents because he contributed to the conception of the subject matter claimed in those patents.

236.    Dr. Helleday's conduct during the prosecution of the '530 and '701 patent applications, including his change in inventorship, infected and permeated the '562 patent, rendering the '562 patent unenforceable.

> **F.    Dr. Helleday's Misrepresentations To The USPTO Were Material To The Patentability Of The '562 Patent**

237.    Dr. Helleday's misrepresentations to the PTO in his July 24, 2024 declarations regarding inventorship of the '701 and '530 patent were each material to the patentability of the related '562 patent under 37 C.F.R. § 1.56.

238.    Dr. Helleday's misrepresentations to the PTO in his July 24, 2024 declarations regarding inventorship of the '701 and '530 patent were each material to the patentability of the related '562 patent to the extent that Plaintiffs contend those declarations and the resulting inventorship change mean that the '701 and '530 patents are legally unavailable to be considered as double patenting references in any double patenting analysis.[5]

---

[5] Defendants do not concede that the '701 and '530 patents are unavailable as double patenting references even if the removal of Dr. Helleday as an inventor is to be deemed legitimate. Defendants maintain that those patents are still available at least insofar as the inventorship change was requested on the day those patents expired and/or was not effectuated by the PTO until after those patents expired.

239.    During the original prosecution of the '507 application, the sole claim of the '562 patent was only allowed due to the examiner's failure to adequately explain how known BRCA1 and BRCA2 defects disclosed in the claims of the '701 and '530 patents were hereditary and linked with a familial predisposition to cancer as required by claim 66 of the '507 application (issued claim 1 of the '562 patent).

240.    However, the claims of the '701 and '530 patents themselves expressly disclose that BRCA mutations were genetic and therefore cause gene-linked, hereditary cancer.  For example, claim 1 of the '701 patent identifies cancers caused by "a genetic defect" in one or both of BRCA1 and BRCA2 genes.  The only reason the PTAB did not uphold the OTDP rejection for claim 1 of the '562 patent in the face of this disclosure was due to the examiner's failure to explain the known relationship between BRCA1 and BRCA2 and gene-linked cancer in the '701 and '530 patent claims.

241.    Further, it was not just known, but well and long-known prior to the July 25, 2003 priority date listed on the face of the '562 patent that BRCA1 and BRCA2 mutations are related to "hereditary" cancers that result in "familial predisposition" for cancer as recited in claim 1 of the '562 patent.

242.    Defendants incorporate herein by reference their contentions served on May 3, 2024 and October 18, 2024 that the claim of the '562 patent is invalid for double patenting based on the '701 and '530 patents.

243.    For example, going back to at least the mid-1990s, it was known that BRCA1 and BRCA2 mutations resulted in gene-linked hereditary cancer.  For example, P. Tonin et al., *Frequency of Recurrent BRCA 1 and BRCA2 Mutations in Ashkenazi Jewish Breast Cancer Families*, 2 Nature Med. 1179 (1996) discusses how "[g]ermline mutations in the breast cancer

susceptibility genes *BRCA1* and *BRCA2* account for the majority of families with hereditary breast cancer." Similarly, Joseph N. Marcus et al., *Hereditary Breast Cancer: Pathobiology, Prognosis, and BRCA1 and BRCA2 Gene Linkage*, 77 Cancer 697 (1996), discusses the BRCA1 and BRCA2 gene linkage with hereditary breast cancer. Likewise, David K. Gaffney et al., *Response to Radiation Therapy and Prognosis in Breast Cancer Patients with BRCA1 and BRCA2 Mutations*, 47 Radiotherapy & Oncology 129 (1998) discusses that BRCA1 and BRCA2 mutated breast cancers are hereditary.

244.    Not only was the link between BRCA mutations and gene-linked familiar breast cancer known in the mid-1990s, testing for BRCA mutations was the subject of patent applications by the late 1990s. For example, U.S. Patent No. 5,747,282 ("the '282 patent") issued on May 5, 1998, and states, "[T]he present invention relates to methods and materials used to isolate and detect a human breast and ovarian cancer predisposing gene (BRCA1), some mutant alleles of which cause susceptibility to cancer, in particular breast and ovarian cancer. More specifically, the invention relates to germline mutations in the BRCA1 gene and their use in the diagnosis of predisposition to breast and ovarian cancer."

245.    Before July 2003, it was known that "inherited mutations of BRCA1 are responsible for about 40-45% of hereditary cancers" and that "[a]bout 80% of the cases of hereditary breast cancer are due to mutations of either BRCA1 . . . or BRCA2 . . . ." Eliot M. Rosen et al., *BRCA1 Gene in Breast Cancer*, 196 J. Cellular Physiology 19, 19-20 (2003), https://onlinelibrary.wiley.com/doi/epdf/10.1002/jcp.10257 (article first published March 31, 2003).

