**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>SANDOZ INC., *et al.*,<br><br>Defendants. | Civil Action No. 23-796 (RK) (TJB)<br>(Consolidated)<br><br>**OPINION**<br>**FILED UNDER TEMPORARY SEAL** |

### KIRSCH, District Judge

**THIS MATTER** comes before the Court following a hearing requested by Plaintiffs AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited, AstraZeneca AB, KuDOS Pharmaceuticals Limited, the University of Sheffield, and MSD International Business GmbH (collectively, "Plaintiffs") and Defendants Natco Pharma Limited ("Natco"), Sandoz Inc. ("Sandoz"), Cipla Limited and Cipla USA, Inc. ("Cipla"), and Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited ("Zydus") (collectively, "Defendants"), for claim construction pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The parties filed opening briefs ("Pl. Open.," ECF No. 199; "Def. Open.," ECF No. 198) and response briefs ("Pl. Resp.," ECF No. 203; "Def. Resp.," ECF No. 202), and the Court subsequently held a *Markman* hearing on July 16, 2025. (*See* "Hearing Tr.," ECF No. 230.)

## I.    BACKGROUND

### A. FACTUAL BACKGROUND

Plaintiffs have patented Lynparza®, a "first-in-class cancer therapy that is approved to treat certain types of ovarian, breast, pancreatic, and prostate cancers." (Pl. Open. at 1.) Defendants have each filed an Abbreviated New Drug Application ("ANDA") "seeking approval to market generic versions" of Lynparza®.[1] (ECF No. 192 at 1.) Plaintiffs contend that the products that are the subjects of these ANDAs will infringe upon one or more of Plaintiffs' patents. (*Id.*) The patents-at-issue for claim construction fall into two categories: (i) patents related to the formulation of Lynparza® (the "Formulation Patents"), and (ii) a patent related to treating homologous recombination ("HR")-defective cancers ("Method of Treatment Patent").

1. '842 Patent, '396 Patent, '001 Patent, '695 Patent, '810 Patent, and '816 Patent (the "Formulation Patents")[2]

The Formulation Patents share a common priority application and a specification. (Pl. Open. at 2; Def. Open. at 2.) All are related to a specific "immediate release pharmaceutical formulation," which includes certain percentages of the active ingredient olaparib. (*Id.*; *see* '842 Patent at 1; '396 Patent at 1; '001 Patent at 1; '695 Patent at 1; '810 Patent at 1; '816 Patent at 1.) These compositions "use certain inactive ingredients (referred to as 'excipients') to disperse the olaparib active ingredient and to keep the olaparib in an 'amorphous' form that is more easily absorbed by the patient's body (*i.e.*, more 'bioavailable')." (Pl. Open. at 2.) As described in the Formulation Patents, Plaintiffs identified a group of inactive ingredients that were "particularly

---

[1] The ANDAs are Nos. 218044 (Natco), 217936 (Sandoz), 219410 (Cipla), and 219893 (Zydus). (ECF No. 192 at 1.)

[2] More specifically, the "Formulation Patents" are U.S. Patent Nos. 8,475,842 ("'842 Patent," ECF No. 200), 11,633,396 ("'396 Patent," ECF No. 200-1), 11,975,001 ("'001 Patent," ECF No. 200-2), 12,048,695 ("'695 Patent," ECF No. 200-3), 12,144,810 ("'810 Patent," ECF No. 200-4), and 12,178,816 ("'816 Patent," ECF No. 200-5).

suitable for use with olaparib in a solid dispersion formulation" (*i.e.*, a formulation "in which an active agent is dispersed in an excipient carrier" such as "pellets, tablets, films or strands"). (*Id.* at 2–3; ECF No. 222-3 at 11.) Essentially, the Formulation Patents claim Plaintiffs' development of drug formulations that effectively deliver olaparib to cancer patients. (Pl. Open. at 2.)

    2.   '562 Patent (the "Method of Treatment Patent")[3]

The '562 Patent is titled "Use of RNAI Inhibiting PARP Activity for the Manufacture of a Medicament for the Treatment of Cancer." ('562 Patent at 1.) This patent claims research undertaken by Dr. Thomas Helleday while working at Plaintiff the University of Sheffield. (Pl. Open. at 3.) His research concerned "HR-defective" or "HR-deficient" cancers, *i.e.*, cancers that are defective in a cellular process called "homologous recombination." (*Id.*) As he discovered, HR-defective cancer cells are "uniquely sensitive to PARP-1 inhibitors," including Lynparza®, and so he developed a new method of treatment for these cancers using PARP-1 inhibitors. (*Id.*) The '562 Patent includes only one claim:

> A method of treatment of cancer cells defective in homologous recombination (HR), the method comprising:
>
> identifying a human patient with a familial predisposition to gene-linked hereditary cancer, wherein said cancer comprises cancer cells defective in homologous recombination;
>
> identifying a compound which inhibits PARP-1, and
>
> administering to said human patient a therapeutically effective amount of said compound.

('562 Patent at 37:23–38:28.)

---

[3] More specifically, the "Method of Treatment Patent" is U.S. Patent No. 8,859,562 ("'562 Patent," ECF No. 200-6).

## B. PROCEDURAL HISTORY

Plaintiffs have filed approximately a dozen patent infringement lawsuits against Defendants in the District of New Jersey since 2023, all of which have been consolidated under the instant docket. *See* Case Nos. 24-5889, 24-7346, 24-8167, 24-8164, 24-5887, 24-8162, 25-15825, 24-10458, 25-230, 25-231, 25-233, 25-234. Following the commencement of discovery, the parties filed their Joint Claim Construction Chart (ECF No. 192) and their respective *Markman* briefs (Pl. Open., Pl. Resp., Def. Open., Def. Resp.).[4] The parties' propose conflicting constructions of three claim terms, two of which appear in the Formulation Patents ("composition" and "at least one polymer chosen from . . .") and one of which appears in the Method of Treatment Patent ("the method comprising"). The Court heard argument as to these disputes at the *Markman* hearing held on July 16, 2025.

## II.    LEGAL STANDARD

Claim construction is the first step in a two-step patent infringement analysis. First, a court "construes the scope of the asserted claims," and then the court "compares the accused device to the properly construed claims to determine whether each and every limitation of a claim is present, either literally or equivalently, in the accused device." *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002).[5] Claim construction "is a matter of law exclusively for the court." *Markman*, 52 F.3d at 970–71.

A claim term should generally be construed to give the words "their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc)

---

[4] Prior to the *Markman* hearing, the parties also jointly provided the Court with presentation slides and associated prose for their technology tutorial undertaken during the *Markman* hearing. (*See* ECF No. 222.)