246.    Upon information and belief, at least AstraZeneca and the University of Sheffield realized that the '701 and '530 patents render the '562 patent invalid for OTDP and thus

79

embarked on a scheme with Dr. Helleday to change the inventorship of the '562 patent in order to remove the '701 and '530 patents' eligibility as double-patenting references.

247.    Because the '701 and '530 patents would be invalid for OTDP if the '701 and '530 patents are eligible as reference patents, Helleday's fraudulent declarations seeking to change inventorship of the '701 and '530 patents are material to the related '562 patent.

**G.    Dr. Helleday's Fraudulent Conduct Renders The '562 Patent Unenforceable**

248.    Dr. Helleday's fraudulent change of the inventorship of the '701 and '530 patents was done for the express purpose of saving the '562 patent from a finding of invalidity due to OTDP in this litigation.  Accordingly, Dr. Helleday's inequitable conduct bears an immediate and necessary relation to the enforcement of the '562 patent in this litigation, rendering the '562 patent unenforceable.

249.    In addition, because the '562 patent shares a common priority application with the '701 and '530 patent, the three patents are related.  Accordingly, Dr. Helleday's inequitable conduct with respect to the '701 and '530 patents spreads to and infects the related '562 patent, rendering the'562 patent unenforceable.

250.    Defendants are entitled to a declaration that the '562 patent is unenforceable due to inequitable conduct.

<div align="center">

**EIGHTH COUNTERCLAIM**
**(DECLARATION OF '562 PATENT**
**UNENFORCEABILITY DUE TO UNCLEAN HANDS)**

</div>

251.    Defendants reallege Paragraphs 1-250 as though fully set forth herein.

252.    As set forth with particularity in Paragraphs 199-236 above, Dr. Helleday, alone or in conspiracy with at least the University of Sheffield and AstraZeneca, intentionally made

<div align="center">

80

</div>

affirmative misrepresentations to the USPTO stating that he is not an inventor of the '701 and '530 patents.

253.   Dr. Helleday, alone or in conspiracy with at least AstraZeneca and the University of Sheffield, engaged in these misrepresentations so that AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield could argue in the above-captioned litigation that the '701 and '530 patents do not share inventorship with the '562 patent and thus do not qualify as reference patents to the '562 patent for purposes of obviousness-type double patenting.

254.   On information and belief, KuDOS and MSD International Business GmbH were knowledgeable about Dr. Helleday's scheme (alone, or in conspiracy with the University of Sheffield and AstraZeneca) and participated in it by virtue of at least the fact that AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield share the same counsel at Williams & Connolly who advised both them and Dr. Helleday regarding the obviousness-type double patenting defense.

255.   During the above-captioned litigation, AstraZeneca, KuDOS, MSD International Business GmbH, Dr. Helleday, and the University of Sheffield engaged in litigation misconduct by refusing to produce non-privileged discovery and/or log privileged documents related to Dr. Helleday's change in inventorship for the '701 and '530 patents.

256.   On information and belief, AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield not only knew of Dr. Helleday's efforts to change the inventorship of the '701 and '530 patents but participated in Dr. Helleday's scheme.

257.   On information and belief, AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield refused to produce non-privileged discovery and/or log

81

privileged documents related to Dr. Helleday's change in inventorship for the '701 and '530 patents in an effort to conceal their role in Dr. Helleday's scheme.

258. On information and belief, Defendants have not yet received full discovery from AstraZeneca, KuDOS, MSD International Business GmbH, the University of Sheffield, and Dr. Helleday regarding the scheme to falsely change the inventorship of the '701 and '530 patents after they expired.

259. Before flat-out refusing to produce the relevant documents, Plaintiffs AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield sought to avoid production of communications related to the change in inventorship of the '701 and '530 by proposing that Defendants to instead accept production of the following: "Non-privileged communications during the past 24 months that refer to the '701 and '530 patents between Pfizer Inc and/or Nicola Curtin, on the one hand, and AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, AstraZeneca AB, KuDOS Pharmaceuticals Limited, The University of Sheffield, and/or MSD International Business GmbH, on the other hand." (ECF 210-18.)

260. On information and belief, Plaintiffs AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield purposely structured this proposal to give the appearance of cooperation while avoiding production of relevant documents. Plaintiffs knew at the time of their proposal that many of their written communications related to the change of inventorship of the '701 and '530 patents had been made indirectly through attorneys at Williams & Connolly and/or Groombridge Wu and not directly between one or more of the Plaintiffs, Dr. Curtin, and/or Dr. Helleday. However, Plaintiffs feigned ignorance of these facts and instead put forth a proposal that would have had Defendants forgoing production of the very documents Defendants sought.