[5] With respect to patent matters such as claim construction, the Court is bound by the precedent of the United States Court of Appeals for the Federal Circuit. *See Saint-Gobain Performance Plastics Corp., HCM Div. v. Truseal USA, Inc.*, 351 F. Supp. 2d 290, 291 n.1 (D.N.J. 2005) ("[T]his Court is bound by the law of the Federal Circuit as it relates to patent issues.").

(quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [("POSA")] in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."[6] *Id.* at 1313. This is an "objective baseline" from which to begin claim construction. *Id.*

In some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. A claim term's ordinary meaning generally will *not* control only "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

In undertaking claim construction, a court "must look first to the 'intrinsic evidence' which consists of the patent claims, the specification, and the prosecution history if in evidence." *Bristol-Myers Squibb Co. v. Immunex Corp.*, 86 F. Supp. 2d 447, 448 (D.N.J. 2000). Indeed, "[s]uch intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp.*, 90 F.3d at 1582. In reviewing the claims in which the disputed terms arise, "the language should not be read solely in the context of the claim under review; instead, it should be analyzed 'in the context of the entire patent' and with an understanding of how that language is used in the field from which the patent comes." *Boehringer Ingelheim Pharms., Inc. v. Lupin Atlantis Holdings SA*, No. 18-12663, 2020 WL 1888247, at *2 (D.N.J. Apr. 16, 2020)

---

[6] The parties did not define the POSA in this case in either their briefing or at the *Markman* hearing. As this implies that the parties' claim construction disagreements do not turn on differing definitions of the POSA, the Court does not endeavor to define the POSA in this Opinion. *See, e.g., Takeda Pharms. Am., Inc. v. Apotex, Inc.*, No. 21-12998, 2023 WL 179965, at *3 n.4 (D.N.J. Jan. 13, 2023).

(quoting *Phillips*, 415 F.3d at 1313). Further, the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

Where the intrinsic evidence is ambiguous, however, the Court may turn to extrinsic evidence. This "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Extrinsic evidence is "less significant than the intrinsic record," but nonetheless "'can shed useful light on the relevant art.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)) (noting "extrinsic evidence cannot alter any claim meaning discernible from intrinsic evidence").

## III.   DISCUSSION

The Court now turns to construing the three disputed claim terms.

### A.   "COMPOSITION"

| Disputed Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "composition" | Plain and ordinary meaning, which is:<br><br>"composition" | Plain and ordinary meaning, which is:<br><br>"the entire pharmaceutical composition including any core and coating" |

(ECF No. 192-1 at 1.)

In order to understand the parties' dispute as to the meaning of "composition" in the Formulation Patents, some general background with respect to the formulation of pharmaceutical drugs is necessary. Pharmaceutical drugs can take the form of a tablet, which compresses an active pharmaceutical ingredient (here, olaparib) with inactive ingredients. (ECF No. 222-3 at 3, 8.)

These tablets can sometimes be covered with a "coating" to "modify drug release, to provide a protective barrier, or to improve taste." (*Id.* at 8.) The Formulation Patents claim particular formulations (*i.e.*, "recipes") of active and inactive ingredients. Not unlike a recipe for baking a cake, the Formulation Patents set out the exact percentages of each ingredient that must be added to the formulations to arrive at the claimed pharmaceutical invention. By way of example, claim 7 of the '842 Patent claims the following "recipe":

> An immediate-release pharmaceutical composition in the form of a solid dispersion, the composition comprising:
>
> an active agent phase comprising 4-[3-(4-cyclopropanecarbonyl-piperazine-1-carbonyl)-4-fluoro-benzyl]-2H-phthalazin-1-one (Compound 1) or a salt thereof; and a carrier phase comprising copovidone; and wherein the active agent phase is dispersed in the carrier phase; *wherein the total concentration of Compound 1 in the composition is 25% by weight*; and wherein the weight ratio of Compound 1 to copovidone is 1:2.3.

('842 Patent at 42:66–43:11 (emphasis added).) Claim 10 goes on to claim, "The composition of claim 7, further comprising *1.8% by weight colloidal silicon dioxide*, *14.7% by weight mannitol*, and *1% by weight sodium stearyl fumarate*." (*Id.* at 43:16–18 (emphasis added).)

These claims suggest that the ingredients are a percentage of the drug's "composition," but the parties dispute what "composition" actually totals. (Pl. Open. at 7; Def. Resp. at 16.) Plaintiffs posit that "composition" in this context refers only to the formulation's *core* (*i.e.*, the active and inactive ingredients) (Pl. Open at 7), whereas Defendants assert that it refers to both the core *and* any possible coating (Def. Open. at 15). To illustrate the parties dispute, to calculate the right weight amount of mannitol in the formulations, Plaintiffs would measure 14.7% of the *core*'s weight, while Defendants would measure 14.7% of the *core and coating*'s weight.

In reviewing the parties' briefing, it is clear that this dispute over the construction of "composition" is narrow. They do not ask the Court to construe "composition" in all contexts, but

rather, only ask the Court to construe "composition" when ingredients' weight percentages are calculated against it. (*See* Pl. Open. at 7 ("The actual dispute does not relate to the term 'composition' itself, but rather to the manner in which the 'weight percentages' for certain ingredients recited in the claims are calculated."); Def. Response at 16 ("[T]he heart of this dispute is how to calculate the weight percent required by the claims.").) Even narrower, the parties only disagree as to how to calculate weight percentages *when there is coating* on the formulation. (*See id.* at 17–18 (agreeing with Plaintiffs that "[i]f the tablet has *no coating*, the denominator is the *core* because that is the entire tablet.") (emphasis added).) In other words, the parties' narrow— but consequential—dispute focuses solely on instances in which both a core *and* coating are present. In those instances, Plaintiffs argue that it should still only be the core's weight that is considered as the total "composition," whereas Defendants argue both that the core *and* its coating should be added together and used as the total "composition" for calculating ingredient weight percentages.

Plaintiffs and Defendants both argue that the Formulation Patents' claims, their shared specification, and their prosecution history support the parties' respective proposed constructions.[7]

1. Claims

The Court has been tasked with construing a term that appears in the claims of six separate, but related, patents. (*See* '842, '810, '816, '001, '695, '396 Patents.) The following are examples of how "composition" is used across the Formulation Patents' claims:

- "An immediate-release pharmaceutical ***composition*** in the form of a solid dispersion, the ***composition*** comprising . . ." ('842 Patent at 42:66–67 (emphasis added).)