261.    AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield's role in the scheme to fraudulently change the inventorship of the '701 and '530 patents and to conceal documents and information regarding that scheme were done for the express purpose of defeating Defendants' affirmative defenses and counterclaims for invalidity of the '562 patent based on obviousness-type double patenting.  As such, there is an immediate and necessary connection between Dr. Helleday, AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield's misconduct; the allegations that Defendants infringe the '562 patent; and Plaintiffs' request to enjoin Defendants from infringing the '562 patent and to prevent them from obtaining final FDA approval of their proposed ANDA products at issue in this litigation prior to the expiration of the '562 patent.

262.    Defendants are entitled to a declaration that the '562 patent is unenforceable due to unclean hands.

### NINTH COUNTERCLAIM
### (UNLAWFUL MONOPOLIZATION (*Walker Process*))

263.    Defendants reallege Paragraphs 1-262 as though fully set forth herein.

264.    This claim arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under the Clayton Act, 15 U.S.C. §§ 15 and 26.

265.    AstraZeneca, KuDOS, MSD International Business GmbH, and University of Sheffield violated Section 2 of the Sherman Act by engaging in fraud pursuant to *Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 173-74 (1965).

266.    This Court has jurisdiction over this claim pursuant to 15 U.S.C. §§ 4 and 16 and 28 U.S.C. §§ 1331 and 1337.

**A.    AstraZeneca Holds Market Power for Olaparib Products in the United States**

267.    The relevant geographic market is the United States.

83

268.    The relevant product market is for an olaparib product.

269.    On information and belief, AstraZeneca is the holder of New Drug Application No. 208558 for Lynparza®, which is the only olaparib product available for sale in the United States.  As such, AstraZeneca holds 100% of the relevant market for olaparib products in the United States.

270.    Lynparza® is the only PARP-1 inhibitor that has received approval from the FDA to treat any type of prostate cancer and, at present, has more approved indications than the other PARP-1 inhibitors that the FDA has approved for use in the United States.

271.    AstraZeneca holds monopoly power in the relevant market for olaparib products in the United States.

272.    Through exclusion of generic competition, AstraZeneca has and continues to exercise 100% market share in the relevant market for olaparib products in the United States.

273.    AstraZeneca holds the power to control prices and/or exclude competition in the relevant market for olaparib products in the United States.

274.    On information and belief, the annual cost per patient prior to rebates for Lynparza® under Medicare Part B and Part D is over $70,000.  Stephanie Wang, et al., *Therapeutic Benefit of Top-Selling Oncology Drugs in Medicare*, JAMA Network Open. (Apr. 2025), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC11971663/.

275.    On information and belief, the cost per patient for olaparib tablets would be significantly reduced if generic competition for Lynparza® were available.

**B.      AstraZeneca, KuDOS, University of Sheffield, And MSD International Business GmbH Sued To Enforce The '562 Patent Despite Knowing It Was Invalid And Then Conspired With Dr. Helleday To Commit Fraud Before**

84

**The USPTO In An Effort To Prevent This Court From Holding The Patent Invalid**

276.     Each of AstraZeneca, KuDOS, University of Sheffield, MSD International Business GmbH, and Dr. Helleday have a financial interest in the '562 patent, which prompted them to conspire to commit fraud before the PTO in an effort to maintain the validity of the '562 patent.

277.     The University of Sheffield has represented that it is the assignee of the '562 patent.

278.     AstraZeneca has represented that it licenses the '562 patent from the University of Sheffield.

279.     On information and belief, KuDOS is a wholly-owned subsidiary of AstraZeneca.

280.     AstraZeneca, KuDOS, University of Sheffield, and MSD International Business GmbH have represented that they collectively possess all exclusive rights and interests in the '562 patent.

281.     AstraZeneca has caused the '562 patent to be listed in the Orange Book.

282.     Dr. Helleday is the sole named inventor listed on the face of the '562 patent and has a significant financial interest in it remaining in force as long as possible due to the royalties he receives indirectly from AstraZeneca through the University of Sheffield as a result of licensing of the '562 patent to AstraZeneca.

283.     On information and belief, the University of Sheffield and Dr. Helleday receive greater royalties than they otherwise would for the '562 patent due to the monopoly pricing charged by AstraZeneca for Lynparza®.