---

[7] Both parties also cite the Court to caselaw that they assert support their respective constructions. (*See, e.g.*, Pl. Open. at 6; Def. Resp. at 17.) However, "claim construction . . . begins with an assessment of the intrinsic evidence and considers extrinsic evidence only if the intrinsic evidence is unclear." *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1363 (Fed. Cir. 2002). Because the intrinsic evidence reveals the proper construction, the Court gives little weight (for purposes of claim construction) to caselaw which construes "composition" under different facts in different patents.

- ". . . wherein the total concentration of Compound 1 in the *composition* is 25% by weight . . ." (*Id.* at 43:8–9 (emphasis added).)

- "The *composition* of claim 1, wherein the total concentration of Compound 1 in the tablet is in the range of from 10% by weight to 35% by weight . . ." ('810 Patent at 41:3–5 (emphasis added).)

- "The *composition* of claim 1, wherein the at least one polymer is chosen from copovidone and povidone." ('816 Patent at 40:18–20 (emphasis added).)

- "The *composition* of claim 1, wherein the *composition* further comprises colloidal silicon dioxide, mannitol, and sodium stearyl fumarate." ('001 Patent at 43:9–11 (emphasis added).)

- "The *composition* of claim 1, wherein the total concentration or Compound 1 in the core *composition* is in the range of from 15% by weight to 30% by weight." ('396 Patent at 38:26–28 (emphasis added).)

- ". . . wherein the total concentration of Compound 1 in the core *composition* is in the range of from 10% by weight to 50% by weight . . ." ('695 Patent at 43:21–23 (emphasis added).)

The Formulation Patents are not explicit as to whether "composition" must factor in coating when calculating weight percentages. Defendants make much of the fact that the Formulation Patents claim "[a]n immediate-release pharmaceutical *composition*," which they posit must mean that "composition" is what is ultimately "release[d]" to a patient (and would necessarily include coating). (Def. Open. at 15; Def. Resp. at 16–17; Hearing Tr. at 125:3–15; *see* '842 Patent at 42:66, '396 Patent at 38:2, '001 Patent at 41:49, '695 Patent at 43:6, '810 Patent at 39:57, '816 Patent at 39:66.) However, as most clearly illustrated in the '695 Patent's claims, the "immediate-release pharmaceutical composition" is made up of a "core composition" and "*optionally* a tablet coating." ('695 Patent at 43:6–25 (emphasis added).) Thus, by the plain language of the claims, even a formulation made up solely of a "core composition" without any coating still qualifies as an "immediate-release pharmaceutical composition." (*Id.*)

To this point, Defendants further argue that because the '695 and '396 Patents refer explicitly to a "*core* composition," (as opposed to just "composition"), "composition" on its own

must mean something different than just "core."[8] (Def. Open. at 15–16; *see, e.g.*, '396 Patent at 38:26–28 (". . . the total concentration of Compound 1 in the *core composition* is in the range of from 15% by weight to 30% by weight . . ." (emphasis added)); '695 Patent at 43:22–24 (". . . the total concentration of Compound 1 in the *core composition* is in the range of from 10% by weight to 50% by weight . . ." (emphasis added).) To illustrate this point, Defendants ask the Court to compare claim 7 in the '842 Patent with claims 1 and 8 in the '695 Patent:

| Claim 7 in the '842 Patent | Claims 1 and 8 in the '695 Patent |
|---|---|
| 7. An immediate-release pharmaceutical composition in the form of a solid dispersion . . .<br><br>**wherein the total concentration of [olaparib] in the _composition_ is 25% by weight . . . .** | 1. An immediate-release pharmaceutical composition in the form of a tablet comprising:<br>(a) a core composition comprising:<br>a solid dispersion . . .<br>(b) optionally a tablet coating . . . .<br><br>8. The composition of claim 1, **wherein the total concentration of [olaparib] in the _core composition_ is 25% by weight.** |

According to Defendants, "Plaintiffs' decision to selectively use either 'composition' or 'core composition' in otherwise identical claim limitations across Plaintiffs' thicket of [F]ormulation [P]atents indicates that those terms have different meanings." (Def. Resp. at 14.) Essentially, their argument is that if Plaintiffs meant to specify "core" composition in claim 7 of the '842 Patent, they would have; the fact that the '842 Patent references only "composition" suggests to Defendants that the term refers to something broader than just a core. To Defendants' point, both the '396 and '695 Patents describe a "core composition" as a sub-component of a

---

[8] The parties agree that the term "core composition" is defined as "uncoated tablet core." (ECF No. 192 at 2.)

broader "immediate-release pharmaceutical *composition.*" ('396 Patent at 38:2–4 (emphasis added); '695 Patent at 43:6–9 (emphasis added).)

It is true that the Federal Circuit "ordinarily interpret[s] claims consistently across patents having the same specification," such as here. *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011). However, "simply noting the difference in the use of claim language does not end the matter. Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). Here, the written description in particular solidifies the Court's view that "composition" can be construed as referring solely to a core when it comes to calculating weight percentages, even though this would mean that the term "composition" in the '842, '001, '810, and '816 Patents overlaps with "core composition" in the '695 and '397 Patents solely with respect to calculating weight percentages.

2. Specification

"[T]he specification is the single best guide to the meaning of a claim term; it is, usually, dispositive." *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966, 972 (Fed. Cir. 2011) (citing *Phillips*, 415 F.3d. at 1318). Here, the Formulation Patents' shared specification is highly revealing as to how "composition" should be construed in terms of calculating weight percentages:

11

## TABLE 17

Composition of Compound 1/copovidone solid dispersion tablet

| Components | 25 mg tablet | 100 mg tablet | | Function |
|---|---|---|---|---|
| **Tablet core** | Quantity (mg per tablet) | | Quantity (% core weight) | |
| Compound 1 | 25.00 | 100.00 | 25.00 | Active pharmaceutical ingredient |
| Copovidone | 57.50 | 230.00 | 57.50 | Polymeric carrier |
| Colloidal silicon dioxide | 1.83 | 7.33 | 1.83 | Glidant |
| Mannitol | 14.67 | 58.67 | 14.67 | Soluble filler |
| Sodium stearyl fumarate | 1.00 | 4.00 | 1.00 | Lubricant |
| Core tablet weight | 100.00 | 400.00 | | |
| **Tablet Coating** | Quantity (mg per tablet) | | Quantity (% coating weight) | Function |
| Hypromellose (HPMC 2910) | 2.19 | 8.75 | 62.5 | Film former |
| Titanium dioxide (E171) | 0.88 | 3.51 | 25.05 | Opacifier |
| Macrogol/ PEG 400 | 0.22 | 0.88 | 6.25 | Plasticiser |
| Iron oxide yellow (E172) | 0.16 | 0.64 | 4.55 | Colouring agent |