284.     On information and belief, prior to filing suit against Sandoz, AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield had received

85

██████████████████████ dated December 28, 2022, which apprised AstraZeneca and the University of Sheffield that the '562 patent is invalid due to obviousness-type double patenting based on at least the '701 patent.

285.    ██████████████████████ dated December 28, 2022 explained that the '701 patent qualifies as a reference patent for purposes of obviousness-type double patenting because its shares Dr. Helleday as a common inventor with the '562 patent and expires before the '562 patent. ██████████ further explained how the subject matter recited in the sole claim of the '562 patent was obvious based on the claims of the '701 patent, rendering the '562 patent invalid for obviousness-type double patenting.

286.    On information and belief, AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield knew no later than ████████████████████████ ██████████ that the '562 patent is invalid due to obviousness-type double patenting.

287.    On February 10, 2023, AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield nonetheless filed suit against Natco Pharma Ltd. in Civil Action No. 23-796, alleging that the olaparib product that is the subject of Natco Pharma Ltd.'s ANDA No. 218044 infringes the '562 patent.

288.    Despite knowledge of the '562 patent's invalidity, on February 2, 2024, AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield again asserted the patent against potential generic competition for Lynparza®, this time against Sandoz Inc. in Civil Action No. 24-641 alleging that the '562 patent will be infringed by the olaparib tablets that are the subject of Sandoz's ANDA No. 217936.

289.    Civil Action No. 24-641 was consolidated with the prior suit against Natco such that all filings in both actions are made in the docket for Civil Action No. 23-796.

86

290.    On May 3, 2024, July 8, 2024, and October 18, 2024, Defendants Natco and Sandoz jointly served invalidity contentions for the '562 patent, which identified both the '701 and '530 patents as reference patents for purposes of obviousness-type double patenting and explained why the sole claim of the '562 patent was invalid due to obviousness-type double patenting based on each of the '701 and '530 patents.

291.    As set forth with particularity in Paragraphs 199-236 above, at least the University of Sheffield, AstraZeneca, and Dr. Helleday conspired to have Dr. Helleday intentionally make affirmative misrepresentations to the PTO stating that he is not an inventor of the '701 and '530 patents.  University of Sheffield, AstraZeneca, and Dr. Helleday engaged in these misrepresentations so that the University of Sheffield and AstraZeneca could argue in the above-captioned litigation that the '701 and '530 patents do not share inventorship with the '562 patent and thus do not qualify as reference patents to the '562 patent for purposes of obviousness-type double patenting.

292.    On information and belief, KuDOS and MSD International Business GmbH were at least knowledgeable about University of Sheffield, AstraZeneca, and Dr. Helleday's scheme and participated in it by virtue of at least the fact that AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield share the same counsel at Williams & Connolly who advised both them and University of Sheffield, AstraZeneca, and Dr. Helleday regarding the change of inventorship of the '701 and '530 patents.

293.    Based on Dr. Helleday's false statements to the PTO that he is not an inventor of the '701 and '530 patents, AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield have argued in Civil Action No. 23-796 that the '562 patent is not invalid

87

due to obviousness-type double patenting because Dr. Helleday is not an inventor of the '701 and '530 patents.

294. On information and belief, University of Sheffield, AstraZeneca, and Dr. Helleday's scheme to fraudulently change the PTO's records of inventorship for the '701 and '530 patents began before AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield filed suit against Sandoz alleging infringement of the '562 patent.

295. By falsely changing the inventorship of the '701 and '530 patents, AstraZeneca seeks to continue to maintain its monopoly on olaparib products in the relevant market until the expiration of the '562 patent in 2031.

**C. Sandoz Has Been and Continues To Be Injured By University Of Sheffield And AstraZeneca's Anticompetitive Conduct**

296. At all relevant times, AstraZeneca possessed and continues to possess substantial market power (i.e., monopoly power) in the market for olaparib in the United States. AstraZeneca possessed and continues to possess the power to control prices in, prevent prices from falling in, and exclude competitors from the U.S. market for olaparib. AstraZeneca's market power is coupled with strong regulatory and contractual barriers to entry.

297. By fraudulently scheming with the University of Sheffield and Dr. Helleday to change the inventorship of the '701 and '530 patents in an effort to avoid invalidity due to obviousness-type double patenting, AstraZeneca knowingly, willfully, and improperly attempted to maintain and did maintain its monopoly power in the U.S. market for olaparib using restrictive and exclusionary conduct, thereby injuring consumers and harming competition. AstraZeneca's conscious objective was to further its dominance and monopoly power in the market for olaparib in the United States.