## TABLE 17-continued

Composition of Compound 1/copovidone solid dispersion tablet

| Components | 25 mg tablet | 100 mg tablet | | Function |
|---|---|---|---|---|
| **Tablet core** | Quantity (mg per tablet) | | Quantity (% core weight) | |
| Iron oxide black (E172) | 0.06 | 0.23 | 1.65 | Colouring agent |
| | | | % of core weight | |
| Nominal Coating Weight | 3.50 | 14.00 | 3.50 | |

('842 Patent at 30–31.[9]) Table 17 in the specification sets out the "composition" of olaparib ("Compound 1") in a "solid dispersion tablet." (*Id.*) The table contains separate sections for the "[t]ablet core['s]" "% core weight" and the "[t]ablet [c]oating['s]" "% coating weight." (*Id.*)

In comparing Table 17 to the '842 and '396 Patent's claims, the table's "core" weight percentages *exactly match* those expressed in claims 7 and 10 of the '842 Patent and 24 and 27 of the '396 Patent when accounting for mathematical rounding:

> An immediate-release pharmaceutical composition in the form of a solid dispersion, the composition comprising . . . wherein the total concentration of Compound 1 in the composition is **25%** by weight . . . [t]he composition of claim 7, further comprising **1.8%** by weight colloidal silicon dioxide, **14.7%** by weight mannitol, and **1%** by weight sodium stearyl fumarate.

(*Id.* at 42:66–43:8–9, 16–18 (emphasis added).)

> An immediate-release pharmaceutical composition comprising . . . wherein the total concentration of Compound 1 in the core composition is **25%** by weight . . . The composition of claim 24, wherein the pharmaceutical composition further comprises **1.8%** by weight colloidal silicon dioxide, **14.7%** by weight mannitol, and **1%** by weight sodium stearyl fumarate.

('396 Patent at 40:12–18, 27–29).)

These percentages also exactly match those expressed in another table in the specification, Table 13, which specifically deals with uncoated tablets:

---

[9] Because the Formulation Patents "share[] a specification," the Court cites only to the '842 Patent for ease of reference. (*See* ECF No. 192-1 at 1 n.1.)

13

## TABLE 13

### Composition of Compound 1/copovidone solid dispersion uncoated tablet

| Components | Quantity (mg) | Quantity (%) | Function | Standard |
|---|---|---|---|---|
| Compound 1 | 200.00 | 25.00 | Active pharmaceutical ingredient | AstraZeneca |
| Copovidone | 460.00 | 57.50 | Polymeric carrier | NF and Ph Eur |
| Colloidal silicon dioxide | 14.64 | 1.83 | Glidant | NF and Ph Eur |
| Mannitol | 117.36 | 14.67 | Soluble filler | NF and Ph Eur |
| Sodium stearyl fumarate | 8.00 | 1.00 | Lubricant | NF and Ph Eur |
| Core tablet weight | 800.00 | | | |

('842 Patent at 27.) Even though, as Defendants point out, Table 17 is titled "*Composition* of Compound 1/copovidone solid dispersion tablet" (*id.* at 30 (emphasis added)), which arguably adds some credence that "composition" describes both the tablet core and the tablet coating together (Def. Resp. at 19), it is clear from comparing the claims to the specification that the embodiments calculate weight percentages of the ingredients referenced in the claims at-issue using the core alone—even when coating is present. *See Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part." (quoting *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003))). This is also true with respect to Table 8 in the specification, which, albeit dealing with a *capsule* instead of a *tablet*, clearly only counts the *contents* of the capsule—rather than the capsule itself—towards total weight:

14

### TABLE 8

Quantitative composition of Compound 1 50 mg capsules

| Constituent | Amount per capsule (mg) | Amount (% w/w) | Function | Standard |
|---|---|---|---|---|
| **Capsule contents** | | | | |
| Compound 1 | 50.0 | 10.0 | Active | AstraZeneca |
| Lauroyl macrogolglyceride (Lauroyl polyoxylglyceride)[a] | 450.0 | 90.0 | Excipient, pharmaceutical aid | Ph Eur (NF[c]) |
| **Capsule** | | | | |
| Hypromellose capsule shell[b] | Size 0 | Each unit | Dosage form presentation | USP, Ph Eur |
| Titanium dioxide | 1.84 | Each unit | Opacifier | |
| Opacode black ink (S-1-7822/S-1-7823) | 0.0332 | Each unit | | |

[a]Supplied as Gelucire 44/14 grade.
[b]Supplied as Capsugel V Cap capsules

('842 Patent at 23.)

Calculating the weight percentages any other way, including Defendants' proposed method of accounting for coating, would improperly "exclude a preferred embodiment." *Glaxo Grp. Ltd. v. Apotex, Inc.*, 64 F. App'x 751, 754 (Fed. Cir. 2003). For one, the figures in Table 17 would *not* align with the claims if Defendants' proposed calculation was used. While Defendants point to other examples in the specification that would broadly align with their proposed method of calculation (*see, e.g.,* '842 Patent at 8:38–9:27, 10:36–45), they cannot explain away that their proposed method would clearly exclude preferred embodiments. Further, it does not appear that *anywhere in the Formulation Patents* are "composition" weights calculated the way Defendants propose—weights are either calculated by (i) calculating an uncoated tablet's "core" weight (Table 13); (ii) calculating a coated tablet's "core" weight separate from the "coating" weight (Table 17);

15

(iii) calculating a capsule's weight based only on the contents of the capsule and excluding the weight of the capsule itself (Table 8); or (iv) ambiguously calculating a percentage of the "composition" as set out in the Formulation Patents' claim terms. Nowhere are weights calculated by considering the core and coating together, and thus the specification "provides necessary context for understanding the claims," which are themselves ambiguous with respect to calculating weight. *Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).

Defendants argue that Plaintiffs' proposed construction is the equivalent of simply rewriting the claim language. (*See* Def. Resp. at 19.) To be sure, "courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Here, however, the Court is not rejecting explicit language in the Formulation Patents and replacing it with more favorable language.[10] "Composition" is not clearly defined in the Formulation Patents, and thus, the Court is required to use claim construction principles, including looking at the specification, to construe the claim term. To that end, construing "composition" as referring only to a core when it comes to calculating weight percentages "most naturally aligns with the patent's description of the invention." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)) (noting that such a construction is "the correct construction").