88

298.    The goal, purpose, and effect of the University of Sheffield, AstraZeneca, and Dr. Helleday's scheme is to delay and/or block generic olaparib products from entering the market, to maintain AstraZeneca's monopoly power in that market, and maintain supracompetitive prices for Lynparza® to the benefit of each of University of Sheffield, AstraZeneca, and Dr. Helleday.

299.    Sandoz is the holder of ANDA No. 217936, which has received tentative approval from the U.S. Food and Drug Administration.

300.    To the extent that University of Sheffield, AstraZeneca, and Dr. Helleday's fraudulent scheme to change the inventorship of the '701 and '530 patent persuades the Court that the '562 patent is not invalid for obviousness-type double patenting, Sandoz will suffer injury because it may be delayed from entering the relevant market for olaparib products in the United States until 2031.

301.    As a result of AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield's conduct to sue on the '562 patent and to maintain the validity of that patent via fraud before the PTO through a scheme with Dr. Helleday, Sandoz has suffered, and will continue to suffer, injury to its business and property, including lost profits and business opportunities through Sandoz's delayed entry into the relevant market for olaparib products in the United States.

302.    As a result of AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield's conduct of suing on the '562 patent and seeking to maintain the validity of that patent via fraud on the PTO through a scheme with Dr. Helleday, Sandoz is suffering, and will continue to suffer, substantial harm in the form of paying attorney fees and costs necessary to defend against AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield's lawsuit alleging infringement of the '562 patent.

89

303.    AstraZeneca, KuDOS, MSD International Business GmbH, and the University of Sheffield's anticompetitive conduct entitles Sandoz to treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15.

304.    AstraZeneca, KuDOS, MSD International Business GmbH, and University of Sheffield should be enjoined from enforcing the '562 patent against Sandoz pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## PRAYER FOR RELIEF

WHEREFORE, Defendant/Counterclaim-Plaintiff Sandoz respectfully requests that this Court enter a Judgment and Order:

A.    dismissing the Complaint, and the claims for relief contained therein, with prejudice;

B.    declaring that Sandoz and the products described in ANDA No. 217936 have not infringed, are not infringing, and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily) any valid or enforceable claim of the '842, '396, and '562 patents;

C.    declaring that Sandoz and the products described in ANDA No. 217936 have not infringed, are not infringing and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily) any valid or enforceable claim of the '842 patent;

D.    declaring that the claims of the '842 patent are invalid;

E.    declaring that Sandoz and the products described in ANDA No. 217936 have not infringed, are not infringing and will not infringe (either literally or under the doctrine of

90

equivalents), directly or indirectly (either by inducement or contributorily) any valid or enforceable claim of the '396 patent;

F.      declaring that the claims of the '396 patent are invalid;

G.      declaring that Sandoz and the products described in ANDA No. 217936 have not infringed, are not infringing and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily) any valid or enforceable claim of the '562 patent;

H.      declaring that the claims of the '562 patent are invalid;

I.      that judgment be entered declaring that the claim of the '562 patent is unenforceable based upon inequitable conduct;

J.      that judgment be entered declaring that the claim of the '562 patent is unenforceable due to unclean hands;

K.      that judgment be entered in favor of Defendants with respect to Plaintiffs' request for equitable relief or relief pursuant to 35 U.S.C. § 271(e)(4)(A);

L.      that judgment be entered declaring that Plaintiffs have violated Section 2 of the Sherman Act, awarding Defendants treble damages as well as costs and attorney fees as provided by law;

M.      permanently enjoining Plaintiffs under 15 U.S.C. § 26 from enforcing the '562 patent against makers of generic olaparib products due to the anticompetitive conduct alleged herein;

N.      declaring this an exceptional case under 35 U.S.C. § 285 and awarding Sandoz attorney fees, costs, and expenses; and

O.      granting Sandoz such other and further relief as this Court deems just and proper.

Dated:  September 29, 2025

Respectfully submitted,

/s/ *Kristine L. Butler*

Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
Kristine L. Butler (kbutler@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08540
T: (609) 924-0808
F: (609) 452-1888

Laura A. Lydigsen
Mark H. Remus
Mary E. LaFleur
**CROWELL & MORING LLP**
455 North Cityfront Plaza Drive
NBC Tower, Suite 3600
Chicago, IL 60611
T: (312) 321-4200
F: (312) 321-4299
llydigsen@crowell.com
mremus@crowell.com
mlafleur@crowell.com

Ryan Seewald
**CROWELL & MORING LLP**
1601 Wewatta Street
Suite 815
Denver, CO 80202
T: (303) 524-8660
F: (303) 524-8650
rseewald@crowell.com

*Attorneys for Defendant Sandoz Inc.*

92