3. Prosecution History

As a last-ditch effort, Defendants argue that a single clarification during the prosecution history of the '695 Patent confirms that "composition" means more than just a core. (Def. Open.

---

[10] The Court's analysis of this term illustrates the "difficult" distinction "between using the specification to interpret the meaning of a claim and importing limitations from the specification." *Phillips*, 415 F.3d at 1323. Here, it is clear that the specification's embodiments "define[d] the outer limits of the claim term" with respect to determining weight percentages, as there is nothing in the context of the patent "'to indicate that the patentee contemplated any alternative' embodiment." *Id.* (quoting *Snow v. Lake Shore & M.S. Ry. Co.*, 121 U.S. 617, 630 (1887)).

at 18–19.) During the prosecution of the patent, the Examiner stated that the limitation "wherein the total concentration of Compound 1 is in the range of from 10% by weight to 50% by weight" was ambiguous and asked "by weight of *what*?" (*Id.* at 18 (citing Def. Open. Ex. 11 at 3).) Thereafter, the patentee amended the claim to read "the total concentration of Compound 1 in the ***core composition*** is in the range of from 10% by weight to 50% by weight." (*Id.* (emphasis added) (citing Def. Open. Ex. 11 at 2, 5–8).)

At a minimum, this clarification, standing alone, is not a "clear and unambiguous" disavowal of scope. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007). Here, the patentee did not disclaim "composition" in favor of "core composition," but rather, added in "core composition" where there was nothing prior. Indeed, claims in the Formulation Patents that exclusively refer to "composition" as opposed to "core composition" were *allowed* by the Examiner. (*See* Pl. Open. at 11.) Thus, the prosecution history does not support Defendants' proposed construction.

"When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The only dispute the parties have asked the Court to resolve with respect to "composition" is whether coating affects the calculated weight percentages of the ingredients in the claimed invention. (Pl. Open. at 7; Def. Response at 16.) There is ample evidence—most clearly in reviewing the claims in light of the specification—to support that a POSA would understand that ingredient weight percentages are calculated using the weight of the core alone. *See Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1305 (Fed. Cir. 2015) ("[T]he appropriate definition can be ascertained from the specification."). This construction does not make the term "composition" a "moving target" as Defendants argue (Def. Open. at 19),

because the Court's holding is a narrow one and only applies to the extent ingredient percentages are being calculated in a formulation that will ultimately include a coating.[11]

### B. "AT LEAST ONE POLYMER CHOSEN FROM COPOVIDONE, POVIDONE, HYPROMELLOSE PHTHALATE, HYPROMELLOSE ACETATE SUCCINATE, 2-HYDROXYPROPYL-B-CYCLODEXTRIN, HYPROMELLOSE, POLYMETHACRYLATES, HYDROXYPROPYL CELLULOSE, AND CELLULOSE ACETATE PHTHALATE"

| Disputed Claim Term | Plaintiffs' Proposed Construction | Zydus's Proposed Construction |
|---|---|---|
| "at least one polymer chosen from copovidone, povidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate" | Plain and ordinary meaning, which is:<br><br>at least one polymer chosen from copovidone, **povidone**, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate<br><br>(emphasis added) | at least one polymer chosen from copovidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate |

(ECF No. 192-1 at 10.)

The invention claimed in the '001, '695, '810, and '816 Patents is an "immediate-release pharmaceutical composition . . . comprising . . . at least one polymer chosen from copovidone, povidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate." ('001 Patent at 41:49–58; '695 Patent at 43:6–18; '810 Patent at 39:57–67; '816 Patent

---

[11] Even though Defendants are correct that Plaintiffs violated Local Patent Rule 4.2(a) by not proposing an exact definition of "composition" beyond its plain and ordinary meaning, courts in this District have nonetheless gone on to perform a claim construction analysis even in the face of such a violation. *See, e.g.*, *JBS Hair, Inc. v. SLI Prod. Corp.*, No. 22-1576, 2024 WL 195257, at *2, *5 (D.N.J. Jan. 18, 2024).

at 39:66–40:9.) Defendant Zydus[12] proposes that "povidone"—one of the polymers *explicitly referenced* in the claims—should be read out because the use of povidone in the claimed invention was disclaimed in both the specification and the prosecution history of the parent '842 Patent. However, in making this argument and relying on a variety of claim construction principles, Zydus overlooks the most basic principle of them all: "[T]he court must presume that the terms in the claims mean what they say and construe them according to their ordinary and accustomed meaning." *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1177 (Fed. Cir. 2002); *see Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("While not an absolute rule, all claim terms are presumed to have meaning in a claim.").

### 1. Claims

Here, each of the claims at-issue explicitly lists povidone as one of the nine polymers from which the claimed pharmaceutical composition can be crafted. ('001 Patent at 41:49–58; '695 Patent at 43:6–18; '810 Patent at 39:57–67; '816 Patent at 39:66–40:9.) The '816 Patent goes even further, claiming a composition "wherein the at least one polymer is chosen from copovidone and *povidone*" and "wherein the at least one polymer is a combination of copovidone and *povidone*." ('816 Patent at 40:18–21 (emphasis added).) The other patents have similar claimed limitations. (*See, e.g.*, '001 Patent at 41:64–67 ("The composition of claim 1, wherein the at least one polymer is chosen from copovidone, *povidone*, hypromellose phthalate, hypromellose acetate succinate, and 2-hydroxypropyl-β-cyclodextrin.") (emphasis added); '695 Patent at 44:22–23 ("The composition of claim 1, wherein the at least one polymer is chosen from *povidone* and copovidone.") (emphasis added); '810 Patent at 40:64–65 (same).)

---

[12] Notably, the other Defendants (Natco, Sandoz, and Cipla) "take no position on the construction of this claim term." (Def. Open. at 21 n.1.)

The Court "cannot construe claims to read an express limitation or element out of the claims." *TDM Am., LLC v. United States*, 85 Fed. Cl. 774, 787 (2009). To read out "povidone" from the list of polymers would not "give[] meaning to all the terms of the claim." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). Rather, it would render the term "povidone" void. *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."). Thus, based on the plain language of the claims alone, it appears Zydus's proposed construction must be rejected.

### 2. Specification and Prosecution History

Zydus's arguments regarding disclaimers in the specification and prosecution history of the parent '842 Patent do not disrupt the Court's reasoning. To start with the specification, it is true that "claims must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). Further, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316. However, "any such disclaimer 'must be clear.'" *Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (quoting *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1357 (Fed. Cir. 2006)).

Here, as evidence of this purported "clear" disclaimer, Zydus argues that the Formulation Patents' specification describes an invention comprising olaparib and "a matrix polymer that exhibits low hygroscopicity and high softening temperatures." (Def. Open. at 22; '842 Patent at 1:17–20.) "[L]ow hygroscopicity" is defined as "having an equilibrium water content <10% at 50% relative humidity . . ." ('842 Patent at 4:55–56.) Damning, according to Zydus, is that Table 4 of the shared specification lists povidone as having a high hygroscopicity of 16%. (*See id.* at 16.)

20

Thus, per Zydus, povidone does not have the "low hygroscopicity" suitable for the claimed invention. (Def. Open. at 22.)

In further support of this position, Zydus cites to portions of the specification which indicate that povidone did not test well (by "crystallis[ing]") during a conducted "stability study":

> The results of the stability study demonstrate that solid dispersions produced using the relatively hygroscopic polymer povidone tended to crystallise when stored at 40°C./75% relative humidity, leading to a reduction in dissolution rate.

('842 Patent at 27:24–28.) Thus, the shared specification ultimately excluded povidone in a list of "suitable matrix polymers for use in the invention." (*Id.* at 5:1–10.)

The Court notes that while the shared specification makes repeated reference to "matrix polymer[s]," the claims of the '001, '695, '810, and '816 Patents only make reference to "polymer[s]" without the word "matrix." ('001 Patent at 41:49–58; '695 Patent at 43:6–18; '810 Patent at 39:57–67; '816 Patent at 39:66–40:9.) Thus, even assuming *arguendo* that the patentee disclaimed povidone as a matrix polymer, there is no clear disclaimer of povidone as simply a "polymer" in the claims of the '001, '695, '810, and '816 Patents. To get around this discrepancy, Zydus argued at the *Markman* hearing that both "polymer" and "matrix polymer" are "one and the same" because the only polymers found to be effective with olaparib in the context of the invention were matrix polymers. (Hearing Tr. at 149:18–150:19.) Yet, any purported disclaimer of povidone as a matrix polymer is not so clear as to suggest the patentee disclaimed povidone as a "polymer" in the claims of the '001, '695, '810, and '816 Patents which *explicitly* include povidone. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) ("To disavow claim scope, the specification must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." (internal quotation marks omitted)). Even though povidone may have been left off the list of suitable matrix polymers in the '842 Patent, the shared specification lists povidone performing *well* under certain, though perhaps not

optimal, conditions. (*See, e.g.*, '842 Patent at 21 (Table 6), 21:37 (noting that "preparation of amorphous solid dispersions was possible for all of the polymers evaluated," which included povidone), 27 (Table 12),  41 (Table 28).)

At most, Zydus's proposed construction appears to be a clear attempt to commit "one of the cardinal sins of patent law" by "reading a limitation from the written description into the claims." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). Zydus favorably cites *SciMed* for the proposition that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.* at 1341; (*see* Def. Open. at 21–22). However, unlike in *SciMed*, Zydus is asking the Court to do more than just determine the scope of a claim. Whereas the issue in *SciMed* was whether claims should be construed as describing "coaxial lumens" or also other types of lumens (such as a "dual lumen configuration"), *SciMed Life Sys.*, 242 F.3d at 1342–1345, here, the issue is whether "povidone" should be construed as "povidone" or *nothing at all.*[13] *C.f. Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) (disclaiming *scope* of claim as opposed to *explicit language* within claim). Erasing "povidone" from the claims would simply render the term void. *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir.

---

[13] The Court's analysis of this term compared to the prior term ("composition") again illustrates the distinction "between using the specification to interpret the meaning of a claim and importing limitations from the specification." *Phillips*, 415 F.3d at 1323. Here, the specification appears to be doing nothing more than "setting out specific examples of the invention" to teach a POSA "how to make and use the invention." *Id.*; *see E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (noting courts should not add an "extraneous" limitation from the specification into the claim term, *i.e.*, "a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim."). There is no need to "interpret" what the patentee meant when "povidone" was claimed, as they meant just that—povidone.

22

2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

Briefly addressing the prosecution history, Zydus argues that in overcoming prior art while prosecuting the '842 Patent, the patentee argued that povidone was "not utilized in the current formulation" and that povidone "unexpectedly failed to provide a stable solid dispersion formulation for Olaparib." (Def. Open. at 25–26 (citing Def. Open. Ex. 1 at 2, 6–7, 9).) However, as Plaintiff notes, these statements were directed towards "pending claims limited to *copovidone* that did not recite povidone," (Pl. Open. at 16; *see* '842 Patent), and that regardless, the Examiner went on to allow claims reciting povidone on multiple occasions within the '001, '695, '810, and '816 Patents. (Pl. Open. at 16–17.)

Significantly, in the prosecution of the '695 Patent, the patentee explicitly selected "povidone" out of the list of polymers for the Examiner to consider, and in prosecution of the '001 Patent, Plaintiff was required to overcome the same prior art that arose during the prosecution of the '842 Patent—in both instances, the Examiner allowed claims that explicitly recited povidone. (*Id.* at 16–17 (citing Pl. Open. Exs. O–S).) While Zydus argued at the *Markman* hearing that "[w]e cannot expect the [E]xaminer to remember exactly what he was told" with respect to the purported '842 Patent disclaimer "ten years" prior (Hearing Tr. at 158:6–11), the patentee's ability to overcome the prior art where povidone was explicitly included in the claim terms of the '001 Patent only emphasizes that the prosecution history of the '842 Patent, dealing with a different claim term altogether, cannot form the basis for "clear" disclaimer. *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1326, 1335 (Fed. Cir. 2003) (requiring prosecution disclaimer to be "clear and unmistakable" and that for disclaimers in parent patent's history to extend to subsequent patents, the "same claim limitation" must be at issue). Even if the prosecution history of the '842 Patent

23

suggests a *preference* for copovidone over povidone, "[m]ere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal."[14] *Thorner*, 669 F.3d at 1366.

At bottom, the Court has not located a single case which reads out an explicit claim term in light of purported specification or prosecution history disclaimer. Indeed, such a fact pattern would require a patentee to disclaim something they *expressly* claim. Though Zydus may be correct that povidone does not lead to the optimal composition of the invention, "even where a particular structure makes it particularly difficult to obtain certain benefits of the claimed invention, this does not rise to the level of disavowal of the structure." *Id.* (internal quotation marks omitted). Thus, the Court finds that a POSA would understand the list of polymers in the '001, '695, '810, and '816 Patents to comprise exactly what is explicitly listed—including povidone.

## C. "THE METHOD COMPRISING"

| Disputed Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "the method comprising" | Plain and ordinary meaning, which is: "the claimed method is not limited to administering a PARP-1 inhibitor in a monotherapy." <br><br> *The claim as a whole requires the two "identifying" steps (i.e., "identifying a human patient with a familial predisposition to gene-linked hereditary cancer" and "identifying a compound which inhibits PARP-1") to be performed prior to the "administering" step (i.e., administering to said human* | Plain and ordinary meaning, which is: "the claimed method is not limited to administering a PARP-1 inhibitor in a monotherapy, *and the claimed method steps may be performed in any order.*" |

---

[14] Because the Court finds that there was not a sufficiently-clear disavowal of povidone, it does not address the parties' arguments regarding rescission of the hypothetical disclaimer. (*See* Def. Open. at 27–28; Pl. Resp. at 19–20.)

|  | *patient a therapeutically effective amount of said compound").* |  |
|---|---|---|

(ECF No. 192-1 at 6–7 (emphasis added).)

The parties' final dispute centers on whether the steps in the '562 Patent's sole claim should be performed in a particular order:

> A method of treatment of cancer cells defective in homologous recombination (HR), the method comprising:
>
> ***identifying a human patient with a familial predisposition to gene-linked hereditary cancer, wherein said cancer comprises cancer cells defective in homologous recombination;***
>
> ***identifying a compound which inhibits PARP-1***, and
>
> ***administering to said human patient a therapeutically effective amount of said compound.***

('562 Patent at 37:23–38:28 (emphasis added).) The order the steps are written in implies, as Plaintiffs posit, that the two "identifying" steps must occur before the final "administering" step. (Pl. Open. at 19.) Defendants concede the steps *could* occur in that order (Hearing Tr. at 93:8–12), but also argue that these three steps could occur in any order, meaning that the "administering" step could happen before either of the two "identifying" steps. (Def. Open. at 6–7.)

"[A]lthough a method claim necessarily recites the steps of the method in a particular order, as a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008). Here, the claim itself does not denote or specify an order of steps. For example, it does not contain numerals (*e.g.*, "1, 2, 3. . .") or conditional language (*e.g.*, "if . . ., then . . ."). Indeed, the use of "comprising" in the claim's preamble "indicates that the claim is open-ended and allows for additional steps." *Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1005 (Fed. Cir. 2014) (internal quotation marks omitted). However, even when a claim does not

explicitly specify an order of operations, the Federal Circuit has set out a two-part test for determining whether the steps must nonetheless be performed in the order written. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003). *First*, courts look "to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Id.* at 1369. *Second*, if the first step fails to require a particular order, courts "look to the rest of the specification to determine whether it 'directly or implicitly requires such a narrow construction.'" *Id.* at 1370 (quoting *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001)).

1. Claim

As a matter of logic and grammar, the "identifying" steps must precede the "administering" step. Taken to its most extreme, Defendants' argument appears to be that "administering to said human patient a therapeutically effective amount of said compound" can occur prior to even identifying the appropriate compound, implying that a doctor would administer an unknown compound to a patient. (Hearing Tr. at 91:16–92:7 (conceding this is not a "common example").) As a matter of logic, this argument is flawed because not only would it stretch the bounds of credulity for a doctor to administer an unknown compound to a patient in general, but also it would be even more dubious for a doctor to know how to administer a "therapeutically effective" amount of this unknown compound to an unknown patient.

To the extent Defendants argue that a doctor could identify the compound, administer it, and *then* identify the patient as one with a "familial predisposition to gene-linked hereditary cancer," logic and grammar still compel the "identifying" steps to come first. The "administering" step directs "*said* compound" to be administered to "*said* human patient." ('562 Patent at 37:23–38:28 (emphasis added).) A doctor performing the administering step must first confirm *what* compound and *which* patient. This antecedent basis for "said compound" and "said human patient"

26

derives from the "identifying" steps. *Id.* In *Hytera Communications Co. v. Motorola Solutions, Inc.*, the Federal Circuit held that a specific ordering of steps was required where, among other things, "each step of the method provide[d] an antecedent basis for the steps that follow[ed]." 841 F. App'x 210, 218 (Fed. Cir. 2021); *see Azurity Pharms., Inc. v. Amneal Pharms., LLC*, No. 21-8717, 2022 WL 3691392, at *8 (D.N.J. Aug. 25, 2022) (collecting cases in which antecedents were relied upon to find sequential ordering). Indeed, the Federal Circuit has held that "[s]ubsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim." *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) (citing *Baldwin Graphic Sys., Inc. v. Siebert, Inc.,* 512 F.3d 1338, 1342 (Fed. Cir. 2008)). Thus, the use of "said" in the "administering" step compels the conclusion that the prior steps, which provide the antecedent bases, must come first as a matter of logic and grammar.[15]

The cases cited by Defendants to argue that "said" should not be given any particular weight are distinguishable (*see* Def. Open. at 9–10):

- In *Altiris*, the Federal Circuit held that two methodological steps—neither of which, notably, derived its antecedent basis from the other—could be sequenced in any order, particularly because experts testified that it was possible for the steps to be performed in any order. *Altiris*, 318 F.3d at 1370–71. Here, the "administering" step derives its antecedent basis from the prior "identifying" steps, and the parties understandably did not provide the Court with expert testimony (as it clearly would not have altered the ultimate findings herein). (*See* '562 Patent at 37:23–38:28.)
- In *Moba, B.V. v. Diamond Automation, Inc.*, the patent's specification "explicitly describe[d] simultaneous performance" of the claimed steps. 325 F.3d 1306, 1310, 1313–15 (Fed. Cir. 2003). As discussed hereinbelow, the '562 Patent's specification includes no such description.

---

[15] Plaintiffs separately argue that the preamble of the claim, which requires "treatment of cancer cells defective in homologous recombination (HR)," limits the scope of the claim itself. (Pl. Open at 21–24.) In essence, Plaintiff argues that the claim's preamble makes clear that the claim itself requires a doctor to *intend* to treat HR-defective cancer cells, and in order to do so, the doctor necessarily must first identify a patient with those cancer cells. (*Id.*) However, even if the preamble could be read as Plaintiffs posit (i.e., requiring that a doctor *intend* to treat HR-defective cancer cells), *see Eli Lilly & Co.*, 8 F.4th at 1342, it does not appear to follow that the treatment itself is *required* to occur in a particular sequence. Regardless, if the preamble *were* so limiting so as to require a particular order of steps, it would only strengthen the Court's conclusion herein.

27

- In *Avidyne Corp. v. L-3 Communications Avionics Systems, Inc.*, the district court determined that the use of "said" in a claim was "simply a way to avoid needless repetition of the full term to which it applies." No. 05-11098, 2008 WL 4849894, at *8 (D. Mass. Nov. 7, 2008). Similarly, in *Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, the district court held that the use of "said" "simply referr[ed] back to an earlier phrase in the claim." No. 21-1015, 2023 WL 4314485, at *15 (D. Del. July 3, 2023) (internal quotation marks omitted). Here, however, even if "said" was simply a way to "avoid needless repetition," a hypothetical, repetitiously-written claim makes clear the necessity of a sequential order. The "administering" step would read "administering to [a human patient with a familial predisposition to gene-linked hereditary cancer, wherein said cancer comprises cancer cells defective in homologous recombination] a therapeutically effective amount of [a compound which inhibits PARP-1]." (*See* '562 Patent at 37:23–38:28.) Obviously, a doctor could not administer that particular compound to that particular patient without identifying both of them first.

- Finally, in *C-Cation Technologies, LLC v. Time Warner Cable, Inc.*, two claimed steps dealt with "establishing communications" and "monitoring" channels "in use." No. 14-59, 2015 WL 1849014, at *19 (E.D. Tex. Apr. 20, 2015). The court concluded that a channel "in use" "may be something less than a channel that has established communications," and thus, the use of "said" throughout the claims did not "mandate a step order." *Id.* Here, unlike the "monitoring" step which could occur independent of the "establishing" step, the "administering" step appears to rely on the prior identification of a particular patient to whom the compound must be administered. (*See* '562 Patent at 37:23–38:28.)

In distinguishing the cases above, "said" as used in the '562 Patent is clearly more than just a shorthand—it identifies the necessary *who* and *what* of the invention. As an illustration by counter-example, in *Nippon Shinyanku*, an invention was claimed which required "repeating steps . . . until Compound 3 is complete" and "reacting said Compound 3 with a deprotecting agent." 2023 WL 4314485, at *14 (internal quotation marks omitted). The United States District Court for the District of Delaware held that a POSA would understand that the step referencing reacting "said Compound 3" merely meant reacting the compound "as previously defined—i.e., Compound 3 having the same chemical structure as shown in the claim—*rather than the results of the prior step.*" *Id.* at 15 (emphasis added). Unlike in *Nippon*, where the compound at-issue was independently identified and defined in the patent, here, the only way to identify the patient and compound referenced in the "administering" step of the '562 Patent, is to literally identify them as directed by the "identifying" steps of the '562 Patent's claim.

28

In sum, the logic and grammar of the '562 Patent's claim requires that the "identifying" steps occur before the "administering" step, as the "administering" step cannot be completed as claimed without identifying the "said" patient and the "said" compound.

2. Specification

Even when courts determine that the claim itself requires a specific order of steps as a matter of logic and grammar, they still review the specification for corroborating or contradictory evidence. *See Azurity Pharms.*, 2022 WL 3691392, at *11 ("[E]ven in cases where the Federal Circuit has determined that the claim language logically requires that the process steps be performed in sequence, it has still looked to the specification in the claim construction inquiry." (cleaned up)).

Here, the only evidence in the specification that Defendants point to in support of their position is an explanation of the prior art in the specification which stated that at the time of the patent in 2003, inhibitors were used in combination with other treatments which "enhance[d] the effectiveness of these forms of treatments." (Def. Open. at 12; *see* '562 Patent at 1:62–67; *id.* at 12:1–3.) Indeed, the parties agree that the '562 Patent's method is "not limited to administering a PARP-1 inhibitor in a monotherapy." (ECF No. 192-1 at 6.) Thus, according to Defendants, "it is entirely possible that a patient with the claimed hereditary cancer would be 'administered' the claimed PARP-1 inhibitor in conjunction with chemotherapy and/or radiation and be 'identified' as a patient with the claimed hereditary cancer *after* or *in conjunction with* that treatment." (Def. Open. at 12.) However, it does not follow that simply because inhibitors had been used in the prior art in combination with other treatments, and the method could still be used in combination with other treatments at the time of the patent in 2003, that the method itself can occur in *any* order. While Defendants conjure a hypothetical where a cancer patient is in such desperate need of treatment that a PARP-1 inhibitor is administered prior to the patient being identified through

29

genetic testing as having a familial predisposition to gene-linked hereditary cancer, there is nothing in the specification, the prosecution history, or even in the very-limited extrinsic evidence provided to the Court that would support Defendants' contention that a POSA would view this order of steps as acceptable beyond counsel's mere conjectures.

While the specification—and the prosecution history, for that matter—do not appear to contain any embodiments that support that the "identifying" and "administering" steps are *required* to be performed in a particular order,[16] the intrinsic evidence also does not contain any embodiments that comport with Defendants' proposed construction or that contradict the Court's conclusion that logic and grammar compel the "identifying" steps to be performed the "administering" steps. *See, e.g.*, *Mantech Env't Corp. v. Hudson Env't Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998) ("[T]he sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise."); *Chiesi USA Inc. v. MSN Pharms. Inc.*, No. 19-18564, 2021 WL 4843806, at *3 (D.N.J. Oct. 18, 2021) (construing terms to have sequential order even where the specification "shed[] no light on the . . . question" of sequential order). Thus, the '562 Patent's claim is construed to require the "identifying" steps sequentially prior to the "administering" step.

---

[16] While Plaintiff cites evidence from the specification and prosecution history that indicates the patentee clearly contemplated the "identifying" steps occurring before the "administering" steps, (*see* Pl. Open. at 26–29; Pl. Resp. at 25–26, 28–30), none of this evidence clearly *requires* that the "identifying" steps come first.

## CONCLUSION

For the reasons set forth above, the Court construes the three disputed claim terms as follows:

1.  "**composition**" in the Formulation Patents: *The weight percentages required by the claims are calculated with reference to the "composition's" core weight alone.*

2.  "**at least one polymer chosen from copovidone, povidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate**" in the Formulation Patents: at least one polymer chosen from copovidone, povidone, hypromellose phthalate, hypromellose acetate succinate, 2-hydroxypropyl-β-cyclodextrin, hypromellose, polymethacrylates, hydroxypropyl cellulose, and cellulose acetate phthalate

3.  "**the method comprising**" in the Method of Treatment Patent: *The two "identifying" steps (i.e., "identifying a human patient with a familial predisposition to gene-linked hereditary cancer" and "identifying a compound which inhibits PARP-1") are performed prior to the "administering" step (i.e., administering to said human patient a therapeutically effective amount of said compound").*

An appropriate Order accompanies this Opinion.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: December 1, 2025

31